**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                          )
DANIEL GREENWOOD,                         )
                                          )
                        Plaintiff,        )
                                          )    Civil Action No. 05-10605 JLT
v.                                        )
                                          )
YALE APPLIANCE AND LIGHTING, INC.,        )
                                          )
                        Defendant.        )
_____

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.    **INTRODUCTION**

Defendant Yale Appliance and Lighting, Inc. ("Defendant" or "Yale") hereby

submits the following memorandum in support of its Motion For Summary Judgment on the

Complaint filed by the plaintiff in this matter, Daniel Greenwood ("Plaintiff").  Yale sells and

services major appliances and lighting.  Plaintiff was formerly employed by Yale as a

delivery driver.  Plaintiff's claim is that he was discriminated against on the basis of his age,

discharged in violation of the Family and Medical Leave Act ("FMLA"), and retaliated

against for taking an FMLA and/or workers' compensation leave, when he was separated

from Yale's employ in August 2004.  In connection with those allegations, Plaintiff asserts

the following counts against Yale:[1] Count III: Violation of the FMLA; Count IV: Retaliatory

Discharge under the FMLA; Count V: Violation of the ADEA; Count VI: Violation of

M.G.L. c. 151B (age); and Count VII: Violation of M.G.L. c. 152, § 75B(2).

---

[1]        On December 2, 2006, Plaintiff voluntarily dismissed Count I: Violation of the FLSA; and Count
II: Violation of M.G.L. c. 149, § 148.

A.     **Summary Of Argument**

As explained more fully below, Plaintiff's claims cannot survive summary judgment. Plaintiff was absent from his job for thirteen weeks in late 2003 and early 2004 due to a work-related injury. These absences more than exhausted his FMLA-protected twelve weeks by early 2004. Plaintiff was absent again when he was hospitalized from July 28 to July 30, 2004 for diverticulitis. Plaintiff remained absent from work, however, until August 9, 2004 without documentation that such absences were necessary for his recuperation, despite Yale's requests for such documentation. These unauthorized absences in August 2004 clearly were not FMLA-protected and violated the company's attendance policy. As a result, Yale lawfully terminated Plaintiff for violation of its attendance policy. For these reasons, Yale did not violate the terms of the FMLA. Moreover, Plaintiff cannot establish a *prima facie* case of retaliatory discharge because there is no record evidence of a causal connection between any of Plaintiff's FMLA-protected absences and his termination.

Plaintiff's state and federal law claims of discrimination on the basis of age also are without merit. Plaintiff cannot even make out a *prima facie* case of age discrimination because he was replaced with an employee who was **older** than him. Even if Plaintiff could demonstrate his *prima facie* case, there is no evidence of pretext where Yale terminated Plaintiff for the legitimate, non-discriminatory reason that he violated Yale's absence policy. There is undisputed evidence that others not of Plaintiff's protected class were treated the same as Plaintiff and older employees successfully returned from similar leaves of absence. Although Plaintiff may rely on a single comment by Lewis Frazer, Director of Operations, as evidence of age bias, the comment is vague at best and, when viewed together with the undisputed evidence, no reasonable juror could find it sufficient evidence of pretext.

Finally, the undisputed evidence does not support a claim that Plaintiff would not have been terminated "but for" his workers' compensation claim. Plaintiff was terminated because he violated the attendance policy. There is undisputed evidence that other Yale employees enjoyed multiple

workers' compensation leaves and returned to Yale successfully.  What is more, if Yale wanted to

terminate Plaintiff because of his workers' compensation absence in 2003-2004, it had an

opportunity to do so when a disciplinary issue arose in between his workers' compensation leave and

his ultimate termination. Yale did not do so.  Again, Plaintiff may attempt to rely on Mr. Frazer's

alleged comment to support his workers' compensation claim but it is entirely ambiguous and no

reasonable juror could find it sufficient, on the undisputed record, to support the claim.  Thus, the

claim must be dismissed.

In sum, Plaintiff's claims are insupportable on the undisputed record developed in

this matter and the Court should grant Defendant's Motion.

## II.    FACTS

Yale hereby incorporates and makes reference to Defendant's Statement Of Material Facts

As To Which No Genuine Issue Remains to Be Tried ("Facts"), filed herewith. [2]

## III.    ARGUMENT

### A.    Plaintiff's Claims Must Be Dismissed Because There Is No Issue Of Material Fact In Dispute And Defendant Is Entitled To Judgment As A Matter Of Law.

Plaintiff's claims must be dismissed because there is no issue of material fact in

dispute and Defendant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

The mere existence of some alleged factual dispute will not defeat an otherwise properly

supported motion for summary judgment; only a genuine issue of material fact is effective in

this regard.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A "genuine"

issue exists only if there is evidence from which a reasonable jury could return a verdict for

the non-moving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[2]    These facts are deemed undisputed for the purposes of Defendant's Motion for Summary Judgment only.

"'Even in employment discrimination cases where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Benoit v. Technical Manufacturing Corp*., 331 F.3d 166, (1<sup>st</sup>Cir. 2003). The moving party may satisfy its initial burden "by pointing to the absence of adequate evidence supporting the nonmoving party's case." *Michelson v. Digital Financial Services*, 167 F.3d 715, 720-21 (1st Cir. 1999).

**B.      Plaintiff Cannot Establish A Violation Of The Terms Of The FMLA.**

Plaintiff alleges both a violation of the terms of the FMLA and retaliation against him for taking FMLA leave. Defendant will address the former first. "The twin purposes of the FMLA are to `balance the demands of the workplace with the needs of families' and `to entitle employees to take reasonable leave for medical reasons.'" *Hodgens v. General Dynamics Corp*., 144 F.3d 151, 159 (1st Cir. 1998). The FMLA's provisions create substantive rights for employees. Specifically, in relevant part, the FMLA provides that "[e]ligible employees `shall be entitled' to up to twelve weeks of unpaid leave per year . . . when the employee has `a serious health condition that makes [him or her] unable to perform the functions of [his or her] position . . . .'" *Hodgens*, 144 F.3d at 159 (internal citations omitted); *McCray v. H&R Block Eastern Enterprises, Inc.*, 2006 WL 1308181, *7-8 (D.Mass. May 10, 2006).[3] In calculating the twelve-month period, employers can dictate which of the several permissible methods of calculation it will follow, as long as the employer notifies the employees. *See* 29 CFR §§ 825.200(b) and (e). Moreover, employers may require an employee's workers' compensation leave run concurrently with his leave pursuant to the FMLA where employers put employees on notice. *See* 29 CFR § 825.702(d)(2); *Daley v. Wellpoint Health Networks Inc., et al.*, 146 F. Supp. 2d 92, 99 (D.Mass. 2001) (noting employer appropriately informed employee "that her paid leave

---

[3]      For the Court's convenience, a copy of this case is attached hereto as <u>Exhibit A</u>.

would run concurrently with her FMLA leave before she submitted her request.")  In determining whether the twelve weeks of leave have expired, employers may include absences ***and*** periods of uncoerced light duty work.  *See* 29 CFR § 825-220(d); *Artis v. Palos Community Hospital,* No. 02-C-8855, 2004 WL 2125414, *6 (N.D. Ill. Sept. 22, 2004) (finding the FMLA satisfied when employee's job is held open for 12 weeks "regardless of whether she spends those twelve weeks on light duty, unpaid leave, or some other combination."); *Wright v. Owens-Illinois, Inc. et al.*, No. 2:02-CV-223, 2004 WL 1087359, *9 (S.D.Ind. May 14, 2004) (finding that employer satisfied obligations under FMLA because employee received 10 weeks of leave and 8 weeks of light duty).[4]

### 1.  Plaintiff exhausted his FMLA time well before the August 2004 absences for which he was terminated.

In the present matter, the Yale Appliance and Lighting Policies and Procedures ("Handbook") included a Family and Medical Leave policy.  (Facts at ¶14).  That policy provided, in relevant part, that Yale will grant up to twelve weeks of unpaid leave for, among other reasons, "[t]o tend to the employee's own serious health condition that renders the employee unable to perform the functions of his or her job."  (Facts at ¶14).  As is permitted, Yale's Handbook defined the twelve (12) month period during which an eligible employee can take a leave under this policy as a rolling period.  (Facts at ¶15).  "This period is measured backward from the date an employee uses FMLA leave.  An eligible employee's leave entitlement consists of up to twelve (12) weeks of FMLA leave during this rolling twelve (12) month period."  (Facts at ¶15).  Indeed, Plaintiff was fully on notice of the terms of Yale's Family and Medical Leave Act policy, as he testified the President of Yale reviewed the Handbooks "page by page" with employees.  (Facts at ¶¶8, 18-19).

---

[4]        For the Court's convenience, copies of these two cases are attached hereto as <u>Exhibit B</u> and <u>Exhibit C</u>, respectively.

Plaintiff's first leave of absence at Yale began in November 2003 when he suffered an on-the-job injury for which surgery was required. (Facts at ¶20). Plaintiff was absent due to this injury, surgery, and recuperation from November 12, 2003 through January 22, 2004. (Facts at ¶21). Plaintiff returned to work on a light duty basis and remained on light duty through February 13, 2004, returning to work full-time with no restrictions on February 17, 2004. (Facts at ¶22). During his light duty period of work, which Plaintiff admits was voluntary, Plaintiff was not working in his position. (Facts at ¶23). Accordingly, Plaintiff's absence for FMLA purposes lasted from November 12, 2003 through February 13, 2004, a total of thirteen weeks and two days. (Facts at ¶26); *see Artis*, 2004 WL 2125414 at *6 (allowing calculation of 12 weeks to include light duty time); *Wright*, 2004 WL 1087359 at *9 (same).[5]

With regard to this set of rights under the FMLA, the sole issue in determining liability is "simply whether the employer provided its employee the entitlements set forth in the FMLA . . . ." *Hodgens*, 144 F.3d at 159. Plaintiff's FMLA leave ended on February 13, 2004. (Facts at ¶22). Because Yale uses a rolling twelve-month period, for any absence after February 13, 2004, Yale would look back twelve months from the start of the next absence to determine whether Plaintiff had any FMLA-protected time remaining. (Facts at ¶¶15, 22). As of February 13, 2004, Plaintiff already had enjoyed more than thirteen weeks of leave. (Facts at ¶26). The FMLA only requires twelve. Accordingly, Plaintiff's August 2004 absence could not, under any circumstances, be protected under the FMLA. There can be no dispute that Yale provided Plaintiff with "the entitlements set forth in the FMLA . . . ." *Hodgens*, 144 F.3d at 159.

---

[5]    Although Plaintiff's November 2003 injury was an on-the-job injury, Yale's Handbook unambiguously provided that FMLA leave would run concurrently with any workers' compensation leave. (Facts at ¶17). *See* 29 CFR §825.702(d)(2); *Daley*, 146 F. Supp. 2d at 99.

2.    <u>**Even assuming Plaintiff had not exhausted his FMLA leave, the absences leading to his termination were not FMLA-protected.**</u>

Even if Plaintiff could present evidence that his November 2003 – February 2004 absence did not exhaust his allotted twelve weeks under the FMLA, Plaintiff's claim still fails because the absences for which he was terminated were not FMLA-protected.

Plaintiff was absent on July 28, 2004 when he was hospitalized for diverticulitis. (Facts at ¶32).  Plaintiff was in the hospital until July 30, 2004.  (Facts at ¶34).  Plaintiff admittedly was determined to be discharged by Friday, July 30, 2004 because he was concerned staying longer would disrupt a court date he had scheduled for that day and weekend plans at his home involving a party.  (Facts at ¶34).  Nevertheless, it is true these three absences (July 28 – July 30), assuming Plaintiff had not yet exhausted his FMLA time, would constitute FMLA-protected leave as Plaintiff was hospitalized during this period.  *See* 29 CFR § 825.114(a)(1).  Notably, it is undisputed that Yale never disciplined Plaintiff for those absences.  (Facts at ¶53).

The fact that some of an employee's absences are FMLA-protected does not mean all absences in that period of time are protected.  As the *McCray* court found in similar factual circumstances:

> While some of the absences related to his back and foot were protected by the FMLA, Plaintiff presented no evidence that the [other absences in the same time period] were FMLA protected.  He provides no justification for taking those days off after having been ordered to return to work other than that he still had sick days coming to him.  There is no evidence he was actually sick, and the evidence of defiance of an order is undisputed.

*McCray*, 2006 WL 130181 at *9; *see also Hodgens*, 144 F.3d at 165.

 Although Plaintiff was discharged from the hospital on Friday, July 30, 2004, he was not willing to work again until August 9, 2004.  (Facts at ¶¶34, 51).  As explained in more detail below, it is undisputed the first time Plaintiff produced any medical documentation to excuse his absences was the following Friday, August 6, 2004 and that documentation was

wholly insufficient.  (Facts at ¶49).  *See* 29 USC § 2613(a); *McCray*, 2006 WL 1308181 at *8 ("It is well-established that an employer "may require that a request for leave be supported by a certification by the health care provider of the eligible employee . . . .")

Specifically, on July 30, 2004, James Rapoza, Yale's Delivery Manager and Plaintiff's supervisor, having not heard from Plaintiff, called him to inquire as to his status. (Facts at ¶38).  Plaintiff told Mr. Rapoza that Plaintiff's doctor wanted Plaintiff to see him the following Monday morning.  (Facts at ¶38).[6]  Mr. Rapoza asked Plaintiff whether he would be able to return to work on a light duty basis. (Facts at ¶39).  Mr. Rapoza asked Plaintiff to follow-up with him after Plaintiff's appointment with his doctor.  (Facts at ¶39).

On Monday, August 2, 2004, Plaintiff did not call Mr. Rapoza as promised.  (Facts at ¶40).  As a result, Mr. Rapoza called Plaintiff and Plaintiff said his doctor's appointment had been rescheduled to the next day, Tuesday, August 3rd.  (Facts at ¶40).  Mr. Rapoza again asked Plaintiff for medical documentation verifying his absence to date and to find out whether he could work on a light duty basis.  (Facts at ¶40).

On Tuesday, August 3rd, having again not heard from Plaintiff, Mr. Rapoza called his house and was told by Plaintiff's girlfriend that he was asleep.  (Facts at ¶42). That afternoon, Plaintiff arrived at Yale and asked Mr. Rapoza whether he could use his vacation time as paid time off for the week since he already had exhausted all of his paid time off days and he expected to be out all week.  (Facts at ¶43).  Mr. Rapoza told Plaintiff he would have to discuss it with Lewis Frazer, Yale's Director of Operations.  (Facts at ¶43).

---

[6]    This statement by Plaintiff was not true.  Plaintiff admitted at deposition that he was not told to visit Dr. Alzaim on any particular day but, rather, just that his discharge form simply said he should "[c]all for appointment with Dr. Alzaim."  (Facts at ¶38).  Dr. Alzaim himself also testified Plaintiff was not told to see him on the following Monday or within any specific time period, but just to follow-up at some point. (Facts at ¶38).

Plaintiff had been to his follow-up appointment earlier that day. (Facts at ¶41). The undisputed evidence reflects ***Dr. Alzaim never restricted Plaintiff's ability to work***. (Facts at ¶¶35-37, 41). Nevertheless, Plaintiff did not provide Mr. Rapoza with any documentation excusing him from work for Monday, August 2nd and Tuesday, August 3rd, despite Mr. Rapoza's request for that documentation. (Facts at ¶44).

Later that day, Mr. Rapoza called Plaintiff to inform him he would not be permitted to use his vacation time as paid time off for that week. (Facts at ¶45). Mr. Rapoza again asked Plaintiff to obtain documentation of the restrictions on his ability to work and again asked Plaintiff whether he could return to work on a light duty basis. (Facts at ¶45). Indeed, Mr. Rapoza and Mr. Frazer wanted Plaintiff to return to work in whatever capacity he was able. (Facts at ¶46). Plaintiff's absence came at the height of Yale's busiest time of year. (Facts at ¶46). Nevertheless, it is undisputed that Plaintiff never even bothered to ask his doctor whether light duty work would be permissible. (Facts at ¶46).

Despite the fact Plaintiff told Mr. Rapoza he would be back in touch with him on Wednesday, August 4th, Plaintiff did not do so. (Facts at ¶47). Plaintiff again failed to call in an hour before the start of his shift even though he still had not provided documentation to support his absence. (Facts at ¶47). On Thursday, August 5th, Plaintiff again did not appear or call anyone at Yale. (Facts at ¶48). Mr. Frazer left Plaintiff a message on his home answering machine regarding his lack of contact and the need for documentation regarding his absences. (Facts at ¶48).

On Friday, August 6th, Plaintiff did not call Yale about whether he would be in that day. (Facts at ¶49). Rather, in the afternoon, Plaintiff appeared at Yale to inquire about his paychecks. (Facts at ¶49). At this time, Plaintiff provided Mr. Frazer with his hospital discharge form. (Facts at ¶49). This was the ***first*** documentation Plaintiff provided since his discharge from the hospital one week earlier. (Facts at ¶49). In the section of this form used

to detail restrictions on the patient's activity, the form provided ***"0 restrictions on activity."*** (Facts at ¶¶35-37, 49) (emphasis added). As a result, and as Plaintiff admits, this document did not explain why Plaintiff could not have worked August 2, August 3, August 4, August 5, or August 6; to the contrary, it specifically indicated there were ***no restrictions*** on Plaintiff's activity after his discharge from the hospital. (Facts at ¶ 49). During this meeting, Mr. Frazer explained to Plaintiff the potential violations of company policy relating to unexcused absences and verification of sick leave. (Facts at ¶49). Despite the fact that Plaintiff already had a full week to get the documentation Yale had been repeatedly asking for, Plaintiff again told Mr. Frazer he would try to get documentation that would excuse his absences during the past week. (Facts at ¶49). Yale agreed to give Plaintiff another opportunity to establish the need for his absences. (Facts at ¶49).

On Monday, August 9th, Plaintiff returned to Yale with a note from Dr. Alzaim that provided "This is to certify that Daniel Greenwood has been under my care, and will be able to return to work on the following date: Tues. August 9 [sic], 2004." (Facts at ¶50).[7] According to Dr. Alzaim, the first time Plaintiff ever mentioned work in any way was at his second and final follow-up appointment with Dr. Alzaim on August 9, 2004. (Facts at ¶51). Dr. Alzaim testified that, on August 9th, Plaintiff asked for a return-to-work note for the first time so Dr. Alzaim gave it to him. (Facts at ¶51). The extent of this note simply was to say Plaintiff could return to work but it provided no excuse for Plaintiff's absences up to that point, nor did it address whether Plaintiff could have been working light duty. (Facts at ¶51).

Separate and apart from the days Plaintiff was in the hospital, he missed five days of work without excuse. At the outset, because Plaintiff already had exhausted his FMLA leave earlier in the year, as explained above, these five days were not protected. In any event,

---

[7]    For purposes of clarification, in 2004, August 9 was as Monday. Dr. Alzaim's note reads "Tues. August 9" but it should have read "Tues. August 10."

Plaintiff's absences during the week of August 2nd undisputedly were not medically required. Finally, specifically on August 4, August 5, and August 6, Plaintiff never even bothered to call in when he knew Yale was waiting to hear from him as to his status. Unexcused absences of three days or more are cause for termination pursuant to the terms of Yale's Handbook, which Plaintiff admits he was familiar with and trained on by the President of Yale himself. (Facts at ¶¶8, 11-13). This course of events is wholly undisputed in the record. On this evidence, there can be no question that Yale's termination of Plaintiff was lawful. *See Green v. New Balance Athletic Shoe, Inc.*, 182 F. Supp. 2d 128, 140 (D.Maine 2002) ("[T]here is no remedy under the FMLA for Plaintiff's termination since Defendant had the right to terminate her once she did not return to work after her leave had expired.")

> **C.    Plaintiff Was Not Retaliated Against For Taking FMLA Leave.**

In addition to alleging a violation of the terms of the FMLA, Plaintiff alleges he was terminated for having taken FMLA-protected leave. The undisputed record evidence does not support such a claim.

> **1.    Plaintiff cannot demonstrate a *prima facie* case of retaliatory discharge.**

To maintain a claim of retaliation in violation of the FMLA, Plaintiff must establish a *prima facie* case by showing:

> (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action.

*Hodgens*, 144 F.3d at 161.

> **a.    The November 2003-February 2004 leave cannot be a basis for Plaintiff's retaliatory discharge claim because there is no causal connection between it and Plaintiff's termination.**

No reasonable juror could find a causal connection between Plaintiff's November 2003-February 2004 leave and his termination. First, Yale allowed Plaintiff to be absent for

over thirteen weeks and took no action against him.  (Facts at ¶26).  Plaintiff's termination

occurred six months after the end of this leave.  (Facts at ¶52).  These events are too

attenuated to establish a causal connection to support a claim of retaliation.  *See*

*MacCormack v. Boston Edison Co*., 423 Mass. 652, 662 n.11 (1996) ("The mere fact that one

event followed another is not sufficient to make out a causal link.").  Indeed, to establish a

causal connection based on temporal proximity, the termination must be "`*very closely*

connected in time to the protected activity . . . ."  *Mole v. University of Massachusetts et al*.,

442 Mass. 582, 595 (2004) (emphasis in original) (citing *Cooper v. North Olmstead*, 795

F.2d 1265, 1267, 1272 (6th Cir. 1986) (finding causation not shown where firing occurred

four months after protected activity)); *see also Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209

(10th Cir. 1997) (same for three months); *Edwards v. Interboro Institute*, 840 F. Supp. 222,

229 (E.D.N.Y. 1994) (same for less than one month).

        In addition, other employees at Yale have returned from FMLA leaves successfully.

For example, Richard Boultenhouse was on FMLA leave for two months in 2004 and

returned to his job thereafter.  (Facts at ¶58).  There is no evidence why that practice would

have changed with regard to Plaintiff.  Finally, Yale had an opportunity to terminate Plaintiff

if it was looking for a reason to do so.  On July 6, 2004, the company that leased Yale the

delivery trucks prohibited Plaintiff from driving their trucks because he had been involved in

a third "avoidable accident" in the last thirty-six months.  (Facts at ¶27).  By Plaintiff's own

admission, certainly this presented Yale with a reason to at least discipline Plaintiff.  (Facts at

¶28).  Yale, however, worked out an arrangement with Plaintiff that allowed him to keep his

job.  (Facts at ¶¶28-30).  Certainly, this is not the mark of an employer looking to retaliate

against an employee because he took an FMLA-protected leave.

b. <u>The August 2004 absence cannot be a basis for Plaintiff's retaliatory discharge claim because Plaintiff's absences were not protected by the FMLA.</u>

The August 2004 absence cannot be the basis of a finding of causal connection either. As explained above, even if Plaintiff's FMLA leave had not already expired for that twelve-month period, these absences were not necessary for recuperation from his hospitalization and, therefore, were not FMLA-protected.[8]  Accordingly, Plaintiff did not "avail himself of a protected right under the FMLA." *Hodgens*, 144 F.3d at 161.  Without that, Plaintiff cannot make out a *prima facie* case of retaliatory discharge under the FMLA based on this absence. *See Hodgens*, 144 F.3d at 161.

**2.    Even if Plaintiff makes his *prima facie* case, Yale has satisfied its burden by articulating a legitimate, non-discriminatory reason for his termination.**

When a plaintiff clears the first hurdle of establishing his *prima facie* case, the burden shifts to the employer to "articulate a legitimate nondiscriminatory reason for terminating [plaintiff's] employment . . . ." *Hodgens*, 144 F.3d at 166.  There can be no dispute that Yale has accomplished this in the present matter.

It is undisputed that Plaintiff fully understood the Notification/Unexcused Absences policy and the Attendance/Tardiness policy, both of which described the necessary procedures for unexcused absences.  (Facts at ¶¶8-13).  Yale's Handbook plainly details that three or more unauthorized absences will result in immediate termination.  (Facts at ¶12).  As explained above, Plaintiff was absent from work from August 2 through August 6, 2004. (Facts at ¶¶40-49).  Even giving Plaintiff the benefit of the first two days, August 2nd and August 3rd, during which he claims to have been trying to attend a follow-up appointment

---

[8]    Moreover, even assuming it were FMLA-protected, in addition to the explanations above as to why the undisputed evidence belies any claim of causal connection, there is no logical reason why Yale would terminate Plaintiff for such a short absence in August 2004 but did not retaliate against him for his thirteen week absence earlier that year.

with his doctor, Plaintiff still expressly violated the unauthorized absence policy for his absences on August 4th – August 6th. (Facts at ¶¶40-49). As Plaintiff was well-aware, such an absence is considered a voluntary resignation and this was the sole reason for the end of Plaintiff's employment with Yale. (Facts at ¶¶8, 11-13). *See Hodgens*, 144 F.3d at 166-67 (affirming summary judgment in part because employer offered "testimony of its decision-making supervisors that [employer] discharged [employee] because of his performance and his non-FMLA absences, and that its decision ignored his FMLA-protected absences.") This legitimate, nondiscriminatory reason is sufficient to carry Yale past this stage of the burden-shifting paradigm.

### 3.    Plaintiff cannot satisfy his ultimate burden of demonstrating Yale's decision was pretextual.

Once Yale provides evidence of its legitimate, non-discriminatory reason for Plaintiff's termination, the ultimate burden rests with Plaintiff to show the reason given was a pretext for the real fact that he was terminated for taking FMLA-protected leave. *See Hodgens*, 144 F.3d at 166. None of the traditional harbingers of pretext are present here. As explained above, Yale's stated reason for Plaintiff's termination is wholly plausible – its Handbook expressly provides for termination in these circumstances, Plaintiff was given several opportunities to comply with the terms of the Handbook, and Plaintiff had enjoyed an FMLA-protected leave several months prior with no adverse consequences. (Facts at ¶26). *Cf. Hodgens*, 144 F.3d at 168 (noting an employee may succeed in establishing pretext where he can show "implausibilities, inconsistencies . . .in the employer's proffered legitimate reasons . . . .") Moreover, there was an absence of temporal proximity between the FMLA-protected leave ending in February 2004 and the adverse action in August 2004. *Cf. Hodgens*, 144 F.3d at 168 (noting "close temporal proximity" can be evidence of pretext). Finally, there was no departure from Yale's normal procedure as the undisputed facts reveal

other employees have been terminated for violation of the attendance policy. (Facts at ¶61). *Cf. Hodgens*, 144 F.3d at 169 (noting "departures from normal procedure" as possible evidence of pretext). For these reasons, there is no evidence of pretext and Plaintiff's clam of retaliatory discharge in violation of the FMLA must be dismissed as a matter of law.

      **D.**    <u>**Plaintiff Cannot Demonstrate Age Discrimination.**</u>

Plaintiff alleges he was terminated because of his age in violation of both the Age Discrimination in Employment Act ("ADEA") and M.G.L. c. 151B, § 4.[9] Plaintiff was forty-one years old in August 2004. (Facts at ¶54). In analyzing age discrimination claims pursuant to both the ADEA and chapter 151B, courts use the *McDonnell Douglas* burden shifting framework where the claim is based on circumstantial evidence. *See Pages-Cahue v. Iberia Lineas Aereas de Espana*, 82 F.3d 533, 536 (1st Cir. 1996) (applying framework to ADEA claim); *Blare v. Husky Injection Molding systems Boston, Inc.*, 419 Mass. 437, 441 (1995) (applying framework to chapter 151B claim).

      **1.**    <u>**Plaintiff cannot establish a *prima facie* case of age discrimination because Plaintiff was replaced with an older employee.**</u>

To demonstrate his *prima facie* case of age retaliation, a plaintiff must show: (1) he fell within the protected age group (over forty); (2) he met the employer's legitimate performance expectations; (3) he experienced an adverse employment action; and (4) other employees not of his protected class were hired or retained for the position. *See Currier v. United Technologies Corp.*, 393 F.3d 246, 254 (1st Cir. 2004); *Blare*, 419 Mass. at 441.

---

[9]     The analysis of Massachusetts state and federal age discrimination claims largely is the same. *See Bennett v. Saint-Gobain Corp.*, 453 F. Supp. 2d 314, 330 (D.Mass. 2006). The analysis under state law is "'in one relevant respect perhaps . . . friendlier to plaintiffs.'" *Id.* That is, "a plaintiff `may be able . . . to avoid a directed verdict and reach a jury if he or she proves that at least one of the reasons given by the defendant was pretextual.'" *Id.* Regardless, even under this standard, Plaintiff is still required to cast doubt on the reasonableness of Yale's proffered reason for terminating him. As explained *infra*, Plaintiff simply cannot do so based on the undisputed record.

In the matter before the Court, Plaintiff simply cannot satisfy this burden.  Plaintiff was replaced with Philip Conroy, who was *older* than Plaintiff (Plaintiff was forty-one and Mr. Conroy was forty-two at the time).  (Facts at ¶¶55-56).  This evidence is undisputed. (Facts at ¶55).  Because Plaintiff was replaced with an older employee, and not someone younger than forty, Plaintiff's age discrimination claims fail as a matter of law.

> **2.    Even if Plaintiff met his initial burden, Plaintiff's age claims fail because he cannot satisfy his ultimate burden of raising a genuine issue of material fact on the issue of pretext.**

If the Court looks past the first stage of the *McDonnell Douglas* analysis, Plaintiff still cannot succeed on these claims.  For the reasons explained above, Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination – violation of the attendance policy.  *See Pages-Cahue*, 82 F.3d at 536.  As a result, the ultimate burden rests with Plaintiff to "'show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age.'"  *See Pages-Cahue*, 82 F.3d at 536.

This Plaintiff cannot do.  In addition to the nondiscriminatory course of events that led to Plaintiff's termination, Plaintiff's age claims also are belied by the fact that employees younger than Plaintiff were treated the same as Plaintiff in similar circumstances.  For example, Michael Bartlett, a delivery driver for Yale, was terminated in 2002 for violating the attendance policy.  (Facts at ¶61).  Mr. Bartlett was twenty-eight years old at the time. (Facts at ¶61).  In addition, older employees got hurt and/or sick, went on leaves of absence, and returned to work successfully.  For example, Richard Boultenhouse, who is older than Plaintiff at over fifty-five years old, has taken three leaves of absence and successfully returned from all of them.  (Facts at ¶¶58-59).  Again, evidence of the employer's consistent application of its policies thwarts the suggestion of pretext.  *See Hodgens*, 144 F.3d at 168-

69.  Indeed, the undisputed evidence reveals Yale treated Plaintiff no differently than it does any other similarly situated employee, whether younger or older.

In support of Plaintiff's attempt to establish pretext, Plaintiff may attempt to rely on a statement he claims Mr. Frazer made in August 2004.  Plaintiff testified:

> And, you know, he told me, `Well, you seem to be getting hurt a lot,' and this and that.  `Maybe you're too old for that.  You know, maybe you're too old to keep doing what you're doing.'  I told him, you know, I mean I got hurt, you know, the previous year, you know what I mean, doing their work and doing the best I could.  You know, I have that hernia injury, you know, and he was just -- `Well, you're getting hurt.  You're getting hurt too much.  How old are you,' and this and that.

(Facts at ¶60).

Such a statement alone, however, is insufficient to establish a showing of pretext. *See Tardanico v. Aetna Life & Casualty Co.*, 41 Mass. App. Ct. 443, 450 (1996) (holding evidence of pretext must go beyond isolated or ambiguous remarks).  Indeed, it is well-settled that one such isolated or ambiguous remark is insufficient to allow a plaintiff to survive summary judgment.  *See Tardanico*, 41 Mass. App. Ct. at 450 (allowing summary judgment where ambiguous and isolated remarks were not supported by any evidence that older employees were treated differently); *see also Pinsky v. Univ. of Mass.*, 2005 WL 1684125, *4 (Mass.Super. June 8, 2005) (allowing summary judgment where only evidence of age bias was one isolated and ambiguous remark);[10] *Cf. Blare v. Husky Injection Molding Systems Boston, Inc.*, et al., 419 Mass. 437, 447 (1995).

### E.  There Is No Evidence Plaintiff Was Terminated Because Of His Workers' Compensation Claim.

Plaintiff's final claim is that he was terminated in retaliation for having exercised his rights to receive workers' compensation benefits in violation of M.G.L. c. 152, § 75B(2).  To establish a claim under the Workers' Compensation Act, a plaintiff must demonstrate:

---

[10]     For the Court's convenience, a copy of this decision is attached hereto as Exhibit D.

> (1) he engaged in an activity protected by the Workers' Compensation Act; (2) [the employer] was aware of the protected activity; (3) [the employer] thereafter engaged in an adverse employment action; and (4) but for his engagement in the protected activity, [the employer] would not have taken the adverse employment action against [the employee].

*Benoit v. Technical Manufacturing Corp.*, 331 F.3d 166, 177 n.5 (1st Cir. 2003). In the matter before the Court, Plaintiff cannot show Yale would not have terminated him "but for" his workers' compensation leave for a number of reasons.

First, there is no evidence to support a claim that Plaintiff was terminated for any reason other than his violation of the express terms of Yale's attendance policy when he amassed unauthorized absences despite Yale's attempts to find a way to deem them authorized.

Second, there is no temporal proximity between the protected activity and the adverse employment action to support Plaintiff's claim. Plaintiff's only leave for which he received workers' compensation benefits was the November 2003-February 2004 absence. (Facts at ¶¶25-26). Plaintiff was terminated in August 2004. (Facts at ¶52). These events are too attenuated to establish a causal connection. *See MacCormack*, 423 Mass. at 662, n.11 ("The mere fact that one event followed another is not sufficient to make out a causal link.") Again, as explained above, to establish a causal connection based on temporal proximity, the termination must be "`*very closely* connected in time to the protected activity . . . ." *Mole*, 442 Mass. at 595 (emphasis in original) (citing *Cooper v. North Olmstead*, 795 F.2d 1265, 1267, 1272 (6th Cir. 1986) (finding causation not shown where firing occurred four months after protected activity)); *see also Richmond,* 120 F.3d at 209 (finding same with three month period); *Edwards*, 840 F. Supp. at 229 (finding same with less than one month period).

What is more, if Yale had a bias against employees who took workers' compensation leave, it had a perfect opportunity to act on that bias with regard to Plaintiff. As discussed above, the leasing company that leased the trucks Plaintiff drove forbade him from driving

their trucks due to multiple motor vehicle accidents. (Facts at ¶27). This occurred in early

July 2004, after Plaintiff's workers' compensation leave. (Facts at ¶27). It is undisputed that

Yale had every right to discipline Plaintiff for this incident but Plaintiff suffered no discipline

of any kind. (Facts at ¶28). Rather, Yale worked out a way for Plaintiff to retain his job in

the face of being told he could not drive the leasing company's trucks, which obviously went

to heart of his position. (Facts at ¶¶28-30).[11]

Finally, other employees in Plaintiff's protected class have taken workers'

compensation leave and successfully returned to employment at Yale. Two such employees

are Richard Boultenhouse and Philip Conroy, both of whom are older than Plaintiff. (Facts at

¶¶57, 59). Mr. Boultenhouse has suffered two workers' compensation injuries and has

returned to his employment as a driver with Yale from both absences. (Facts at ¶59). Mr.

Conroy was injured and was on workers' compensation leave until he returned on light duty

status in a different position. (Facts at ¶57). To date, Mr. Conroy still is working light duty.

(Facts at ¶57).

As with the age claim, Defendant anticipates Plaintiff will rely on Mr. Frazer's

alleged comment to support his claim of workers' compensation retaliation. (Facts at ¶60).

Such reliance is misplaced. Certainly there is nothing to support a claim that Mr. Frazer

made this comment because Plaintiff was out on workers' compensation leave again in

August 2004. Plaintiff's August 2004 absences stemmed from an illness, not an on-the-job

injury, which means this leave was not workers' compensation leave. (Facts at ¶¶25, 32).

No reasonable juror could sensibly find this statement to be evidence that the real reason

---

[11]    In addition to this claim being unsupported by the record evidence, it is also unsupported by logic.
Plaintiff's job was to load, deliver, and unload heavy appliances. (Facts at ¶¶6-7). On-the-job injuries are
not uncommon at Yale due to the nature of their business. (Facts at ¶7). As a result, Yale regularly deals
with employees who are on, and returning from, workers' compensation leaves. (Facts at ¶7). Even if
terminating these employees for this reason was lawful, it would certainly not be practical for a business
like Yale.

Plaintiff lost his job was because he had taken a workers' compensation leave nine months prior, with all that intervened in the meantime.

Moreover, as explained above, "'isolated or ambiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent.'"  *Tardanico*, 41 Mass. App. Ct. at 450 (quoting *Fontaine*, 415 Mass. at 314 n.7)). Where there is no other evidence tending to support a claim for retaliation for having taken workers' compensation leaves, this remark, standing alone, is an insufficient basis for this claim of retaliation.  *See Tardanico*, 41 Mass. App. Ct. at 450 (allowing summary judgment where ambiguous and isolated remarks were not supported by any evidence older employees treated differently).  Accordingly, this claim must be dismissed as a matter of law.  *See Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993) (holding that nonmovant may not defeat summary judgment motion by relying on evidence that is "merely colorable").

**IV.    CONCLUSION**

For all the foregoing reasons,  Defendant's Motion for Summary Judgment should be allowed.

                                    YALE APPLIANCE
                                    AND LIGHTING, INC.
                                    By its attorneys,


                                    /s/ Tracy Thomas Boland
                                    Jaclyn Kugell (BBO# 561622)
                                    Tracy Thomas Boland (BBO# 638878)
                                    MORGAN, BROWN & JOY, LLP
                                    200 State Street
                                    Boston, MA 02109
                                    (617) 523-6666

Dated: January 22, 2007

### CERTIFICATE OF SERVICE

I, Tracy Thomas Boland, hereby certify that I have caused a copy of the foregoing to be served upon Plaintiff's attorney, Daniel W. Rice, Glynn, Landry, Harrington & Rice, LLP, 10 Forbes Road, Braintree, MA 02184, by ECF on this 22nd day of January 2007.

/s/ Tracy Thomas Boland
Tracy Thomas Boland

Westlaw.

Slip Copy                                                                                   Page 1
Slip Copy, 2006 WL 1308181 (D.Mass.)
(Cite as: Slip Copy)

C

Briefs and Other Related Documents
McCray v. H & R Block Eastern Enterprises,
Inc.D.Mass.,2006.Only the Westlaw citation is
currently available.
United States District Court,D. Massachusetts.
Adrian McCRAY, Plaintiff,
v.
H & R BLOCK EASTERN ENTERPRISES, INC.,
and Linda Murphy, Defendants.
Civil Action No. 04-12232-PBS.

May 10, 2006.

Paul A. Manoff, Law Office of Paul A. Manoff,
Boston, MA, for Plaintiff.
Adrienne M. Markham, Deborah H. Dossantos,
Jennifer Belli, Goulston & Storrs, PC, Boston, MA,
for Defendants.

### MEMORANDUM AND ORDER

SARIS, U.S.D.J.

*1 Plaintiff Adrian McCray alleges that Defendants
H & R Block Eastern Enterprises, Inc. ("Block") and
Linda Murphy, the Vice President and Managing
Director of Block's Northeast Division, terminated
his employment on January 20, 2003 in retaliation for
his having filed a complaint before the Massachusetts
Commission Against Discrimination (the "MCAD"),
in violation of Mass. Gen. Laws ch. 151B, § 4(4).
Plaintiff also asserts violations of the Family Medical
Leave Act (the "FMLA"), 29 U.S.C. § § 2601-2654.
Defendants move for summary judgment, and
Plaintiff opposes. After hearing and review of the
briefs, the motion is ALLOWED.

### I. BACKGROUND

The facts and procedural history pertinent to this
motion follow. Except where noted, the facts are not
in dispute.

#### A. April 2002 Investigation

In August 2001, Block hired McCray to serve as a
regional resources manager and assigned him to its
Pembroke, Massachusetts office. He reported jointly
to Murphy and Franciene Gill ("Gill"), the Director

of Field Human Resources and an African-American
woman.

In April 2002, McCray and a co-worker were
assigned to investigate a complaint alleging that
district manager Rick Bartlett failed to respond to
inappropriate comments about an employee's sexual
orientation and discriminated himself against that
employee. Bartlett is Murphy's son-in-law. At the end
of the investigation, Plaintiff concluded that Bartlett
had engaged in wrongful conduct, but Murphy
instructed Plaintiff to write a report exonerating
Bartlett. According to Plaintiff, Murphy told him that
any time she wanted, she could make a case against
someone to get him fired, and that she would get
anyone who made a negative statement about her
son-in-law. In April 2002, McCray drafted a report
stating that the investigation was inconclusive, but he
warned Murphy that he would not write any more
fraudulent reports. Plaintiff believes that this
disagreement was the source of a future vendetta by
Murphy.

#### B. Problems with Performance

Gill and Murphy described performance deficiencies
in Plaintiff's first performance review dated May 15,
2002. In that review, Plaintiff received a rating of
"meets expectations minus" in four of seven
categories based on several specific deficiencies,
including: lack of timeliness in entering cases into
Block's Clarify database; taking time off with short
notice; inflexible and rigid interaction with his field
management team; and inadequate reporting.
Accordingly, the review instructed Plaintiff to focus
on written communication skills, acting as a team
player, listening and responding appropriately, and
reporting absences in a timelier manner. Plaintiff
disputes the allegations in this review and alleges
there was no criticism of his job performance before
he protested Murphy's actions during the Bartlett
investigation.

Gill and Murphy issued Plaintiff a written warning
dated May 31, 2002 alleging that Plaintiff failed to
notify either of his supervisors that he would be on
vacation on May 24, 2002, the Friday before his
scheduled vacation week. The warning further
alleged he failed to finish certain assigned tasks that
needed to be completed before his vacation. Plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2006 WL 1308181 (D.Mass.)
(Cite as: Slip Copy)

alleges he received approval for this additional vacation day and denies Defendants' allegation that there was work due prior to his vacation that he failed to complete.

**\*2** In August 2002, Gill and Murphy issued a development plan to Plaintiff. Similar to his May 15, 2002 performance review, the development plan instructed Plaintiff to improve both his written communication skills and ability to act as team player, listen and respond appropriately, and report absences on a timelier basis. The plan gave Plaintiff specific steps to undertake and required him to meet with Gill and/or Murphy on a periodic basis to discuss his work performance. Plaintiff contends there was no basis, other than a retaliatory one, for him to receive the development plan.

### C. *The Car Accident*

In late November 2002, Plaintiff informed Gill and Murphy that he had suffered back injuries in a car accident and ultimately requested leave under the FMLA. Block conditionally granted Plaintiff's request for FMLA leave pending the receipt of medical certification. In response to a medical certification from a chiropractor stating Plaintiff was completely unable to work from November 17 to December 2, 2002, Block approved Plaintiff's request for FMLA leave for that time period. Another note from the same chiropractor indicated he could return to work part-time (twenty to forty hours per week) as of December 2, 2002. However, Plaintiff failed to report to work on December 2, 3, 4, and 6. There is nothing in the record to explain this four-day absence.

### D. *First MCAD Complaint*

On December 4, 2002, Plaintiff filed a charge of discrimination with the MCAD, in which he alleged he had been subject to different terms and conditions of employment based on his African-American race. The MCAD ultimately issued a lack of probable cause finding with respect to this first MCAD complaint. Plaintiff did not appeal and does not press the race discrimination claim in this case.

### E. *Deterioration*

On December 9, 2002, Plaintiff returned to work in the same position with the same duties. At this juncture, the parties hotly dispute what happened. Defendants contend that on December 9, Murphy and Gill had a meeting with Plaintiff to discuss his performance under the August 2002 development plan. According to Defendants, Murphy and Gill informed Plaintiff that he was not making sufficient progress and warned him that his recruitment of new employees had deteriorated, the disorganized condition of his office was unacceptable, there were complaints about training sessions he had led, he had been rude and insubordinate to Murphy, and he was failing to work his scheduled hours. Plaintiff contends that this meeting never occurred and that he told Gill of his first MCAD complaint prior to December 10. Defendants dispute that they knew about the first MCAD complaint at the time of the meeting.

On December 11, 2002, Plaintiff provided Block with a supplemental doctor's note indicating that he continued to suffer from injuries incurred in the car accident, should not perform any lifting or bending at the waist, and should limit his work to between twenty and forty hours per week for the next four to eight weeks. After informing Gill and Murphy that he would not report to work the following two days because he had aggravated his back lifting boxes, Plaintiff was absent on December 12 and 13. On December 12, Gill informed Plaintiff that he would be required to work six hours a day, five days a week, for the remainder of the time he needed a part-time schedule.

**\*3** In late December 2002, Gill and Murphy attended one of Plaintiff's training sessions in response to alleged complaints about Plaintiff's training performance in mid-November. Defendants allege that Plaintiff was unprepared, read directly from the training materials, and failed to make certain logistical arrangements, such as providing coffee and lunch for participants. Plaintiff contends that he gave Gill a stack of favorable reviews and denies he failed to make appropriate logistical arrangements.

Block asked Plaintiff to submit to an independent medical examination, but Plaintiff later indicated that he was no longer in need of leave. Plaintiff ultimately submitted to the independent medical examination on January 6, 2003, and the doctor scheduled Plaintiff for a follow-up MRI on January 13, 2003.

### F. *More Problems A-Foot*

Between January 7 and 10, 2003, Plaintiff was absent

Slip Copy
Slip Copy, 2006 WL 1308181 (D.Mass.)
(Cite as: Slip Copy)

from work for foot problems. He requested FMLA leave from January 6 to January 22. On January 9, Gill approved this request conditionally pending receipt of medical documentation. On either January 10 or 13, Plaintiff presented Block with medical documentation in support of his request that stated he suffered from an intractable plantar keratoma (a callus on the bottom of the foot) and could work provided he was permitted to sit 60% of the time and stand 40%. Accordingly, Block requested that he return to work. An additional note stated that Plaintiff planned to undergo surgery for his foot condition on January 23.

On January 13, Defendants allege that despite Gill's specific directive to attend a training in Kansas City, Plaintiff reported to work in Pembroke instead. Plaintiff denies he received specific instructions to attend the training.

On January 14, Gill and Murphy issued Plaintiff a final written warning. It summarized Plaintiff's alleged performance problems, including his failure to be prepared for training sessions, meet the expectations of the August 2002 development plan, report absences, complete work in a timely manner, and attend the Kansas City training. The warning further required Plaintiff to take specific steps to improve. Plaintiff contends that he complied with the August 2002 development plan, completed his work in a timely manner, and reported his absences in the required fashion. The warning also stated that the medical certification for the foot absences were inadequate.

A meeting between Murphy and Plaintiff to discuss this final written warning also took place on January 14, 2003. Plaintiff gave Murphy a note from his podiatrist, which indicated Plaintiff would have to miss four to six weeks because of his foot problem, and Murphy returned the note. Murphy alleges she informed Plaintiff that his FMLA leave request for surgery was denied because he had not provided the company with thirty-day notice and had scheduled the leave during the busiest time of Block's business cycle. Murphy contends that Plaintiff became "very hostile [and] very agitated" and "[s] tood up with his fist raised at [her] face" and that during the meeting, she was "very afraid" of him. Murphy further alleges that Plaintiff made it clear that he would not comply with the final written warning and would continue to take time off despite the denial of his request for FMLA leave. Plaintiff denies he engaged in this conduct.

*4 The same day, after the meeting between Plaintiff and Murphy, Gill sent Plaintiff a follow-up email stating his FMLA leave was denied because he had failed to provide thirty-day notice and had scheduled the surgery during Block's busiest time of year. It also stated that McCray had to file a daily report of tasks he completed each day, notify the directors of Block via email when he arrived and left each day, and that he was required to work certain Saturdays.

Plaintiff alleges he planned to return from leave by February 1, when the busy tax season began.

### G. *Denouement*

Plaintiff never reported to work after January 14, 2003. He called in sick for four days after January 14, contending that he still had sick days coming to him. However, there is no evidence that Plaintiff was actually sick or that those absences were otherwise justified or authorized. According to Defendants, Murphy called Plaintiff on January 20, 2003 to inquire about his status. Defendants allege Plaintiff informed Murphy that he would not report to work that day and that Murphy thus informed him that his employment was terminated. While Plaintiff denies having this phone conversation with Murphy, it is undisputed that he received a letter dated January 20, 2003 indicating he was terminated. The letter stated that his termination was the result of his "[a]bsenteeism, in conjunction with insubordination during the meeting on January 14, 2003, [his] refusal to perform work as assigned and unacceptable work performance."

### H. *Second MCAD Complaint*

On February 3, 2003, Plaintiff filed a second MCAD complaint claiming that his termination and other adverse actions were in retaliation for the filing of his first MCAD complaint. On March 30, 2004, Plaintiff requested that the MCAD dismiss the retaliation charge and issue him a "right to sue" letter. Subsequently, Plaintiff filed the instant Complaint in Massachusetts Superior Court, and Defendants removed the case to this Court on the basis of his FMLA claim providing federal question jurisdiction.

## II. DISCUSSION

### A. *Summary Judgment Standard*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4
Slip Copy, 2006 WL 1308181 (D.Mass.)
**(Cite as: Slip Copy)**

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.' " *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.' " *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249-50) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### B. *Unlawful Retaliation Claim*

**\*5** Plaintiff asserts that Defendants terminated him because he filed the first MCAD complaint.

### 1. *Exhaustion of Administrative Remedies*

"Chapter 151B require[s] an employee to file an administrative charge as a prerequisite to commencing a civil action for employment discrimination." *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 464 (1st Cir.1996) (citing Mass. Gen. Laws ch. 151B, § § 5-9). Civil complaints for employment discrimination are limited in scope to the charge filed with the MCAD and " 'the investigation which can reasonably be expected to grow out of that charge.' " *Id.* (quoting *Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir.1990)). "Even a *pro se* complainant is required to describe the essential nature of the claim and to identify the core facts on which it rests." *Id.*

(citation omitted).

Defendants argue that Plaintiff's retaliation claim based on his handling of the sexual orientation harassment investigation is barred for failure to exhaust his administrative remedies. This argument is a red herring because Plaintiff's retaliation claim is based on his second, rather than his first, MCAD complaint. In his second MCAD complaint Plaintiff did not even mention his handling of the sexual harassment investigation. Instead, Plaintiff described "the essential nature of [his] claim" by alleging that his termination was in retaliation for filing his first MCAD complaint based on racial discrimination. *Lattimore*, 99 F.3d at 464. Plaintiff further "identif[ied] the core facts on which [his claim] rest[ed]" in the second MCAD complaint. *Id.* Since the filing of the complaint I feel that Respondent's [sic] commenced to retaliate against me, the incident [sic] that transpired are as following: 1. They alleged that the Training session where [sic] insufficient in substance and/or not long enough; ... 5. I was subjected to a hostile work environment in that Respondent's told everyone about the complaint I filed; 6. Subjected to harassing statements and comments by Linda Murphy, Supervisor; she called me a liar; and 7. Francine Gill, HR cancelled a medical appointment using my confidential information with out my permission.... On January 20, 2003, I was terminated for absences and fabricated performance problems."

(Aff. Belli Ex. 33, at 4.) Accordingly, Defendants' argument that Plaintiff failed to exhaust his administrative remedies fails.

Plaintiff's civil action, however, is limited to the retaliation claim he asserted in his second MCAD complaint, alleging retaliation for the filing of his first MCAD complaint, and "the investigation which c[ould] reasonably be expected to grow out of that charge." *Lattimore*, 99 F.3d at 464 (citing *Powers*, 915 F.2d at 38). Plaintiff did not exhaust any claim of retaliation based on his handling of the sexual orientation investigation involving Murphy's son-in-law.

### 2. *Protected Activity*

A plaintiff who has no direct evidence of a retaliatory motive has the burden of establishing a prima facie case of retaliation. *See Mole v. Univ. of Mass.*, 442 Mass. 582, 591, 814 N.E.2d 329, 338 (2004).
**\*6** Once a prima facie case is delineated, the burden

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1308181 (D.Mass.)
(Cite as: Slip Copy)

Page 5

shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. If this is accomplished, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is a pretext masking retaliation.... As in the discrimination context proper, courts confronted by summary judgment motions must at this point focus on the ultimate question, scrapping the burden-shifting framework in favor of considering the evidence as a whole. Thus, the critical inquiry becomes whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question.

_Mesnick v. Gen. Elec. Co.,_ 950 F.2d 816, 827 (1st Cir.1991), _cert. denied,_ 504 U.S. 985 (1992) (applying this burden-shifting framework to a retaliation case under the Age Discrimination in Employment Act) (citations omitted); _see also Mole,_ 442 Mass. at 591, 814 N.E.2d at 338 (applying framework to Mass. Gen. Laws ch. 151B, § 4(4) retaliation claim).

To satisfy his initial burden of proof and establish a prima facie case, Plaintiff must establish that "he engaged in protected conduct, that he suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action.' " _Mole,_ 442 Mass. at 591-592, 814 N.E.2d at 338-39 (quoting _Mesnick,_ 950 F.2d at 827) (footnotes omitted).

It is unlawful "[f]or any employer ... to discharge, expel or otherwise discriminate against any person ... because he has filed a complaint" with the MCAD. Mass. Gen. Laws ch. 151B, § 4(4). As Defendants concede, Plaintiff engaged in protected activity when he filed his first MCAD complaint based on racial discrimination. While the MCAD ultimately concluded that Plaintiff's racial discrimination claim lacked probable cause, "[t]he fact that a complaint is later found to be unmeritorious does not preclude a retaliation claim based on the protected activity of pursuing that complaint." _Mole,_ 442 Mass. at 592 n .13, 814 N.E.2d at 339 n. 13. Moreover, it is undisputed that Plaintiff's termination was adverse action.

The pivotal issue is whether Plaintiff has established a causal connection. "[T]he mere fact that one event followed another is not sufficient to make out a causal link." _Mole,_ 442 Mass. at 592, 814 N.E.2d at 339 (quotations and citations omitted). Where "adverse action is taken against a satisfactorily performing employee in the immediate aftermath of

the employer's becoming aware of the employee's protected activity, an inference of causation is permissible." _Id._ (citation omitted). As Plaintiff was terminated approximately six weeks after Defendants became aware of his filing of an MCAD complaint, the two events were "_very closely_ connected in time." _Id._ at 595, 814 N.E.2d at 341 (quoting _Anderson v. Coors Brewing Co.,_ 181 F.3d 1171, 1179 (10th Cir.1999)); _see Calero-Cerezo v. U.S. Dept. of Justice,_ 355 F.3d 6, 25-26 (1st Cir.2004) (finding temporal proximity where Plaintiff received her first suspension six weeks after Defendants became aware Plaintiff filed an employment discrimination complaint under Title VII).

*7 "Where, [however], adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation." _Mole,_ 442 Mass. at 594, 814 N.E.2d at 340; _see also Dziamba v. Warner & Stackpole LLP,_ 56 Mass.App.Ct. 397, 407, 778 N.E.2d 927, 935 (2002) (finding lack of "evidentiary support for a claim of retaliatory conduct by the employer" where there had been "expressions of dissatisfaction, warnings about unsatisfactory accomplishment," and decisions not to raise the employee's salary beginning well before the employee " 'had done or said anything that could be characterized as an exercise of protected rights' " (citation omitted)).

Defendants offer evidence that Plaintiff was an unsatisfactory employee well before he filed his first MCAD complaint on December 4, 2002 through, for example, their submission of his May 15, 2002 performance review, his May 31, 2002 written warning, and his August 2002 development plan.

Plaintiff responds that these complaints about his performance between May and December 2002 stemmed not from the quality of his work but rather, from his protest of Murphy's handling of the sexual orientation harassment investigation. While relations may have been taxed because of Plaintiff's resistance to exonerating Murphy's son-in-law, the bottom line is that Plaintiff yielded to Murphy, and there is sparse evidence that the taxed relationship caused Murphy to give Plaintiff persistent bad reviews. Moreover, even assuming that Plaintiff had engaged in protected conduct in criticizing Murphy's son-in-law for sexual harassment and discrimination and that Murphy had an improper retaliatory motivation, there is no evidence that Gill, Plaintiff's other supervisor, who

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1308181 (D.Mass.)
(Cite as: Slip Copy)

Page 6

joined in the negative employment reviews, was similarly motivated.

The undisputed record is that there had been a series of long-standing disagreements between Plaintiff and Block over a host of employment-related issues, which was worsening. While in other circumstances, the temporal relationship between the filing of the first MCAD complaint and the termination might support an inference of retaliatory motive, the mere filing of a MCAD complaint to stave off imminent discipline for pre-existing problems by a savvy human resource employee who sees the handwriting on the wall is insufficient to support an inference of causal connection. *Mole*, 442 Mass. at 592, 814 N.E.2d at 339. Accordingly, Plaintiff's unlawful retaliation claim fails.

### C. *FMLA Claims*

Plaintiff also alleges that he was discharged in retaliation for exercising his FMLA rights arising from a foot problem. 29 U.S.C. § 2615(a)(1). "The FMLA entitles an employee to twelve workweeks of leave during any twelve-month period '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.' " *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 161 (1st Cir.1998) (citing 29 U.S.C. § 2612(a)(1)(D)). Whether Plaintiff's FMLA claims will survive summary judgment is analyzed under the *McDonnell Douglas* burden-shifting framework. *Hodgens,* 144 F.3d at 160-61.

**\*8** Plaintiff asserts he was discharged for taking leave under the FMLA in January 2003 due to his intractable plantar keratoma (a foot callous). In order to establish a prima facie case of retaliation, plaintiff must "show that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Id.*

While an employee may be eligible for FMLA leave due to a serious medical condition under 29 U.S.C. § 2612(a)(1)(D), employers may require that a request for leave be supported by a certification by the health care provider of the eligible employee under 29 U.S.C. § 2613(a). In instances where an employer finds a certification incomplete, the employer must advise the employee and "provide the employee a reasonable opportunity to cure any such deficiency."

29 C.F.R. § 825.305(d).

Defendants do not contest Plaintiff's claim on grounds that the foot problem was not a serious medical condition, but they do argue that he failed to provide adequate certification for his January 7-10, 2003 leave. Plaintiff had requested FMLA leave and was conditionally granted that leave pending medical certification. After his leave, Plaintiff provided Defendants with a document stating that he suffered from an intractable plantar keratoma and could return to work provided he was permitted to sit 60 percent of the time and stand 40 percent. Because the document stated that Plaintiff could return to work, Defendants take the position that McCray never presented the required certification for his earlier four-day absence. Under 29 C.F.R. § 825.305(d), it was the duty of Defendants to notify Plaintiff if the documentation he provided was insufficient and afford him an opportunity to cure any deficiency. While Defendants requested that he return to work, there is no evidence that Defendants afforded Plaintiff the required opportunity to cure. Accordingly, Plaintiff has established that his January 7-10, 2003 leave was protected under the FMLA.

In response to Plaintiff's second request for FMLA leave in January 2003 in order to have surgery on his intractable plantar keratoma, Defendants argue that Plaintiff failed to provide thirty-day notice or to make a reasonable effort to schedule his surgery at a time when it would not unduly disrupt their operations.

"[W]hen the need to obtain treatment and diagnosis is foreseeable, the employee must provide adequate notice." *Hodgens,* 144 F.3d at 165 n. 10 (citing 29 U.S.C. § 2612(e)(2)). The employee "shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave." 29 U.S.C. § 2612(e)(1). Where, however, "30 days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable." 29 C.F.R. § 825.302(a). In addition, where the necessity for leave is foreseeable, the employee "shall make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer, subject to the approval of the health care provider of the employee." 29 U.S.C. § 2612(e)(2)(A).

**\*9** In *Hopson v. Quitman County Hosp. & Nursing Home, Inc.,* the Fifth Circuit noted:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 7
Slip Copy, 2006 WL 1308181 (D.Mass.)
(Cite as: Slip Copy)

What constitutes a "change in circumstances," whether a plaintiff's notice is given "as soon as practicable", and whether the employee has made a reasonable effort to schedule her treatment so as not to disrupt unduly the operations of the employer requires an inquiry into the particular facts and circumstances of each case. Such determinations are questions of fact and are better left to the jury with its traditional function of assessing human behavior and expectations.

126 F.3d 635, 640 (5th Cir1997).

In this case, Plaintiff provided Defendants with a second note on either January 10 or 13, 2003, which indicated he was having surgery on January 23 for his foot condition. Whether Plaintiff's scheduled surgery involved a circumstance making 30-day notice impractical, whether he gave notice as soon as practicable, and whether he made reasonable efforts to schedule his surgery to avoid unduly disrupting Defendant Block's operations are questions of fact. Therefore, there are genuine issues as to whether Plaintiff availed himself of a protected right under the FMLA when he requested leave for surgery.

Plaintiff has also provided evidence to establish the second and third prongs of his prima facie case. Not only did his termination constitute an adverse action, but there is a sufficient basis for concluding that there is a causal connection between his protected activity and Defendants' adverse action. Defendants cited absenteeism as a basis for termination, and the termination occurred within ten days after Plaintiff notified Defendant of his foot surgery. Thus, Plaintiff has established a prima facie case that the termination was improperly motivated.

Now that the ball is in their court, Defendants point out that many of Plaintiff's absences were unprotected and argue they took into account his non-FMLA protected absences, in addition to his insubordinate attitude and prior poor performance in their decision to terminate him. While absenteeism would not serve as a legitimate, nondiscriminatory reason for termination if Plaintiff were terminated for FMLA-protected absences, Defendants "w[ere] not precluded from taking ... unprotected absences into account in evaluating [Plaintiff's] performance" and terminating him. Hodgens, 144 F.3d at 172. While some of the absences related to his back and foot were protected by the FMLA, Plaintiff presented no evidence that the absences from January 14 to January 20 were FMLA protected. He provides no justification for taking those days off after having

been ordered to return to work other than that he still had sick days coming to him. There is no evidence he was actually sick, and the evidence of defiance of an order is undisputed.

Plaintiff argues that the temporal proximity between his exercise of FMLA protected rights and his termination, his claim that charges insubordination at the meeting on January 14 were trumped up, and the improper (and extraordinary) decision of the company to cancel his surgery without his permission, create disputed fact issues. Were it not for the final act of defiance from January 14 to January 20, I might agree. However, those final days of absence were utterly unprotected under the FMLA. When the evidence of prior job-related performance is combined with the unprotected absenteeism, Plaintiff has not produced enough admissible evidence for a reasonable trier of fact to find in his favor of retaliation for the exercise of FMLA rights.

### ORDER

*10 Defendants' motion for summary judgment is *ALLOWED.* (Docket No. 13.)

D.Mass.,2006.
McCray v. H&R Block Eastern Enterprises, Inc.
Slip Copy, 2006 WL 1308181 (D.Mass.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3534839 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Nov. 15, 2005) Original Image of this Document (PDF)
• 2004 WL 2778166 (Trial Pleading) Answer of Defendants H&R Block Eastern Enterprises, Inc. and Linda Murphy (Nov. 1, 2004)
• 1:04cv12232 (Docket) (Oct. 25, 2004)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d                                           Page 1
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA)
1729
(Cite as: Not Reported in F.Supp.2d)

C
Briefs and Other Related Documents
Artis v. Palos Community Hosp.N.D.Ill.,2004.
    United States District Court,N.D. Illinois, Eastern
                        Division.
              Bernita ARTIS, Plaintiff,
                          v.
    PALOS COMMUNITY HOSPITAL, Defendant.
                  No. 02 C 8855.

                   Sept. 22, 2004.

Jesse Valentino Barrientes, Attorney at Law, Glen
Ellyn, IL, for Plaintiff.
Joan E. Gale, Anne Elizabeth Duprey, Seyfarth
Shaw, Chicago, IL, for Defendant.

          MEMORANDUM OPINION AND ORDER
PALLMEYER, J.
*1 Plaintiff Bernita Artis worked as a certified
nursing assistant for Palos Community Hospital until
a wrist injury rendered her temporarily unable to
continue. She continued for several months on light
duty but was not able to obtain another permanent
position with the hospital and was discharged in
December 2000. In this lawsuit, Artis alleges that her
termination was in violation of the Family & Medical
Leave Act ("FMLA"), 29 U.S.C. § § 2601 et seq.,
and that she was discharged in retaliation for having
filed an application with the Illinois Industrial
Commission, i.e., a worker's compensation claim.
Defendant moves for summary judgment, arguing
that the undisputed facts show that there was no
violation of the FMLA and that her discharge was
unrelated to her filing of a workers' compensation
claim. For the reasons discussed below, the court
grants summary judgment in favor of Defendant.


                  FACTUAL BACKGROUND

Plaintiff was hired by the Defendant, Palos
Community Hospital, as a certified nursing assistant
in March of 1999 and worked there until December
of 2000. (Defendant's Statement of Material Facts
(hereinafter, "Def.'s 56.1") ¶ 4.) On June 27, 2000,
Plaintiff injured her left wrist while attempting to
prevent a patient from falling out of bed. (Id. ¶ 5;
Plaintiff's Statement of Additional Material Facts

(hereinafter, "Pl.'s 56.1 Stmt.") ¶ 4.) Following
instructions from the charge nurse, Plaintiff went to
the Hospital's emergency room, where she was
diagnosed with inflammation and swelling. (Pl. 56.1
Stmt. ¶ 13; Def.'s 56.1 ¶ 6.) Plaintiff took at least
three days off work to recover from the injury and
then returned to work in the Hospital's Human
Resources Department on temporary limited duty
("TLD") on July 5, 2000. (Pl.'s 56.1 Stmt. ¶ 9; Def.'s
56.1 ¶ 7.)

Plaintiff contends that on July 5, 2000, she informed
Dorothy Morande of Employee Health Services that
she was not fully recovered from her injury and
needed more time off, but Ms. Morande responded
that if Plaintiff did not start TLD she would lose her
job. (Plaintiff Aff. ¶ 13, Ex. 17 to Pl.'s 56.1 Stmt.)
The Hospital denies this conversation ever took
place, noting that in her own deposition, Plaintiff
testified she was put off work for three days until she
saw Ms. Morande, but then corrected herself and said
it was actually someone named "Judy" with whom
she met. (Defendant's Response to Plaintiff's
Statement of Additional Material Facts (hereinafter,
"Def.'s Resp.") ¶ 15; Plaintiff Dep., at 47.) In her
testimony, Plaintiff made no mention of an ultimatum
issued by anyone at the Hospital.

Plaintiff also argues that she was never given
information as to her FMLA leave rights and was
never advised that TLD was voluntary or that it was
in lieu of FMLA leave. (Plaintiff Aff. ¶ 16, Ex. 17 to
Pl.'s 56.1 Stmt.) The parties agree that Plaintiff was
given some information concerning the nature of the
TLD program, specifically a handout entitled
"Temporary Limited Duty, Your Questions
Answered," and a "Statement of Policy" relating to
TLD. (Plaintiff Dep., at 50-52; Def.'s 56.1 ¶ 8.) The
policy statement explains that "[i]f an employee
elects not to return to the TLD assignment, available
vacation and holiday hours will be paid, but the
employee will not be eligible for Worker's
Compensation or sick time benefits.... If the
employee's position has been filled when the
employee is cleared for regular duties, every effort
will be made to assist the employee to find a suitable
position." (Statement of Policy, Ex. 4 to Plaintiff
Dep., at 1, 2.) The stated purpose for the policy is
"[t]o provide a program through which an employee
who is temporarily disabled can readjust to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA) 1729
(Cite as: Not Reported in F.Supp.2d)

Page 2

working environment" while working in some capacity until he or she is able to resume his or her job. (*Id.* at 1.) The policy statement also refers to the FMLA, explaining that "an employee who qualifies under the [FMLA] ... will be given job protection of twelve weeks from the last day worked in his/her regular position." (*Id.* at 2.)

*2 Plaintiff claims that the employee handbook is silent on the matter of FMLA rights, but the court notes that the handbook does address the matter, explaining in the Leave of Absence section that if "your leave qualifies under the [FMLA], job protection of 12 weeks per year will be provided. This means that, on return from leave within this period, you will be restored to the position you held or an equivalent position." (Employee Handbook, Ex. 8 to Pl.'s 56.1 Stmt., at 24.) Plaintiff also claims that the Hospital's Employee Handbook, FMLA poster, Leave of Absence Policy 951.412, and TLD notice all fail to inform employees that light duty work is in lieu of FMLA leave and voluntary. (Pl.'s 56.1 Stmt. ¶ 32; Ex.'s 7-10, 12 to Pl.'s 56.1 Stmt.) Defendant denies this assertion in part, pointing out that the pages from the employee handbook cited by Plaintiff do discuss FMLA leave. The Department of Labor poster used by Defendant is a government form; it makes no mention of the relationship between TLD and FMLA leave. (Ex. 12 to Pl.'s 56.1 Stmt.) Defendant specifically denies that assignment to TLD is involuntary, and notes that the TLD policy explicitly states that employees may choose not to return to light duty, at the price of losing eligibility for worker's compensation or sick time benefits.[FN1] (Def.'s Resp. ¶ 32; Statement of Policy, Ex. 4 to Plaintiff Dep.) The TLD policy also states that if the employee's position has been filled when he or she is "cleared for regular duties, every effort will be made to assist the employee to find a suitable position." (Statement of Policy, Ex. 4 to Plaintiff Dep.)

FN1. This language makes no mention of the possibility of FMLA leave for a worker who suffers from a serious medical condition; the Policy might therefore benefit from a revision. Read in context, it appears that this provision addresses the circumstance in which a temporarily disabled worker prefers to remain employed but nevertheless declines the particular TLD assignment. As noted, the following page of the Policy does refer explicitly to FMLA leave, stating, "an employee who qualifies

under the Family Medical Leave Act of 1993 (FMLA), will be given job protection of twelve weeks from the last day worked in his/her regular position."

Defendant contends that employees are given a choice between FMLA leave and TLD, and inevitably choose light duty because it allows them to continue making money while they recover from their injury/illness. (Def.'s Resp. ¶ 29.) Defendant has provided no evidence to support this contention besides the statement of William Cleary, Director of Human Resources at the Hospital, who declared that an employee in the Plaintiff's position "has a choice between temporary limited duty ... and a leave of absence ... one or the other." (*Id.*; Cleary Dep., at 33.) In asserting that employees are given a choice, Cleary does not specify how employees were expected to know about this choice, and does not state that Plaintiff herself was given full information about the two options. There is also no evidence demonstrating how many employees were offered a choice between FMLA leave and TLD, and voluntarily chose light duty.

As a result of her wrist injury, Plaintiff underwent surgery on September 8, 2000 and was again forced to miss at least three days of work. (Pl.'s 56.1 Stmt. ¶ ¶ 5, 10.) At the time of both the June accident and the September surgery, Plaintiff had worked more than 1,250 hours in the preceding twelve-month period. (*Id.* ¶ ¶ 7-8.) When sufficiently recovered from the surgery, Plaintiff returned to TLD work in the Human Resources Department until she was placed on job search leave of absence in November of 2000. (Def.'s 56.1 ¶ 14.) Plaintiff admits that she never requested any other leave of absence and never requested FMLA leave. (*Id.* ¶ 23; Plaintiff Dep., at 69.)

*3 In a memorandum dated August 28, 2000, Dorothy Morande informed Plaintiff that her job protection would end on September 20, 2000 and that her nursing position might be filled. (*Id.* ¶ 10, Ex. 5 to Plaintiff Dep.) Plaintiff admits that she was aware throughout the fall of 2000 that she was expected to look for alternate employment at the Hospital. (Def.'s 56.1 ¶ 11; Plaintiff Dep., at 55-56.) Plaintiff continued to work in the TLD program through the fall until November 14, when she was sent another memorandum from Dorothy Morande informing her that, because she had been cleared for work effective on November 20, she would need to start looking for another job in the Hospital on November 21. (Def.'s

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA)
1729
(Cite as: Not Reported in F.Supp.2d)

56.1 ¶ 12; Ex. 6 to Plaintiff Dep.) The letter also advised her that if she were unable to find a new position by December 15, her employment with the hospital would cease. (Def.'s 56.1 ¶ 13; Ex. 6 to Plaintiff Dep.) Because Plaintiff's original nursing job had been filled, she was placed on job search leave of absence on November 21 while she searched for a replacement position. (Def.'s 56.1 ¶ 14; Pl.'s 56.1 Stmt. ¶ 34.) As of November 21, Plaintiff had worked 1,159 hours in the previous twelve months and was fully able to return to her original nursing duties. (Def.'s 56.1 ¶ ¶ 15, 25.) Plaintiff never returned to her original certified nursing assistant job at the hospital. (*Id.* ¶ 9.)

The Hospital does not ordinarily advise employees on a job search leave of absence about any job openings; instead, the employee has the responsibility of seeking out and applying for such positions on her own. (*Id.* ¶ 20.) Job openings are posted on a cafeteria bulletin board, and employees apply by placing bids on vacant positions. (*Id.*) While on her job search leave of absence, Plaintiff put in a written job bid for a Phlebotomist position and a Home Health Care Assistant position, and claims to have orally requested numerous other positions. She was not interviewed or hired for any of these slots. (Pl.'s 56.1 Stmt. ¶ 19.)

Plaintiff wrote to the Hospital sometime in December, stating that she would be returning to work on December 15. (Def.'s 56.1 ¶ 18; Ex. 7 to Plaintiff Dep.) Plaintiff testified that in writing the letter, "I followed all the [Hospital's] instructions. I just wanted to know what my status was at which I hadn't found anything within the hospital." (Def.'s 56.1 ¶ 19; Ex. 7 to Plaintiff Dep.) On December 16, 2000, Ellen Disbrow from Human Resources wrote Plaintiff to inform her that because her "job search leave of absence had reached the maximum of four weeks," and she had failed to find another position at the Hospital, her employment at the hospital would be terminated. (Ex. 8 to Plaintiff Dep.; Def.'s 56.1 ¶ 20.)

Just two weeks earlier, on December 1, 2000, Plaintiff had filed an Application for Adjustment of Claim with the Illinois Industrial Commission, seeking compensation for the June work accident. (Pl.'s 56.1 Stmt. ¶ 35; Def.'s 56.1 ¶ 16.) Mr. Cleary claims that the Hospital did not receive notice of the application until December 8, 2000. (Def.'s 56.1 ¶ 16; Cleary Decl. ¶ 7.) As a result of the application, on September 18, 2001, Plaintiff received a

settlement on the worker's compensation claim of $7,449, after deduction of attorney's fees. (Def.'s 56.1 ¶ 17; Plaintiff Dep., at 67.) Plaintiff alleges her termination was, at least in part, retaliation for having filed this claim. (Compl.¶ 13.)

*4 In her deposition, Plaintiff's stated reasons for suing the Hospital under the FMLA are, "I believe if I had that protection [FMLA job protection], I would have my job. My job would have been secured." (Def.'s 56.1 ¶ 23; Plaintiff Dep., at 69.) Plaintiff admits that she never specifically requested FMLA leave, but does contend that she asked for time off to recover from both the June accident and the September surgery. (Plaintiff Dep., at 69; Pl.'s 56.1 Stmt. ¶ ¶ 13-14.) Defendant denies that Plaintiff ever asked for "leave," noting that she was off work for just three days following the wrist injury. (Def.'s Resp. ¶ ¶ 13-14.) In her affidavit, Plaintiff also contends that Mr. Cleary told her she could come back to work, and that it was her understanding she would be returned to her nursing job after she was released to full work by her doctor. (Plaintiff Aff. ¶ ¶ 15, 17.) Defendant argues that Plaintiff was fully aware that her nursing job would be filled after September 20. (Def.'s Resp. ¶ 17.) Plaintiff finally contends that department supervisors at the Hospital are trained to tell an employee that she may be eligible for FMLA leave if advised by the employee of a potential FMLA qualifying event, but that her own supervisors failed to advise Plaintiff of her FMLA eligibility. (Pl.'s 56.1 Stmt. ¶ 23; Cleary Dep., at 10-11.) According to Defendant, the Hospital does not actively seek out FMLA-eligible individuals, but supervisors are instructed "under family medical leave that if they are advised by an employee that the employee let's say has an ... illness, then the supervisors are trained to say you may be eligible for family medical leave." (Def.'s Resp. ¶ 23; Cleary Dep., at 11-12.) Defendant does not contend that this policy was adhered to in this case, but argues that the fact is immaterial. (Def.'s Resp. ¶ 23.)

## DISCUSSION

### I. Standard of Review

Defendant moves for summary judgment on Plaintiff's claims. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There is no genuine issue of material fact unless "a reasonable jury could find for the party opposing the motion based on the record as a whole." Pipitone v. United States, 180 F.3d 859, 861 (7th Cir.1999) (internal quotations and citations omitted). The court must construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Plaintiff brings two counts against Defendant. Count I alleges that Defendant violated her FMLA rights. (Compl.¶ ¶ 7-10.) Count II asserts that Defendant terminated Plaintiff in retaliation for Plaintiff having filed a worker's compensation claim with the Illinois Industrial Commission. (Id. ¶ 13.) The court addresses each claim in turn.

II. Family & Medical Leave Act Claim

*5 Plaintiff alleges that she was entitled to FMLA leave within the meaning of 29 U.S.C. § 2612(a)(1), and that she lost pay as a direct result of Defendant's failure to place her on leave. (Compl.¶ ¶ 9-10.) In her brief, she acknowledges that FMLA leave is unpaid, but argues that her complaint "clearly is referring to subsequent wages and thus alleging that she lost her position in violation of the FMLA." (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (hereinafter, "Pl.'s Mem."), at 1.) Plaintiff's brief further asserts that Defendant was put on notice of her need for FMLA leave and that Defendant willfully violated the FMLA by denying FMLA leave, inducing and coercing Plaintiff to accept temporary light duty ("TLD"), and failing to include sufficient notice regarding FMLA rights. (Id. at 2-3.) Plaintiff further alleges that such violations constituted a willful interference with her rights. (Id. at 1-2.)

The FMLA provides job security to employees who miss work because of their own illnesses, to care for family members who are ill, or to care for new babies. 29 U.S.C. § 2612. Eligible employees are covered under the Act for up to twelve weeks of leave each year, and the Act guarantees reinstatement

to the employee's original job when work is resumed. 29 U.S.C. § § 2612(a)(1), 2614(a)(1). Employees who seek FMLA protection for their own illness must have worked for at least 1,250 hours in the previous twelve-month period, and possess a "serious health condition" as defined by the FMLA regulations. 29 U.S.C. § 2611(2). For purposes of summary judgment, the court is satisfied that Plaintiff may be classified as having a "serious health condition" following both her June 2000 wrist injury and September 2000 surgery under the Act, as she was incapacitated for more than three consecutive days, and required continuing treatment by a health care provider. 29 C.F.R. § 825.114. Because Plaintiff had also worked more than 1,250 hours in the twelve months preceding both the wrist injury and the surgery, she would be an FMLA-eligible employee at both of these times. (Pl.'s 56.1 Stmt. ¶ ¶ 7-8; Pl.'s Mem., at 5.) The FMLA makes it unlawful for an employer to interfere with an eligible employee's exercise or attempted exercise of rights granted to her by the Act. 29 U.S.C. § 2615(a). As Plaintiff was an FMLA-eligible employee following her injury and surgery, the remaining issue is thus whether Defendant interfered with Plaintiff's FMLA rights in violation of the Act.

Plaintiff asserts that advising Defendant of her injury, and her later need for surgery, was sufficient to put Defendant on notice that FMLA leave was needed. (Pl.'s Mem., at 6.) An employee does not qualify for FMLA protection until she has provided the employer with "enough information to put the employer on notice that FMLA-qualifying leave is needed." Stoops v. One Call Communications, Inc., 141 F.3d 309, 312 (7th Cir.1998). In putting the employer on notice of the need for FMLA leave, the employee does not have to mention the FMLA or demand its benefits; the employee can even be completely ignorant of the Act. 29 C.F.R. § 825.208(2); Byrne v. Avon Prods., Inc., 328 F.3d 379, 382 (7th Cir.), cert. denied, 540 U.S. 881, 124 S.Ct. 327, 157 L.Ed.2d 147 (2003). When an employee provides notice that FMLA leave is needed, the employer is required to investigate further if it needs additional information to determine if such leave is appropriate. 29 C.F.R. § § 825.208(a), 825.303(b); Stoops, 141 F.3d at 312. Plaintiff argues that Defendant was put on notice of the potential need for FMLA leave when Plaintiff informed the Hospital of her need for time off following both the June 2000 wrist injury and the September 2000 surgery. (Pl.'s Mem., at 6-7.) She further claims that this information was sufficient to trigger an investigation

Not Reported in F.Supp.2d                                                     Page 5
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA)
1729
(Cite as: Not Reported in F.Supp.2d)

by Defendant into the need for FMLA leave, and notes that department supervisors are expected to tell employees that they may qualify for FMLA leave if advised of a potential FMLA-qualifying event. (*Id.* at 7; Cleary Dep., at 11-12.) Plaintiff finally notes that Defendant's policy clearly states that employees can be placed on leave even if they do not explicitly ask for it. (Pl.'s Mem., at 7.)

**\*6** In Plaintiff's view, these facts establish that Defendant violated the FMLA in two ways. First, Defendant denied Plaintiff FMLA leave following her injury. Alternatively, Plaintiff argues that she was coerced into accepting a limited duty assignment in lieu of FMLA leave.

The first of these arguments requires little discussion. In support of her notion that Defendant willfully denied her FMLA leave, Plaintiff merely recounts the argument that she put the Defendant on notice of the need for leave and that such notice was sufficient to trigger an investigation by Defendant. (Pl.'s Mem., at 7-9.) She does not suggest that Defendant ever intentionally denied a request for FMLA leave, and she admitted in her deposition that she never made a request for leave. (Plaintiff Dep., at 69.) Plaintiff also has not asserted that she was denied time off to recover from her June wrist injury and September surgery. Her affidavit merely states that after both the accident and the surgery she "was incapacitated and unable to work for more than three consecutive calendar days, and could not perform the essential functions of my job as a Certified Nursing Assistant," and that she asked for time off to recover. (Plaintiff Aff. ¶¶ 8, 12, Ex. 17 to Pl.'s 56.1 Stmt.) Plaintiff further testified that she in fact "was put off work for about three days" following the original wrist injury in June of 2000. (Plaintiff Dep., at 47-48.) She remained on the hospital's payroll, however. The fact that Plaintiff continued working, albeit on limited duty, militates against the conclusion that the Defendant knew of her need for FMLA leave. Indeed, Plaintiff did not and does not now assert that she was unable to work at all after the injury.

Plaintiff argues, alternatively, that Defendant violated the Act by coercing her to accept temporary light duty in lieu of FMLA leave. (Pl.'s Mem., at 10.) Regulations interpreting the FMLA bar an employer from "interfering with, restraining, or denying the exercise of (or attempts to exercise) any right provided by the [FMLA]." 29 C.F.R. § 825.220(a)(1). Examples of interference with FMLA rights include "refusing to authorize FMLA leave,"

"discouraging an employee from using such leave," and manipulation by an employer to avoid FMLA duties, such as "changing the essential functions of the job to preclude the taking of leave." 29 C.F.R. § 825.220(b)(2). While "employees cannot 'trade off' the right to take FMLA leave against some other benefit offered by the employer," the regulations do contemplate situations where, as in this case, an employee is not ready to return to her regular job, but can perform light duty work. 29 C.F.R. 825.220(d). Under such circumstances, the FMLA is satisfied so long as acceptance of light duty work is "voluntary and uncoerced," and the employee's regular job is held open for twelve weeks, regardless of whether she spends those twelve weeks on light duty, unpaid leave, or some combination. *Id.*

**\*7** Plaintiff suggests that her acceptance of limited duty was coerced because Defendant failed to advise her of her FMLA leave rights and failed to explain that TLD was voluntary and in place of FMLA leave. (Pl.'s Mem., at 10.) In her affidavit, Plaintiff asserts that Dorothy Morande of Employment Health Services threatened to terminate her if she did not accept transfer to light duty on July 5, 2000. (Plaintiff Aff. ¶ 13, Ex. 17 to Pl.'s 56.1 Stmt.)

The evidence that would support the theory that Plaintiff's acceptance of light duty was not voluntary is thin. First, in response to specific and repeated questions at her deposition concerning the grounds for her FMLA claim, Plaintiff made no mention of coercion.[FN2] She admitted that she never asked for leave and that she was given information as to the nature of the TLD program. (Def.'s 56.1 ¶¶ 8, 24; Plaintiff Dep., at 50-51, 69.) The TLD policy that Plaintiff received does mention FMLA leave and presents limited duty as an option for the employee rather than as mandatory: "If an employee *elects not to return* to the TLD assignment, available vacation and holiday hours will not be paid, but the employee will not be eligible for Worker's Compensation or sick time benefits." (Ex. 4 to Plaintiff Dep.) (Emphasis added).

FN2. Except under limited circumstances, an affiant may not contradict her deposition testimony to establish a disputed issue of fact. *Adusumilli v. City of Chicago,* 164 F.3d 353, 360 (7th Cir.1998). Plaintiff made two statements in her deposition that arguably contradict her allegations regarding Ms. Morande. First, when asked how long

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA) 1729
(Cite as: Not Reported in F.Supp.2d)

she was put off work following the work accident, Plaintiff responded, "At that time, I don't remember. I think it was for three days until I saw Dorothy Morande, the lady that works in the human resource office. Her name is Judy-no, Judy. I'm sorry, her name is Judy." (Plaintiff Dep., at 47.) This confusing answer seems to infer that it was not Ms. Morande who Plaintiff first saw in the relevant period following her accident and before her assignment to temporary light duty. Later, when questioned about the date on which she started TLD, Plaintiff made no mention of Ms. Morande or of any threat. (*Id.* at 48-50.) Finally, when asked three times if there were any other reasons why Plaintiff was suing under FMLA, Plaintiff did not mention coercion, did not mention Ms. Morande, and did not mention any threat or pressure to begin TLD work. (*Id.* at 69-71.)

William Cleary testified that when faced with a serious health condition, Hospital employees are given a choice between paid light duty work and unpaid leave (except for remaining vacation and sick days), and almost all choose to take a light duty position as it allows them to keep earning money while they recover. (Cleary Dep., at 31-35.) No witness testified that Plaintiff herself was offered such a choice, however. Nor did Defendant offer evidentiary support for its apparent theory that, given a choice between light duty on full pay and leave without pay, any employee capable of light duty work would opt for it. The court concludes there is a dispute of material fact concerning this issue.

Even if the court were to resolve the matter in favor of Plaintiff, however, the court concludes she will not be able to establish a deprivation of rights protected by the FMLA. Assuming that Plaintiff would have preferred unpaid FMLA leave to fully-paid limited duty, the fact remains that she was accorded a full twelve weeks of job protection, from June 27 to September 20, 2000. Under relevant regulations, an employee who accepts light duty must retain the "right to restoration to the same or an equivalent position ... until 12 weeks have passed within the 12-month period, including all FMLA leave taken and the period of 'light duty.'" 29 C.F.R. § 825.220(d). The Hospital's TLD policy adheres to this requirement; it provides: "In accordance with hospital policy for Leave of Absence, an employee who qualifies under the Family Medical Leave Act of

1993 (FMLA) will be given job protection of twelve weeks from the last day worked in his/her regular position." (Ex. 9 to Pl.'s 56.1 Stmt.) Under the regulations, whether on FMLA leave or light duty, an employee who is unable to resume her original position after twelve weeks has no further protection under FMLA. It is undisputed that Plaintiff here was not cleared to return to her CNA position until November 20, 2000, more than twenty weeks after she was injured and began light duty. (Ex. 6 to Plaintiff Dep.) Even on that date, she was not terminated; instead, Defendant gave her an additional four weeks of job search leave to find a replacement position in the Hospital. (*Id.*) The Defendant had no duty to give her her nursing job back and was justified in terminating her at any time following September 20.

*8 Plaintiff is reduced to arguing that on June 27, 2000 she should have been granted unpaid leave (which she never requested) and been given over twenty weeks of job protection until November of 2000. Instead, she was given temporary light duty work with full pay and benefits and received substantially more than the FMLA-prescribed twelve weeks of protection. (Defendant's Reply Brief in Support of its Motion for Summary Judgment, at 11.) If the court were to resolve disputed facts in her favor, the undesirable conclusion would be that Defendant acted improperly only in continuing to employ and pay Plaintiff.

At oral argument on this motion, the court briefly addressed a theory of recovery that Plaintiff arguably could have, but did not advance: that by depriving her of unpaid leave, the Hospital prevented her from recovering within twelve weeks of her June 2000 injury. Importantly, Plaintiff herself has never suggested that, had she taken twelve weeks without pay, rather than returning to a light duty assignment, she would have recovered fully from her wrist injury. Nor does any evidence in the record support such a theory. Neither side has offered any evidence concerning the circumstances in which she was initially transferred to light duty in July, but the record does contain her doctor's recommendation that she begin light duty work two weeks after her surgery in September. (Semba Progress Notes, Ex. 14 to Pl.'s 56.1 Stmt., at 6.) The doctor did not state then, nor has Plaintiff offered any expert opinion now, that the light duty work she performed prevented or delayed the healing process. Nor is there any evidence that Plaintiff herself ever expressed unwillingness or inability to perform the light duty assignment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA)
1729
(Cite as: Not Reported in F.Supp.2d)

Plaintiff's final argument is that Defendant's lack of notice and guidance in its employee handbook, policies, poster, and brochure that the TLD program was voluntary and in place of FMLA leave "constitutes a willful interference and restraint of plaintiff's FMLA rights." (Pl.'s Mem., at 11.) Plaintiff concedes that the only statutory notice obligation is that employers post a Department of Labor poster, an obligation that she admits the Hospital met. (Pl.'s Mem., at 11, citing 29 C.F.R. § 825.300(a); see also 29 U.S.C. § 2619.) FMLA-covered employers are further required to include information on FMLA rights in any employment handbooks or notices. 29 C.F.R. § 825.301(a)(1). Defendant appears to have fulfilled these additional notice requirements, as well. First, the Hospital included information on FMLA rights in its Employee Handbook. (Ex. 8 to Pl.'s 56.1 Stmt.) Second, TLD policy notices discuss FMLA job protection. (Ex. 9 to Pl.'s 56.1 Stmt.) Third, the Hospital Leave of Absence brochure outlines the FMLA and who is eligible. (Ex. 11 to Pl.'s 56.1 Stmt.) While none of these resources explain specifically that TLD work is in lieu of FMLA leave, the court concludes that the absence of such an explanation does not violate this regulation. Plaintiff also admits that Hospital staff explained the TLD program to her. (Plaintiff Dep., at 50-52.) Plaintiff has not established that the Defendant failed to fulfill the regulations' FMLA notice requirements. Finally, as noted earlier, Defendant kept Plaintiff's job open while she was on TLD for several weeks more than the FMLA demands. Thus, any failure to notify Plaintiff more fully of her FMLA rights resulted in no actionable damages.

**\*9** The court finds no violation of FMLA on this record; but to the extent that any violation has been shown, Plaintiff has not satisfied the court that there was willfulness, and therefore her case would be dismissed as untimely anyway.[FN3] See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) (holding that in order to establish a willful violation of labor laws, a plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.") Because Plaintiff is unable to support her claim that Defendant interfered with her FMLA rights, and because it is undisputed that she received the full twelve weeks of job protection that the FMLA provides, Defendant's motion for summary judgment as to Plaintiff's FMLA claim will be granted.

FN3. The statute of limitations requires non-willful allegations to be brought within two years and willful allegations to be brought within three years. 29 U.S.C. § 2617(c). As the complaint was filed on December 9, 2002, any claim based on events occurring before December 9, 2000 would be time barred unless they constitute a willful violation of the FMLA.

### III. Retaliatory Discharge Claim

Plaintiff's second cause of complaint is that she was terminated in retaliation for filing an Application for Adjustment of Claim with the Illinois Industrial Commission. Illinois courts recognize an action for retaliatory discharge where employees are discharged in retaliation for exercise of their worker's compensation rights. Hartlein v. Illinois Power Co., 151 Ill.2d 142, 159, 176 Ill.Dec. 22, 601 N.E.2d 720, 728 (1992); Kelsay v. Motorola, Inc., 74 Ill.2d 172, 181, 23 Ill.Dec. 559, 384 N.E.2d 353, 356 (1978). Such a claim requires a showing that (1) the plaintiff was the defendant's employee before her injury; (2) the plaintiff exercised a right granted by the Worker's Compensation Act; and (3) the plaintiff's discharge was causally connected to her having filed a worker's compensation claim. Borcky v. Maytag Corp., 248 F.3d 691, 695 (7th Cir.2001). As the first two elements are clearly met in this case, the important matter is the causation element.

In retaliatory discharge cases, the employer's intent is often the critical issue. Dixon Distributing Co. v. Hanover Ins. Co., 244 Ill.App.3d 837, 851, 183 Ill.Dec. 919, 612 N.E.2d 846, 852 (5th Dist.1993), aff'd, 161 Ill.2d 433, 204 Ill.Dec. 171, 641 N.E.2d 395 (1994). Plaintiff points out that the issue of intent or motive is a question of material fact and one which is not normally appropriate for summary judgment. Jones v. Burkart Foam, Inc., 231 Ill.App.3d 500, 173 Ill.Dec. 258, 596 N.E.2d 882 (5th Dist.1992). Plaintiff further argues that an employer's failure to inform an employee of the next available position can be evidence of retaliatory motive, Hugo v. Tomaszewski, 155 Ill.App.3d 906, 108 Ill.Dec. 562, 508 N.E.2d 1139, 1142 (5th Dist.1987), and proving that an employer reneged on its promise to rehire an employee can demonstrate retaliatory motive. Jackson v. Bunge Corp., 40 F.3d 239, 243 (7th Cir.1994).

In this case, Defendant admittedly did very little to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA)
1729
(Cite as: Not Reported in F.Supp.2d)

inform Plaintiff of open positions and assist in her job search, as Hospital policy places the responsibility to search out and apply for open positions on the employee herself. (Pl.'s 56.1 Stmt. ¶ 20.) Plaintiff did apply for a Phlebotomist and Home Health Care Assistant position, but was not interviewed or hired for either. (*Id.* ¶ 19.) Plaintiff additionally contends that Mr. Cleary promised her she could return to work, and reneged on his promise. (*Id.* ¶ 18.) Plaintiff contends these facts establish retaliatory motive that was causally related to her filing of a worker's compensation claim. (Pl.'s Mem., at 14.)

**\*10** In a retaliatory discharge case the employee bears the burden of proving all elements of the cause of action; the employer is not required to supply an explanation for the employee's discharge. *Borcky,* 248 F.3d at 696. Nevertheless, "if the employer has a valid, nonpretextual basis for discharging the employee" then the element of causation is not met. *Paz v. Commonwealth Edison,* 314 Ill.App.3d 591, 594, 247 Ill.Dec. 641, 732 N.E.2d 696, 701 (2d Dist.2000).

In this case the undisputed facts defeat any inference of causation. Plaintiff filed her worker's compensation claim on December 1, 2000, (Pl.'s 56.1 Stmt. ¶ 35; Ex. 19 to Pl.'s 56.1 Stmt.), but Defendant did not receive notice of this application until December 8. (Def.'s 56.1 ¶ 16; Cleary Decl. ¶ 7, Ex. 3 to Def.'s 56.1.) On November 14, 2000, well before she ever filed her claim, Plaintiff received a letter from Dorothy Morande informing her that she was being placed on a four-week job search leave of absence, and that if she failed to find another position in the hospital by December 16, she would lose her job. (Def.'s 56.1 ¶¶ 12-13; Ex. 6 to Plaintiff Dep.) Defendant thus notified Plaintiff of her potential termination more than two weeks *before* Plaintiff even filed her worker's compensation claim, and three weeks before Defendant received notice of such claim. Plaintiff's termination letter and Mr. Cleary's deposition both clearly state that she lost her job because she had not secured another position before her job search leave of absence expired. (Def.'s 56.1 ¶ 20, Ex. 8 to Plaintiff Dep.; Cleary Dep., at 68.) The undisputed fact that Plaintiff was notified of the date and reason for her termination prior to her filing the worker's compensation application clearly serves as a valid, nonpretextual reason for her discharge. The fact that Plaintiff's termination occurred two weeks after she filed the worker's compensation claim does not prove retaliatory motive.

Nor is the court persuaded by Plaintiff's argument that Defendant's failure to advise her of open positions and assist her in finding a job at the Hospital demonstrates retaliatory motive. The Defendant's policy is to post job openings on the employee bulletin board, giving employees first shot at positions before the public. (Pl.'s 56.1 Stmt. ¶ 20; Disbrow Dep., at 38-43.) Plaintiff argues that this hands-off approach conflicts with the Hospital's own TLD policy, which assures employees that "every effort will be made to assist [them in finding] ... a suitable position" following their recovery. (Pl.'s 56.1 Stmt. ¶ 28; Ex. 9 to Pl.'s 56.1 Stmt.) The lack of any effort on Defendant's part to actually assist Plaintiff here may be disappointing, but it does not, without more, establish a causal link between her termination and the filing of the Application.

*Marin v. American Meat Packing Co.,* 204 Ill.App.3d 302, 149 Ill.Dec. 818, 562 N.E.2d 282, 286 (1st Dist.1990), cited by Plaintiff, is not to the contrary. *Marin* observed that the employer's persistent and well-documented attempts to return the plaintiff to work negated any retaliatory motivation; it does not suggest that the absence of such efforts establishes that the employer was in fact motivated to retaliate. Nor does the fact that the Hospital failed to advise her of available positions establish retaliatory motive; in the case she cites, *Hugo v. Tomaszewski,* 155 Ill.App.3d 906, 108 Ill.Dec. 562, 508 N.E.2d 1139 (5th Dist.1987), the plaintiff, a 23-year employee, was discharged when he attempted to return to work with certain restrictions, six months after suffering a work-related injury for which he recovered workers' compensation benefits. The employer asserted that its decision was motivated by loss of business, but the court noted that the employer filled another position soon afterwards, without offering the position to plaintiff. *Id.* at 910, 108 Ill.Dec. 562, 508 N.E.2d at 1142. Plaintiff here offers no evidence of a specific opening for which she was qualified, nor did the Hospital suggest that a decline in business was the reason for her discharge.

**\*11** Plaintiff suggests that Defendant reneged on a promise to restore her to her previous position, and cites *Jackson v. Bunge Corp.,* 40 F.3d 239, 243 (7th Cir.1994), where the employer promised to rehire the plaintiff if she produced a doctor's note, but then reneged, allegedly in retaliation for the plaintiff having filed a worker's compensation claim. Plaintiff asserts that Mr. Cleary told her she could come back to work (Pl.'s 56.1 Stmt. ¶ 18; Plaintiff Dep., at 60-61); she conceded, however, that she understood

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA) 1729
**(Cite as: Not Reported in F.Supp.2d)**

what he meant: that if a job opened up she might be rehired. (Plaintiff Dep., at 61.) Indeed, Mr. Cleary testified that Plaintiff was "eligible for rehire at any time," (Cleary Dep., at 69), and at oral argument on this motion, counsel for the Hospital confirmed that Plaintiff remains now eligible to return to work for any position for which she qualifies.[FN4] Nor has Plaintiff offered any evidence connecting Mr. Cleary's alleged broken promise with her worker's compensation claim. Plaintiff cannot even remember whether she visited him before or after she filed her worker's compensation application. (Plaintiff Dep., at 59-61.)

> FN4. If Plaintiff had prevailed on her claim that her termination was unlawful, the Hospital's stated willingness to rehire her might well defeat any claim for lost pay for any date after a position for which she qualifies became available.

Plaintiff has offered no evidence that Defendant was motivated by her workers' compensation claim in discharging her. Defendant is entitled to summary judgment on this claim.

### CONCLUSION

There are no disputes of material fact concerning Plaintiff's FMLA claim; even if the Hospital failed adequately to advise Plaintiff that she was entitled to take unpaid leave following her wrist injury, she remained on the payroll and entitled to return to her original job for well more than 12 weeks after that injury. She therefore suffered no damage as a result of Defendant's alleged violation of FMLA. Nor has she established any causal link between her filing of a workers' compensation claim and her termination. Plaintiff was and remains eligible for rehire by the Hospital.

Defendant's motion for summary judgment (Doc. No. 9-1) is granted.

N.D.Ill.,2004.
Artis v. Palos Community Hosp.
Not Reported in F.Supp.2d, 2004 WL 2125414 (N.D.Ill.), 150 Lab.Cas. P 34,910, 9 Wage & Hour Cas.2d (BNA) 1729

Briefs and Other Related Documents (Back to top)

• 2004 WL 1686246 (Trial Pleading) Plaintiff's Answer to Defendant's Motion for Summary Judgment (Mar. 29, 2004) Original Image of this Document (PDF)
• 2003 WL 23685151 (Trial Pleading) Plaintiff's Answer to Defendant's Affirmative Defenses (Jan. 17, 2003) Original Image of this Document (PDF)
• 2003 WL 23685150 (Trial Pleading) Defendant's Answer and Affirmative Defenses to Plaintiff's Complaint (Jan. 8, 2003) Original Image of this Document (PDF)
• 2002 WL 32604261 (Trial Pleading) (Dec. 9, 2002) Original Image of this Document with Appendix (PDF)
• 1:02CV08855 (Docket) (Dec. 09, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
**(Cite as: Not Reported in F.Supp.2d)**

**C**

Briefs and Other Related Documents

Wright v. Owens-Illinois, Inc.S.D.Ind.,2004.
United States District Court,S.D. Indiana, Terre
Haute Division.
Gerald E. WRIGHT, Plaintiff,
v.
OWENS-ILLINOIS, INC., and Owens-Brockway
Plastics, Inc., and Glass, Molders, Pottery, Plastics &
Allied Workers International Union, Defendants.
**No. 2:02-CV-223-LJM-WGH.**

May 14, 2004.

Robert P. Kondras, Jr., Hunt Hassler & Lorenz LLP,
Terre Haute, IN, for Plaintiff.
Richard P. Winegardner, Robert P. Johnstone, Barnes
& Thornburg, Indianapolis, IN, Adrienne A. Berry,
Segal Stewart Cutler Lindsay Janes & Berry,
Louisville, KY, for Defendants.

*ORDER ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT*

MCKINNEY, Chief J.
**\*1** This matter comes before the Court on two
summary judgment motions seeking judgment on the
claims of Plaintiff, Gerald E. Wright ("Wright" or
"Plaintiff"): one filed by Defendants', Owens-Illinois,
Inc. and Owens-Brockway Plastics, Inc. (collectively
"Owens"), and another filed by Defendant Glass,
Molders, Pottery, Plastics & Allied Workers
International Union (the "Union"). Wright's
Amended Complaint alleges: (1) retaliatory discharge
for making a worker's compensation claim; (2) a
claim under the Family and Medical Leave Act
("FMLA"), 29 U.S.C. § 2601, *et seq.;* (3) a "hybrid
action" under § 301 of the Labor Management
Relations Act ("LMRA"), 29 U.S.C. § 141, *et seq.;*
and (4) a "regarded as" claim under the Americans
with Disabilities Act ("ADA"), 42 U .S.C. § 12101,
*et seq.* Wright asserts all four of the above-listed
claims against Owens, and he adds the Union as a
Defendant on the LMRA and ADA claims. The
parties have fully briefed their arguments, and the
motion is now ripe for ruling.

*I. BACKGROUND*

A. NON-COMPLIANCE WITH LOCAL RULES

Local Rule 5.1(a) requires that the text in all Court
filings be double-spaced, except for quoted material.
L.R. 5.1(a). As noted by Owens, Plaintiff has single-
spaced 3 and 1/2 consecutive pages of *argument* in
his 35-page response. If Plaintiff had complied with
Local Rule 5.1(a) by double-spacing all of his
argument, his response brief would have been
approximately 42 pages, which exceeds the
maximum page limit on briefs filed in this Court.
L.R. 7.1(b) (no brief shall exceed 35 pages and no
reply brief shall exceed 20 pages without permission
of the Court). Plaintiff did not seek permission of the
Court for an extension of the page limit with respect
to his response brief.

Plaintiff also has failed to comply with Local Rule
56.1(b). Rule 56.1(b) provides:
The [response] brief shall include a section labeled
'Statement of Material Facts in Dispute' which
responds to the movant's asserted material facts by
identifying the potentially determinative facts and
fact disputes which the nonmoving party contends
demonstrate that there is a dispute of fact precluding
summary judgment.

L.R. 56.1(b). Instead of responding to Owens' fact
section by identifying and focusing on potentially
determinative facts and fact disputes in his
"Statement of Material Facts in Dispute" section,
Plaintiff simply recites his version of the facts and
includes numerous facts that are clearly not in
dispute. This failure to comply with Local Rule
56.1(b) forces the Court to sift through the parties'
fact sections to determine if there actually are factual
disputes. As a sanction for Plaintiff's failure to
comply with Local Rules 5.1(a), 7.1(b), and 56.1(b),
the Court will not consider the last three pages of his
response brief (pages 33-35).

Owens also filed a Motion to Strike Portions of
Plaintiff's Surreply Brief, arguing that portions of
Plaintiff's surreply are beyond the scope of Local
Rule 56.1(d). 56.1(d) provides:
**\*2** Surreply. If, in reply, the moving party relies upon
evidence not previously cited or objects to the
admissibility of the non-moving party's evidence, the
non-moving party may file a surreply brief limited to
such new evidence and objections, no later than
seven days after service of the reply brief.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

With respect its Motion for Summary Judgment, Owens did file a reply brief that relied in part upon evidence not previously cited and objected to some of Plaintiff's evidence. In his surreply brief, consistent with his rights under Rule 56.1(d), Plaintiff responded to Owens' new evidence and objections. However, in a section entitled "Owens' 'Abandoned Claims' Argument," Plaintiff also responded to legal arguments that Owens made in its reply brief. Because Plaintiff's "Owens' 'Abandoned Claims' Argument" section does not address new evidence or evidentiary objections, it is beyond the proper scope of a surreply brief and the Court will not consider it. Accordingly, the Court GRANTS Defendants' Motion to Strike Portions of Plaintiff's Surreply Brief.[FN1]

> FN1. Ten days after Owens filed its reply brief, Wright filed a Motion to Submit the Supplemental Affidavit of Juanita K. Pearison. Doc. No. 54. Defendants object to the late submission of the affidavit, arguing that Wright should have been submitted the affidavit with his response. The Court agrees with Defendants, and DENIES Plaintiff's Motion to Submit the Supplemental Affidavit of Juanita K. Pearison.

### B. THE FACTS

#### 1. *Termination of Wright's Employment at Owens*

Wright was employed as a set-up person at Owens-Brockway's plant in Sullivan, Indiana, when he suffered a back injury in November 1999. Def.'s Stmt. of Facts at 5. Wright reported the injury to his supervisors and was placed on "light duty" for three days. Id. In late 2000 and early 2001, Wright experienced increasing back pain. Def.'s Stmt. of Facts at 5. Initially, Wright did not seek to have his injury treated through the worker's compensation system. Id. Instead, he sought treatment from Dr. Balmasada, a physician covered by his health insurance. Pl.'s Stmt. of Facts at 2. On March 14, 2001, Dr. Balmasada diagnosed Wright with a protruding disc, and placed him on a 25-pound lifting restriction. Id.

Prior to the March 2001 restriction, Wright was responsible for setting up machines which made plastic bottles, a job known as the set-up position. Def.'s Stmt. of Facts at 5. Owens does not have a job

description for the set-up position. Pl.'s Stmt. of Facts at 5. However, the job involved pushing/pulling molds (which weighed up to 250 pounds), changing steel transfer heads (which weighed up to 80 pounds), emptying 35-gallon barrels of bottles (which weighed over 20 pounds), and frequent bending and reaching. Def.'s Stmt. of Facts at 5; Def.'s Ex. 22. The job also involved running, monitoring, and fixing the bottle-making machines. Jack Heady Depo. at 14.

After Wright was placed on the 25-pound lifting restriction, Owens assigned him to a training position in the upstairs portion of the plant (which was where Wright normally performed his set-up duties), and then had him check for defective bottles in the downstairs area of the plant. Id. During the period that Wright worked in the upstairs portion of the plant, he continued to perform some of the duties of the set-up position, but he was assisted by co-workers with lifting and he did not want to lift anything heavy. Wright Depo. at 68. Wright remained in the above-mentioned "light duty" positions from March 14, 2001, until March 1, 2002, when Owens terminated his employment (with a period of leave in the middle after surgery in October 2001). Def.'s Stmt. of Facts at 6.

*3 On July 10, 2001, Wright completed an Employee Report of Accident Form in order to process his continuing back injury as a worker's compensation claim. Pl.'s Stmt. of Facts at 2. Owens' third party administrator, GAB Robbins, investigated the claim and determined that Wright's back injury was work-related. Def.'s Stmt. of Facts at 6. In October 2001, due to GAB Robbins' determination that Wright's back injury was work-related, Owens referred him to Dr. Coscia of OrthoIndy in Indianapolis. Id.; Pl.'s Stmt. of Facts at 2. Dr. Coscia recommended that Wright undergo a decompression/diskectomy surgery, which was performed on October 29, 2001. Id. As a result of the surgery, Wright was placed on medical leave from October 26, 2001, through January 1, 2002. Id.

When Wright returned to work on January 2, 2002, he was placed under a 15-pound lifting restriction. Id. Consequently, he remained working in his "light duty" position checking for defective bottles. Id. Wright stayed in the position until February 28, 2002. Id.

On February 28, 2002, Wright had his last appointment with Dr. Coscia. Pl.'s Stmt. of Facts at 3. On that date, Dr. Coscia determined that Wright had reached maximum medical improvement and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

prescribed a *permanent* 20-pound lifting restriction. Def.'s Ex. 11. Dr. Coscia also noted that Wright was doing quite well despite having re-injured his back at work on January 16, 2002. Id. In addition, Dr. Coscia recommended that Owens return Wright to his employment with the permanent restrictions. Id.

On March 1, 2002, Scott Seehawer ("Seehawer"), the plant production manager, received Dr. Coscia's report and decided to terminate Wright's employment. Def.'s Stmt. of Facts at 7; Pl.'s Stmt. of Facts at 3. Seehawer informed Wright of the decision at a meeting that same day. Pl.'s Stmt. of Facts at 3. At the meeting, Seehawer gave Wright a letter that stated:

After further review of your permanent restrictions as a result of a back injury, Owens-Illinois has determined that the company is unable to accommodate these restrictions. As a result of these restrictions, Owens-Illinois has no work that you can perform. Therefore, I regret to inform you that your employment with Owens-Illinois has been terminated, effective as of today's date [dated March 1, 2002].

Def.'s Ex. 23. Wright was upset about the decision and he stated that his "doctor had mentioned spinal fusion but didn't recommend it." Seehawer Depo. at 93. Wright also asked Seehawer, "What can I do?" Id. Seehawer informed him that he could get a second opinion about the spinal fusion surgery at his own cost, and that if the second opinion disagreed with Owens' doctor, then "we can go from there." Id. Wright's health insurance continued until March 31, 2002. Def.'s Stmt. of Facts at 3.

### 2. *The Union's Grievance on Wright's Behalf*

While Wright was employed by Owens, he was a member of Glass, Molders, Pottery, Plastics & Allied Workers International Union Local 66.[FN2] Union Stmt. of Facts at 2. Roy Terrell ("Terrell"), the Local Union President, and Wanda Collins ("Collins"), the Local Union Vice President, were both present at the March 1, 2002, meeting when Owens terminated Wright's employment. Id. at 3. After the termination, Terrell filed a grievance on behalf of Wright challenging the discharge and asking for reinstatement. Id. At Wright's request, the grievance also demanded "reasonable accommodation per 1990 Federal Disability Act." Id. at 4.

FN2. The majority of these facts are from

the Union's Motion for Summary Judgment. Doc. No. 41.

*\*4 Because the grievance concerned a termination rather than something less serious, the parties agreed to accelerate Wright's grievance to the Third Step, which involved International Union Representative Russell Babcock ("Babcock"). Id. Babcock met with Terrell and Collins prior to meeting with Owens. Id. Terrell and Collins, who had many years of experience at the Sullivan, Indiana, plant, did not believe that there was any available bargaining unit job which Wright could totally perform with the 20-pound lifting restriction. Id. Terrell himself had worked various jobs at the Sullivan, Indiana, plant over the years, including the set-up position, and he did not think that Wright could perform a job at the plant with the 20-pound lifting restriction. Babcock Depo. at 29. Babcock relied on their evaluation of the bargaining unit jobs. Union's Stmt. of Facts at 4.

Babcock met with Owens regarding Wright's grievance on April 18, 2002, pursuant to the Third Step of the grievance procedure. Id. at 5. Max Straub ("Straub"), the plant manager, and Scott Seehawer, the plant production manager, were Owens' representatives at the meeting. Id. During the meeting, Owens took the position that even if Wright was improving, it did not mean that he would ever have his permanent restrictions removed to the point that he could handle all of the duties of a job at the plant. Id. Babcock proposed that Owens reinstate Wright on medical leave and provide him with medical benefits while he pursued a second medical opinion. Id. Babcock also requested an extension of time before having to proceed to the Fourth Step of the grievance procedure (arbitration), hoping that Wright's permanent lifting restriction would be changed. Id.

In an April 22, 2002, letter, Straub rejected Babcock's proposal and stated that the grievance was denied. Id. However, Owens subsequently granted Wright an extension of the grievance time limits so that it could consider the results of a Functional Capacity Evaluation that Wright was scheduled to undergo. Def.'s Ex. 17.

### 3. *The May 22, 2002, Functional Capacity Evaluation*

On May 22, 2002, Wright underwent a Functional Capacity Evaluation ("FCE"). Id. at 8. During the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

Page 4

evaluation, Wright informed his evaluator that his set-up job entailed pushing and pulling up to 250 pounds and lifting 25 to 75 pounds. Def.'s Ex. 22. The exam revealed that: (1) on an occasional basis, Wright could lift between 30 and 55 pounds (depending on whether the lift was from the floor or from the waist and whether the lift was to the waist or shoulders or overhead), push up to 70 pounds and pull up to 95 pounds and, (2) Wright could frequently lift between 15-25 pounds. Def.'s Ex. 22.

After receiving the results of his FCE, Wright voluntarily waived his rights to seek an examination by his personal physician for purposes of his worker's compensation claim. Id. In addition, Wright's Union withdrew the grievance because the FCE did not change Wright's permanent lifting restriction. Union's Stmt. of Facts at 6.

### 4. Deposition Testimony of Jack Heady

*5 Jack Heady ("Heady") has worked for Owens as a set-up person for about 16 or 17 years. Heady Depo. at 9-10. On or about February 26, 2002, Heady injured his right shoulder on the job. Heady Ex. 2. He had one surgery on his shoulder on May 2, 2002, and then a second surgery on January 16, 2003. Heady Depo. at 27, 40. Prior to his first surgery, Owens placed Heady on "light duty" for approximately three months. Id. at 44. After his first surgery, Heady was off work for over five months. Id. at 40-41. After his second surgery, Heady was off work for over two months. Id. In sum, Heady was off work recovering from his surgeries for a period of six or seven months, and he worked "light duty" for three months. In July 2003, Heady's doctor placed him on a permanent restriction of no overhead work with his right arm. Heady Depo. at 47.

When asked about his responsibilities as a set up person, Heady testified that sometimes the job was physically demanding, and other times it was not physically demanding, depending on how well the machines were running. Heady Depo. at 15. When a machine "rings out," the set up person in charge of the machine has to pull up the safety gates (an overhead pull that "feels like" 40 or 50 pounds). Id. at 16. With his restriction, Heady cannot use his right arm to pull up the safety gates, so he pulls up with his left arm, or he asks someone for help if someone is there. Id. Heady also is unable to move molds in and out of the machines with his restriction. Id. The molds weigh between 200 and 1,500 pounds. Id. Heady has an unwritten understanding with Owens

that he does not have to move molds or lift transfer heads. Id.

### II. *SUMMARY JUDGMENT STANDARD*

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1267-68 (7th Cir.1990). Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.,* 96 F.3d 992, 997 (7th Cir.1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex,* 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992).

*6 In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 5
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm,* 94 F.3d 254, 257 (7th Cir.1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson,* 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992). "If the nonmoving party fails to establish the existence of an element essential to [her] case, one on which [she] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996).

### III. *DISCUSSION*

Wright alleges that Owens violated his rights under three federal statutes: the FMLA, the LMRA, and the ADA. In addition, Wright advances a state law theory of retaliatory discharge for filing a worker's compensation claim. The Court will first consider the parties' arguments related to the federal statutes.

### A. FMLA CLAIM

Wright alleges that Owens violated the Family and Medical Leave Act of 1993 when it terminated his employment on March 1, 2002. Specifically, Wright asserts that Owens retaliated against him for attempting to exercise his FMLA rights, and that Owens wrongfully interfered with his FMLA rights. Owens denies Wright's assertions, and moves for summary judgment on the FMLA claim.

The FMLA establishes two categories of protections for employees. First, the FMLA contains prescriptive protections that are expressed as substantive statutory rights. *See King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir.1999). The Act provides eligible employees of a covered employer the right to take unpaid leave for a period of up to 12 work weeks in any 12-month period for a serious health condition as defined by the Act. *See id.* (citing 29 U.S.C. § 2612(a)(1)). After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. *See id .* (citing 29

U.S.C. § 2614(a)). To insure the availability of these guarantees, the FMLA declares it " 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." ' *Id.* (quoting 29 U.S.C. § 2615(a)(1)).

When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate, by a preponderance of the evidence, only entitlement to the disputed leave. In such cases, the intent of the employer is immaterial. *See id.* (citing *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 713 (7th Cir.1997) ("We shall continue to resolve suits under the FMLA ... by asking whether the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims.")).

*7 In addition to the substantive guarantees contemplated by the Act, the FMLA also affords employees protection in the event they are discriminated against for exercising their rights under the Act. *See id.* (citing 29 U.S.C. § 2615(a)(1)-(2)). Specifically, " '[a]n employer is prohibited from discriminating against employees ... who have used FMLA leave." ' *Id.* (quoting 29 C.F.R. § 825.220(c)). Furthermore, an employer may not consider the taking ofFMLA leave as a negative factor in employment actions. *See id.* Because the FMLA's implementing regulations bar certain discriminatory conduct, the protections contemplated by these sections have been characterized as proscriptive in nature. *See id .*

In addition to the aforementioned statutory provisions, the United States Department of Labor has promulgated regulations implementing the FMLA, as authorized by 29 U.S.C. § 2654. Of significance to the instant case, § 29 C.F.R. § 825.208 provides:
(a) In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section.

Once the employer has notice that an employee has a qualifying reason for FMLA leave, "the employer must promptly (within two business days absent extenuating circumstances) notify the employee that the paid leave is designated and will be counted as FMLA leave." 29 C.F.R. § 825.208(b)(1).

Owens also directs the Court's attention to the Labor Department Regulation pertaining to "light duty."

Not Reported in F.Supp.2d                                                                      Page 6
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
**(Cite as: Not Reported in F.Supp.2d)**

The "light duty" regulation provides, in relevant part: Employees cannot waive, nor may employers induce employees to waive, their rights under FMLA. For example, employees (or their collective bargaining representatives) cannot "trade off" the right to take FMLA leave against some other benefit offered by the employer. *This does not prevent an employee's voluntary and uncoerced acceptance (not as a condition of employment) of a "light duty" assignment while recovering from a serious health condition (see § 825.702(d)). In such a circumstance the employee's right to restoration to the same or an equivalent position is available until 12 weeks have passed within the 12-month period, including all FMLA leave taken and the period of "light duty."*

29 C.F.R. § 825.220(d) (emphasis added).

### 1. *Substantive Claim or Retaliation Claim?*

With those standards in mind, the Court must determine whether Wright's FMLA claim should be characterized as a substantive FMLA claim, as an FMLA retaliation claim, or as both. Wright advances both types of claims in his Amended Complaint. Owens contends that Wright's FMLA claim should be characterized as a substantive claim. Wright offers little resistance to Owens' characterization argument and focuses on his substantive FMLA claim. See Pl.'s Response at 19-25. The Court agrees with Owens that Wright's FMLA claim should be characterized as a substantive claim. Because Wright never asked for FMLA leave, and Owens never designated his leave or "light duty" period as FMLA-qualifying, it is difficult for Wright to argue that he was retaliated against for exercising his FMLA rights. *See Gilliam v. United Parcel Serv., Inc., 233 F.3d 969, 971 (7th Cir.2000)* (observing that the thrust of an FMLA claim is substantive when the employer does not think that the employee took FMLA leave in the first place). Accordingly, the Court will consider the merits of Wright's substantive FMLA claim.

### 2. *Merits of Substantive FMLA Claim*

**\*8** Owens' central argument on Wright's FMLA claim is that Wright received everything he was entitled to under the FMLA and, as a consequence, he cannot complain that his leave was not designated as FMLA leave. Owens cites the recent Supreme Court decision in *Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002)* in support of its argument. In response, Wright

asserts that Owens violated the FMLA by failing to designate the leave and "light duty" period as FMLA leave. Wright also attempts to distinguish *Ragsdale* from the present case.

The Court will begin with a discussion of *Ragsdale* because all of Owens' arguments are related to it. In *Ragsdale,* the defendant/employer had granted the plaintiff/employee a total of 30 weeks of leave to recover from cancer. *See Ragsdale, 535 U.S. at 86.* When the plaintiff requested an extension beyond the 30 weeks, the defendant refused her request and fired her when she did not report to work. *See id.* The plaintiff then filed suit, alleging that C.F.R. § 825.700(a), a Labor Department Regulation, required her employer to give her 12 additional weeks of leave because her employer had never informed her that her 30-week absence would count against her FMLA leave. *See id.*

The Supreme Court concluded that the regulation was invalid because it altered the statutory framework of the FMLA. *See id.* at 88-89. The Court explained:
The challenged regulation is invalid because it alters the FMLA's cause of action in a fundamental way: It relieves employees of the burden of proving any real impairment of their rights and resulting prejudice. In the case at hand, the regulation permitted Ragsdale to bring suit under § 2617, despite her inability to show that Wolverine's actions restrained her exercise of FMLA rights. Section 825.700(a) transformed a company's failure to give notice-along with its refusal to grant her more than 30 weeks of leave-into an actionable violation of § 2615. This regulatory sleight of hand also entitled Ragsdale to reinstatement and backpay, even though reinstatement could not be said to be "appropriate" in these circumstances and Ragsdale lost no compensation "by reason of" Wolverine's failure to designate her absence as FMLA leave. By mandating these results absent a showing of consequential harm, the regulation worked an end run around important limitations of the statute's remedial scheme.

*Id.* at 90-91.

The regulation that the Supreme Court invalidated in *Ragsdale* pertained to employers who provide more generous benefits than required by the FMLA. [FN3] The Court explicitly declined to address the validity of the more generalized individualized notice provisions of 29 C.F.R. § 825.208, which are at issue in the instant case. *See. id.* at 88. However, the individualized notice provisions of § 825.208, which require employers to promptly notify an employee if

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

leave has been designated as FMLA leave, are similar to the provision invalidated by *Ragsdale,* and district courts have properly questioned the continuing validity of § 825.208 in the wake of *Ragsdale. See, e.g., Sims v. Schultz,* 305 F.Supp.2d 838, 845 (N.D.Ill.2004) ("While section 825.208 was not specifically addressed, it is similar and its validity may fairly be questioned after *Ragsdale."* ); *Donahoo v. Master Data Cntr.,* 282 F.Supp .2d 540, 555 (E.D.Mich.2003) (finding for defendant even though defendant did not notify plaintiff of FMLA designation under § 825.208 because plaintiff did not establish that she was prejudiced by the lack of notice).

> FN3. Specifically, 29 C.F.R. § 825.700 provides, in relevant part:
> What if an employer provides more generous benefits than required by the FMLA?
> (a) If an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement.

**\*9** After *Ragsdale,* an employer's failure to give notice that leave has been designated as FMLA leave, standing alone, does not violate the FMLA. A plaintiff must demonstrate that the lack of notice caused her FMLA rights to be prejudiced. *See Summers v. Middleton & Reutlinger, P.S.C.,* 214 F.Supp.2d 751, 757 (W.D.Ky.2002) ("[P]laintiff cannot merely rely on the fact that defendant designated her FMLA leave retrospectively, she must demonstrate her rights under the FMLA were violated and she was harmed as a result."). *Ragsdale* instructs courts to take into consideration the reality of what would have happened had the notice been given, including whether or not the employee would have returned to work after taking leave. *See Ragsdale,* 535 U.S. at 88-91 ("The fact that the employee would have acted in the same manner if notice had been given is, in the Secretary's view, irrelevant ... Even if Wolverine had complied with the notice regulations, Ragsdale still would have taken the entire 30-week absence. Blind to this reality, the Secretary's provision required the company to grant Ragsdale 12 more weeks of leave ... To determine whether damages and equitable relief are appropriate under the FMLA, the judge or jury must ask what steps the employee would have taken had circumstances been different-considering, for example, when the employee would have returned to

work after taking leave.").

In light of *Ragsdale,* the Court must consider whether Wright's FMLA rights were prejudiced under the circumstances of this case. As noted above, the FMLA entitles qualifying employees to 12 weeks of unpaid leave, continuation of medical benefits while on leave, and job restoration. In addition, a Labor Department Regulation indicates that an uncoerced period of "light duty" counts as FMLA leave. 29 C.F.R. § 825.200(d). In the instant case, Wright received approximately 10 weeks of leave to recover from his October 2001 back surgery, and Owens placed him on "light duty" for 8 weeks after the surgery, from January 1, 2002, until March 1, 2002. During the 10 weeks of leave, Wright received partial pay. In addition, Wright received medical benefits during the 10 weeks of leave, during his 8-week "light duty" period, and for four weeks after the termination of his employment (the medical benefits ended on March 31, 2002). In sum, Wright received everything he was entitled to under the FMLA-he was on leave or "light duty" work for more than 12 weeks and he received medical benefits for more than 12 weeks. In addition, even if the 8-week "light duty" period did not count toward his FMLA leave and Wright consequently only received 10 weeks of medical leave, it would elevate form over substance to require an employer to provide an employee with the 2 remaining weeks of medical leave when a doctor has placed permanent medical restrictions on the employee that prevent him from performing the essential functions of his job, and the employer has extended medical benefits to cover more than 12 weeks. *See Cehrs v. Northeast Ohio Alzheimer's Research Cntr.,* 155 F.3d 775, 784-85 (6th Cir.1998) (granting summary judgment for defendant despite fact issue about plaintiff's termination date because there was no dispute that plaintiff was unable to return to work when the 12-week FMLA leave expired).

**\*10** Wright was not entitled to job restoration under the FMLA. Generally speaking, the FMLA entitlements, including the job restoration entitlement, expire after 12 weeks. 29 U.S.C. § 2612; 29 U.S.C. § 2614; 29 C.F.R. § 825.214(b). Moreover, as noted above, when an employee voluntarily accepts a "light duty" assignment, the time spent in the "light duty" assignment counts toward the employee's 12-week FMLA entitlement. 29 C.F.R. § 825.220(d). Thus, after 10 weeks of medical leave and 8 weeks of "light duty," Wright was not entitled to job restoration because the 12-week FMLA period had expired. In addition, as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

Page 8

explained below in the Court's analysis of Wright's ADA claim, Wright could not perform the essential functions of his job when he was fired on March 1, 2002, and he still could not perform the essential functions of the job when he was evaluated on May 22, 2002. As a consequence, job restoration was not required (or possible). 29 § C.F.R. 825.214(b) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious medical condition, the employee has no right to restoration to another position under the FMLA.").

Wright's attempts to distinguish *Ragsdale* are unconvincing. Wright criticizes Owens for stating that *Ragsdale* invalidated 29 C.F.R. § 825.702(d)(2) and then seeking to use other applicable regulations against Wright. Pl.'s Resp. at 23 n. 4. However, the *Ragsdale* Court did not invalidate every one of the Labor Department's implementing regulations. Instead, it invalidated the provision before it, and cast doubt on the notice of designation provisions-provisions that Wright seeks to enforce. Wright also contends that Owens should have notified Wright that his FMLA rights were being exhausted and that his job was in jeopardy. However, after *Ragsdale*, lack of notice of FMLA designation is irrelevant if a plaintiff cannot make a showing of prejudice. Wright cannot connect the lack of notice to any prejudice because he would not have been able to return to his set-up position even if Owens promptly notified him that his 10-week leave and "light duty" assignment counted as FMLA leave.

The plaintiff in *Ragsdale* lost because she could not show "any real impairment of [her] rights and resulting prejudice." *Ragsdale, 535 U.S. at 90*. Similarly, Wright has failed to show how he was harmed by the fact that Owens did not designate his leave and "light duty" assignment as FMLA leave. As explained above, Wright already received more than 12 weeks of leave and "light duty," and his medical benefits continued for more than 12 weeks. Moreover, he was not entitled to job restoration under the FMLA. Wright has received everything he is entitled to under the FMLA. In other words, Wright cannot establish that he has been prejudiced by any violation of his FMLA rights. *See Ragsdale, 535 U.S. at 90*. Thus, the Court GRANTS Owens' Motion for Summary Judgment withregard to Wright's FMLA claim.

B. SECTION 301 CLAIM

*11 The crux of Wright's § 301 claim is that the Union violated its duty of fair representation by withdrawing his grievance and not pursuing arbitration. Wright maintains that the Union's decision to withdraw his grievance was both arbitrary and discriminatory. Wright also contends that Owens violated various provisions of the CBA when it fired him, including a medical leave provision, a seniority rights provision, a handicapped employees provision, and a no termination except for just cause provision. The Union asserts that pursuing arbitration was futile because Wright could not fully perform any of the jobs at the plant with his lifting restrictions. Owens argues that it did not violate any of the CBA provisions at issue.

An action brought under § 301 of the LMRA is referred to as a hybrid action because it consists of two causes of action that are "inextricably interdependent." *DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-65, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983)*. First, Wright must demonstrate that the Union breached its duty of fair representation by taking action that was arbitrary, discriminatory, or in bad faith. *See McKelvin v. E.J. Brach Corp., 124 F.3d 864, 867-68 (7th Cir.1997)*. Second, if Wright demonstrates a breach of the Union's duty of fair representation, he must show that Owens violated the CBA. *See Filippo v. N. Ind. Pub. Serv. Corp., Inc., 141 F.3d 744, 748 (7th Cir.1998)*. Failure to establish either cause of action is fatal to the hybrid action.

Wright first argues that the Union's decision to withdraw his grievance and not pursue arbitration was arbitrary. Wright bears a heavy burden on this issue:

Our review of whether a union acted arbitrarily in deciding not to pursue a grievance or arbitration is "highly deferential." *Air Line Pilots, 499 U.S. at 78, 111 S.Ct. at 1135*. A union's actions are deemed arbitrary only if they are "so far outside a 'wide range of reasonableness' as to be irrational." *Air Line Pilots, 499 U.S. at 67, 111 S.Ct. at 1129* (citation omitted); *Garcia v. Zenith Electronics Corp., 58 F.3d 1171, 1176 (7th Cir.1995)*. In applying this extremely deferential standard, we will " 'not substitute [our] judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." ' *Garcia, 58 F.3d at 1176* (quoting *Ooley v. Schwitzer Division, 961 F.2d 1293, 1302 (7th Cir.)*, cert. denied, 506 U.S. 872, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992)). "This wide degree of deference is warranted because Congress did not intend courts to interfere with the decisions of the employee's chosen bargaining representative." *Ooley,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

Page 9

961 F.2d at 1302. In applying this standard at the summary judgment phase, we have explained that "so long as a colorable argument could be made at the time of the union's decision to drop its support that the grievance is meritless (and the union did not then treat substantively similar grievances differently from the plaintiff's), the decision cannot be regarded as arbitrary." *Trnka v. Local Union No. 688, 30 F.3d 60, 61 (7th Cir.1994).* McKelvin's burden on summary judgment, in other words, is not just to establish that his position is as plausible as the union's, but to show that the union's position "could eventually be deemed not even colorable[.]" *Id.*

**\*12** *McKelvin,* 124 F.3d at 867-68.

With this deferential standard in mind, the Court turns to the arbitrariness issue in the instant case. Babcock, the International Union Representative who decided to withdraw Wright's grievance, was informed by Terrell and Collins, the local union representatives, that Wright could not perform any of the jobs at the plant with the 20-pound lifting restriction. Terrell himself had worked various jobs at the Sullivan, Indiana, plant over the years, including the set-up position, and he did not think that Wright could fully perform a job at the plant with the 20-pound lifting restriction. Babcock Depo. at 29. After Terrell and Collins informed him that they did not think Wright could work at the plant with his restrictions, Babcock requested an extension of the grievance, hoping that the permanent restrictions would be lifted during the extension. Babcock Depo. at 34-35. Owens granted the extension to await the results of a Functional Capacity Evaluation. However, the May 22, 2002, exam did not change Wright's permanent lifting restriction and, consequently, the Union withdrew the grievance.

Wright attacks the factual basis of the Union's explanation. For example, Wright asserts that "there is no rational or justifiable basis for Union to argue against its own member whom it is obligated to represent and claim that he had this fictional 20 pound lifting restriction after the May 22, 2002 functional capacity evaluation was completed." Pl.'s Response at 14. Wright's position is not supported by the record. The lifting restriction was not fictional. Dr. Coscia placed Wright on a permanent 20-pound lifting restriction on February 28, 2002. Although the report from the subsequent FCE did not mention the 20-pound restriction, the exam revealed that: (1) on an occasional basis, Wright could lift between 30 and 55 pounds (depending on whether the lift was from the floor or from the waist and whether the lift was to

the waist or shoulders or overhead), push up to 70 pounds and pull up to 95 pounds and, (2) Wright could frequently lift between 15-25 pounds. As detailed in the Court's analysis of the ADA claim below, the set-up position required that Wright be able to lift, push, and pull more than that, and those restrictions prevented him from performing essential functions of his position. The Union reviewed the report and concluded that Wright still could not perform any job at the plant. As a consequence, the Union withdrew the grievance that it filed on Wright's behalf.

The Union's decision to withdraw the grievance prior to arbitration was not irrational. The Union filed the grievance on Wright's behalf, seeking reinstatement. It would have been senseless to proceed to arbitration seeking reinstatement if Wright could not perform any job in the plant. Although Wright asserts that Owens violated a number of provisions of the CBA, he does not identify any CBA provision that gave him or the Union the ability to alter his job responsibilities based on his physical limitations. Nor does he cite to a provision that required Owens to keep him in a "light duty" position indefinitely, or shift him to another position when no positions were available. The Union sought and received a time extension to give Wright more time to have his restrictions lifted, and Wright now believes that the Union should have sought more time by proceeding to arbitration. However, it is not appropriate for the Court to substitute its judgment for that of the Union where the Union's judgment was rational. The Union's decision was that it was futile to pursue arbitration for reinstatement because Wright could not fully perform any job at the plant based on his physical limitations. This decision falls within the "wide range of reasonableness" that gives unions the discretion necessary to effectively and efficiently represent union members. *See Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 45-46, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998). Accordingly, the Court rejects Wright's argument that the Union's failure to arbitrate his grievance was arbitrary.

**\*13** Wright also contends that the Union breached its duty of fair representation by handling his grievance in a discriminatory fashion. In support of this contention, Wright references his arguments in support of his ADA claim. However, the Court concludes below that Wright does not have a viable ADA claim against Owens. Regardless of the merits of the ADA claim, Wright has not adduced any evidence that the Union's decision to withdraw Wright's grievance was motivated by discriminatory

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

animus. As a result, the Court concludes that the Union did not breach its duty of fair representation by discriminating against Wright on the basis of a protected characteristic.

The Union's decision to withdraw Wright's grievance before arbitration was neither arbitrary nor discriminatory. Wright does not argue that the action was taken in bad faith. Therefore, the Union did not breach its duty of fair representation to Wright. The Court GRANTS the Union's Motion for Summary Judgment on the § 301 claim. In addition, because Wright's hybrid action against Owens depends on his ability to establish that the Union breached its duty of fair representation, the Court GRANTS Owens' Motion for Summary Judgment with respect to the LMRA claim.

## C. ADA CLAIM

Wright also asserts that Owens' decision to terminate his employment violated the ADA. In addition, Wright contends that the Union violated his rights under the ADA. Wright frames his ADA claim as a "regarded as disabled" claim. Owens maintains that it did not regard Wright as disabled within the meaning of the ADA, and contends that Wright was not qualified to perform the essential functions of the set-up position. The Union makes similar arguments. In response, Wright argues that the Defendants regarded him as disabled in the major life activity of working, and asserts that he was qualified for the set-up position.

The central anti-discrimination provision of the ADA provides:
No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112. In other words, in order to establish his ADA discrimination claim, Wright must show that (1) Owens regarded him as disabled within the meaning of the ADA; (2) he was qualified to perform the essential functions of the set-up position; and (3) he suffered from an adverse employment action. See *Dyke v. O'Neal Steel, Inc., 327 F.3d 628, 631 (7th Cir.2003).*

The Court will assume that Wright can establish that

Owens regarded him as disabled within the meaning of the ADA, and turn to the question of whether a reasonable jury could find that he was qualified to perform the essential functions of the set-up position. Under the ADA, a "qualified individual with a disability" is one who, with or without reasonable accommodation, can perform the essential functions of the job. 42 U.S.C. § 12111(8). The inquiry into whether or not Wright was a "qualified individual with a disability" is a two-step process. *See Bay v. Cassens Transp. Co., 212 F.3d 969, 974 (7th Cir.2000).* First, the Court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licences, etc." 29 C.F.R. app. § 1630.2(m). If the individual meets the first prong, the Court then considers "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." Id. The Court will focus on whether or not Wright was a "qualified individual with a disability" on March 1, 2002, which is when Owens decided to terminate his employment. *See Bay, 212 F.3d at 974* ("Whether or not an individual meets the definition of a qualified individual with a disability is to be determined as of the time the employment decision was made.").

*14 Because Owens does not argue that Wright did not have the appropriate skills and background for the set-up position, the only issue is whether Wright could perform the essential functions of the position, with or without reasonable accommodation, on March 1, 2002. Owens asserts that Wright could not perform the essential functions of the set-up position with the permanent 20-pound lifting restriction imposed by Dr. Coscia. In his response, Wright argues that Owens cannot claim that he was not qualified for the set-up position because Owens did not have a job description for the position and because Wright had worked in the set-up position with a 25-pound restriction prior to the surgery. Wright also emphasizes that other set-up workers sometimes performed their heavy lifting duties in pairs, and asserts that his FCE report showed that he had improved his lifting from 20 pounds to 55 pounds.

The Court finds Wright's arguments on this issue to be unpersuasive. First, the lack of a job description for the set-up position does not preclude Owens from arguing that Wright could not perform an essential function of the position. Wright himself is certainly competent to testify about his job duties, and he testified in his deposition that his job entailed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 11
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

pushing/pulling molds which weighed up to 200 pounds, changing steel transfer heads which weighed up to 80 pounds, and emptying 35-gallon barrels of bottles which weighed over 20 pounds. Jack Heady, another set up worker, testified that the job involved pulling 40-50 pound safety gates overhead, and moving molds that weighed between 200 and 1,500 pounds. In addition, Wright informed the doctor performing the Functional Capacity Evaluation that his job involved pushing/pulling up to 250 pounds and lifting approximately 25-75 pounds once or twice a day. Def.'s Ex. 22 at 124. With the permanent 20-pound lifting restriction that Dr. Coscia imposed on Wright on February 28, 2002, he was not qualified to perform the heavier lifting and pushing/pulling that his job entailed.

Wright's reliance on the results of the FCE is misplaced. First, whether or not Wright was a qualified individual with a disability is determined as of the time the employment decision was made. *See Bay,* 212 F.3d at 974. In the instant case, because the employment decision in question was made on March 1, 2002, the Court must determine whether Wright was "a qualified individual with a disability" as of that date. The FCE did not take place until May 22, 2002, two and one half months after the employment decision took place. Def.'s Ex. 22. Therefore, the results of the FCE are irrelevant to the question of whether Wright was "a qualified individual with a disability" on March 1, 2002. Second, even if the FCE results were relevant, they actually support Owens' position on the qualified individual issue. For example, Wright stated that his job entailed pushing/pulling up to 250 pounds, and the FCE indicated that Wright could only occasionally push 70 pounds and pull 95 pounds. That conclusion, along with other conclusions in the FCE, suggests that Wright was not qualified to perform essential functions of the set-up position even on May 22, 2002.

*15 Wright's contention that he had performed the essential functions of the set-up position with a 25-pound restriction prior to his surgery is not supported by the record. Wright cites the following colloquy from his deposition in support of the contention:
Q: Were you placed on light duty after you handed [Dr. Balmasada's March 14, 2001, report placing Wright on a 25-pound lifting restriction] to somebody at Owens-Brockway?
A: I still done my same job, but lifting-wise I had assistance and I didn't want to do anything heavy.
Q: Were you placed on light duty?
A: Yes.

Q: Part of that light duty was they had others perform the lifting tasks normally associated with your job; is that correct?
A: Well, they would help me if it was heavy, if I needed help. If I didn't need help, I done it myself.

Wright Depo. at 68. Although Wright states that he did his same job, he also admits that co-workers aided him with the heavy lifting due to his restriction. In other words, Wright could not perform the essential functions of the set-up job without assistance from others. Rather than bolstering Wright's position, the testimony tends to undermine Wright's assertion that he could perform the essential functions of the set-up job on March 1, 2002, with a 20-pound lifting restriction.

The fact that other set-up workers sometimes performed their heavy-lifting duties in pairs does not save Wright's ADA claim. Wright's permanent 20-pound lifting requirement would have required that a co-worker be available whenever he had to do heavy lifting. The ADA does not require such an accommodation. *See Peters v. City of Mauston,* 311 F.3d 835, 845 (7th Cir.2002) (collecting cases that rejected similar requests as unreasonable because such an accommodation would require another person to perform the essential functions of plaintiff's job). In addition, Owens had no duty to keep Wright in a "light duty" set-up job indefinitely. *See Watson v. Lithonia Lighting,* 304 F.3d 749, 752 (7th Cir.2002).

Wright's arguments related to the testimony of Jack Heady are equally deficient. First, Heady testified that the set up position was physically demanding at times, depending on how well the machines were functioning. According to Heady, set up workers would have to move molds that weighed between 200 and 1,500 pounds, and pull safety gates overhead, which weighed about 40 pounds. Wright could not perform those types of tasks when he was discharged. Second, the fact that Owens makes an accommodation for Heady does not mean that heavy lifting and pushing/pulling are not essential functions of the set up position, nor does it mean that Owens had to make a similar accommodation for Wright. *See Basith v. Cook Co.,* 241 F.3d 919, 930 (7th Cir.2001) (courts grant significant deference to employer's judgment as to essential functions of job, and mere fact that other employees could assist plaintiff with work does not make it nonessential); *Sieberns v. Wal-Mart Stores,* 125 F.3d 1019, 1022 (7th Cir.1997) ("Employers should not be discouraged from doing more than the ADA requires

Not Reported in F.Supp.2d                                                         Page 12
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69
(Cite as: Not Reported in F.Supp.2d)

...").

*16 Given the permanent nature of the lifting restrictions at the time and the nature of Wright's job responsibilities, the Court concludes that Wright could not perform the essential functions of the set-up position without accommodation on March 1, 2002. Moreover, Wright has not explained how he could have performed the essential functions of the set-up position with a reasonable accommodation. As a result, the Court concludes that Wright was not a "qualified individual with a disability" on March 1, 2002. Because Wright has not established that he was a qualified individual within the meaning of the ADA, his ADA claim fails at the summary judgment stage. The Court GRANTS Owens' Motion for Summary Judgment with respect to the ADA claim. Wright's inability to establish that he was a qualified individual also dooms his ADA claim against the Union. Accordingly, the Court GRANTS the Union's Motion for Summary Judgment with respect to the ADA claim.

### D. JURISDICTION

In his Amended Complaint, Wright invokes the Court's federal question jurisdiction and supplemental jurisdiction. Because the Court has dismissed all of Wright's federal claims, it appears that original jurisdiction is now lacking and the Court may pursuant to 28 U.S.C. § 1367(c)(3) properly dismiss Wright's remaining state law retaliation claim. "In an ordinary case of supplemental jurisdiction, the presumption is in favor of relinquishment when the claim that is within the original jurisdiction of the district court was dismissed before trial." *Alonzi v. Budget Constr. Co.,* 55 F.3d 331, 334 (7th Cir.1995). *See also Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir.1993). Wright may file a brief on or before Friday, May 28, 2004, to SHOW CAUSE why this Court still has jurisdiction over his state law claim. If Wright fails to file such a brief, the Court will exercise its discretion under 28 U.S.C. § 1367(c)(3), and dismiss his state law retaliation claim without prejudice.

### IV. *CONCLUSION*

For the reasons stated herein, the Court GRANTS the Union's Motion for Summary Judgment in its entirety. In addition, the Court GRANTS Owens' Motion for Summary Judgment with respect to the federal claims. Due to this disposition of the federal claims, it appears that the Court lacks original jurisdiction over the remaining state law claim. Plaintiff may file a brief on or before Friday, May 28, 2004, to SHOW CAUSE why this Court still has original jurisdiction over his state law claim. If Plaintiff does not file such a brief by that date, the state law claim will be dismissed without prejudice. The pending motions in the case regarding expert reports are MOOT.

IT IS SO ORDERED.

S.D.Ind.,2004.
Wright v. Owens-Illinois, Inc.
Not Reported in F.Supp.2d, 2004 WL 1087359 (S.D.Ind.), 28 NDLR P 69

Briefs and Other Related Documents (Back to top)

• 2:02cv00223 (Docket) (Aug. 28, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in N.E.2d                                                          Page 1
Not Reported in N.E.2d, 19 Mass.L.Rptr. 456, 2005 WL 1684125 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

**C**
Pinsky      v.      University      of
MassachusettsMass.Super.,2005.
Superior Court of Massachusetts.
Venyamin PINSKY
v.
UNIVERSITY OF MASSACHUSETTS et al.[FN1]

FN1. Dr. Susan Skea.
**No. 0002069.**

June 8, 2005.

*MEMORANDUM OF DECISION AND ORDER ON
DEFENDANTS UNIVERSITY OF
MASSACHUSETTS MEDICAL CENTER AND DR.
SUSAN SKEA'S MOTION FOR SUMMARY
JUDGMENT*
<u>S. JANE HAGGERTY</u>, Justice.
**\*1** This is an action brought by the plaintiff,
Venyamin Pinsky ("Pinsky"), alleging employment
discrimination based on age and national origin
against the defendants, the University of
Massachusetts ("UMass"), and Dr. Susan Skea
("Skea"). Pinsky asserts that the unlawful
discrimination resulted in his being fired from his
position as a staff psychiatrist at Bridgewater State
Hospital ("Bridgewater"). The matter is before this
court on a motion for summary judgment brought by
UMass and Skea.

For the reasons set forth below, the defendants'
motion for summary judgment is *ALLOWED*.

### BACKGROUND

This dispute arises as the result of the defendants'
decision to fire Pinsky from his staff psychiatrist
position at Bridgewater in May of 1999. At this
summary judgment stage, the facts are reported in the
light most favorable to the plaintiff. *Anderson Street
Associates v. City of Boston,* 442 Mass. 812, 816
(2004), citing *Augat, Inc. v. Liberty Mut. Ins. Co.,*
410 Mass. 117, 120 (1991).

Pinsky was originally hired as a staff psychiatrist at
Bridgewater in 1979. When UMass took over the
mental health program at Bridgewater in September

1998, Pinsky remained at the hospital. He was
working, part-time, as a staff psychiatrist, and was
under a contract that the University entered with
Correctional Medical Services ("CMS") until June
30, 1999. The program was supervised by the
Director of the University's Correctional Mental
Health Program, Dr. Kenneth Applebaum
("Applebaum"). Skea's duties at Bridgewater
included supervising all of the psychiatrists,
including Pinsky. At the time he was fired, Pinsky
was approximately sixty-four years old. He is of
Russian descent and speaks with a Russian accent.

In September of 1998, Skea and Applebaum
conducted a review of the existing psychiatric
program at Bridgewater. In the process of observing
and interacting with Pinsky between October 1998,
and June 1999, Skea questioned Pinsky as to why he
prescribed medication at high doses in his unit.
Pinsky responded that he needed "megadoses"
because the patients were not responding to lower
doses. Pinsky's prescription practices were monitored
by the State Office of Pharmacy Services, through its
Director of Pharmacy Services, Mr. Dean Najarian
("Najarian"). Najarian conducted a "unit
comparison" in monitoring the medication doses for
all of the patients at Bridgewater. Pinsky testified
regarding two schools of thought on giving increased
doses to patients, and stated that he believes that
those patients with long-standing diseases who have
not responded to average doses could only be
improved by a combination of medications given in
high doses. Pinsky also testified regarding Skea's
concerns with his illegible notes. He stated that Skea
told him in a meeting that his writing was "very
poor."

Pinsky alleges that certain disparaging remarks
illustrate that he was the victim of both age and
national origin discrimination. At one point Skea
introduced Pinsky to a newly hired psychiatrists and
said, "he is even older than you." Further, Skea
allegedly repeated a word that Pinsky said and
laughed at the way he pronounced it, and "ironically
smiled" when he was speaking. Pinsky stated that
Skea also commented to the Unit Director, Muriel
Ericson ("Ericson") that she would get help in the
form of good psychiatrists in the future, allegedly
implying her bias against Pinsky.

**\*2** Skea and Applebaum informed Pinsky of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                    Page 2
Not Reported in N.E.2d, 19 Mass.L.Rptr. 456, 2005 WL 1684125 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

UMass' decision to not offer him a new contract. Pinsky sent a letter to Applebaum on July 26, 1999, in which he stated that he recognized that he and Skea "had some differences of opinion this winter." UMass hired Dr. Tenenbaum ("Tenenbaum") to take over Pinsky's unit. Tenenbaum was fifty-seven years old when he was hired. In addition, two more psychiatrists who were older than Pinsky were hired. Dr. O'Connor ("O'Connor") was seventy-five at the time he was hired, while Dr. Fortin ("Fortin") was sixty-six. Additional psychiatrists were also hired at this point.

Pinsky filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") in August of 1999, pursuant to G.L .c. 151B. The MCAD complaint was filed against UMass alleging age and national origin discrimination.

## DISCUSSION

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Highland Ins. Co. v. Aerovox, Inc.,* 424 Mass. 226, 232 (1997), citing Mass.R.Civ.P. 56(c). In a case such as this, where the opposing party will have the burden of proof at trial, the moving party is entitled to summary judgment if it can demonstrate by reference to these materials, "unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991).

Skea argues that the court does not have jurisdiction over the claims against her because she was not formally named in the MCAD complaint. A prerequisite to filing a complaint in Massachusetts Superior Court pursuant to G.L.c. 151B, is to timely file with the MCAD. *Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 583 (1994). The filing must occur within 300 days of the alleged discriminatory act. See G.L.c. 151, § 5.[FN2] However, it has been held that "faced with the question, the Massachusetts Supreme Judicial Court would hold that failure to name a party as a respondent in a charge filed with the MCAD does not preclude a later civil action against that party if the conduct of the party was put at issue by the charge and the party had notice of and an opportunity to conciliate the charge." *Chapin v.*

*University of Massachusetts,* 977 F.Sup. 72, 76 (D.Mass 1997), quoting *Chatman v. Gentle Dental Center of Waltham et al.,* 973 F.Sup. 228, 235 (D.Mass 1997). The court concluded that the conduct of the unnamed party was put at issue in *Chapin* where the MCAD charge mentioned the party's specific conduct in describing the allegations against the named defendant on the MCAD charge. *Chapin,* 977 F.Sup. at 76. Further, the court determined that the unnamed defendant had notice and an opportunity to conciliate the charge because of the defendant's involvement in helping the named defendant respond to the MCAD charge. *Id.* at 77.

> FN2. At the time of these alleged events, G.L.c. 151B, § 5 provided for filing a complaint within six months of the alleged discriminatory act.

*3 In this case, the plaintiff's MCAD complaint identifies Skea as Pinsky's supervisor and specifically mentions her allegedly disparaging remarks concerning Pinsky's age and national origin. In addition, Skea is identified in the MCAD complaint as the Medical Director at Bridgewater. For purposes of notice, Skea participated in responding to the allegations before the MCAD and was deposed in May 2002 as part of the discovery process. Accordingly, the fact that Skea was not specifically named in the MCAD complaint does not bar this court from exercising jurisdiction over Pinsky's claims against her.[FN3]

> FN3. The defendants argue that the plaintiff's deposition that was taken in 1999 pursuant to the MCAD claim is inadmissible hearsay and does not meet the requirements of prior recorded testimony for purposes of admissibility. The court disagrees that an opportunity and similar motive to develop testimony was not made available to UMass at the time the deposition was taken. There may be additional reasons for excluding the deposition at a trial but those are not before me.

### A. Age Discrimination

Pursuant to G.L.c. 151B, a plaintiff who is terminated from employment can establish a prima facie case of discrimination by producing evidence that he is a member of a protected class under the statute, he performed his job at an acceptable level, he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                        Page 3
Not Reported in N.E.2d, 19 Mass.L.Rptr. 456, 2005 WL 1684125 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

terminated, and the employer sought to fill the position by hiring another individual with similar qualifications. *Sullivan v. Liberty Mut. Ins. Co.,* 444 Mass. 34, 41 (2005). With regard to alleged discrimination based on age, the court has clarified the fourth element, stating that "discrimination may only logically be inferred when a plaintiff in the protected class, who is performing adequately, is terminated and replaced by someone who is 'substantially younger.' " *Knight v. Avon Products, Inc.,* 438 Mass. 413, 423 (2003), citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 n. 7 (1981). The SJC established a line at five years for purposes of determining what was "substantially younger." *Knight,* 438 Mass. at 425.

In this case, Pinsky has established a prima facie case of age discrimination. Pinsky is a member of a protected class, he was terminated from employment, and he was replaced by Tenenbaum, who is seven years younger than he. In addition, viewing the evidence in the light most favorable to the plaintiff, Pinsky performed his job at an acceptable level.

Once the plaintiff has satisfied the initial burden of establishing a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination "by articulating a legitimate, non-discriminatory reason for its hiring decision." *Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 440 (1995). This burden of production is not onerous, and it only requires a proposed reason and presentment of supporting facts to dispel the presumption of discrimination. *Lewis v. Area Homecare for Senior Citizens, Inc.,* 397 Mass. 761, 766 (1986). The proposed justifications for the employment decision "may be unsound or even absurd, but if they are not discriminatory and if the plaintiff does not prove they are pretexts, the plaintiff cannot prevail." *Id.* The defendants contend that the plaintiff was not offered a contract at Bridgewater for several reasons, including his practice of prescribing medication in excessive dosages, and his failure to keep legible documentation regarding medication he prescribed to his patients. Pinsky's own testimony regarding his increased dosages given to his patients, in conjunction with the testimony of Skea and Applebaum, constitutes sufficient supporting facts to dispel the presumption of discrimination, and to shift the burden to the plaintiff to demonstrate that the offered reasons are pretextual.

*4 Assuming a defendant satisfies their burden of production, "the presumption of discrimination vanishes, and the burden returns to the plaintiff to

persuade the court, by a fair preponderance of the evidence, that the defendant's proffered reason for its employment decision was not the real reason, but is a pretext for discrimination." *Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 128 (1997), citing *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 444-45 (1995). In order to prevail, the plaintiff must provide sufficient evidence that would support a jury verdict "that it was more likely than not that the articulated reason was a pretext for actual discrimination." *Id.* Such evidence must go beyond mere "isolated or ambiguous remarks" that tend to suggest animus based on age. *Fontaine v. Ebtec Corp.,* 415 Mass. 309, 314 n. 7 (1993). These types of remarks "are insufficient standing alone, to prove an employer's discriminatory intent." *Id.*

In *Tardanico v. Aetna Life & Cas. Co.,* 41 Mass.App.Ct. 443, 450 (1996), the Appeals Court affirmed summary judgment for an employer who fired a fifty-seven-year-old employee, and hired a thirty-one-year-old replacement, to whom the employer paid $6,000 less in salary. The employee who had recommended the plaintiff's discharge had confronted the plaintiff and made statements that he "had been around a long time," and that perhaps his "bag was getting too heavy." *Id.* The Appeals Court held that the comments fell "well short" in proving that the employer's stated reason for his discharge was pretextual. *Id.*

The SJC's holding in *Blare,* 419 Mass. 437, 447, illustrates the types of comments that are sufficient to survive summary judgment based upon a pretext argument. In *Blare,* a supervisor had asked the plaintiff directly, "Are you getting too old that you can't handle two machines?" *Id.* at 439. Further, the supervisor told the plaintiff that few people retired from the company. *Id.* In addition to the comments, younger employees were not disciplined for the same types of problems at work that the plaintiff was fired for. *Id.* at 447.

In this case, Pinsky has not provided sufficient evidence to support a jury verdict that it was more likely than not that the defendants' proffered reason for his dismissal was a pretext for age discrimination. Pinsky offers one isolated comment in which Skea joked about his age. He argues that this comment, in conjunction with the fact that Skea was ten years younger than he, and that a younger psychiatrist was hired to replace him, is sufficient for purposes of the summary judgment stage. This evidence clearly does not compare to the combination of comments and circumstances that the SJC relied on in *Blare* in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                          Page 4
Not Reported in N.E.2d, 19 Mass.L.Rptr. 456, 2005 WL 1684125 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

denying summary judgment. Further, Pinsky's assertion that Skea told a social worker not to worry, and that she would send help does not support an argument for age discrimination, and does not appear to even relate to age in any sense. Ultimately, Pinsky relies on the types of isolated and ambiguous remarks that the appellate courts have held insufficient to demonstrate pretext.

**\*5** Pinsky argues that the comments made by Skea reflect direct evidence of discrimination, and that the three-pronged framework for a discrimination claim is not necessary. He relies on *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 431 (1st Cir.2000), in arguing that the comments create a genuine issue of material fact. In *Dominguez-Cruz,* the plaintiff's supervisor repeatedly referred to the plaintiff as an "old fart," and notes were discovered that were written by another employee. *Id.* at 433. The notes referred to a "cover up," and "age descrim. [sic] ." *Id.* The court stated that the notes could lead a reasonable jury to infer discrimination and an attempted cover-up. *Id.* In this case, Tenenbaum was fifty-seven when he was hired to replace Pinsky. In addition, other psychiatrists hired after Pinsky was fired were older than he. Clearly, while Pinsky relies on the fact that the comments in *Dominguez-Cruz* are similar to those in this case, there was significant additional evidence which the court relied on in denying summary judgment. Such evidence has not been provided by Pinsky in this case.

### B. National Origin Discrimination

The same three-pronged framework and analysis discussed above, as articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973), applies to other types of discrimination in the Commonwealth, including those protections under Title VII at the federal level. See *Wynn & Wynn, P.C. v. Massachusetts Com'n Against Discrimination,* 431 Mass. 655, 665 (2000). Assuming *arguendo* that Pinsky can establish a prima facie case of national origin discrimination, and that the defendants can produce a legitimate, non-discriminatory reason for his dismissal, the burden again shifts to Pinsky to establish pretext. See *Luna v. Harvard Community Health Plan,* 54 Mass.App .Ct. 1101 (discussing three-step burden shifting analysis for national origin discrimination). As discussed above with regard to the claim of age discrimination, "isolated or ambiguous remarks" that tend to suggest animus are insufficient to show a discriminatory intent on the part of an employer. *Fontaine v. Ebtec*

*Corp.,* 415 Mass. 309, 314 n. 7 (1993).

In this case, Pinsky asserts that Skea once repeated the word "sister" after he said it, and that she laughed. While he stated that other instances occurred in which she was laughing at his expense and was amused by his accent, he is unable to recall any other specific incidents. Further, Pinsky has not provided any evidence of other employees being treated differently based on their national origin. The speculative nature of the evidence, and Pinsky's mere suspicion of Skea's animus based on his national origin are clearly insufficient to demonstrate that the defendants' preferred reasons for his dismissal were pretextual.

### ORDER

For the foregoing reasons it is hereby *ORDERED* that the defendants' motion for summary judgment be *ALLOWED.*

Mass.Super.,2005.
Pinsky v. University of Massachusetts
Not Reported in N.E.2d, 19 Mass.L.Rptr. 456, 2005 WL 1684125 (Mass.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.