## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

DANIEL GREENWOOD,                      )
                                       )
                    Plaintiff,         )
                                       )    Civil Action No. 05-10605 JLT
v.                                     )
                                       )
YALE APPLIANCE AND LIGHTING, INC.,     )
                                       )
                    Defendant.         )
_____)

## DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS
## AS TO WHICH NO GENUINE ISSUE REMAINS TO BE TRIED

In accordance with Rule 56.1 of the Local Rules of Civil Procedure and Rule 56 of the Federal Rules of Civil Procedure, defendant Yale Appliance and Lighting, Inc. hereby makes the following statement of material facts as to which no genuine issue remains to be tried:[1]

### Overview of Parties

1.    Plaintiff, Daniel Greenwood ("Plaintiff"), resides at 143 High Street, Whitman, Massachusetts.  (Deposition of Daniel Greenwood ("Greenwood Dep."), relevant pages of which are attached collectively hereto as Exhibit 1, at 12).

2.    Defendant, Yale Appliance and Lighting, Inc. ("Defendant" or "Yale"), has a place of business at 240 Forbes Boulevard, Mansfield, MA 02248.  (Affidavit of Lewis Frazer ("Frazer Aff."), attached hereto as Exhibit 2, at ¶2).  The core of Yale's business is the sales and servicing of appliances and lighting.  (Frazer Aff., Ex. 2, at ¶3).

---

[1]    These facts are deemed undisputed for the purposes of Defendant's Motion for Summary Judgment only.

<u>Procedural History</u>

3.      On September 17, 2004, Plaintiff filed a Charge with the Massachusetts

Commission Against Discrimination ("MCAD") alleging discrimination on the

basis of his age.  (Charge attached hereto as <u>Exhibit 3</u>).

4.      On March 28, 2005, the MCAD issued a Dismissal and Notification of Rights

indicating that it was "unable to conclude that the information establishes a

violation of the statutes."  (Dismissal and Notification of Rights attached hereto as

<u>Exhibit 4</u>).

5.      On or about March 28, 2005, Plaintiff filed the Complaint in the United States

District Court for the District of Massachusetts.  (Complaint attached hereto as

<u>Exhibit 5</u>).  Plaintiff's Complaint alleged the following causes of action: Count I:

Violation of the FLSA; Count II: Violation of M.G.L. c. 149, § 148; Count III:

Violation of the FMLA; Count IV: Retaliatory Discharge under the FMLA; Count

V: Violation of the ADEA; Count VI: Violation of M.G.L. c. 151B (age); and

Count VII: Violation of M.G.L. c. 152, § 75B(2).[2]

<u>Plaintiff's Employment History At Yale</u>

6.      Plaintiff began with Yale in 1998 as a delivery driver and remained in that

position for the duration of his tenure with Yale.  (Greenwood Dep., Ex. 1, at 55-

56).

7.      Plaintiff's job was to load, deliver, and unload heavy appliances.  (Greenwood

Dep., Ex. 1, at 209).  On-the-job injuries are not uncommon at Yale due to the

nature of the business.  (Greenwood Dep., Ex. 1, at 209).  As a result, Yale

---

[2]      On December 2, 2006, Plaintiff dismissed Count I: Violation of the FLSA and Count II: Violation of M.G.L. c. 149, § 148.

regularly deals with employees who are on, and returning from, workers'
compensation leaves.  (Greenwood Dep., Ex. 1, at 209; Frazer Aff., Ex. 2, at ¶5).

<u>Yale's Relevant Policies And Procedures</u>

8.    Plaintiff was given Yale's employee handbook and signed an Acknowledgment of
Receipt of the handbook.  (Greenwood Dep., Ex. 1, at 113-15, 122-23; 2003 and
2004 Acknowledgments attached hereto collectively as <u>Exhibit 6</u>).  Plaintiff
testified he received the 2004 handbook, among others.  (Greenwood Dep., Ex. 1,
at 128-29).  Moreover, Stephen Sheinkopf, the President of Yale, held meetings
with employees to review the handbook and "school" employees on its terms.
(Greenwood Dep., Ex. 1, at 114-18; 122; Frazer Aff, Ex. 2, at ¶ ).  At these
meetings, as Plaintiff himself described, Mr. Sheinkopf would "go through each
and every page  . . . ." of the handbook.  (Greenwood Dep., Ex. 1, at 117-18).

9.    Yale's handbook included a policy entitled "Notification/Unexcused Absences."
(2004 Yale Appliance + Lighting Policies and Procedures ("Handbook"), which is
attached hereto as <u>Exhibit 7</u>, at 12-13; Affidavit of Mary T. Conley ("Conley
Aff."), attached hereto as <u>Exhibit 8</u>, at ¶2).  This policy required Yale employees
to notify their supervisor of an unexcused absence as soon as possible and, at a
minimum, no later than an hour before the employee's scheduled start time.
(Handbook, Ex. 7, at 12-13).  The policy gives the employee other options for
who to call if the supervisor should be unreachable.  (Handbook, Ex. 7, at 12-13).
The policy provides that an employee's failure to follow these rules, "may result
in disciplinary action, including, in the discretion of Yale, immediate
termination."  (Handbook, Ex. 7, at 12-13).

10.    Plaintiff was familiar with and fully understood the terms of the

Notification/Unexcused Absences policy.  (Greenwood Dep., Ex. 1, at 123-25).

11.    This reporting procedure is repeated in the Handbook as part of Yale's policy

entitled "Attendance/Tardiness."  (Handbook, Ex. 7, at 21-22).

12.    The Attendance/Tardiness policy further provided that unexcused absences of

three or more days "will be considered a voluntary resignation and employment

will be immediately terminated."  (Handbook, Ex. 7, at 22).

13.    Plaintiff was familiar with and fully understood the terms of the

Attendance/Tardiness policy, including those specific to unexcused absences.

(Greenwood Dep., Ex. 1, at 124-26).

14.    Yale's Handbook also outlined its Family and Medical Leave Act policy.

(Handbook, Ex. 7, at 3).  That policy provided, in relevant part, that Yale will

grant up to twelve weeks of unpaid leave for, among other reasons, "[t]o tend to

the employee's own serious health condition that renders the employee unable to

perform the functions of his or her job."  (Handbook, Ex. 7, at 3).

15.    The Family and Medical Leave Act policy further provided that:

[t]he twelve (12) month period during which an eligible employee can take a
leave under this policy is a rolling period.  This period is measured backward
from the date an employee uses FMLA leave.  An eligible employee's leave
entitlement consists of up to twelve (12) weeks of FMLA leave during this rolling
twelve (12) month period.

(Handbook, Ex. 7, at 4).

16.    The Family and Medical Leave Act policy also provided that employees wishing

to take family and medical leave must exhaust all available paid leave (e.g.

vacation or paid time off) before unpaid family and medical leave may be used.

(Handbook, Ex. 7, at 4).

17.     The Family and Medical Leave Act policy further provided:

[a]n on-the-job injury may result in a serious health condition for which FMLA
leave may be taken.  When this occurs, Yale may require that an employee's
FMLA leave run concurrently with the employee's worker's compensation leave.
Accordingly, in those instances when an employee's work-related injury qualifies
as a serious health condition under the FMLA, the FMLA leave will run
concurrently with the employee's worker's compensation leave.

(Handbook, Ex. 7, at 7).

18.     Plaintiff admittedly was made aware of these policies relating to the Family and

Medical Leave Act.  (Greenwood Dep., Ex. 1, at 114-18, 126-131; Frazer Aff.,

Ex. 2, at ¶4).

19.     Specifically, Plaintiff testified that, at these meetings, Mr. Sheinkopf, the

President of Yale, would "go through each and every page  . . . ." of the

Handbook.  (Greenwood Dep., Ex. 1, at 117-18; Frazer Aff., Ex. 2, at ¶4).

<u>Plaintiff's First Leave Of Absence</u>
<u>November 2003</u>

20.     On November 12, 2003, Plaintiff suffered an on-the-job injury that resulted in a

hernia for which surgery was required.  (Greenwood Dep., Ex. 1, at 199-200;

Employer's First Report of Injury or Fatality, attached hereto as <u>Exhibit 9</u>).

21.     Plaintiff was absent due to this injury, surgery, and recuperation from November

12, 2003 through January 22, 2004.  (Greenwood Dep., Ex. 1, at 199-200; Conley

Aff., Ex. 8, at ¶3; relevant drivers' work schedules attached hereto collectively as

<u>Exhibit 10</u>).

22.     Plaintiff returned to work on a light duty basis and remained on light duty through February 13, 2004, returning to work full-time with no restrictions on February 17, 2004.   (Greenwood Dep., Ex. 1, at 200-03; Conley Aff., Ex. 8, at ¶3).

23.      Plaintiff fully consented to the light duty assignment.  (Greenwood Dep., Ex. 1, at 202).  During his light duty period of work, Plaintiff was not working in his position.  (Greenwood Dep., Ex. 1, at 202; Deposition of Lewis Frazer ("Frazer Dep."), attached hereto as Exhibit 11, at 19).  Rather, Plaintiff was doing some paperwork in the office, some light construction within Yale's warehouse, and helping as a runner in the office.  (Frazer Dep., Ex. 11, at 19).

24.     Plaintiff received workers' compensation benefits for this absence.  (Greenwood Dep., Ex. 1, at 203; Frazer Dep., Ex. 11, at 16-17; Affidavit of Michael Kelley, attached hereto as Exhibit 12, at ¶ ).

25.     This was the only workers' compensation leave of absence Plaintiff had at Yale. (Greenwood Dep., Ex. 1, at 208, 218).

26.     The total time of Plaintiff's absence related to his on-the-job injury, including his light duty work, lasted from November 12, 2003 through February 13, 2004, a total of thirteen weeks and two days.  (Greenwood Dep., Ex. 1, at 199-201; Conley Aff., Ex. 8, at ¶3; drivers' work schedules, Ex. 10).

<u>Leasing Company's Restrictions on Plaintiff and Plaintiff's Evaluation</u>
<u>July 2004</u>

27.     On July 6, 2004, the company that leased Yale the delivery trucks that Plaintiff drove for Yale sent Lewis Frazer, Vice President of Operations, a letter informing him that Plaintiff had been involved in a third "avoidable accident" in the last thirty-six months.  (Letter from AMI Leasing dated July 6, 2004 attached hereto

as <u>Exhibit 13</u>).  By this letter, the leasing company required Plaintiff be prohibited

from driving any trucks they leased to Yale.  (AMI Leasing letter, Ex. 13).

28.    Despite the fact that Yale could have disciplined Plaintiff for this, they did not.

(Greenwood Dep., Ex. 1, at 205-06).

29.    Rather, Yale was willing to hear Plaintiff's perspective on the matter and to work

it out with him by allowing him to ride in, but not drive, these trucks.

(Greenwood Dep., Ex. 1, at 205-06).

30.    Plaintiff received no discipline for the accident/driving issue.  (Greenwood Dep.,

Ex. 1, at 205-06; Performance appraisal, Ex. 14).

<u>Plaintiff's Absence In July 2004</u>

31.    On Tuesday, July 27, 2004, Plaintiff informed Yale he would not be in the next

day because he was going to the doctor's due to stomach pain.  (Greenwood Dep.,

Ex. 1 at 137-39; Memo from Lewis Frazer dated August 10, 2004, attached hereto

as <u>Exhibit 15</u>;[3] Deposition of James Rapoza ("Rapoza Dep."), relevant pages of

which are attached hereto collectively as <u>Exhibit 16</u>, at 7).

32.    On July 28, 2004, Plaintiff was admitted to the emergency room at South Shore

hospital and was diagnosed with diverticulitis.  (Inpatient Record attached hereto

as <u>Exhibit 17</u>; Greenwood Dep., Ex. 1, at 131-33, 135).

33.    Plaintiff 's admitting and treating physician was Aboualkheir Alzaim, M.D.

(Inpatient record, Ex. 17; Greenwood Dep., Ex. 1, at 135-36; Deposition of Dr.

---

[3]    The Memorandum dated August 10, 2004 at Ex. 15 was drafted by Lewis Frazer and James
Rapoza. (Rapoza Dep., Ex. 16, at 32; Frazer Aff., Ex. 2, at ¶8).  Together, Mr. Frazer and Mr. Rapoza used
this memo to document the sequence of events surrounding and leading up to Plaintiff's violation of the
attendance policy.  (*Id.*)  Mr. Rapoza and Mr. Frazer prepared this document on August 9 and August 10,
2004.  (*Id.*)

Alzaim ("Dr. Alzaim Dep."), relevant pages of which are attached hereto

collectively as <u>Exhibit 18</u>, at 8).

34.    Plaintiff was discharged on Friday, July 30, 2004.  (Greenwood Dep., Ex. 1, at

143; Patient Discharge Instruction and Information Form attached hereto as

<u>Exhibit 19</u>).  Plaintiff admittedly was determined to be discharged by Friday, July

30, 2004 because he was concerned staying longer would disrupt a court date he

had scheduled for that day and weekend plans at his home involving a party.

(Greenwood Dep., Ex. 1, at 142).

35.    Plaintiff's Discharge Instruction and Information Form was completed by a nurse

based on instructions given by Plaintiff's treating physician, Dr. Alzaim.  (Dr.

Alzaim Dep., Ex. 18, at 12-13).

36.    Plaintiff's Discharge Instruction and Information Form included absolutely no

restrictions on activity, including no restrictions relating to work.  (Discharge

Form, Ex. 19; Dr. Alzaim Dep., Ex. 18, at 20, 23-24).  Indeed, this is reflected in

the Discharge Instruction and Information Form.  (Discharge form, Ex. 19).  In

the section entitled "**ACTIVITIES / RESTRICTIONS**" was the following entry:

**"0 restriction on activity."**  (Discharge form, Ex. 19) (emphasis added).

37.    The only restrictions Dr. Alzaim detailed for Plaintiff upon his discharge related

to Plaintiff's diet and Dr. Alzaim's instructions to take antibiotics and follow-up

with Dr. Alzaim at his office.  (Discharge form, Ex. 19; Dr. Alzaim Dep., Ex. 18,

at 20, 23-24).

38.    On July 30, 2004, the day of Plaintiff's discharge from the hospital, James

Rapoza, Yale's Delivery Manager and Plaintiff's supervisor, having not heard

from Plaintiff, called Plaintiff to inquire as to his status.  (Rapoza Dep., Ex. 16, at 5, 9; Greenwood Dep., Ex. 1, at 156).  Plaintiff told Mr. Rapoza that his doctor wanted Plaintiff to see him the following Monday morning.  (Greenwood Dep., Ex. 1, at 156-58; Rapoza Dep., Ex. 16, at 9).  Plaintiff admitted at his deposition, however, that his Discharge Instruction and Information Form did not require him to visit Dr. Alzaim on any particular day but, rather, just indicated he should "[c]all for appointment with Dr. Alzaim."  (Greenwood Dep., Ex. 1, at 148; Discharge form, Ex. 19).  Indeed, Dr. Alzaim himself testified Plaintiff was not told to see him on the following Monday or within any specific time period, but just to follow-up at some point.  (Dr. Alzaim Dep., Ex. 18, at 18-20).

39.  During the phone call between Plaintiff and Mr. Rapoza on Friday, July 30, 2004, Mr. Rapoza asked Plaintiff whether he would be able to return to work on a light duty basis.  (Greenwood Dep., Ex. 1, at 158-160; Rapoza Dep., Ex. 16, at 9).  Mr. Rapoza asked Plaintiff to follow-up with him after Plaintiff's appointment with his doctor.  (Greenwood Dep., Ex. 1, at 161-62; Rapoza Dep., Ex. 16, at 9).

40.  On Monday, August 2, 2004, Plaintiff did not call Mr. Rapoza as he said he would.  (Greenwood Dep., Ex. 1, at 161-62; Rapoza Dep., Ex. 16, at 9).  As a result, Mr. Rapoza called Plaintiff and Plaintiff told him his doctor's appointment had been rescheduled to the next day, Tuesday, August 3rd.  (Rapoza Dep., Ex. 16, at 9-10; Greenwood Dep., Ex. 1, at 166-67).  Mr. Rapoza again asked Plaintiff for medical documentation to verify his absences and to find out whether he could work on a light duty basis.  (Rapoza Dep., Ex. 16, at 9-10; August 10, 2004 Memo, Ex. 15).

41.     On Tuesday, August 3rd, Greenwood visited Dr. Alzaim (Greenwood Dep., Ex. 1,

at 167; Note from Dr. Alzaim's office records dated August 3, 2004 attached

hereto as Exhibit 20).  Neither Dr. Alzaim's office record nor his memory of the

August 3rd appointment reflect any restrictions on Plaitniff's ability to work.

(August 3, 2004 office record, Ex. 20; Dr. Alzaim Dep., Ex. 18, at 24-30).

42.     On Tuesday, August 3rd, having again not heard from Plaintiff, Mr. Rapoza called

his house and was told by Plaintiff's girlfriend that he was asleep.  (Rapoza Dep.,

Ex. 16, at 10; Greenwood Dep., Ex. 1, at 169-170).

43.     On Tuesday, August 3rd, in the afternoon, Plaintiff arrived at Yale and asked Mr.

Rapoza whether he could use his vacation time as paid time off for the week since

he already had exhausted all of his paid time off days and he expected to be out

all week.  (Greenwood Dep., Ex. 1, at 171-72; Rapoza Dep., Ex. 16, at 14).  Mr.

Rapoza told Plaintiff he would have to discuss it with Mr. Frazer.  (Greenwood

Dep., Ex. 1, at 171-73; August 10, 2004 Memo, Ex. 15).

44.     On Tuesday, August 3rd, Plaintiff did not provide Mr. Rapoza with any

documentation excusing him from work for the days he already had missed or for

his ability to work that week, despite Mr. Rapoza's request for that

documentation.  (Greenwood Dep., Ex. 1, at 171; Rapoza Dep., Ex. 16, at 14;

August 10, 2004 Memo, Ex. 15).

45.     Later that day, Mr. Rapoza called Plaintiff to inform him he would not be

permitted to use his vacation time as paid time off for that week.  (Greenwood

Dep., Ex. 1, at 174; August 10, 2004 Memo, Ex. 15).  Mr. Rapoza again asked

Plaintiff to obtain medical documentation to verify his absences that week and

any restrictions on his ability to work and again asked Plaintiff whether he could

return to work on a light duty basis. (Greenwood Dep., Ex. 1, at 174-75; Rapoza

Dep., Ex. 16, at 14-15; August 10, 2004 Memo, Ex. 15).

46.    Indeed, Mr. Rapoza and Mr. Frazer wanted Plaintiff to return to work in whatever

capacity he was able as Yale was in the middle of its busiest season. (Greenwood

Dep., Ex. 1, at 175-76; Rapoza Dep., Ex. 16, at 13-14; Frazer Dep., Ex. 11, at 38-

39). However, Plaintiff admittedly never even bothered to ask his doctor whether

light duty work would be permissible. (Greenwood Dep., Ex. 1, at 175-76).

47.    Despite the fact Plaintiff told Mr. Rapoza he would be back in touch with him on

Wednesday, Plaintiff did not do so. (Greenwood Dep., Ex. 1, at 176-77; Rapoza

Dep., Ex. 16, at 15; August 10, 2004 Memo, Ex. 15). On Wednesday, August 4th,

Plaintiff failed to call in an hour before the start of his shift. (Greenwood Dep.,

Ex. 1, at 176-77; Rapoza Dep., Ex. 16, at 15). Plaintiff still had not provided

documentation to support this absence or the absences for any of the previous

days. (Greenwood Dep., Ex. 1, at 177-78).

48.    On Thursday, August 5th, Plaintiff did not come to work and again failed to call in

an hour before his shift. (Greenwood Dep., Ex. 1, at 178). Mr. Frazer left

Plaintiff a message on his home answering machine regarding his lack of contact

and the need for documentation regarding his absences. (Greenwood Dep., Ex. 1,

at 182-83; August 10, 2004 Memo, Ex. 15.

49.    On Friday, August 6th, Plaintiff did not call Yale about whether he would be in

that day. (Greenwood Dep., Ex. 1, at 183; Rapoza Dep., Ex. 16, at 15-16).

Rather, in the afternoon, Plaintiff appeared at Yale to inquire about his paychecks.

(Greenwood Dep., Ex. 1, at 183-84; August 10, 2004 Memo, Ex. 15; Rapoza

Dep., Ex. 16, at 15-16).  At this time, Plaintiff provided Mr. Frazer with his

hospital discharge form.  (Greenwood Dep., Ex. 1, at 185; Frazer Dep., Ex. 11, at

33; August 10, 2004 Memo, Ex. 15; Discharge Form, Ex. 19).  This was the first

documentation Plaintiff provided since his hospitalization over one week prior on

July 28th and it provided "**0 restrictions on activity.**"  (Greenwood Dep., Ex. 1, at

185, 188-89; August 10, 2004 Memo, Ex. 15; Discharge Form, Ex. 19) (emphasis

added).  As a result, and as Plaintiff admits, this document did not explain why

Plaintiff could not work during that week, the week of August 2nd; to the contrary,

it specifically indicated there were ***no restrictions*** on Plaintiff's activity after his

discharge from the hospital.  (Greenwood Dep., Ex. 1, at 189; Frazer Dep., Ex.

11, at 33).  During this meeting, Mr. Frazer explained to Plaintiff the potential

violations of company policy relating to unexcused absences and verification of

sick leave.  (August 10, 2004 Memo, Ex. 15).  Plaintiff indicated he would

endeavor to get the proper documentation.  (August 10, 2004 Memo, Ex. 15;

Frazer Dep., Ex. 11, at 33; Greenwood Dep., Ex. 1, 189-90).  Yale agreed to give

Plaintiff yet another opportunity to provide documentation to establish the need

for his absences.  (Rapoza Dep., Ex. 16, at 17-18; Frazer Aff., Ex. 2., at ¶7).

50.    On Monday, August 9th, Plaintiff returned to Yale with a note from Dr. Alzaim

that provided "This is to certify that Daniel Greenwood has been under my care,

and will be able to return to work on the following date: Tues. August 9 [sic],

2004." (Note from Dr. Alzaim dated August 9, 2004, attached hereto as <u>Exhibit 21</u>; Greenwood Dep., Ex. 1, at 190-91; Frazer Dep., Ex. 11, at 28-29, 33-35).[4]

51.   According to Dr. Alzaim, the first time Plaintiff ever mentioned work in any way was at his second follow-up appointment on August 9, 2004. (Dr. Alzaim Dep., Ex. 18, at 33-34). On August 9th, Plaintiff asked for a return-to-work note for the first time so Dr. Alzaim gave it to him. (Dr. Alzaim Dep., Ex. 18, at 33-34). The extent of this note simply was to say Plaintiff could return to work but it provided no excuse for Plaintiff's absences up to that point, nor did it address whether Plaintiff could have been working light duty. (August 9, 2004 note, Ex. 21; Greenwood Dep., Ex. 1, at 190-92; Frazer Dep., Ex. 11, at 44-46).

52.   By memorandum dated Monday, August 9th, Mr. Frazer informed Plaintiff of the termination of his employment due to violation of the Attendance/Tardiness Policy based on his unexcused absences during the week of August 2, 2004. (Memo to Plaintiff dated August 9, 2004 attached hereto as <u>Exhibit 22</u>).

53.   Plaintiff's absences while hospitalized, July 28 – July 30, 2004, were not counted against him as "unexcused absences." (Frazer Aff., Ex. 2, at ¶6).

54.   Plaintiff's date of birth is May 3, 1963, which makes him forty-one years old at the time of his termination. (Complaint, Ex. 5, at ¶4).

<u>Plaintiff's Replacement and Other Drivers At Yale
At The Time Of Plaintiff's Termination</u>

55.   Plaintiff was replaced with Philip Conroy. (Frazer Dep., Ex. 11, at 51-52). In July 2004, Mr. Conroy was employed as a driver's helper. (Frazer Dep., Ex. 11,

---

[4]    For purposes of clarification, in 2004, August 9 was as Monday. Dr. Alzaim's note, at Ex. 21, is dated Monday, August 9 and is referring to the following day, Tuesday. In doing so, Dr. Alzaim references "Tues. August 9 but it should have read "Tues. August 10."

at 51-52).  In August 2004, Mr. Conroy replaced Plaintiff as a delivery driver after Plaintiff's termination.  (Frazer Dep., Ex. 11, at 51-52; Greenwood Dep., Ex. 1, at 209-210).

56.    In August 2004, Mr. Conroy was forty-two (42) years old, which means he was older than Plaintiff.  (Conley Aff., Ex. 8, at ¶4; Complaint, Ex. 5, at ¶4).

57.    In August 2005, Mr. Conroy was injured and was on workers' compensation leave from August 28, 2005 until he returned on light duty status in a different position on December 13, 2005.  (Conley Aff., Ex. 8, at ¶5).  To date, Mr. Conroy still is working light duty.  (Conley Aff., Ex. 8, at ¶5).

58.    At the time of Plaintiff's termination, Richard Boultenhouse was the oldest delivery driver employed at Yale.  (Conley Aff., Ex. 8, at ¶6).  In August 2004, Mr. Boultenhouse was fifty-three (53) years old.  (Conley Aff., Ex. 8, at ¶6).  On October 17, 2004, Mr. Boultenhouse began an FMLA-protected leave of absence due to a heart attack and related surgery.  (Conley Aff., Ex. 8, at ¶6).  Mr. Boultenhouse returned successfully to his employment at Yale thereafter on December 13, 2004 and remains employed with Yale.  (Conley Aff., Ex. 8, at ¶6).

59.    Mr. Boultenhouse also has suffered two workers' compensation injuries and has returned to his employment as a driver with Yale from both absences.  (Conley Aff., Ex. 8 at ¶7).  First, Mr. Boultenhouse was absent from August 12, 2002 until September 9, 2002 due to an ankle sprain, at which time he was fifty-one years old.  (Conley Aff., Ex. 8 at ¶7).  Second, Mr. Boultenhouse was absent from October 29, 2003 until November 3, 2003 due to a back strain, at which time he was fifty-two years old.  (Conley Aff., Ex. 8 at ¶7).

60. Despite the fact that Plaintiff was replaced with an employee who was older than him and both the replacement, Mr. Conroy, and Mr. Boultenhouse are two examples of employees who returned from workers' compensation leave successfully, Plaintiff alleges Mr. Frazer made the following comment to him in August 2004:

> And, you know, he told me, `Well, you seem to be getting hurt a lot,' and this and that. `Maybe you're too old for that. You know, maybe you're too old to keep doing what you're doing.' I told him, you know, I mean I got hurt, you know, the previous year, you know what I mean, doing their work and doing the best I could. You know, I have that hernia injury, you know, and he was just -- `Well, you're getting hurt. You're getting hurt too much. How old are you,' and this and that.

(Greenwood Dep., Ex. 1, at 186-87).

61. Michael Bartlett was a delivery driver for Yale from November 2001 to July 2002. (Conley Aff., Ex. 8, at ¶8). Mr. Bartlett was terminated for his violation of the Attendance/Tardiness policy when he failed to appear for work on two consecutive days, after previously being told he could not have those days off. (Conley Aff., Ex. 8 at ¶8). Mr. Bartlett was twenty-eight years old at the time. (Conley Aff., Ex. 8, at ¶8; Letter from Hector Gonzalez attached hereto as <u>Exhibit 23</u>).

<div align="right">

YALE APPLIANCE
AND LIGHTING, INC.
By its attorneys,

/s/ Tracy Thomas Boland
Jaclyn Kugell (BBO# 561622)
Tracy Thomas Boland (BBO# 638878)
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
(617) 523-6666

</div>

Dated: January 22, 2007

## <u>CERTIFICATE OF SERVICE</u>

  I, Tracy Thomas Boland, hereby certify that I have caused a copy of the foregoing to be served upon Plaintiff's attorney, Daniel W. Rice, Glynn, Landry, Harrington & Rice, LLP, 10 Forbes Road, Braintree, MA 02184, by ECF on this 22nd day of January 2007.

        <u>/s/ Tracy Thomas Boland</u>
        Tracy Thomas Boland

Page 1

1                                          Volume: I

2                                          Pages:  1 - 245

3            UNITED STATES DISTRICT COURT

4         FOR THE DISTRICT OF MASSACHUSETTS

5                      C.A. No. 05-10605

6

7    DANIEL GREENWOOD,

8              Plaintiff,

9       v.

10   YALE APPLIANCE AND LIGHTING, INC.,

11             Defendant.

12

13

14

15

16                   **********

17          DEPOSITION OF DANIEL GREENWOOD

18            Friday, October 13, 2006

19            Morgan, Brown & Joy, LLP

20               200 State Street

21            Boston, Massachusetts

22                 10:23 a.m.

23          Reporter:  Linda M. Grieco

24

Daniel Greenwood

Page 10

1   A.  No.
2   Q.  What's your date of birth?
3   A.  5/3/63.
4   Q.  And your social security number?
5   A.  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.
6   Q.  Have you ever had any other social security
7   numbers?
8   A.  No.
9   Q.  Are you married?
10   A.  No.
11   Q.  Have you ever been married?
12   A.  Yes.
13   Q.  To whom?
14   A.  Deborah Murphy.
15   Q.  When were you married to Ms. Murphy?
16   A.  Let me think, '80 -- I think it's '87 to
17   '89, something like that, I believe.
18   Q.  And you have not been married since?
19   A.  No.
20   Q.  Where does Ms. Murphy live?
21   A.  She lives in Whitman.  Washington Street,
22   Whitman.
23   Q.  Do you remain in contact with Ms. Murphy?
24   A.  Yes.

Page 11

1   Q.  Do you know her telephone number?
2   A.  I do.  781-447, I have to look at my phone
3   just to get that.  I think it's 9203, I believe it
4   is.  I'll check that.
5   Q.  If you check it afterwards, if you find out
6   it's different, let me know.
7   A.  Absolutely.
8   Q.  Is she employed?
9   A.  I don't believe so, no.
10   Q.  Was she employed during the period of time
11   that you were at Yale Electric?
12   A.  I don't know that.  I know she writes for
13   the Whitman newspaper, but I'm not sure if that's a
14   paid position or if it's a volunteer thing.
15   Q.  And she did that at the time you were
16   employed at Yale?
17   A.  She did that.  I know she on and off has
18   been writing for that local newspaper.
19   Q.  Do you have a girlfriend?
20   A.  I do.
21   Q.  What's her name?
22   A.  Donna Colado, C-O-L-A-D-O.
23   Q.  How long have you been with Ms. Colado?
24   A.  11 and a half years.

Page 12

1   Q.  So the two of you were together during your
2   period of employment at Yale?
3   A.  Yes.
4   Q.  Just let me finish.
5   A.  I'm sorry.
6   Q.  That's okay.  It's not necessarily natural.
7   A.  Okay.
8   Q.  Where does she live?
9   A.  She lives with me at 143 High Street,
10   Whitman, Mass.
11   Q.  How long has she lived at that address?
12   A.  We've both lived there for -- I'll have to
13   say five and a half years.
14   Q.  So you were living there together during
15   your employment at Yale?
16   A.  Yes.  There, and we have rented an apartment
17   as well.  I think we bought the house in '01, I
18   believe.  And we previously rented apartments.
19   We've been living together 11 and a half years.
20   Q.  So throughout your period of employment with
21   Yale?
22   A.  Absolutely, yes.
23   Q.  Is she employed?
24   A.  She is.

Page 13

1   Q.  Where does she work?
2   A.  She works at Campanelli's Restaurant,
3   Braintree, Massachusetts.
4   Q.  I'm sorry, you said she lived with you at
5   143 High Street?
6   A.  Yes, that's where we currently live.
7   Q.  What's your telephone number there?
8   A.  781-447-0658.
9   Q.  And she works at Campanelli's Restaurant?
10   A.  Yes.
11   Q.  That's located where?
12   A.  Washington Street, Braintree.
13   Q.  How long has she worked there?
14   A.  Six, seven years.
15   Q.  During your time of employment at Yale?
16   A.  Yes, I would say so.
17   Q.  Anyone else live with the two of you during
18   this period of time?
19   A.  My son Daryl lives with us.
20   Q.  How old is Daryl?
21   A.  He's 18.  And Donna and I have a daughter,
22   Dana Greenwood, D-A-N-A.  She's five.
23   Q.  Did Daryl live with you during your period
24   of employment at Yale?

4 (Pages 10 to 13)

**Page 54**

1  A. I was contacted by some people from Yale.
2  Q. Who called you?
3  A. I think it was Billy Malic and asked me if
4  I, you know, if I was interested in doing some spare
5  work, coming in and helping them out once in awhile.
6  Q. He was a driver, right?
7  A. Yes.
8  Q. Do you know if someone asked Billy to give
9  you a call?
10  A. I know I come in, I met with I think Bobby
11  Joyce or -- I don't know. I can't remember. I
12  eventually, I ended up meeting with Steven, and
13  Steven asked me to, you know, he wanted me back
14  full-time.
15  Q. Did you know Steven from before?
16  A. I did.
17  Q. Did you know him well?
18  A. I knew him pretty well. I worked for him
19  through Shea and Curt's Metropolitan Trucking. I
20  knew him well. I liked him. You know, we had a
21  decent rapport, I believe.
22  Q. So you agreed to go to Yale?
23  A. Yes.
24  Q. Am I right that you don't remember exactly

**Page 55**

1  when that was?
2  A. Well, it must have been '98, if you've got
3  that there.
4  Q. Yes, that's what I'm asking you. Does that
5  jive with your memory?
6  A. It does, yeah, it was around there.
7  Q. Were you hired for a particular position?
8  A. Yeah, you know, I was hired as a driver,
9  delivery driver.
10  Q. Were you in that position pretty much until
11  the time you left?
12  A. Yes.
13  Q. What were your duties?
14  A. Just delivering appliances, bringing them
15  into people's homes. Making customers happy.
16  Q. You were generally the driver?
17  A. Yeah.
18  MR. RICE: Objection.
19  A. I pretty much --
20  MR. RICE: You can answer.
21  THE WITNESS: Did you say answer or
22  don't answer?
23  MR. RICE: Go ahead, answer.
24  Q. He'll make it clear when he doesn't want you

**Page 56**

1  to answer.
2  A. Can you ask me the question again?
3  Q. Yes. Am I correct that throughout your
4  tenure at Yale Appliance, you were generally
5  assigned the driver's position?
6  MR. RICE: Objection. Go ahead.
7  A. Yes.
8  Q. Let's just go through again. Is it the same
9  kind of job that you would -- we'll do it step by
10  step. You would participate in loading the vehicle?
11  A. Correct.
12  Q. You would load it same as you described
13  before?
14  A. Yes.
15  Q. From last delivery to first or -- yes,
16  last --
17  A. Last stop first, load first.
18  Q. And again, as the driver, you had the
19  responsibility for the safety and security of the
20  vehicle?
21  A. Yes.
22  Q. That included identifying any problems with
23  the vehicle for Yale?
24  A. Correct.

**Page 57**

1  Q. At some point were you asked to take a
2  physical for your position?
3  A. At one time I did have a, what do you call
4  it, a medical, driver's medical card. I mean, at
5  one time I did have it. I think it was Shea
6  Trucking that made me get that. I think that was
7  good for a couple of years. But I don't think I
8  ever took a physical for Yale.
9  Q. Do you recall having, during your period of
10  time with Yale, a DOT card?
11  A. Yeah, like I said, I think Shea wanted me to
12  get one. You know, I believe it expired as I, you
13  know, when I was with Yale.
14  Q. Do you recall acknowledging to Yale that you
15  understood you needed a DOT card?
16  A. They didn't require it.
17  Q. Did you understand that you were in a drug
18  testing pool while you were employed at Yale?
19  A. I do, yes.
20  Q. And you understood that Yale was drug
21  testing its drivers randomly and other folks who
22  would be responsible for --
23  A. Yes, yes.
24  Q. Were you ever drug tested?

15 (Pages 54 to 57)

Daniel Greenwood

1    Q. I'm sorry, you can't -- you just answer my
2  question.
3    A. All right. I said I don't remember signing
4  it. I don't remember seeing this document. I don't
5  know how else you want me to answer that. I'm
6  answering honestly. I don't remember signing it. I
7  don't remember ever seeing it. I can read it. I
8  understand what it means. I see it's got what looks
9  like my signature on it. But if you're asking me if
10  I've seen it before, do I recognize it? I don't.
11    Q. I understand what you're saying. I'm asking
12  a different question.
13    A. Okay, I'm listening.
14    Q. The question I'm asking is while I
15  understand sitting here today, you don't have a
16  memory of this document.
17    A. Right.
18    Q. Am I also correct that you have no reason to
19  dispute that it is a document that at one point in
20  time you received and signed?
21       MR. RICE: Other than the fact that he
22  doesn't remember it?
23       MS. KUGELL: I understand.
24    Q. I'm asking you -- let's begin again. Is

1  that your signature?
2    A. It looks to be my signature, yeah.
3    Q. So at some point in time, you would agree
4  with me you signed this document?
5    A. Ask me again, I'm sorry.
6    Q. Well, you agree that's your signature,
7  correct?
8    A. I mean, it looks to be a very sloppy, you
9  know, signature, yes. I do sometimes sign my name
10  like that.
11    Q. So at some point in time, can we agree you
12  signed this document?
13       MR. RICE: He doesn't have to agree.
14       MS. KUGELL: I understand he doesn't
15  have to agree. It's his question.
16    A. I don't agree. Like I said, I don't
17  remember seeing it. I'm not, you know, you're
18  asking me, "Do you remember seeing it? Do you
19  remember signing it?" I don't.
20    Q. But it is your signature?
21    A. It seems to be my signature, yeah.
22       MS. KUGELL: I'd ask that counsel
23  refrain from providing comments other than
24  objection.

1    Q. You didn't have a contract of employment at
2  any time while you were working for Yale, correct?
3    A. I'm sorry?
4    Q. You didn't have a contract of employment for
5  term or length --
6    A. Did I have a contract of employment? No,
7  no, we weren't union.
8    Q. So you were free to leave your employment at
9  Yale at any point in time?
10    A. Yes.
11    Q. And nobody at Yale ever told you, you had a
12  job for any specific period of time, right?
13    A. Well, I do remember one thing distinctly, a
14  conversation I had with Steve when I came back there
15  and when he wanted, you know, he wanted a
16  commitment. I was kind of running my own thing. He
17  wanted a commitment. "We want you back. We want
18  you to work a long time. You know, we want you back
19  full-time and we want you, you know, to come on
20  board, and, you know, give us a commitment." And I
21  do remember him, you know, saying -- well, you know,
22  I told him I was doing pretty well. But the word I
23  remember Steven saying is -- you know, I asked him,
24  you know, "You're telling me I got a job here in

1  good standing? I'm not just going to be used for a
2  couple, you know, a couple of months and thrown
3  away?" And Steven said to me, "Dan, I'm not going
4  to forget the guys who got us here to where we are."
5  You know, I wouldn't forget the guys -- you know, I
6  won't forget the guys -- I don't know why I still
7  remember that to this day, you know. You know, I'm
8  trying to get the right words. But like I say, to
9  this day I remember that. I think I was subbing a
10  little bit for them, and I had a little meeting with
11  him. He made me some offers. "Listen, I'll give
12  you two weeks vacation right now, I'll give you
13  this, I'll give you that." I told him, you know,
14  "I'd come back if, you know, this job's going to be
15  solid, and I'm not just going to be tossed when
16  you're done with me." He said, "No, I'm not going
17  to forget the guys that got us here," is I believe
18  what the statement. I do remember that. I don't
19  know if that was a guarantee. There was no
20  guarantee or anything. It was just kind of a little
21  man-to-man thing, and I took him at his word.
22    Q. Now at some point during your employment
23  with Yale, did you receive an employee handbook?
24    A. I'm sure, yes.

Daniel Greenwood

Page 114

1    Q. Do you recall if that was right when you
2  were first hired or soon after?
3    A. They used to have meetings every, you know,
4  once a year they'd have a company meeting and they'd
5  have us, you know, go through handbooks and stuff
6  and give us a dinner or whatever.
7    Q. So you actually remember someone going
8  through the handbook with you at a meeting?
9    A. Yes. They used to change things every year.
10  I believe I missed the last one. I think they were
11  always around December, and I think the last one I
12  was at was -- I think it was in 2001 or something or
13  2002. I know I missed one because I had just had
14  surgery, and I know I missed the meeting. I know
15  Steve was kind of upset. But I mean, I had just
16  been out of -- I just got out of the hospital.
17    Q. Well, you had surgery in December -- I'm
18  sorry, November of 2003, right?
19    A. Yeah, I think that sounds about right.
20        (Exhibit 8 marked for identification)
21        (Document exhibited to witness)
22    Q. Mr. Greenwood, have you seen this document
23  before?
24    A. Let's see. I mean, probably. You know, I

Page 115

1  know at these meetings, they'd throw a bunch of
2  paperwork, you know, in front of you sign this, sign
3  that, sign this.
4    Q. You don't remember if you signed this at the
5  beginning of your employment or some point during
6  your employment?
7    A. I don't remember when I signed it, no.
8    Q. But it is your signature?
9    A. Yes.
10    Q. And is it fair to say that your memory is
11  that you got this at the same time that you got an
12  employee handbook?
13    A. I would think so. It looks like something
14  they would have passed out at one of the meetings.
15        (Exhibit 9 marked for identification)
16        (Document exhibited to witness)
17    Q. Mr. Greenwood, I show you a document that's
18  marked as Exhibit 9 to your deposition. Have you
19  ever seen this before?
20    A. Yes, I believe so.
21    Q. And again, is that your signature on the
22  document?
23    A. It is.
24    Q. And again, at this point in time, did you

Page 116

1  receive a Yale Electric policies and procedures
2  handbook?
3    A. I'd imagine so. That's what this says.
4    Q. And you understand that you're acknowledging
5  that you reviewed it and understood the handbook?
6    A. I believe so.
7    Q. If we can look at that Exhibit 9 again.
8    A. Yes.
9    Q. This was the handbook you received in 2002,
10  right?
11    A. I would guess.
12    Q. Because of the date on the document?
13    A. Right.
14        (Exhibit 10 marked for identification)
15        (Document exhibited to witness)
16    Q. Mr. Greenwood, have you seen -- I'm sorry.
17  Hold on one second. Have you seen the document
18  that's been marked Exhibit 10 before?
19    A. I do.
20    Q. You have?
21    A. Well, I see it.
22    Q. Have you seen it before, sorry?
23    A. Yes.
24    Q. Again, that's your signature on the

Page 117

1  document?
2    A. Right.
3    Q. This is the document you received, the
4  handbook you received in 2003; is that right?
5    A. I don't know that.
6    Q. Well, it's dated 2003.
7    A. Yes, I suppose so, yup.
8    Q. Given that Exhibit 10 is dated 2003, is it
9  your understanding that this is the document that
10  you would have signed in 2003 when you received the
11  handbook?
12    A. I would guess so.
13        (Exhibit 11 marked for identification)
14        (Document exhibited to witness)
15    Q. Mr. Greenwood, I'm going to represent to you
16  that Exhibit 11 is the Yale Electric handbook that
17  you received in or about 2003. Have you seen this
18  document before?
19    A. I have.
20    Q. You have?
21    A. Uh-hum.
22    Q. At the time you received it or at any time
23  thereafter, did you read it and review the handbook?
24    A. Like I said, at these meetings, Steven would

Daniel Greenwood

Page 118

1  go through each and every page by page by boring
2  page.
3      Q. So you were schooled on, even if you didn't
4  read it --
5      A. Absolutely, yes.
6      Q. -- you were schooled on what was contained
7  in the handbook?
8      A. Yes, absolutely.
9          (Exhibit 12 marked for identification)
10         (Document exhibited to witness)
11     Q. Mr. Greenwood, I'm going to show you a
12  document that's been marked Exhibit 12.
13     A. I see.
14     Q. I ask if you -- well, I'm going to again
15  represent to you that this is a handbook that was
16  provided to you in or around 2004. Have you seen
17  this document before?
18     A. I mean, I don't know. Is it the same as
19  this or is it different? I'm not sure.
20     Q. As you said, policies and procedures do
21  sometimes change a bit. So it has some changes in
22  it.
23     A. Right. Have I seen -- I mean, believe me,
24  this isn't something I would sit down and write --

Page 119

1  and read, you know.
2      Q. I understand.
3      A. Have I seen it before? I'm not sure. I
4  mean, like I said, if this is one of the things at
5  the meeting I was at. Like I said, Steve used to go
6  through these and, you know, I'm pretty sure he had
7  a little chalkboard or something up there and a
8  pointer. He used to go through them pretty, you
9  know, in detail.
10     Q. So if I understand what you're telling me,
11  sitting here today, you don't have any recollection
12  of actually reviewing Exhibit 12; is that right?
13     A. Right. I mean, I just -- I mean, it just
14  looks like a policy book. I don't know when I may
15  have looked at it or if I seen, you know, I just --
16  you know.
17     Q. You wouldn't argue that this was the
18  effective -- let me rephrase that so I don't get you
19  concerned.
20         This purports to be the policy and
21  procedures book that was in effect in January of
22  2004. You have no reason to doubt that, is that
23  right?
24     A. I mean, I don't know when this, you know, I

Page 120

1  mean when, you know, this thing came out. I'm not
2  quite sure. There's no dates on it.
3      Q. Well, there actually is.
4      A. Is there?
5      Q. The bottom of every page it says January of
6  2004, outside of the index.
7      A. Oh, I see. Like I say, I know the last
8  meeting at one of these, I had missed I believe the
9  last one because of an injury, you know, because I
10  was sick. I think it was after I had surgery. So
11  I'm not quite sure if this was the one meeting that
12  I missed.
13     Q. Okay.
14     A. Because I remember I did miss, I believe,
15  the last meeting, and I know Steve was not so happy
16  with me.
17     Q. Okay. Did you ultimately receive a copy of
18  the handbook that they --
19     A. I'm sure I did, yeah.
20     Q. And if this is the handbook that they went
21  through at that meeting, it would have been the one
22  that you then received when you returned to work; is
23  that right?
24     A. Yeah, that seems reasonable.

Page 121

1      Q. So again, you would agree, if I am telling
2  you that this is the handbook in effect in January
3  of 2004, you don't have any -- sitting here today
4  you have no reason to doubt it?
5      A. No, I wouldn't disagree with that, no.
6          (Exhibit 13 marked for identification)
7          (Document exhibited to witness)
8      Q. Mr. Greenwood, is this your signature on the
9  document?
10     A. Yes.
11     Q. Have you seen this document before?
12     A. I don't know.
13     Q. You understand that it indicates that you've
14  received the employee handbook?
15     A. Yes, I see what it indicates here. I mean,
16  with no date or, you know --
17     Q. This one was actually witnessed, though,
18  correct?
19     A. I guess.
20     Q. Do you know who that witness --
21     A. It looks like maybe Dave Shawn. Is that
22  right? I don't know.
23     Q. I don't know. So you don't have a memory of
24  someone witnessing that document?

31 (Pages 118 to 121)

Daniel Greenwood

Page 122

1  A. I mean, yeah, like I said -- I mean, we're
2  talking years ago. How can I remember every piece
3  of paper, you know what I mean? To be totally
4  honest with you, yeah. Have I seen this before? I
5  can't remember if I seen it. If it's got my
6  signature on it, I mean, I read and understood the
7  company handbook. There's no date on it. There's
8  not a whole lot of information on this. But, yeah,
9  I would agree that's my signature. And it looks
10  like maybe Dave Shawn's signature.
11  Q. But you don't know whose signature it is?
12  A. I think it's Dave's.
13  Q. But it may not be?
14  A. May not be.
15  Q. Okay. So your testimony is, though, your
16  recollection is each year or thereabouts there would
17  be at least one meeting where Yale would review the
18  contents of the employee handbook in depth?
19  A. Right, yes.
20  Q. And that each year or thereabouts you
21  received, either because you were at that meeting or
22  otherwise --
23  A. Right.
24  Q. -- a copy of the employee handbook?

Page 123

1  A. Sure.
2  Q. And that was throughout your tenure at Yale?
3  A. Well, I think they started that towards the
4  last few years I was there.
5  Q. I think we went through your handbook,
6  sometime 2002 or after just based on the years?
7  A. Yeah, I think it was 2001, 2002 they started
8  doing that.
9  Q. If I could ask you to turn to page 12 of
10  Exhibit 12.
11  MR. RICE: This is the 2004 one?
12  MS. KUGELL: Yes.
13  Q. It actually moves over to -- sorry about
14  that. In the 2003 one, it's actually in page 12.
15  It's at the bottom of page 12 on the 2004 one. If
16  you can just look at that for a moment, the section
17  that talks about notification and unexcused
18  absences.
19  A. Right.
20  Q. You understood that you were obligated to
21  call the supervisor no later than an hour prior to
22  your shift time if you weren't going to be at work;
23  is that right?
24  A. Right.

Page 124

1  Q. If you couldn't reach -- this indicates that
2  you had to telephone Robert Joyce, correct?
3  A. Yes, that's what this says, yeah.
4  Q. Is that what you had to do to report your
5  absence?
6  A. You know what, I don't believe I -- I think
7  my whole time at Yale I called in sick once. So I
8  don't really know what -- I can see that. I know
9  there was an issue in the past, because where we
10  started at six in the morning, we were the first
11  employees to, you know, get there. There was really
12  nobody to call. But I guess that's probably when
13  they instituted this thing to call Bobby Joyce.
14  Q. And if you couldn't get ahold of Mr. Joyce,
15  did you understand who you were supposed to call
16  then?
17  A. I don't know. You just called dispatch, I
18  would guess.
19  Q. This indicates that you have to leave a
20  voice mail message for Steven Sheinkopf; is that
21  right?
22  A. Right.
23  Q. Do you have an understanding that if you
24  didn't follow these procedures, you could be

Page 125

1  actually subject to discipline up to and including
2  termination?
3  A. Right.
4  Q. Now, let's look at -- go again in the 2004
5  handbook. If you looked at page 22. Sorry about
6  that. Give you a second to get there. To be clear,
7  it's Exhibit 12.
8  A. You said 22?
9  Q. Page 22. You're in the 2004 handbook,
10  right?
11  A. Right.
12  Q. You can see on page 22 where again the whole
13  process for phoning in your absence is outlined; is
14  that right?
15  A. I see, yes.
16  Q. And again, having to contact your immediate
17  supervisor an hour before the start of your shift is
18  required, right?
19  A. Right.
20  Q. Do you see the section that says unexcused
21  absences of three or more days?
22  A. I see.
23  Q. So you then were aware that an unexcused
24  absence for three or more days could result in

32 (Pages 122 to 125)

Daniel Greenwood

Page 126

1 disciplinary action, including termination?
2     A. Yes.
3     Q. And, further, you understood that three
4 unauthorized days without notification or
5 authorization could be termed a voluntary
6 resignation?
7     A. Right, I see that.
8     Q. Do you know what the Family Medical Leave
9 Act is?
10     A. I do. I believe -- I don't understand it
11 like my lawyer does.
12     Q. I understand. What do you understand it to
13 be?
14     A. What I understand about it is it protects
15 you from losing your job while you're, you know,
16 sick.
17     Q. And you understand that you get a certain
18 amount of time for job protection, right?
19     A. Right.
20     Q. And do you know what that period of time is?
21     A. I don't.
22     Q. I'd ask you to look at your 2004 handbook at
23 page seven. Actually, you don't have to go through
24 it in detail. But if you turn to the table of

Page 127

1 contents, you can see that the Family Medical Leave
2 Act is spelled out in great detail from page three
3 all the way through to page seven, correct?
4     A. Okay. Yes, I see.
5     Q. If you can see at the bottom of page seven
6 where it says worker's comp absence may count as
7 FMLA.
8     A. What do you want me to look at now?
9     Q. This, it's actually section 14, worker's
10 comp absence may count as FMLA.
11     A. Okay.
12     Q. Just take a moment. I'm going to ask you a
13 question. You've reviewed the section?
14     A. I see it, yes.
15     Q. And this is the handbook that you received
16 from Yale?
17     A. Right.
18     Q. And the handbook that was reviewed each year
19 with Yale, with the employees of Yale; is that
20 right?
21     A. Right.
22     Q. And you see how, therefore, where it says
23 serious health condition under the FMLA will run
24 concurrently with a worker's compensation leave?

Page 128

1     A. I see.
2     Q. If you could look at Exhibit 11, the 2003
3 handbook, also go to page seven. You see that same
4 section on page seven, worker's compensation absence
5 may count as FMLA?
6     A. On page 11?
7     Q. Page seven.
8     A. I thought you had me jump to 11.
9     Q. No, I had you jump to seven in Exhibit 11,
10 sorry.
11     A. Okay. Okay, yes.
12     Q. Now, this 2003 handbook, you said you missed
13 one handbook meeting, right?
14     A. Right.
15     Q. That would have been the end of 2003. So
16 going into the 2004 handbook, because that's
17 typically what happened at Yale, right?
18     A. I believe so.
19     Q. So it was the January 2004 handbook that we
20 looked at that you missed that meeting?
21     A. Probably, yes.
22     Q. And you got after you returned from your
23 leave, right?
24     A. Yes.

Page 129

1     Q. So this handbook, the 2003 would have been
2 distributed at one of those meetings where Steven
3 goes through page by page, correct?
4     A. Correct.
5     Q. If you look at page seven, that same
6 language with respect to your serious health
7 condition under the FMLA will run concurrently with
8 your worker's compensation, that was included in the
9 2003 handbook, correct?
10     A. Okay.
11     Q. Do you see that?
12     A. So now I'm looking at the 2003 handbook?
13     Q. The same one we were just looking at. So
14 that same language that we went over in the 2004
15 handbook is in the 2003 handbook; is that right?
16     A. I would guess.
17     Q. Take your time. Get to page seven.
18     A. In which book? I got two books here.
19     Q. Exhibit 11. It's the one that does not have
20 January 2004 at the bottom.
21     A. You're killing me.
22     Q. Sorry.
23     A. Okay, I see.
24     Q. So not to beat a dead horse here, but this

33 (Pages 126 to 129)

Daniel Greenwood

Page 130

1  handbook is one that you sat through a meeting --
2      A.  Right.
3      Q.  -- where Steven went through each page,
4  correct?
5      A.  Right.
6      Q.  So you understood that the time you spent on
7  worker's compensation leave would be designated as
8  FMLA, correct?
9          MR. RICE:  Objection.  Go ahead and
10 answer.
11     A.  Answer?  I'm sorry, say it one more time.
12     Q.  Sure.  This handbook was reviewed with you
13 page by page, correct?
14     A.  Yeah.  I think he just, you know, hit the
15 high, you know, the stuff.  I'm not sure if he word
16 for word read the handbook.  But I mean, he was
17 fairly thorough, I would say.
18     Q.  Right.  You said he went through page by
19 page?
20     A.  Right.
21     Q.  So you understood that the time you spent on
22 worker's comp would be designated as FMLA; is that
23 right?
24         MR. RICE:  Objection.

Page 131

1      A.  I'm not sure what I understood about that.
2  I mean, I'm really kind of confused about what we're
3  talking about.  Do I understand that FLA or Family
4  Medical Leave Act runs concurrently with workmen's
5  comp?  I understand that now.  Did I understand that
6  then?  I'm not sure how hard I was
7  listening when Steven was going through all this.
8  But I understand it now, if that's what you're
9  asking me.  Did I understand it then?  I'm -- you
10 know.
11     Q.  But this document was reviewed with you?
12     A.  I would think so, yeah.  I probably went
13 through it.
14         MS. KUGELL:  Can we go off the record
15 for a second?
16         (Discussion off the record)
17         (Whereupon, at 1:01 a lunch recess was
18 taken)
19         (Resumed at 1:38)
20     Q.  Mr. Greenwood, you understand you're still
21 under oath?
22     A.  I understand.
23     Q.  Now, you were hospitalized sometime in the
24 summer of 2004, right?

Page 132

1      A.  Yes.
2      Q.  Now, do you remember the date that you
3  actually went to the hospital?
4      A.  I don't.  I believe -- know it was like a
5  Monday or a Tuesday.  May have been a Tuesday the --
6  I'm sorry, I don't remember the date.
7      Q.  Okay.  I'm going to help refresh your memory
8  with some of this in a second, by looking at some
9  documents.
10     A.  Okay.
11     Q.  But you first went to the hospital when you
12 went to the emergency room, right?
13     A.  Correct.
14         (Exhibit 14 marked for identification)
15         (Document exhibited to witness)
16     Q.  Before we get to the document that I've just
17 given you, let me make sure I understand the
18 chronology of events.  You walked into the emergency
19 room, correct?
20     A.  I did.
21     Q.  You did?  And you went right from the
22 emergency room to being admitted into the hospital,
23 correct?
24     A.  Yeah, they admitted me.

Page 133

1      Q.  So this inpatient record says that you were
2  admitted on July 28, 2004.  Does that sound correct?
3      A.  Yes.
4      Q.  When I say "this," I'm sorry, Exhibit 14 is
5  a copy of records we received from South Shore
6  Hospital.
7      A.  Yes.
8      Q.  So you probably have not seen these records
9  before.
10     A.  Right.
11     Q.  I'm going to represent to you that they're
12 documents that I've obtained through South Shore
13 Hospital.
14     A.  Okay.
15     Q.  Do we agree that July 28th was the day you
16 went to the hospital?
17     A.  Yeah, sure.
18     Q.  Now, that was a Wednesday, so you know.
19     A.  Okay.  The thing, you know, I -- I don't
20 know if they admitted -- you know, like I said, I
21 was in the emergency room until like after midnight.
22 They had me on a stretcher in the hallway.  I don't
23 know if -- like I say, I went there after work.  I
24 thought it was a Tuesday.  They may not have

Daniel Greenwood

Page 134

1  admitted me until the next day. I mean, I was there
2  overnight. I got a room, I don't know, the next
3  morning, room the next morning or whatever.
4      Q. This says time is 3:56. It doesn't say a.m.
5  or p.m.
6      A. I'm willing to guess that's a.m. Like I
7  say, I was there very uncomfortable for hours and
8  hours, and I think I ended up getting a room like
9  the next morning.
10     Q. So your memory is you went Tuesday night
11 after work?
12     A. That's what I'm thinking, yeah.
13     Q. So that would be Tuesday, July 27th?
14     A. That's what I'm guessing.
15     Q. What was the reason you went to the
16 hospital?
17     A. I was in extreme pain. You know, I just had
18 this, you know, this bellyache. I mean, I couldn't
19 even stand up straight. I got through my workday,
20 you know, and went home and my girlfriend took me
21 right to the hospital.
22     Q. That was when you went to the emergency
23 room?
24     A. Yes.

Page 135

1      Q. That was at South Shore Hospital?
2      A. Yes.
3      Q. Were you diagnosed with a condition or any
4  sort of medical illness, do you remember?
5      A. I don't know when they diagnosed me with the
6  diverticulitis. I heard about that sometime the
7  next day. I think that, you know, I had a doctor
8  that come in and, you know, might have said that to
9  me.
10     Q. So you remember your diagnosis being
11 diverticulitis?
12     A. Yes.
13     Q. Had you ever had that condition before?
14     A. Never.
15     Q. I'm correct that you were treated at South
16 Shore Hospital?
17     A. Correct.
18     Q. And the doctor who treated you, his name was
19 Aboualkheir Alzaim, right?
20     A. Okay.
21     Q. Well, let me just cut to the chase. Do you
22 remember his name being Dr. Alzaim?
23     A. I mean, when I was in the hospital, there
24 were several doctors in and out, interns, this that.

Page 136

1  I believe that was the gentleman I want to after I
2  was released. He was the guy I had to see after.
3      Q. Okay. And you saw him during your stay at
4  South Shore as well, right?
5      A. I guess, yeah.
6      Q. Well, if you look at Exhibit 14.
7      A. Yes.
8      Q. Do you see his name appearing as the
9  admitting and attending physician?
10         MR. RICE: Can I show him where it is
11 just to speed this up?
12         MS. KUGELL: Yes.
13         MR. RICE: It's right there.
14     A. I see.
15     Q. That's the same doctor that you saw
16 afterwards?
17     A. Yes, right.
18     Q. You reported having no family doctor; is
19 that right?
20     A. Correct.
21     Q. And you did not have a family doctor?
22     A. No.
23     Q. You don't have any regular doctor?
24     A. No.

Page 137

1      Q. Now, you reported that the reason you
2  thought you were in pain was you had been eating
3  lobsters all day before the pain started; is that
4  right?
5      A. Come to find out, what it was that hurt me
6  was popcorn. It wasn't lobster.
7      Q. But you reported that you thought it was
8  lobster?
9      A. Yeah, could have. I didn't know what it
10 was. I was just in extreme pain.
11     Q. But tell me when, because that's sort of
12 about when the pain started, right?
13     A. Actually, yeah, I had been in pain a couple
14 of days, and it was increasing and getting
15 increasingly worse. In fact, I considered calling
16 in sick Tuesday. But since I had an outstanding
17 record and, you know, I was a reliable guy, you
18 know, I just tried to get through it. And I did get
19 through my run and went to the hospital.
20     Q. Now, do you remember when you called Yale to
21 tell them you were going to the hospital?
22     A. I talked to Lewis Frazer in the dispatch
23 office when I was leaving, told him that my, you
24 know, that I was in pain. I was going to the

35 (Pages 134 to 137)

Daniel Greenwood

Page 138

1 hospital. Originally we had some softball thing we
2 were planning on. It was supposed to be softball
3 practice, and I told the guys I couldn't go. I was
4 in pain.
5     Q. So you had a conversation with Mr. Frazer in
6 the dispatch office?
7     A. I did.
8     Q. And that was on the 27th of July?
9     A. Yes.
10     Q. Who was present?
11     A. I think Eamon and Jim O'Neill.
12     Q. Do you know Eamon's last name?
13     A. Malone? I think.
14     Q. Who is Eamon?
15     A. He's a funny little dispatcher guy.
16     Q. Okay. How about Jim O'Neill?
17     A. What about Jim?
18     Q. Who is he?
19     A. He's the head dispatcher.
20     Q. So you remember telling Mr. Frazer you were
21 in pain, and you were --
22     A. Yeah, I was going to the hospital.
23     Q. And you couldn't go to the softball game?
24     A. Right. I don't know if I was talking to

Page 139

1 Eamon and Jim about that. But Lewis was in the
2 office, and I told him I was hurting and I was going
3 to the hospital.
4     Q. Did you tell him anything else?
5     A. I may have said, "I don't know if I'm going
6 to be in tomorrow. I'm in extreme pain. I'm going
7 to the hospital now."
8     Q. So you didn't call Mr. Frazer, you talked to
9 him face to face?
10     A. I did, yes.
11     Q. What did Mr. Frazer say?
12     A. He said, "Your belly hurts?" He said, "We
13 fixed your belly last year. You better be in
14 tomorrow." Something to that effect.
15     Q. And Mr. Malone and Mr. O'Neill were there?
16     A. Yeah, I don't know how much they were
17 listening. They were both busy. I mean, all three
18 of them were doing things at different desks.
19     Q. What did you say?
20     A. I just left.
21     Q. You just left?
22     A. I mean, I just, you know, I got in my truck
23 and headed home and went to the hospital.
24     Q. Now, on July 28th when you were admitted, do

Page 140

1 you recall telling or soon after you were admitted,
2 do you recall telling somebody that you wanted to go
3 home because you had weekend plans?
4     A. No, actually, I had a scheduled day off on
5 that Friday, which I had a court date. It was a
6 family court thing. Something that I brought, and I
7 had a date. And, you know, I didn't want to lose my
8 court date.
9     Q. I understand that. But what -- I asked a
10 different question. Do you recall telling one of
11 the medical providers at the hospital that you
12 wanted to go home because you have weekend plans?
13     A. No.
14     Q. Did you have weekend plans?
15     A. Actually, yeah, we did have -- I did have
16 some plans that weekend.
17     Q. What were your plans for the weekend?
18     A. We were having a pig roast.
19     Q. At your home?
20     A. Yes. It was actually sponsored by a buddy
21 of mine. It was kind of a birthday party, kind of
22 like a bike a pig roast thing.
23     Q. So you were throwing your buddy a birthday
24 party?

Page 141

1     A. He was actually the one paying for the whole
2 thing. He was basically using my yard. It was
3 mostly his friends and this and that. I just agreed
4 to have it at my house.
5     Q. Was it an all weekend thing?
6     A. No.
7     Q. When was it to occur?
8     A. It was for that Saturday. I don't know what
9 the date was. It was Saturday.
10     Q. In any event, you were concerned about
11 having to be in the hospital because you had things
12 planned towards the end of the week, and you wanted
13 to get out?
14     A. Not necessarily. I was more concerned about
15 missing my court date.
16     (Exhibit 15 marked for identification)
17     (Document exhibited to witness)
18     Q. I'm going to ask you, Mr. Greenwood, to look
19 sort of in the middle of the page.
20     A. Yup.
21     Q. I know some of this writing is difficult to
22 read. But actually the block lettering in the
23 middle of the page is not as hard to read once you
24 start to look at it. Do you see where it says

36 (Pages 138 to 141)

Daniel Greenwood

Page 142

1   patient wants to go home, has plans for the weekend?
2       A. I do.
3       Q. But sitting here today, you don't have any
4   memory of advising the provider at South Shore
5   Hospital with that fact?
6       A. No, I told them I would be signing myself
7   out to go to court on Friday. That was the day that
8   I already had off from Yale. I had it scheduled. I
9   had to be in court, you know. It had to do with one
10  of my sons. And I told them that I would not miss
11  my court date, and I would sign myself out.
12      Q. So you were concerned the hospital stay was
13  going to disrupt the court event?
14      A. Yes.
15      Q. Were you also concerned the hospital stay
16  was going to disrupt your weekend plans?
17      A. Yeah, yeah, I suppose.
18      Q. So one way or the other, you were going to
19  make sure you were out of the hospital by the end of
20  the week?
21      A. I was going to make sure I made my court
22  date. It meant a lot of money. I was trying to get
23  my child support lowered. It took me quite awhile
24  to get a date and get all that set up. If I missed

Page 143

1   that court hearing, it would have been pushed back
2   for months.
3       Q. Actually, it's good you're chatting about
4   that, because that's exactly what I wanted to ask
5   you about. You had a court appointment was it
6   10 o'clock on July 30th that you had --
7       A. I don't know, it was the morning.
8       Q. It was the morning?
9       A. Yeah.
10      Q. The court appointment, I think you just
11  described it, was to get your child support lowered?
12      A. Yes.
13      Q. So you were discharged on July 30th; is that
14  right?
15      A. I was, yeah. They discharged me that
16  morning, and I went right to court.
17      Q. Do you remember telling the doctor on the
18  morning of the 30th that you felt much better, and
19  you only had mild discomfort?
20      A. Probably. I would have said anything to get
21  out of there.
22      Q. Well, that --
23      A. Yeah, I was still in pain. I certainly was.
24  But, yeah, it sounds right.

Page 144

1       Q. Was that accurate that you felt much better?
2       A. Yeah, I felt -- I certainly did from when I
3   came in, yes.
4       Q. Do you also recall telling the doctor that
5   you felt fine?
6       A. I don't think I felt fine, because he was
7   pushing on my belly and stuff, and he knew I was
8   still in pain. I don't think fine was the
9   description. I think what you said, you know, I
10  felt better certainly. I mean, I still hadn't had
11  anything to eat.
12          (Exhibit 16 marked for identification)
13          (Document exhibited to witness)
14      Q. I'm going to show you a document marked
15  Exhibit 16 to your deposition. Again, I know you've
16  not seen these likely before. These are notes from
17  your file from South Shore Hospital. Again, while
18  difficult to read, I think if you look one, two,
19  three, four -- four to five lines down, can you read
20  halfway through where it says wants to go home
21  today, quote, I feel fine, quote?
22      A. I can't read it, to tell you the truth.
23      Q. Okay. So you don't know if that's what it
24  says?

Page 145

1       A. Yeah, I mean I can't even read it. I can
2   see where it says wants to go home today. Whether
3   that says feel fine, I don't know.
4       Q. Sitting here today, you say you don't have a
5   memory of saying that?
6       A. I don't, no.
7       Q. Now, when you were discharged, you were told
8   to drink liquid for 24 hours, correct?
9       A. Right.
10      Q. And to continue your antibiotics for seven
11  days; is that right?
12      A. Correct, I believe so.
13      Q. And to follow up in the doctor's office
14  within the next one to two weeks?
15      A. They wanted to see me early the next week.
16          (Exhibit 17 marked for identification)
17          (Document exhibited to witness)
18      A. The doctor said he would release me, but he
19  said he wanted to see me Monday. I ended up seeing
20  him Tuesday, I believe.
21      Q. Well, I'd ask you to look at the bottom of
22  your record. It's been marked Exhibit 17 to your
23  deposition.
24      A. Okay.

37 (Pages 142 to 145)

Daniel Greenwood

Page 146

1    Q. See where it says, you indicated that you
2 did get the first instruction, right, clear liquids
3 another 24 hours; see where it says that?
4    A. Yeah, yeah.
5    Q. See where it says I believe that's
6 abbreviation for antibiotics times seven days, it
7 says Cipro and Forel? See where it says that,
8 number two?
9    A. Okay, yes.
10    Q. So those first two instructions you believe
11 you did receive at your discharge?
12    A. Yes.
13    Q. Then see where it says third instruction?
14    A. Right.
15    Q. It says F slash U, which I interpret to
16 mean, tell me if you interpret it differently,
17 follow up in office one to two weeks. See where it
18 says that?
19    A. I don't know if that says that.
20    Q. Okay. So you don't know what that says?
21    A. No.
22    Q. And your testimony is that's not the
23 instruction you received?
24    A. You know what, going back two years, I mean,

Page 147

1 my recollection is he told me to stay with the clear
2 liquids for a day or so. Then he told me by Monday
3 I could start drinking stuff like chicken broth and
4 this and that. You know, and slowly, you know. He
5 didn't want me to start with the food yet. So I
6 believe I, you know, I hadn't had anything to eat
7 until after I had seen them, seen him again I
8 believe it was the following Tuesday. You know,
9 then he told me I could try a little chicken soup,
10 try this, try that, try eating food.
11    Q. So your testimony is that until you saw him
12 on Tuesday, you hadn't eaten any food?
13    A. Right, I don't believe I did. They told me
14 nothing solid. So I was doing, you know, some clear
15 liquids or whatever.
16    Q. So you were not back to your old diet at
17 that point?
18    A. Certainly not.
19    (Exhibit 18 marked for identification)
20    (Document exhibited to witness)
21    Q. I show you a document that's been marked
22 Exhibit 18 for the record.
23    A. Yes.
24    Q. You have seen this document before, correct?

Page 148

1    A. Yes.
2    Q. And this is the patient discharge
3 information that you received as you were leaving
4 the hospital on the 30th, correct?
5    A. Right.
6    Q. Does it indicate anywhere on here that you
7 need to see your physician on Monday?
8    A. I don't see anything about that, no.
9    Q. It does indicate that you have no
10 restrictions on activity, correct?
11    A. I see that, yeah, except for eating, which
12 is a restriction. There's restrictions about
13 eating, you know, the fluids and stuff.
14    Q. Yeah, again, it says clear liquids another
15 24 hours, right?
16    A. Right.
17    Q. No other restrictions on eating, correct?
18    A. Right.
19    Q. Now, you understood you were discharged on
20 Friday with no restrictions on activity, right?
21    A. Uh, yes. They wanted me to start walking.
22 I think I was walking maybe a day or so.
23    Q. Well, you had no restrictions on activity,
24 correct?

Page 149

1    A. Correct.
2    Q. Where did you go when you were discharged
3 from the hospital?
4    A. Home.
5    Q. You went --
6    A. Oh, I went to court and then home.
7    Q. How long were you in court?
8    A. I mean, I was in and out of there pretty
9 quick, because they had just taken an IV out of me,
10 and I was bleeding in the courtroom, which was
11 freaking everybody out. So I was there maybe 45
12 minutes.
13    Q. And were you heard before the judge?
14    A. I was, yeah.
15    Q. So your court business was taken care of?
16    A. Yeah, motion denied.
17    Q. What did you do once you returned home? I'm
18 sorry, did you go directly home?
19    A. I did.
20    Q. What did you do once you got home?
21    A. Went right to bed.
22    Q. Was anyone else home at the time?
23    A. You know, my daughter. You know, my kids,
24 whatever, were in and out. My parents, you know,

38 (Pages 146 to 149)

Daniel Greenwood

Page 154

1   contact with Jim Rapoza all week.
2       Q.  Well, let's go through that.  It's your
3   testimony you called Jim Rapoza on the 28th of July?
4       A.  What day was that?
5       Q.  Wednesday.
6       A.  Yes, I'm sure I called him in the morning
7   and told him I was admitted in the hospital.
8       Q.  I don't want you to guess.  I want you to
9   tell me as you're sitting here today --
10      A.  I'm sure I did.  I'm sure.
11      Q.  So sitting here today, you have personal
12  knowledge of speaking with Mr. Rapoza --
13      A.  Absolutely.
14      Q.  -- on Wednesday, July 28th?
15      A.  Yes.
16      Q.  What did you say to Mr. Rapoza on the 28th
17  of July?
18      A.  "This is Dan.  I'm in the hospital."
19      Q.  What did Mr. Rapoza say?
20      A.  You know, whatever.  "How you feeling?"
21  "What's up?"  This, that, you know.  "When are you
22  going to be out," you know.
23      Q.  Remember him saying anything else?
24      A.  Yeah, "We need the phone back.  The phone

Page 155

1   goes with the truck."
2       Q.  So whoever was driving the truck needed your
3   phone?
4       A.  Uh-hum.
5       Q.  Did Mr. Rapoza say anything else?
6       A.  "Get well."  I don't know.
7       Q.  Now, Thursday, the 29th of July, did you
8   speak with Mr. Rapoza?
9       A.  You know, they had me on heavy drugs and
10  stuff.  You know, I mean, I can't -- I'm sure, you
11  know, I was in contact with him.  I had my radio.  I
12  was on.  I was talking to -- I'm sure I talked to
13  the dispatcher.  In fact, you know, I don't know if
14  I talked to the dispatcher Jim O'Neill first or Jim
15  Rapoza.  But I mean, I was in contact with them.
16  They knew I was in the hospital.
17      Q.  I'm going to stop you again and ask you
18  whether, you just said you were under heavy drugs,
19  whether you are certain that on July 29, 2004, that
20  you spoke with anybody at Yale?
21      A.  I'd be willing to bet that I did.
22      Q.  I don't want you to bet.  I want you to tell
23  me whether you remember, sitting here today, whether
24  you talked to somebody on July 29th or not?

Page 156

1       A.  No, two years back, no, I can't -- I
2   wouldn't, you know, stake my life on it.
3       Q.  All right.  So sitting here today, do you
4   remember speaking to Jim Rapoza on Friday, July
5   30th, the day you got discharged?
6       A.  Yes.
7       Q.  Tell me about that conversation.  First of
8   all, let me ask you, do you remember who called who?
9       A.  I don't.
10      Q.  Okay.  Do you remember about what time of
11  day it was?
12      A.  Must have been the morning.  I'm sure I told
13  him I was getting released and, you know.
14      Q.  What else happened during this phone call?
15  Tell me what you remember.
16      A.  Nothing.
17      Q.  You don't remember what Jim Rapoza said?
18      A.  No.  Like I said, I'm sure it was small
19  talk, this and that.  Two years out, I don't
20  remember.
21      Q.  Do you remember telling Mr. Rapoza that you
22  signed yourself out of the hospital that day?
23      A.  I told him I was prepared to sign myself
24  out, yeah, probably.

Page 157

1       Q.  Now, did you tell Mr. Rapoza anything about
2   your doctor wanting to see you on Monday?
3       A.  I don't remember, but I do remember the
4   doctor telling me that he'd release me, but he
5   wanted to see me, you know, first thing, you know,
6   next week.  He gave me, you know, specific
7   instructions and whatever before I left.
8       Q.  Well, tell me what the doctor told you.
9       A.  He said, you know, they come in, they
10  examined me.  "I heard you want to go home," this
11  and that.  I was probably kind of, you know, not the
12  easiest patient by Friday, you know what I mean,
13  having not eaten and just being uncomfortable.  I
14  wanted to, you know, make my court date.  I wanted
15  out.  I wanted to get out of the hospital, you know
16  what I mean?  I was starting to walk a little bit.
17  I was starting to get back on my feet a little bit.
18  They had me walking Thursday night or whatever,
19  gingerly walking, and I was ready to go.
20      Q.  So tell me more about what you remember the
21  doctor telling you.
22      A.  "Come and see me Monday," whatever.  "Don't
23  eat anything, take your drugs, take your, you know,
24  your antibiotics, you know, until they're done,"

40 (Pages 154 to 157)

Daniel Greenwood

Page 158

1  this and that. That's about all I remember.
2      Q. Did the doctor schedule an appointment for
3  you on Monday?
4      A. I don't think it was a scheduled
5  appointment. He told me just to be in there early
6  Monday.
7      Q. Did he say Monday or did he say early next
8  week?
9      A. He said -- I believe it was Monday.
10     Q. So what time was your appointment on Monday?
11     A. Like I said, he didn't give me an
12 appointment. What he told me was just come in on
13 Monday. "Come in and see me Monday morning. If you
14 have any problems, call me at home. If you have any
15 increased pain, whatever, go back to the hospital."
16     Q. So you were supposed to go in and see him
17 Monday morning?
18     A. Correct.
19     Q. That's what you told Mr. Rapoza?
20     A. Probably.
21     Q. Do you recall Mr. Rapoza asking you if you
22 could come back to work on light duty?
23     A. Yes.
24     Q. What did you say?

Page 159

1      A. No.
2      Q. Why did you say no?
3      A. Because I was still very uncomfortable. I
4  still hadn't gotten my strength back. You know, I
5  had some diarrhea, and I needed to recover.
6      Q. Doctor hadn't told you, you could not come
7  to work on light duty, right?
8      A. He told me not to go to work.
9      Q. Well, you said he said to come see him on
10 Monday morning.
11     A. Right.
12     Q. Did he say anything else about what would
13 happen after that?
14     A. No, he told me just take it easy and lay
15 low, get some rest.
16     Q. So the doctor didn't tell you not to work
17 after the appointment on Monday?
18     A. Did he tell me not to -- yeah, he told me
19 don't work. You know, he told me go home and relax.
20     Q. That was on Friday?
21     A. No, that was when I seen him. Actually, you
22 know, I didn't end up seeing him on Monday. It was
23 actually Tuesday that I went in and seen him.
24     Q. I understand. We haven't gotten there yet.

Page 160

1  I'm still on the conversation you had with
2  Mr. Rapoza on Friday. As of Friday when Mr. Rapoza
3  said could you come in and do some light duty,
4  nobody had told you, you couldn't work?
5      A. Right.
6      Q. But you told Mr. Rapoza you could not do
7  light duty at that time?
8      A. Right. I wasn't up for it.
9      Q. That was your decision?
10     A. Certainly was. I was in pain and weak.
11     Q. Now, do you know if things were busy that
12 week?
13     A. No idea. I wasn't there.
14     Q. Well, you had been there earlier in the
15 week.
16     A. What, before I went in the hospital?
17     Q. Yes.
18     A. Yeah. I mean, I can't remember what I was
19 doing then. I do remember my last stop. It was
20 brutal. But I can't remember what happened.
21     Q. So you don't remember how busy it was the
22 last week of July?
23     A. I can't remember, no.
24     Q. Do you understand that Yale was looking for

Page 161

1  all hands on deck the end of July, the beginning of
2  August to get people in --
3      A. They're always looking for all hands on
4  deck. That's nothing knew.
5      Q. So you knew they needed your help?
6      A. Yes.
7      Q. Now, do you recall telling Mr. Rapoza that
8  you would give him a call after your appointment on
9  Monday?
10     A. I don't recall, no.
11     Q. Would you have said something like that?
12     A. Probably.
13     Q. You didn't call Mr. Rapoza on Monday, August
14 2nd, correct?
15     A. Don't remember.
16     Q. Did anyone call you on August 2nd?
17     A. I can't remember.
18     Q. So Monday -- on Monday, August 2nd, you have
19 no memory of anyone --
20     A. I think we did talk. I don't know if I
21 talked to Jim. You know, I was in contact with
22 them. I don't know if I talked to Jim or Lewis, you
23 know, and told them, you know, I'd be in after my,
24 you know, after my doctor's appointment.

41 (Pages 158 to 161)

Daniel Greenwood

Page 162

1   Q. That's what you said on Friday that you'd
2 give them a call after your doctor's appointment?
3   A. Right.
4   Q. On Monday morning you didn't call them?
5   A. No. I don't think so. I can't remember.
6   Q. But on Monday morning you didn't go to the
7 doctor's, either?
8   A. No.
9   Q. Why is that?
10   A. I don't remember the exact circumstances. I
11 mean, I still wasn't feeling real well. I don't
12 know. I don't know if it was something he was out
13 of town or he wasn't available. I don't remember
14 the exact reason.
15   Q. Do you remember Mr. Rapoza calling you in
16 the afternoon on August 2nd?
17   A. What day was that?
18   Q. That was Monday.
19   A. Like I say, I can't remember specific
20 conversations two years out.
21   Q. Do you remember telling Mr. Rapoza that your
22 doctor's appointment had been canceled?
23   A. I don't remember.
24   Q. Do you remember telling Mr. Rapoza that you

Page 163

1 were seeing the doctor on August 3rd?
2   A. No. I mean, like I said, I just can't
3 remember these conversations two years out.
4   Q. So if Mr. Rapoza says that these are the
5 things that he noted, is that something -- I'm
6 sorry, let me strike that.
7     If Mr. Rapoza said these are the things
8 that occurred during the conversation, do you have
9 any basis to dispute it?
10   A. Yes.
11   Q. What would that be?
12   A. It seemed it was, you know, at the time that
13 they were not happy with me. And, you know, it
14 seemed like, like I said, it seemed they had it out
15 for me at that time. They weren't happy about me
16 being in the hospital. Lewis had already warned me,
17 you know, he fixed my belly, and to be in the next
18 day. So I knew they weren't so happy with me. So,
19 you know, I'm not going to jump in and agree with
20 everything that they may have said or stated, you
21 know, at that time.
22   Q. But you have no -- you have no documentation
23 or any other evidence what was said during those
24 conversations, right?

Page 164

1   A. Right, right.
2   Q. You indicated that you thought that they
3 were upset with you or not happy with you; is that
4 right?
5   A. Yes, right.
6   Q. Other than the comment that you attribute to
7 Mr. Frazer, what else would cause you to believe
8 that they weren't happy with you?
9   A. You know, "Hey, we need you," this, that,
10 you know. You know, "When are you going to be
11 back," you know. "When are you going to come in?"
12 "Are you going to be here Monday?" "No, I'm not
13 feeling well. I haven't even started eating yet.
14 I'm weak and I'm still in pain. I got a diarrhea
15 thing happening. I am not available to work. I'm
16 still recovering." And they didn't like that.
17   Q. When did that conversation occur?
18   A. I mean, that was the theme the whole next
19 week.
20   Q. We haven't gotten to the next week yet.
21 We're still only on August 3rd.
22   A. What day are we talking about now?
23   Q. That's Tuesday. Let's recap. On Wednesday
24 you said you called Jim and told him, "I'm in the

Page 165

1 hospital"?
2   A. Right.
3   Q. You indicated, to the best of your memory,
4 he handled the call by saying "get well"?
5   A. Yes, I would think.
6   Q. Thursday you don't have any recollection of
7 talking to anybody. You said that was the day you
8 said you were on drugs and you don't remember?
9   A. Right.
10   Q. On Friday you say you remember speaking with
11 Mr. Rapoza, remember telling him you were supposed
12 to go see the doctor in the morning, right?
13   A. Yes, I remember talking to him. But I mean,
14 if you're asking me word-for-word conversations, I
15 can't remember.
16   Q. I understand. I'm trying to get to the
17 heart of what you just said, because nothing that
18 we've gone through so far says what you just said.
19 I want to make sure I haven't missed anything.
20   A. All right.
21   Q. The other piece of that conversation was
22 that you said you were going to the doctor's, and
23 you would give him a call after you went to doctor's
24 on Monday, correct?

42 (Pages 162 to 165)

Daniel Greenwood

Page 166

1    A. Right.
2    Q. Then we have Monday, August 2nd, where you
3  didn't go to the doctor's?
4    A. Right.
5    Q. You didn't call Mr. Rapoza in the morning;
6  is that right?
7    A. I can't recall.
8    Q. You don't remember, okay. You and
9  Mr. Rapoza talked that afternoon?
10   A. I would imagine so. I mean, I was in
11  contact with them, you know.
12   Q. Well, Mr. Rapoza called you that afternoon?
13   A. Like I said, I can't remember. All I can
14  remember -- I was in contact with them all week.
15   Q. You were in contact with them all week,
16  oftentimes only because they called you, correct?
17   A. I'm pretty sure, you know, if I'm in
18  contact, I'm sure it was going both ways, you know.
19   Q. But sitting here today, you tell me what day
20  you called them.
21   A. You know, a year out. Like I said, I had my
22  work phone. I mean, I was in contact with them. I
23  mean, I was, you know, the phone was on.
24   Q. We're going to get to that.

Page 167

1    A. If you're asking me, "Did you call in, too?"
2  I mean, I don't know. I just can't recall.
3    Q. All right, you can't recall. So on Tuesday,
4  August 3rd, you go to the doctor; is that right?
5    A. Yes.
6    Q. Tell me what happens at that doctor's
7  appointment.
8    A. I go to the doctor's. "How you feeling?"
9  Pushes on the belly, this and that. "Have you eaten
10  anything yet?" "No." "Are you keeping everything
11  down?" "Diarrhea?" Yes, a little bit, this, that.
12  "Anymore pain?" "Are you taking your medicine," you
13  know, this and that, you know, was basically how it
14  went. You know, told me to, you know, continue to
15  take my antibiotics. Any, you know, anymore pain or
16  anything, call him back. If I had, you know,
17  anything changed, give him a call. I think he told
18  me that I could start to eat some solid food. I
19  believe.
20   Q. So you just went through a bunch of stuff.
21  So you said he asked you about diarrhea?
22   A. Yes.
23   Q. And you indicated that, that was continuing
24  or no?

Page 168

1    A. Yes.
2    Q. So it was continuing?
3    A. Yes.
4    Q. And he asked you about pain?
5    A. Yes.
6    Q. What did you say about that?
7    A. I was still a little tender, you know. I
8  wouldn't call it pain, but I was still
9  uncomfortable.
10   Q. And he asked you if you were keeping
11  everything down?
12   A. Yeah, he was asking me if I had eaten solid
13  food yet.
14   Q. And you said no?
15   A. No, I told him I had been doing the chicken
16  soup or whatever, the stuff he was telling me to do.
17  Then he told me to start eating some light food. I
18  forget what it was that he told me to start eating.
19  But he told me at that time I could start slowly,
20  you know, to get back to eating.
21   Q. Did he ask you how you felt?
22   A. He did.
23   Q. What did you tell him?
24   A. I was feeling better certainly from the week

Page 169

1  before. But, you know, just some, you know, a
2  little bit of pain and a little bit of discomfort
3  from diarrhea, and I still was pretty weak.
4    Q. Anything else you remember from that
5  doctor's appointment?
6    A. No, I can't remember right now anything
7  else.
8    Q. Now, you had told Mr. Rapoza that you -- do
9  you know if Mr. Rapoza called your house that
10  afternoon? Actually, let me start over.
11       Do you remember calling Yale Electric on
12  the morning of August 3rd, an hour before your
13  shift?
14   A. What day are we talking about now?
15   Q. Tuesday.
16   A. Do I have any -- I don't.
17   Q. Do you know if Mr. Rapoza at some point
18  during the day on August 3rd called your home?
19   A. I don't.
20   Q. Do you remember if he may have spoken with
21  your girlfriend sometime during the afternoon of
22  August 3rd?
23   A. I don't remember.
24   Q. Did she indicate anything to you about

43 (Pages 166 to 169)

Daniel Greenwood

Page 170

1  Mr. Rapoza calling and her saying that you were
2  asleep?
3     A. I can't remember.
4     Q. Now, you had told Mr. Rapoza that you would
5  come in and see him that afternoon, do you remember
6  that?
7     A. Right, uh-hum.
8     Q. After your doctor's appointment?
9     A. Right.
10    Q. So sometime during the Monday call, you told
11 him you'd come in sometime Tuesday after your
12 doctor's appointment?
13    A. Yeah, I imagine.
14    Q. Did you come into Yale?
15    A. I did.
16    Q. Do you remember about what time that was?
17    A. I think it was early afternoon.
18    Q. Mr. Rapoza called your home around one, and
19 actually you came to Yale around three. Does that
20 jive your memory?
21    A. Possibly.
22    Q. Who did you see on Tuesday, August 3rd?
23    A. I think I met with -- I think I met with Jim
24 Rapoza and Lewis.

Page 171

1     Q. You think Mr. Frazer was at that meeting?
2     A. I believe so. Like I said, going back. I
3  was there a few times. So I'm trying to remember.
4     Q. But you know at a minimum you met with
5  Mr. Rapoza?
6     A. I'm sorry?
7     Q. You know at a minimum you met with
8  Mr. Rapoza?
9     A. Yes.
10    Q. What do you remember telling Mr. Rapoza?
11    A. I was looking for -- I wanted my vacation.
12 I was asking him if I could have my vacation week.
13 That, you know, I still had a vacation week out
14 there. If I could use it for this week that I was
15 recovering from, from being sick.
16    Q. Did you provide any documentation verifying
17 your need to have been absent from work during this
18 period at that point?
19    A. I didn't, no.
20    Q. Why not?
21    A. I really didn't think, you know, that -- at
22 that time, I mean, I really didn't think that I was,
23 you know, I was in as much trouble as I was then. I
24 mean, I really wasn't thinking that these guys were

Page 172

1  going to hammer me about documentation and this and
2  that. I just figured that my friends from work
3  would just be concerned about, you know, be glad
4  that I was back and I was recovering. You know, I
5  wasn't really, you know, I didn't really realize
6  that they were going to start, you know, pressuring
7  me for documentation, this, that and, you know,
8  which was kind of a shock to me.
9     Q. So you said that during your conversation
10 with Mr. Rapoza, you asked him if you could use
11 vacation time and take the rest of the week off?
12    A. Right.
13    Q. And he said -- well, actually, do you
14 remember what he said?
15    A. I told him I'd be off for the week, and
16 could I use my vacation week.
17    Q. Do you remember what he said?
18    A. I don't. I remember that it was denied.
19    Q. Do you remember that he said he had to go
20 ask Mr. Frazer?
21    A. I think so, yeah.
22    Q. So Mr. Frazer was not in the room, right?
23    A. Possibly, yeah.
24    Q. Because he called you later and told you he

Page 173

1  talked to Lewis?
2     A. Yeah, I believe we were talking in Jim's
3  office at the time, right.
4     Q. So you left asking him -- you said you were
5  going to be off that week?
6     A. Right.
7     Q. Did you indicate why you were going to be
8  off that week?
9     A. I think it was kind of obvious. I had just
10 been out of the hospital, and, you know, I was still
11 recovering.
12    Q. Well, what did you tell Mr. Rapoza?
13    A. What did I tell him why I'd be off that
14 week?
15    Q. Yes.
16    A. Because I'm still not feeling well, and I'm
17 not going to be in. I need some time to recover.
18 I'm not eating. I haven't started eating yet, and
19 I'm weak and still in a bit of pain and discomfort.
20    Q. Did Mr. Rapoza again ask you -- strike that.
21       So you said you asked him if you could
22 use your vacation. You're going to be out for the
23 week. He said he was going to talk to Mr. Frazer.
24 Did he call you later that afternoon?

44 (Pages 170 to 173)

Daniel Greenwood

<table>
<tr><td valign="top">

Page 174

1   A. It's possible. Like I said, I'm having a
2  hard time remembering conversations two years back.
3  I don't remember how I, you know, how I was
4  contacted or whatever. But I do remember I was
5  surprised that they weren't willing to help me out.
6   Q. So at some point -- it was that day, right,
7  at some point that day?
8   A. Could have been, yeah.
9   Q. Mr. Rapoza called you back and said you
10  can't use your vacation?
11   A. Yeah, right.
12   Q. Do you recall Mr. Rapoza at that time again
13  asking you if you could come in and perform some
14  light duty work?
15   A. Do I -- say again, please.
16   Q. Do you remember him, after saying that,
17  asking if you could come in and do some light duty
18  work?
19   A. Yeah, right.
20   Q. So you do remember that?
21   A. Yeah, I remember, you know, sure.
22   Q. Do you remember him telling -- you had been
23  on light duty before, right?
24   A. Right.

</td><td valign="top">

Page 176

1  statement that I wasn't told medically not to work.
2  But as far as light duty thing, you know, yeah, I
3  mean, he didn't say oh, you know, he told me to take
4  a week off and relax. He didn't specifically say,
5  "Oh, but you can do light duty," you know what I
6  mean? It was just, "Go home and relax and recover."
7   Q. Did you ever call the doctor and ask him if
8  you could do light duty?
9   A. No, I wasn't up for the light duty. I just
10  wanted to stay home and recover.
11   Q. But you understood that Mr. Rapoza felt he
12  needed you on light duty?
13   A. I don't think that light duty, I don't
14  think -- I don't know what I could have possibly
15  done that would have helped them, you know.
16   Q. But Mr. Rapoza had indicated he would like
17  you to consider light duty?
18   A. He did, yes, yes.
19   Q. Because Mr. Rapoza wanted you to come back
20  in some form that week?
21   A. Right.
22   Q. Now, you were off again on August 4th,
23  correct?
24   A. August 4th?

</td></tr>
<tr><td valign="top">

Page 175

1   Q. So you knew you could do light duty in the
2  warehouse or the office, you knew what that meant?
3   A. Right.
4   Q. And do you remember Mr. Rapoza raising that
5  with you and saying that you can do light duty in the
6  office or the warehouse?
7   A. Right.
8   Q. Is that right?
9   A. Right.
10   Q. What did you say?
11   A. I'm not up for it. I'm not feeling well.
12  I'm still weak. I'm uncomfortable. I have
13  diarrhea. I'm not, you know, I can't do it.
14   Q. But you had been released from the hospital
15  with no restrictions, correct?
16   A. Right.
17   Q. So no medical provider was telling you, you
18  couldn't do this?
19   A. No.
20   Q. It was you who had decided?
21   A. Yes. I mean, now that I'm thinking about
22  it, it was actually that doctor when I went and seen
23  him Tuesday, he told me to take the week off and
24  relax. So, I mean, that wasn't exactly a true

</td><td valign="top">

Page 177

1   Q. That's the Wednesday.
2   A. Okay, yes.
3   Q. You didn't call Yale an hour before the
4  start of your shift on August 4th to report your
5  absence, correct?
6   A. Right.
7   Q. Is that correct?
8   A. I suppose so, yeah.
9   Q. Let me ask you, I'm sorry, do you recall
10  Mr. Rapoza also telling you that you would need some
11  sort of medical documentation to support your
12  absences?
13   A. Right.
14   Q. At that point, as of August 4th, you still
15  had not provided --
16   A. Right.
17   Q. -- Yale any medical information, correct?
18   A. Correct.
19   Q. And you didn't -- you did not call and
20  report your absence on August 4th?
21   A. No, because I told them I was going to be
22  off for the week, and they knew I was in the
23  hospital. So --
24   Q. Well, you were not in the hospital on

</td></tr>
</table>

45 (Pages 174 to 177)

Daniel Greenwood

Page 178

1  August 4th?
2     A. No.
3     Q. And you did not call to report your absence
4  on August 4th, right?
5     A. No.
6     Q. And you did not provide any medical
7  documentation on August 4th for your absence on that
8  day or any day prior?
9     A. Correct.
10    Q. Now, you also didn't come to work on
11 Thursday, August 5th, right?
12    A. Correct.
13    Q. And you did not call in and report your
14 absence an hour before the shift?
15    A. No, I think I was talking to them on
16 Thursday. I know Wednesday, you know, that
17 Wednesday that you're talking about, you know, they
18 were starting with some phone calls. I talked to
19 Donna, and they talked to my nephew, and Lewis was
20 calling some of my guys at work, some guys I work
21 with and telling them that, "You better call your
22 boy and get him in here or we're going to fire him."
23 So I started getting calls from my parents that were
24 concerned. Of course they call my nephew and

Page 179

1  telling him, "Tell your uncle to get in here or else
2  he's going to be all done." Of course he tells my
3  brother, who tells my parents. I start getting
4  calls from some of my friends in there. You know,
5  saying, you know, "They're going to fire you.
6  They're pissed. You better get in there," you know.
7  I was just shocked by the whole thing, you know.
8     Q. Okay. I understand you were getting
9  contacted from other people. But I'm focusing on
10 your contact with the management of Yale and their
11 contact with you.
12    A. Right, okay.
13    Q. We'll talk about who else was calling you at
14 some other point in time.
15    A. Sure.
16    Q. I just want to make sure we process through
17 the week. Actually, that does remind me. When you
18 went in on Tuesday, you returned your radio, right?
19    A. Right.
20    Q. So you no longer had the radio --
21    A. Right.
22    Q. -- contact with them?
23    A. Right.
24    Q. Just because given what you just said, I

Page 180

1  just want to confirm while I understand, on
2  Wednesday and Thursday you're saying people started
3  calling you. You did not call Yale to report your
4  absence either on Wednesday, August 4th or Thursday,
5  August 5th?
6     A. No, I reported it on Tuesday.
7     Q. So you believe that it was sufficient for
8  you --
9     A. Right.
10    Q. -- to have told them I'm not working for the
11 rest of the week?
12    A. Sure.
13    Q. When you hadn't provided any medical
14 documentation to support your absence?
15    A. Right.
16    Q. On Thursday, August 5th, you also didn't
17 provide any medical information?
18    A. No.
19    Q. And on Thursday, August 5th, do you recall
20 that Mr. Frazer actually did leave you a message on
21 your answering machine?
22    A. I can't remember.
23    Q. Do you remember at any point in time telling
24 Mr. Rapoza on Tuesday when you met with him that you

Page 181

1  would check with your doctor to find out if you
2  could perform light duty and call him?
3     A. I can't remember that.
4     Q. Now, did you get Mr. Frazer's message on
5  Thursday, August 5th?
6     A. You say he left a message on the answering
7  machine?
8     Q. Do you remember that?
9     A. No.
10    Q. So you don't have any recollection of
11 talking to Lewis on Thursday?
12    A. You know, I can't remember certain dates and
13 times and conversations. But I do know that, you
14 know, it was getting thick, you know what I mean?
15 They were calling, and it was obvious that they were
16 upset that I wasn't going to come back, you know,
17 until I was ready. I don't remember certain
18 conversations, but I do remember people calling me.
19 I don't remember, you know, the answering machine
20 message.
21    Q. Okay.
22    A. But, yeah, I knew the pressure was on, the
23 heat was on.
24    Q. But you only knew that by way of things that

46 (Pages 178 to 181)

Daniel Greenwood

Page 182

1   other people were telling you?
2       A. I'm pretty sure I talked to them on Thursday
3   and told them I'd be in on Friday. I think I did
4   talk to them on Thursday, and they told me I'd
5   better come in with some kind of documentation, this
6   and that. That's when I came in and gave them that.
7       Q. Well, on Thursday afternoon Mr. Frazer left
8   a message on your answering machine because he had
9   not seen you at all on Thursday. Does that strike
10  your memory at all, then you arrived on Friday?
11      MR. RICE: Objection.
12      A. Like I said, you know, I had been in
13  contact, I can't remember what times, dates, who
14  exactly I talked to. But I do remember, you know,
15  somebody called me. I don't know if it was Lewis or
16  Jim. But somebody called me and said, "You'd better
17  get in here with some documentation and show us
18  something." I was like, "You don't believe I was in
19  the hospital?" So I did, I come in and showed them
20  that.
21      Q. So you recall getting information from Lewis
22  on Thursday that you needed to come in with some
23  medical documentation; is that right?
24      A. Right.

Page 183

1       Q. Then on Friday, you came in with some
2   medical documentation?
3       A. Correct.
4       Q. And the medical documentation you provided
5   to them is the document that's been marked Exhibit
6   18?
7       A. Yeah. It was that and maybe one or two
8   other things. I don't remember.
9       Q. Sitting here today, what do you remember
10  providing him other than the document marked Exhibit
11  18?
12      A. I remember this one.
13      Q. You remember the document marked Exhibit 18?
14      A. I do.
15      Q. That's the one you gave him?
16      A. Right.
17      Q. So you called -- you made contact with Yale
18  on Friday, August 6th; is that right?
19      A. I was there.
20      Q. Were you there or did you make a call?
21      A. I showed up. I was in the office. I had a
22  meeting with Lewis and Jim.
23      Q. Did you first call to inquire or come in to
24  inquire about your paychecks?

Page 184

1       A. Possibly. I don't know.
2       Q. Tell me what you remember -- you said you
3   remember on that Friday meeting with Lewis?
4       A. Yes, and Jim Rapoza.
5       Q. And Jim. About what time?
6       A. I don't know. I think it was, you know,
7   afternoon, sometime in the afternoon. I think it
8   was noon, you know, early afternoon.
9       Q. Had you called the company that morning?
10      A. I can't remember. I can't, like I said, we
11  were back and forth all week. So --
12      Q. You keep saying you were back and forth all
13  week. Have I missed a conversation in my
14  recitation?
15      A. I'm not just not picking up every individual
16  conversation I had all week. Like I said, I was in
17  contact with them all week. It was either Jim or
18  Lewis or this one and that one, but we were in
19  contact.
20      Q. Sitting here today, I'm asking you is there
21  a conversation that you had with Mr. Frazer and
22  Mr. Rapoza sometime between July 28th and August 5th
23  that we have not yet discussed?
24      A. Like I said, I'm not recalling, you know,

Page 185

1   all these conversations from two years ago. I do
2   remember, you know, I remember specifics, you know,
3   certain contacts, certain meetings, you know, that I
4   had. But I'm not able to pick up, you know, every
5   conversation, every phone call, every message, you
6   know.
7       Q. So you can't tell me about any other
8   conversation or contact you made, other than what
9   has already been discussed?
10      A. Well, I mean, up to what's been discussed.
11      Q. Right.
12      A. Right.
13      Q. Okay. So on Friday in the afternoon, you
14  recall meeting with Lewis and Jim Rapoza?
15      A. Right.
16      Q. Now, you brought in the documents?
17      A. I did.
18      Q. Brought in Exhibit 18 and provided that to
19  Lewis?
20      A. Right.
21      Q. What else can you remember happening?
22      A. I don't know. It was an ugly meeting. Back
23  and forth. Like I said, I was just kind of shocked.
24  You know, I came to realize that my job was on the

47 (Pages 182 to 185)

Daniel Greenwood

Page 186

1  line and, you know, I'm not understanding being an
2  employee of, you know, for so many years and a good
3  employee, you know, I was starting to get the
4  feeling that, you know, they were about to let me
5  go.
6      Q. Tell me anything more you remember about
7  this conversation.
8      A. I remember Lewis asking me how old I was.
9  He asked me, "How old are you now?" I said, "I'm
10  41." He said, "You know, maybe you're getting too
11  old to be doing what you're doing. We think you're
12  getting too old to be doing, you know, moving
13  appliances. And if you can't do that, if you can't
14  do that anymore, we don't have anything for you."
15      Q. What did you say?
16      A. I told them, "I'm the biggest, strongest,
17  best delivery guy you have, and I'm not too old to
18  do my job."
19      Q. Anything else said in that conversation that
20  you can remember?
21      A. There was lots of stuff said. I mean, those
22  are the highlights. I remember a couple of
23  highlights. You know, I don't know. Like I say, it
24  was an ugly meeting.

Page 187

1      Q. Mr. --
2      A. Then I think -- you know, I had another
3  appointment with my doctor to get me cleared for
4  work. He told me to -- you know, I told him -- I
5  think I had an appointment for Tuesday, for Monday
6  or Tuesday. And he told me, you know, I told him
7  I'd see him then. Then they were telling me, you
8  know, we're busy, we're this, we're that. "I had
9  nobody to run this truck, that truck. You really
10  put us in a tough position." You know, my thing
11  was, "Hey, you know what, I'm sick. You know, I'm
12  trying to recover, you know." And, you know, he
13  told me, "Well, you seem to be getting hurt a lot,"
14  and this and that. "Maybe you're too old for that.
15  You know, maybe you're too old to keep doing what
16  you're doing." I told him, you know, I mean I got
17  hurt, you know, the previous year, you know what I
18  mean, doing their work and doing the best I could.
19  You know, I have that hernia injury, you know, and
20  he was just -- "Well, you're getting hurt. You're
21  getting hurt too much. How old are you," this and
22  that. Basically telling me I couldn't do what I was
23  doing.
24      Q. Well, you weren't out at that point in time

Page 188

1  because you got hurt, right? You were out because
2  you had an illness?
3      A. Exactly. I don't think it mattered to Lewis
4  whether I was hurt or injured. It's just you're not
5  there.
6      Q. So I'm going to ask you to look at the
7  document that's marked Exhibit 18. That was the
8  document that you presented to Mr. Frazer on Friday
9  to explain your absence, right?
10      A. Right.
11      Q. Why did you think this document would excuse
12  your absence for the week of August 2nd?
13      A. Well, I mean, you know. I mean -- I was
14  surprised actually that it said no restriction on
15  activity. But I mean, I was still in pain. I was
16  three days out of the hospital, you know. I still
17  hadn't had a meal. I still hadn't had solid food
18  yet. I wasn't real ready to come back to work.
19      Q. Well, by Friday, actually, you had, you had
20  solid food?
21      A. Right, I was starting to recover. I was
22  starting to get some strength back. When you don't
23  eat for a week, I lost a bunch of weight. Like I
24  said, I still had the diarrhea. I still had some

Page 189

1  pain, and I wasn't ready to come back.
2      Q. I understand. But the medical note you
3  provided him did not indicate that you should have
4  been absent the week of August 2nd, right?
5      A. Right, right.
6      Q. And that's the document you handed him on
7  Friday to excuse your absence, right?
8      A. Right. Well, it wasn't to excuse my
9  absence. He basically wanted proof I was in the
10  hospital. He wasn't believing me.
11      Q. He wanted proof that you had a reason for
12  not coming to work, too, right?
13      A. Right, right.
14      Q. And that document doesn't say you can't work
15  the week of August 2nd.
16      A. It doesn't, no.
17      Q. So did you understand why Mr. Frazer might
18  have been frustrated?
19      A. Yes.
20      Q. Now, despite the fact -- well, let me strike
21  that.
22          So tell me how this meeting that you've
23  just described, how did that end?
24      A. I think I told him that I had another

48 (Pages 186 to 189)

Daniel Greenwood

Page 190

1  appointment with my doctor. And when I went back
2  and seen him, I would tell him that I was, you know,
3  ready to go back to work. And I would provide him a
4  note, you know, that I was ready to come back to
5  work.
6      Q. Did you provide any additional documentation
7  after August 6th?
8      A. I did end up -- you mean after my second
9  appointment with my doctor I think the following
10  week?
11      Q. Yes.
12      A. I did come in with a note saying that
13  Dan's ready to go back to work from this doctor,
14  whatever his name is there.
15          (Exhibit 19 marked for identification)
16          (Document exhibited to witness)
17      Q. Is this the document that you presented to
18  Mr. Frazer?
19      A. It is.
20      Q. Actually, did you give it to Mr. Frazer or
21  did you give it to somebody else?
22      A. I gave it to Lewis.
23      Q. When did you do that?
24      A. I think it was the Monday or Tuesday. I

Page 191

1  think it might have been a Tuesday the next week.
2      Q. Do you recall if you said anything to him
3  when you gave it to him?
4      A. I said, "Yeah, I'm ready to come back. I'll
5  see you tomorrow."
6      Q. Do you remember if Mr. Frazer asked anything
7  or said anything?
8      A. I remember what he said. He said -- well,
9  he told me, "No, don't come in tomorrow." He said,
10  "We're going to talk to our lawyers. We think you
11  violated company policy." He said, "Just go home
12  and wait for my phone call" or, you know, wait for
13  whatever. Wait for a call.
14      Q. Do you recall Mr. Frazer asking you if there
15  was anything else that you planned on submitting?
16      A. No.
17      Q. Do you remember telling him that -- handing
18  him this document and saying, "I should be all set"?
19      A. Saying that I should be all set?
20      Q. Quote, I should be all set.
21      A. Well, I was ready to go back to work. I
22  think that's what I said. "Here's my note, see you
23  tomorrow."
24      Q. And did Mr. Frazer indicate to you that this

Page 192

1  documentation was not good enough to excuse your
2  absence from work all of the prior week?
3      A. I mean, I don't remember what he, you know,
4  the exact statements were, but I do remember him
5  saying, "We're going to call our lawyers. We think
6  you violated company policy. Just go home and wait
7  for our call," you know, "wait for our phone call,"
8  you know.
9      Q. You would agree with me that this document
10  does not indicate that you could not have worked
11  light duty the prior week, right?
12      A. This is stating that I'm ready to come back
13  to work.
14      Q. Right.
15      A. Now, there's nothing here that says anything
16  about light duty.
17      Q. When was the next time you heard from Yale?
18      A. I think I called Steven on the phone. Might
19  have been the next day or -- I think it was probably
20  the next day, you know, and basically, "Steven,
21  what's going on?" You know what I mean? "Am I done
22  over here?" I told him, you know, "Hey, I was in
23  the hospital, dude, I was weak. I couldn't come
24  back last week. It sounds like Lewis is ready to

Page 193

1  fire me. Am I all done or what?" He says, "I don't
2  know. I'm going to call Lewis. I'm going to get
3  back to you," or something to that effect. I never
4  did hear from Steven again. But the next day, I did
5  hear -- I guess they had a meeting the next morning,
6  you know, with the -- telling all the drivers that I
7  had been fired. And, you know, that's basically how
8  I, you know, learned is people calling me like,
9  "Gee, sorry about what happened." I'm like, "What
10  are you talking about?" "Well, you know, there's
11  been a big meeting this morning talking about you
12  got fired." So --
13      Q. Who told you about that?
14      A. I don't know if it was my nephew or --
15      Q. You've referred to your nephew a few times.
16  Who is he?
17      A. He's Peter Greenwood. He works for Yale.
18      Q. So was it your nephew who told you that or
19  who else?
20      A. I think it was my nephew, you know, I don't
21  know if he was the first one who told me. But I
22  remember my nephew calling me, "Hey, sorry, you
23  know, sorry to hear what happened," this and that.
24  "I don't know what you're talking about." He's

49 (Pages 190 to 193)

Daniel Greenwood

Page 198

1   heard from Yale?
2       A.  I got a letter in the mail saying that I had
3   been excused for unexcused absence.  I'd been
4   terminated for unexcused absence.
5           (Exhibit 20 marked for identification)
6           (Document exhibited to witness)
7       Q.  I show you a document marked Exhibit 20.
8       A.  Yes.
9       Q.  Is that the document that you received in
10  the mail?
11      A.  Yes, it looked like that, yes.
12      Q.  Upon receiving it, did you talk to anybody
13  about it?  Well, actually upon receiving it, did you
14  talk to anybody about it?
15      A.  Did I talk to anybody?  You mean anybody at
16  Yale?
17      Q.  Anybody.
18      A.  My wife, my girlfriend.  Of course.
19      Q.  So your wife and your girlfriend?
20      A.  I was crushed.  No, just my girlfriend.  I
21  sometimes, you know, after all these years, I call
22  her my wife sometimes.  I was crushed.
23      Q.  Did you talk to anybody at Yale?
24      A.  I didn't.  I don't believe so.  Like I said,

Page 199

1   I was deeply crushed and depressed and pissed off.
2       Q.  Did you talk to your nephew?
3       A.  I don't think so.
4       Q.  Other than the conversations we've discussed
5   already, can you remember sitting here today any
6   other conversations you had with anybody about your
7   absences during the week of August 2nd?
8       A.  I can't.
9       Q.  And any other medical information supplied
10  to Yale Electric about your absences, other than
11  Exhibits 18 or 19?
12      A.  No, I don't believe so.
13      Q.  Now, August 2004 wasn't the first time you
14  were absent for over three days, right?
15      A.  No, I had that hernia operation.
16      Q.  And you had that hernia operation in late --
17  you actually went out on November 12, 2003; is that
18  right?
19      A.  Yeah, sounds right.
20      Q.  And you were out until -- out full-time
21  until January 25, 2004?
22      A.  Right.  Are we almost done or can we break?
23      Q.  Take a break.
24          (Whereupon, at 2:51 a recess was taken)

Page 200

1           (Resumed at 2:59)
2           (Exhibit 21 marked for identification)
3           (Document exhibited to witness)
4       Q.  Mr. Greenwood, I don't actually know, the
5   document that's just been submitted, I don't know
6   actually if you've ever seen it before or not.  You
7   have not?
8       A.  No, I haven't seen it.
9       Q.  But it concerns the period of time that you
10  were out for your hernia surgery, right?
11      A.  Uh-hum.
12      Q.  And it confirms that the injury date was
13  11/2/03, and you were cleared to return to work in
14  late January of 2004, correct?
15      A.  Okay, yes.
16      Q.  And this indicates that the doctor
17  recommends that you return to work for one week
18  light duty; is that right?
19      A.  Right.
20      Q.  You actually returned to work for more than
21  one week light duty; is that right?
22      A.  I think so.  I can't remember exact dates.
23  But, yes, I do remember after my hernia operation, I
24  did come back on light duty.

Page 201

1       Q.  Again, that was at your doctor's suggestion?
2       A.  Right.  I think it was basically at
3   Yale's -- you know, I suggested it to my doctor and,
4   you know, they wanted me.
5       Q.  And you were on light duty for about --
6   until about February 13, 2004?
7       A.  I think so, yeah.
8       Q.  That sounds right?
9       A.  Yes.
10      Q.  What was the position that you were
11  performing light duty?
12      A.  That was building a little training area.
13  Now, the first couple of days I don't remember
14  exactly -- actually, I do remember my first day
15  back.  I went out to help a team install a
16  frigerator.  There was a problem install.  In fact,
17  we ended up, I believe, taking it out over the fire
18  escape or something.  I do remember I tweaked my
19  back on that, that day, my first day back.  And I
20  think I come in late the next day.  Then, like I
21  say, then they had me, you know, doing some other
22  odd stuff.  Then we talked about, you know, building
23  a little training center, because we were starting
24  to get into more installs and stuff like that.

51 (Pages 198 to 201)

Daniel Greenwood

Page 202

1    Q. And you were okay with being back on light
2  duty?
3    A. Yes.
4    Q. And the position you were performing was not
5  your driver's job, right?
6    A. No.
7    Q. You were not on the road doing any
8  deliveries?
9    A. No.
10    Q. Do you remember the scheduled hours that you
11  were working in the light duty job?
12    A. I don't. I think they were basically, you
13  know, nine to five or something similar, eight to
14  four or something like that.
15    Q. So was the day shorter than your typical
16  driver day?
17    A. Yes, I think so.
18    Q. By a couple of hours or --
19    A. Yeah, by a few hours. I was working a
20  regular schedule.
21    Q. Do you remember returning to work to your
22  regular driver's duty on February 17, 2004?
23    A. I don't remember the exact day. I do
24  remember, you know, coming back. I don't remember

Page 203

1  exactly, but I do eventually remember going back to
2  my duties.
3    Q. Do you remember it was around mid February?
4    A. I imagine so, sure.
5    Q. And you received worker's compensation
6  benefits throughout that absence that began in
7  November of 2003?
8    A. I believe so, yes.
9    Q. And you received that throughout the whole
10  time that you were on -- you were completely out of
11  work, right?
12    A. When I was out of work, yes, I was getting
13  workmen's compensation until I went being back on
14  light duty.
15    Q. When you went back to light duty, did they
16  start paying you at your regular driver duty rate?
17    A. Yes.
18    Q. Even though you were on light duty?
19    A. Right.
20    Q. And that's the same rate you would have
21  received if you were performing your driver's
22  duties?
23    A. Correct.
24    Q. And in July of 2004, do you remember

Page 204

1  receiving a performance appraisal?
2    A. I do.
3    Q. Do you remember that it was generally a good
4  appraisal?
5    A. I do. I believe I got a raise.
6    Q. Do you remember what kind of raise you got?
7    A. I think it was 15 percent or something or
8  eight percent. I don't remember.
9    Q. Do you consider it a good raise?
10    A. I was -- I do. I think it was a good raise.
11  I hadn't had a raise in years. So, yeah, so I was
12  happy with it.
13        (Exhibit 22 marked for identification)
14        (Document exhibited to witness)
15    Q. Do you remember if this is a copy of the
16  last page of your overall performance appraisal?
17    A. I believe it is.
18    Q. Do you have any memory of any of the -- if
19  there were pages that came before it or is this all
20  you remember?
21    A. I don't remember. I do remember signing
22  this, and I think I was happy with the review.
23    Q. So you were pleased with it?
24    A. Yes.

Page 205

1    Q. Now, the date of this is July 16, 2004,
2  correct?
3    A. Correct.
4    Q. Do you remember just a few weeks before that
5  being advised that the leasing company had notified
6  Yale that you had been in a number of accidents?
7    A. Right.
8    Q. What do you remember about that?
9    A. I remember that, you know, that they were
10  trying to charge me with an accident. I didn't
11  think it was my fault. I remember talking to Lewis.
12  He was like, "Well, what should we do about it?" I
13  remember I told him, "We should go to the leasing
14  company and try to fight it or whatever, you know."
15  I believe at that time they wanted me to let my
16  partner do some driving to try to keep me out of the
17  driving seat for awhile.
18    Q. To try to make the leasing company happy?
19    A. Just to try to -- I suppose limit my
20  exposure to, you know. They put me with a guy
21  who --
22        (Exhibit 23 marked for identification)
23        (Document exhibited to witness)
24    Q. Do you recall seeing a copy of this?

52 (Pages 202 to 205)

Daniel Greenwood

Page 206

1    A. I think they did show it to me, yeah.
2    Q. This came out just a couple of weeks before
3    you got your appraisal, right?
4    A. I think so, yeah.
5    Q. You didn't get disciplined for this?
6    A. No. We talked about what we should do about
7    it.
8    Q. And the company was willing to hear you out
9    and work with you on it?
10    A. Yes.
11    Q. And were you pleased with the way the
12    company treated you about it?
13    A. I was.
14    Q. You thought that they dealt with you fairly?
15    A. Yes.
16    Q. You understood that this is the kind of
17    thing you could have been disciplined for?
18    A. Sure.
19    Q. And maybe even lost your job over?
20    A. There was a lot of issues like with
21    different guys there. Yeah, I mean, like I said,
22    you know, they said they'd work with me about it.
23    What should we do about it. I told them that maybe,
24    you know, a couple of these things, you know, we

Page 207

1    should fight and see if they were actually my
2    accidents. There was a couple, you know, I mean,
3    there was a little fender bender type things. But
4    there was one accident in particular that they were
5    calling an avoidable accident, which it was one that
6    somebody turned into me in a rotary. You know, and
7    I was being charged as a, you know, one of my
8    accidents. So I wanted to fight that one and see if
9    there was any way to fight that avoidable accident.
10    I mean, somebody turns into you in a rotary, it's
11    not really avoidable.
12    Q. But in any event, they heard you out and
13    they didn't --
14    A. Yeah.
15    Q. And they didn't discipline you for it?
16    A. No, I don't believe so.
17    Q. You understood that, that could be a serious
18    problem for the organization?
19    A. Yes.
20    Q. And that's not the first time that AMI had
21    expressed concern or I should say -- let me strike
22    that.
23        That's not the first time that AMI had
24    reported that you had three accidents, correct?

Page 208

1    A. I believe this is the first I had heard of
2    it.
3    Q. So you weren't aware that in June of 2003,
4    AMI had also reported three separate accidents?
5    A. No.
6        (Exhibit 24 marked for identification)
7        (Document exhibited to witness)
8    Q. I'm going to show you a document that's been
9    marked Exhibit 24 to your deposition. Have you ever
10    seen this before?
11    A. No.
12    Q. And you were not aware that AMI had made
13    this report to Yale back in 2003?
14    A. No.
15    Q. Now, you did not receive any worker's
16    compensation for your absences in July and August of
17    2004, right?
18    A. Absences for --
19    Q. The diverticulitis.
20    A. Workmen's comp?
21    Q. Yes.
22    A. No, that wasn't a comp thing.
23    Q. Now, your job as a delivery driver, would
24    you say that's a physical job?

Page 209

1    A. Yes.
2    Q. Physical because in addition to the driving,
3    you've got to move the appliances; is that right?
4    A. Yes.
5    Q. They can be heavy?
6    A. Yes.
7    Q. Would you agree your line of work is the
8    type where people regularly injure themselves?
9    A. Yes.
10    Q. Do you know of any other employees who have
11    been injured on the job and received worker's
12    compensation at Yale?
13    A. Yeah, I remember a couple of guys. A guy
14    broke his ankle, I think.
15    Q. Do you know his name?
16    A. Black dude. Daryl something or other. He
17    broke his ankle. He was out for a little bit.
18    Q. Anybody else?
19    A. Yeah, I know that one. I know he probably
20    definitely got some comp on that one. I'm not sure
21    about anybody else getting injured and doing comp.
22    That's the only one I know that he was out for a
23    little bit.
24    Q. Do you know the name of the employee who

53 (Pages 206 to 209)

Daniel Greenwood

Page 210

1  replaced you after you left Yale?
2      A. I don't.
3      Q. Do you know if he's ever received comp?
4      A. The one who replaced me?
5      Q. Yes.
6      A. I have no idea.
7      Q. Do you know how old the person is who
8  replaced you?
9      A. No.
10     Q. Do you know he's in fact older than you are?
11     A. No, I don't know that.
12     Q. You don't know the ages of all the other
13  drivers at Yale, do you?
14     A. I mean, pretty much. I think when I worked
15  there, there was only one guy I think that was maybe
16  a year older than me or so. But, you know, I was
17  definitely one of the older, you know, I think the
18  second oldest guy.
19     Q. And that's the best of your knowledge, you
20  didn't --
21     A. Yes.
22     Q. I assume you didn't specifically poll people
23  about their birth dates?
24     A. No. We were all pretty tight. We know, you

Page 211

1  know.
2      Q. The driver's helpers, do they lift?
3      A. Yes.
4      Q. Do you know all of their ages?
5      A. No.
6      Q. Other than what you've already indicated to
7  me, is there any other facts on which you base your
8  claim that you were discriminated against on the
9  basis of your age?
10     A. I was just told straight out -- I was told
11  straight out in the office, "You're too old to do
12  what you do."
13     Q. That's the conversation you claim Mr. Frazer
14  made to you on that Friday?
15     A. Right.
16     Q. Other than that, anything else?
17     A. No, I don't believe so.
18     Q. Do you know of any other employees at Yale
19  who failed to come in for several days on absences
20  that were considered unauthorized who were not
21  terminated?
22     A. I mean, there was guys that were out. In
23  fact, you know, my buddy Shawn Polh. He had some
24  kind of injury, a stomach problem or whatever. He

Page 212

1  was out for, you know, several weeks or whatever,
2  you know. I mean, you know, he had some kind of
3  similar thing to me.
4      Q. Do you know if Mr. Polh provided medical
5  documentation --
6      A. I don't know.
7      Q. Do you know if the doctor told him that he
8  could not work?
9      A. I don't know what his doctor said.
10     Q. And you don't know whether Yale asked him to
11  return to work light duty?
12     A. I don't know.
13     Q. And you don't know if his doctor said he
14  couldn't work light duty?
15     A. I don't know. I remember, you know, I went
16  and visited him when he was sick. He was in
17  pretty -- he was in tough shape. He had tubes
18  coming out of his stomach and everything.
19     Q. Do you know was he receiving disability pay?
20     A. I don't know that.
21     Q. Does Yale have a disability benefit policy?
22     A. I don't know.
23     Q. Anybody else you can think of who was absent
24  as you've indicated and not fired?

Page 213

1      A. That was absent hurt or --
2      Q. That was out like you were, who wasn't
3  fired.
4      A. One of the secretaries, nice girl that
5  worked there. I think she had some kind of, you
6  know, problem that she was out for quite awhile, a
7  month or two. I remember Daryl, the black dude, he
8  took a vacation and one of his vacations, 4th of
9  July, in fact. I remember this because for some
10  reason, they let him bump me because he was going to
11  Georgia or something, and he ended up coming back
12  three or four days after his vacation was up, and he
13  wasn't fired.
14     Q. Do you know if anybody at Yale authorized
15  him to extend his vacation?
16     A. I don't know, no. But what I heard was he
17  hit the lottery, and he wanted to take some more
18  time off.
19     Q. This woman that you're talking about --
20  first of all, do you know how old Daryl is?
21     A. I don't. Early 30's, probably.
22     Q. Does he still work at Yale, do you know?
23     A. I don't know.
24     Q. Did he work at Yale when you left?

54 (Pages 210 to 213)

Daniel Greenwood

Page 218

1    Q. Did you ever tell anyone at Yale about
2  Mr. Frazer's alleged comment?
3    A. Can't remember.
4    Q. Did you ever file a complaint?
5    A. I did.
6    Q. Where?
7    A. Discrimination board, Mass. --
8    Q. Mass. Commission Against Discrimination
9  board?
10    A. Right.
11    Q. I'm sorry, Mass. Commission Against
12  Discrimination?
13    A. Yes.
14    Q. Did you ever file any internal complaint
15  with Yale about Mr. Frazer' alleged comments to you?
16    A. I was already gone. There was nobody to
17  talk to at that point.
18    Q. Is there anything that we haven't discussed
19  that you believe supports your claim for worker's
20  comp retaliation?
21    A. No, I think you've been pretty thorough.
22    Q. Now, do you remember in October of 2003 Yale
23  got contacted about a levy against you from the IRS?
24    A. Yes.

Page 219

1    Q. And you talked to Mr. Frazer about that,
2  correct?
3    A. I did.
4    Q. And in November of 2003, Mr. Frazer asked a
5  Mr. Tom, is it Allgani, am I saying his name
6  properly?
7    A. I'm not sure Tom's name. But, yeah, he's an
8  accountant.
9    Q. And Mr. Frazer asked Tom to work with you to
10  try to resolve this issue with the IRS, correct?
11    A. Yeah, right.
12    Q. And Tom worked with you in this fashion?
13    A. He did.
14    Q. And he negotiated on your behalf with the
15  IRS, correct?
16    A. He did. He actually got them to drop the
17  levy, you know, and I thought they were going to
18  help me work it out. Steven talked to me and said
19  we would help you.
20    Q. So Steven -- Mr. Frazer and Mr. Sheinkopf
21  sought to assist you in late 2003?
22    A. Yes, right.
23    Q. About this IRS issue?
24    A. Right.

Page 220

1    Q. Did you ever talk to Mr. Sheinkopf about the
2  possibility of moving into a sales position?
3    A. No, I don't believe so.
4    Q. Mr. Greenwood, do you allege that you are
5  owed lost wages by Yale?
6    A. Am I owed lost wages? Yeah, I mean, I
7  believe I, you know, I got fired for, you know,
8  for -- without cause. And I believe they violated
9  my rights, you know. They broke the law when they
10  fired me. So I believe I deserve some kind of
11  compensation.
12    Q. Have you alleged or are you alleging that
13  you're entitled to any emotional distress damages?
14    A. Yes.
15    Q. Do you have any physical symptoms of
16  emotional distress?
17    A. I don't, but I went through severe
18  depression. I mean, me and my girlfriend came real
19  close to splitting up. My family almost split up.
20  You know, we had to, you know, depend on her dad to
21  help us out. You know, helping us out with some
22  mortgage payments and some bills. It was
23  embarrassing. It was depressing. It damaged our
24  relationship for a long time. Took me a little bit

Page 221

1  to get back on my feet, you know. I was pretty
2  depressed for awhile.
3    Q. What were your symptoms of depression?
4    A. Not wanting to get out of bed, not wanting
5  to see anybody, not wanting to do anything. You
6  know, just kind of in a shell for a while. I just
7  didn't want to see anybody. I didn't want to, you
8  know, I felt that nobody respected me anymore. I
9  didn't feel like, you know, a man. I didn't feel
10  like a provider. I didn't feel like I could provide
11  for my kids. We had some Christmas's and some
12  birthdays I would have liked to have done nice that
13  didn't happen. You know, we had some tough times.
14    Q. How long did you feel like you couldn't get
15  out of bed and didn't want to see anybody?
16    A. I mean, it came and went. I mean, you know,
17  my girlfriend, she's not the type to just lay back
18  and let things happen. She was on me, you know.
19  "You got to get out, you got to do this. We got to
20  make a living. You got to this. We're going to
21  lose the house." It came and went. I mean, it
22  affected our relationship, you know. I mean, only
23  up until, you know, I mean, we just -- we were
24  basically just hanging on, you know, for years. For

56 (Pages 218 to 221)

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                    )
DANIEL GREENWOOD,                   )
                                    )
                    Plaintiff,      )
                                    )   Civil Action No. 05-10605 JLT
v.                                  )
                                    )
YALE APPLIANCE AND LIGHTING, INC.,  )
                                    )
                    Defendant.      )
_____)
```

## AFFIDAVIT OF LEWIS FRAZER SUBMITTED IN SUPPORT OF DEFENDANT YALE APPLIANCE AND LIGHTING, INC.'S MOTION FOR SUMMARY JUDGMENT

I, Lewis Frazer, hereby state under the pains and penalties of perjury:

1.     I am Director of Operations of Yale Appliance and Lighting, Inc. ("Yale"). Since 2002, I have had full responsibility for the drivers at Yale.

2.     Yale has a place of business at 240 Forbes Boulevard, Mansfield, MA 02248.

3.     The core of Yale's business is the sales and servicing of major appliances and lighting.

4.     Stephen Sheinkopf, the President of Yale, held annual meetings with employees to review Yale's Handbook page by page and educate Yale's employees on the terms of the Handbook.

5.     Because of the nature of our business, Yale regularly deals with employees who are on, and returning from, workers' compensation leaves.

6.    Dan Greenwood's absences while hospitalized, July 28 – July 30, 2004, were not counted against him as "unexcused" or "unauthorized" absences.

7.    On Friday, August 6, 2004, Yale agreed to give Mr. Greenwood yet another opportunity to provide documentation to establish the need for his absences during the week August 2, 2004.

8.    The Memorandum dated August 10, 2004 was drafted by me and James Rapoza. Together, we used this memo to document the sequence of events surrounding and leading up to Mr. Greenwood's violation of the attendance policy. To the best of my recollection, we prepared this document on August 9 and August 10, 2004.


Signed under the pains and penalties of perjury this 22 day of January, 2007.

Lewis Frazer

2

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

9/17/2004

*Lewis Frazier*
c/o Yale Electric
HR Director
295 Freeport St
Boston, MA 02122

RE: Daniel  Greenwood  vs. Yale Electric, Lewis
Frazier,James  Rapoza
MCAD Docket Number:  04BEM02579
EEOC/HUD Number: 16CA402595

Dear Respondent:

Please be advised that the Massachusetts Commission Against Discrimination (MCAD) has received the
above referenced complaint of discrimination which alleges that you have committed an act of
discrimination.  A copy of that complaint is enclosed.

State law requires the Commission to impartially review the allegations in that complaint.  The
Commission has assigned one of its staff, Neldy Jean-Francois, to investigate the complaint.  This MCAD
investigator will keep the parties informed of developments arising from that investigation.

State law requires that you submit a formal written answer to the complaint in the form of a Position
Statement.  This written answer should be submitted to MCAD Investigator within twenty-one (21) days of
receipt of this notification.  In addition, the Position Statement **must be signed under the pains and
penalties of perjury**.  A copy must also be forwarded to the Complainant at the address listed on the
enclosed complaint.  Failure to file an answer or Motion for a More Definite Statement within the prescribe
time may result in sanctions being imposed in accordance with 804 CMR 1.16.  These sanctions may
include but are not limited to:
   a.   allegations in the complaint being taken as established for the purposes of the case in accordance
        with the claims of the Complainant;
   b.   a waiver by Respondent of the right to have the Commission conduct further investigation,
        determine whether   there  is probable cause and/or make conciliation efforts;
   c.   your being barred from  introducing any and all evidence at the public hearing;
   d.   your being barred from introducing designated matters into evidence at the public hearing;
   e.   your being barred from presenting any and all defenses at the public hearing; and,
   f.   your being barred from opposing  designated claims or supporting designated defenses at the
        public hearing.

Please note that you must include in the Position Statement one of the following statements:

I am (or Respondent is) represented by an attorney in this matter.
                     -OR-
I am (or Respondent is) not represented by an attorney in this matter.

Failure to submit an accurate statement may result in adverse action being taken against you as the
Respondent. Please note that if your representational situation changes, you must notify the Commission
immediately.

In order to reduce the time necessary to investigate and resolve complaints of discrimination, the MCAD schedules an Investigative Conference with the parties shortly after the complaint is filed. Information about that Conference is included with this notice.

An Investigative Conference regarding the above complaint will be held at the Commission's Offices, One Ashburton Place , Boston, MA, at 09:00 AM on 11/15/04. You are required to attend this Conference.

One important purpose of this Conference will be to determine whether the parties are willing to consider a rapid, informal and voluntary resolution of this dispute. The Commission encourages such resolutions as an alternative to the often lengthy and expensive litigation process.

If you have any questions pertaining to the Investigative Conference, please contact Neldy Jean-Francois at (617) 994-6038.

Sincerely,

Neldy Jean-Francois
Investigator

Cc:

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

| | |
|---|---|
| Yale Electric<br>HR Director<br>295 Freeport St<br>Boston, MA 02122 | Person Filing Charge:    Daniel  Greenwood<br>This Person (Check One):    ( ) Claims to be aggrieved<br>                                          ( ) Is filing on behalf of<br>Date of Alleged Violation:    08/12/04<br>Place of Alleged Violation:    Dorchester, |
| Lewis  Frazier<br>Yale Electric<br>HR Director | EEOC Charge Number:    16CA402595<br>MCAD Docket Number:    04BEM02579 |

James  Rapoza
Yale Electric
HR Electric

---

NOTICE OF CHARGE OF DISCRIMINATION WHERE AN FEP AGENCY WILL INITIALLY
PROCESS (See Attached Information Sheet For Additional Information)

You are hereby notified that a charge of employment discrimination under
    [✓] Title VII of the Civil Rights Act of 1964
    [✓] The Age Discrimination in Employment Act of 1967 (ADEA)
    [ ] The Americans Disabilities Act (ADA)
Has been received by
[ ]    The EEOC and sent for initial processing to    MCAD
                                (FEP Agency)
[ ]    The Mass. Commission Against Discrimination
        (FEP) Agency and sent to the EEOC for dual filing purposes.

While  the  EEOC  has jurisdiction  (upon the  expiration  of  any deferral requirements if this is a  Title VII
or ADA Charge) to  investigate this charge, EEOC may  refrain from  beginning  an  investigation and
await the issuance of the Agency's final findings and orders. These  final findings and orders will be given
weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe
that  the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and  evidence  provided  by
you  to  the  Agency  in  the  course  of its proceedings  will  be  considered  by  the  Commission  when it
reviews the Agency's final findings and orders. In many instances the  Commission will take no further
action, thereby avoiding the necessity of an investigation by both the Agency  and  the  Commission. This
likelihood is  increased by your active cooperation with the Agency.

[X]    As a party to the charge, you may request that EEOC review the final decision and order of the above
    named Agency. For such a request to be honored, you must notify the Commission in writing within
    15 days of your receipt  of the Agency's issuing  a final finding and order. If the agency  terminates
    its  proceedings  without  issuing  a  final finding and order,  you  will  be  contacted  further  by  the
    Commission.  Regardless  of  whether  the  Agency  or the  Commission  processes  the charge,  the
    Recordkeeping and Non-Retaliation provisions of  Title VII and the ADEA as explained on the
    second page of this form apply.

For further correspondence on this matter, please use the charge number(s) shown.

EEOC Charge Number 16CA402595, EEOC Transmittal Letter to Respondent          **DEF 0148**

[ ]   An Equal Pay Act Investigation (29 U.S.C 206(d) will be conducted by the Commission concurrently
      with the Agency's investigation of the charge.

[X]   Enclosure: Copy of the Charge

| Basis of Discrimination | | | | |
|---|---|---|---|---|
| ( ) Race | ( ) Color | ( ) Sex | ( ) Religion | ( ) National Origin |
| ( ) Age | ( ) Disability | ( ) Retaliation | ( ) Other | |

Circumstances of alleged violation:
SEE ENCLOSED COPY OF THE CHARGE OF DISCRIMINATION (or EEOC FORM 5)

| Date | Type Name/Title of Authorized EEOC Official | Signature |
|---|---|---|
| 9/17/2004 | Robert L. Sanders, Director | |

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

---

MCAD DOCKET NUMBER: 04BEM02579     EEOC/HUD CHARGE NUMBER: 16CA402595
FILING DATE: 09/17/04                VIOLATION DATE: 08/12/04

---

Name of Aggrieved Person or Organization:
Daniel Greenwood
143 High St.
Whitman, MA 02382
Primary Phone: (781)447-0658 ext. _____

---

Named is the employer, labor organization, employment agency, or state/local government agency who
discriminated against me:
Yale Electric
HR Director
295 Freeport St
Boston, MA 02122
Primary Phone: (617)825-9253 ext. _____

Lewis Frazier
Yale Electric
HR Director

,
Primary Phone: (617)825-9253 ext. _____

James Rapoza
Yale Electric
HR Electric

,

No. of Employees:        25+

Work Location: warehouse

---

Cause of Discrimination based on:
Age, Age of Complainant, specified.

---

**The particulars are:**
I, Daniel Greenwood, the Complainant believe that I was discriminated against by Yale Electric, Lewis
Frazier,James Rapoza, on the basis of Age. This is in violation of M.G.L. 151B Section b Paragraph 4 and
ADEA.

1. I have been employed with Yale Electric as a Truck Driver since 1998. My responsibilities included
delivering and installing major appliances.

2. Throughout my employment, I consistently received outstanding performance evaluations. Until
November 2003, I never missed a day of work.

MCAD Docket Number 04BEM02579, Complaint

**DEF 0150**

3. In November of 2003, I was required to have hernia surgery and received workers' comp. I was out of work for approximately six-seven weeks.

4. Around thiis Lewis Frazier and James Rapzsa, my supervisors, began suggesting that I was too old for the job and might want to think about finding another job.

5. When I returned to work, I continued to receive outstanding evaluations.

6. On July 27 2004, I began experiencing abdominal pain and, after finishing my shift, I met with Lewis Frazier to discuss the pain. He said he didn't want to hear about as they had "just dealt" with my hearnia. Later that day, I contacted a dispatcher and informed him that I would be going to the hospital and would likely be out the following day.

6. I was admitted to the hospital with an intestinal infection and remained there until July 30th. I was in contact with James Rapoza throughout this time.

7. I was out, on droctor's orders throughout the first week of August. On August 6th, I met with Mr. Frazier and Mr. Rapoza. At this meeting they wanted to know what duties I could perform. They asked how old I was and asked how long I thought I'd be able to continue working. They told me they thought I was getting too old for the job.

8. On August 9, I returned to work with a note from my doctor clearing me for work. Lewis Frazier accepted the note, told me to go home while he spoke to his company lawyer.

9. On August 12, I received a letter from Mr. Frazier stating that I had "self-terminated" by taking unauthorized time off from August 4th through 6th.

10. To the best of my knowledge, I was the oldest Truck Driver on staff.

11. I can also provide information regarding younger employees who have violated similar company rules and who were not terminated.

---------------------------------------------------------------------------------------------------------

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein are true to the best of my knowledge.

(Signature of Complainant)

DEF 0151

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place, Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

MAR 30 2005

- **DISMISSAL and NOTIFICATION of RIGHTS** -

| To: | Daniel C. Greenwood | **Case:** Greenwood v. Yale Electric, Lewis Frazer, James Rapoza |
|---|---|---|
| | 143 High St. | **MCAD Docket Number:** 04BEM02579 |
| | Whitman, MA 02382 | **EEOC Number:** 16CA402595 **25+ employees** |
| | | **Investigator:** Neldy Jean-Francois |

**Your complaint has been dismissed for the following reasons:**

[ ]   The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ]   Respondent employs less than the required number of employees.

[ ]   Your complaint was not timely filed with the Commission, i.e. you waited too long after the date(s) of the alleged discrimination to file. Because it was filed outside the time limit prescribed by law, the Commission cannot investigate your allegations.

[ ]   You failed to provide requested information, failed or refused to appear or to be available for necessary interviews/conference, or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your complaint. You have had more than 30 days in which to respond to our written request.

[ ]   The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in which to respond to a notice sent to your last known address.

[ ]   The Respondent has made a reasonable settlement, offering full relief for the harm you alleged. 30 days have expired since you received actual notice of this settlement offer.

[x]   The Commission issues the following determination. Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes a violation of the statutes. This does not certify that the Respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this complaint.

[ ]   Other (briefly state)

- **NOTICE of APPEAL** -

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice. You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this Commission. **Attention: Nancy To.**

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

_____          _____3/2 8/05_____
**Dorca I. Gomez**                                          **Date**
**Investigating Commissioner**

Cc:

Maria C. Moynihan, Esq.
Morgan, Brown & Joy, LLP
One Boston Place
Boston, MA 02108

**MEMORANDUM**

| | |
|---|---|
| **TO CASE FILE:** | *Greenwood v. Yale Electric, Lewis Frazer, James Rapoza* |
| **MCAD NO:** | 04-13-02579 |
| **EEOC NO:** | 16CA402595    *25+ employees* |
| **FROM:** | Neldy Jean-Francois, Investigator |
| **RE:** | **Dismissal and Notification of Rights** |

**Issues Investigated:**

On September 17, 2004 Complainant filed a complaint with this Commission alleging unlawful discrimination. The issue presented is whether Respondents unlawfully discriminated against Complainant by terminating his employment based on his age (d.o.b. 5/3/63) in violation of Massachusetts General Laws Chapter 151B, Section 4, Paragraph 1B and the Age Discrimination in Employment Act, as amended.

**Recommendation:**

Complainant alleges that Respondents terminated his employment because of his age. Specifically, Complainant alleges that when he returned to work after a medical leave of absence in December 2003/January 2004 his supervisors, Lewis Frazier and James Rapoza, "began suggesting that [he] was too old for the job and might want to think about finding another job." Complainant contends that he was the oldest Truck Driver working for Respondents. Complainant further alleges that when he returned to work after being out of work for about one week due to abdominal pains, Mr. Rapoza and Mr. Frazier met with him to discuss what duties he could perform. During this meeting Complainant asserted that his supervisors inquired about his age and asked him how long he would continue working. Complainant also alleges that they told him that he was getting too old for the job. Complainant stated that when he tried to return to work on August 9, 2004 after his sick leave with abdominal pain, Respondent refused to allow him to return to work. On August 12, 2004 Mr. Frazier gave Complainant a letter stating that he had self-terminated by taking unauthorized time off from August 4, 2004 to August 6, 2004. Complainant contends that Respondent's stated reasons for his termination are pretextual and that his age was the real reason for Respondent's decision to terminate his employment.

Respondent denies the allegations of discrimination. Respondent stated that the actions taken against Complainant were based on legitimate, nondiscriminatory reasons. Specifically, Respondent contends that Complainant was terminated for failing to report to work and/or call in to report his absences for three consecutive days.

Investigation revealed that Complainant began working for Respondent in 1998 as a Truck Driver. Investigation further revealed that throughout his employment, Complainant received positive evaluations from the same supervisors who Complainant alleges discriminated against him. The most recent evaluation, written by Mr. Rapoza, was given to Complainant on July 16, 2004, less than one month before Complainant was terminated. Investigation also revealed that on July 27, 2004 Complainant left work due to abdominal pains. Complainant went to the hospital and was released on July 30, 2004 without restrictions. Complainant, however, did not return to work until August 9, 2004. Complainant also did not call his supervisors to report his absences until August 6, 2004 when he came to the office and stated that his doctor told him not to return to work until August 9, 2005. Respondents contend that despite numerous requests, Complainant failed to provide Respondent with sufficient medical documentation to support his absences. Investigation also revealed that Complainant was aware of Respondent's company policy that requires employees to call in each day that he/she is absent. The policy also states that absence of three or more days may require medical documentation. Complainant failed to call in and/or provide medical documentation. As a result, Respondent terminated Complainant's employment. Respondent also provided the Commission with evidence that Complainant was not the oldest driver working for the company. There wee at least two other employees working for Respondent who were older than Complainant. Investigation therefore failed to substantiate Complainant's allegation of age discrimination.

Respondent has therefore articulated legitimate, nondiscriminatory reasons for its treatment of the Complainant. For the above reasons, there is insufficient evidence that Complainant was discriminated against by Respondent on the basis of the above-referenced discrimination charges. It is therefore recommended that this Complaint be dismissed for lack of probable cause.

| | |
|---|---|
| Neldy Jean-Francois | Jean A. Clanton |
| Investigator | Supervisor |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL GREENWOOD, | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| YALE APPLIANCE AND LIGHTING, INC., | ) |
| | ) |
| | ) |
| Defendant | ) |
| | ) |

## PARTIES

1.    The Plaintiff, Daniel Greenwood ("the Plaintiff" or "Greenwood"), is a resident of Whitman, Plymouth County, Commonwealth of Massachusetts.

2.    The Defendant, Yale Appliance and Lighting Inc., ("the Defendant or Yale"), is a corporation organized under the laws of the Commonwealth of Massachusetts, having a principal place of business in Boston, Suffolk County, Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

3.    The Defendant employed Greenwood as a delivery driver.

4.    Greenwood's date of birth is May 3, 1963.

5.    In or about 2003, Greenwood suffered a work-related injury, and as a result, missed work, and received worker's compensation benefits pursuant to G.L. c. 152.

6.    Greenwood returned to work in or about in or about January 2004.

1

7.    On or about July 27, 2004, Greenwood became sick with diverticulitis, and as a result, was hospitalized and received care from physicians and other medical professionals, and was forced to be absent from work.

8.    During his hospitalization, Greenwood was contacted by one James Rapoza, a manager employed by the Defendant, and informed Rapoza that he did not know yet when he might be released from the hospital, or when he might be able to return to work, and thus had to remain on leave.

9.    On or about Tuesday, August 3, 2004, Greenwood met with Rapoza at Yale's facility in Norwood, Massachusetts, and told him he would not be able to return to work until he was reevaluated by his physician on Monday, August 9, 2004.

10.    Later that day, Greenwood responded to Rapoza's inquiry by telling him that he could not return to work even for light duty purposes until he was cleared by his physician.

11.    On or about Friday, August 6, 2004, in response to his request to pick up a pay check for his accrued vacation leave, Rapoza told Greenwood that he should provide him with documentation regarding his absence.

12.    Later that day, Greenwood provided a record of his hospitalization and met with Rapoza and another manager, Louis Frazer.

13.    Frazer told Greenwood that Yale was missing a number of employees that week, and needed Greenwood to return to work.

14.    Frazer also asked Greenwood how old he was, and asked Greenwood if he could still perform his job as a delivery driver, in light of his age, the fact that he had

2

missed work due to his recent hospitalization, and as a result of his previous work-related injury.

15.    Frazer told Greenwood that if Greenwood could not carry out his duties as a driver, he could no longer work for Yale, as there were no inside jobs available for Greenwood.

16.    Greenwood told Frazer and Rapoza that he would return to work on August 10, 2004, with his physician's permission.

17.    On Monday, August 9, 2004, Greenwood presented Frazer with a note from his physician, dated August 9, 2004, indicating that he could return to work on "Tuesday, August 9 (*sic*), 2004." (Exhibit A.)

18.    Frazer took Greenwood's note, and told Greenwood to depart, and that he would consult with Yale's lawyer about Greenwood's status.

19.    By letter dated August 12, 2004, Yale notified Greenwood that he was terminated from employment.

20.    During his employment with Yale, Greenwood frequently worked more than 40 hours per "workweek," as this term is defined by the Fair Labor Standards Act, 29 U.S.C. § 201, et seq.

21.    Yale did not pay Greenwood overtime wages for hours he worked in excess of 40 per workweek.

<div align="center">

**COUNT I**
**VIOLATION OF THE FLSA**

</div>

22.    The Plaintiff, Daniel Greenwood, makes his claim under this count of this Complaint on behalf of himself and all similarly situated employees under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, ("FLSA").

23.    The Defendant is an "employer" within the meaning of the FLSA.

24.    Greenwood was employed by the Defendant to deliver and install appliances in the Greater Boston area, and was its "employee" within the meaning of the FLSA, and his employment was subject to the FLSA's requirement that employees must receive overtime pay for hours worked in excess of 40 in a workweek at a rate not less than time and one-half their regular rates of pay.

25.    In violation of the FLSA, the Defendant did not pay Greenwood, and upon information and belief, similarly situated employees, overtime pay for hours worked in excess of 40 in a workweek at a rate not less than time and one-half their regular rates of pay.

26.    Greenwood has been harmed, injured, and damaged as a result of the Defendant's violation of the FLSA.

### COUNT II
### VIOLATION OF G.L. C. 149, § 148

27.    The Plaintiff incorporates by reference all previous allegations in this Complaint.

28.    The Plaintiff has satisfied all prerequisites to suit under G.L. c. 149, § 148. (Ex. B.)

29.    The Plaintiff brings this count of this Complaint on behalf of himself and all similarly situated employees pursuant to G.L. c. 149, § 148 and § 150.

30.    The Defendant's employment of the Plaintiff was subject to the provisions of G.L. c. 149, § 148.

31.    By failing to pay the Plaintiff and similarly situated employees overtime wages, the Defendant has violated G.L. c. 149, § 148 by failing to pay all wages due and owing within the time specified by G.L. c. 149, § 148.

32.    The Plaintiff has been harmed, injured, and damaged as a result of the Defendant's violation of G.L. c. 149, § 148.

<div align="center">

**COUNT III**
**VIOLATION OF FMLA**
**TERMINATION FOR ABSENCES PROTECTED UNDER THE FMLA**

</div>

33.    The Plaintiff incorporates by reference all previous allegations in this Complaint.

34.    The Defendant is an employer within the meaning of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA").

35.    The Plaintiff was an "employee" of the Defendant within the meaning of the FMLA.

36.    As result of suffering from diverticulitis, the Plaintiff suffered from a "serious medical condition" within the meaning of the FMLA, and was entitled under the FMLA to 12 weeks of unpaid leave, upon his request for leave.

37.    In violation of the FMLA, the Defendant did not provide the Plaintiff with requested leave, and did not restore him to employment upon his representation that he could return to work, but terminated his employment for absences for which he was entitled to leave under the FMLA.

38.    The Plaintiff has been harmed, injured, and damaged as a result of the Defendant's violation of the FMLA.

**COUNT IV**
**VIOLATION OF THE FMLA**
**RETALIATORY DISCHARGE**

39.    The Plaintiff incorporates by reference all previous allegations in this complaint.

40.    The Plaintiff engaged in conduct protected by the FMLA by requesting leave for diverticulitis, by taking leave for this condition, and for taking leave attributable to his work-related injury in 2002.

41.    In retaliation for this protected activity, and in violation of the FMLA, the Defendant terminated the Plaintiff's employment.

42.    The Plaintiff has been harmed, injured, and damaged as a result of the Defendant's violation of the FMLA.

**COUNT V**
**VIOLATION OF THE ADEA**

43.    The Plaintiff incorporates by reference all previous allegations in this complaint.

44.    The Plaintiff has satisfied all prerequisites to suit under 29 U.S.C. § 621, *et seq.*, the Age Discrimination in Employment Act (the "ADEA").

45.    The Defendant is an employer within the meaning of the ADEA.

46.    The Plaintiff was an employee of the Defendant within the meaning of the ADEA.

47.    The Defendant terminated the Plaintiff's employment because of his age, in violation of the ADEA.

6

48.    The Plaintiff has been harmed, injured, and damaged as a result of the Defendant's violation of the ADEA

## COUNT VI
## VIOLATION OF G.L. c. 151B
## AGE DISCRIMINATION

49.    The Plaintiff incorporates by reference all previous allegations in this complaint.

50.    The Plaintiff has satisfied all prerequisites to suit under G.L. c. 151B.

51.    The Defendant is an employer within the meaning of G.L. c. 151B.

52.    The Plaintiff was an employee of the Defendant within the meaning of G.L. c. 151B.

53.    The Defendant terminated the Plaintiff's employment because of his age, in violation of G.L. c. 151B.

54.    The Plaintiff has been harmed, injured, and damaged as a result of the Defendant's violation of G.L. c. 151B.

## COUNT VII
## VIOLATION OF G.L. c. 152, § 75B(2)
## RETALIATORY DISCHARGE

55.    The Plaintiff incorporates by reference all previous allegations in this complaint.

56.    The Defendant is an employer within the meaning of G.L. c. 152.

57.    The Plaintiff was an employee of the Defendant within the meaning of G.L. c. 152.

58.    By missing work and receiving worker's compensation benefits as a result of a work-related injury, the Plaintiff exercised rights afforded by G.L. c. 152.

7

59.   The Defendant terminated the Plaintiff's employment in retaliation for his having exercised rights afforded by G.L. c. 152, in violation of G.L. c. 152, § 75B(2).

60.   The Plaintiff has been harmed, injured, and damaged as a result of the Defendant's violation of G.L. c. 152, § 75(B)(2).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that his Court:

(a)   Enter Judgment for Plaintiff on each Count of the Complaint in an amount sufficient to compensate him for the full amount of his injuries and damages together with all interest and costs of this action;

(b)   Award him back pay, front pay, damages for emotional distress, compensatory and punitive damages, liquidated damages, treble damages, interest, costs and attorney fees, as provided by G.L. c. 151B, G.L. c. 149, § 150, G.L. c. 152, the FMLA, the FLSA, and the ADEA.

(c)   Grant such other and further relief as this Court deems necessary and proper.

8

**JURY DEMAND**

The Plaintiff demands a trial by jury on all counts so triable.

Respectfully submitted,

DANIEL GREENWOOD

By his attorney,

Daniel W. Rice
GLYNN, LANDRY,
HARRINGTON & RICE, LLP
10 Forbes Road
Braintree, MA 02184
(781) 849-8479
BBO # 559269

Dated: March 25, 2005

9

# Aboualkheir Alzaim, M.D.

## Pulmonary Medicine & Internal Medicine
1221 Main Street, Suite 301, South Weymouth, MA 02190
Tel: 781-340-6420  Fax: 781-340-6421

## Return to Work

Date: _8/9/04_

This is to certify that

_Daniel Greenwood_

has been under my care, and will be able to return to work on the following date:

_Tues. August 9, 2004_

Remarks:

Aboualkheir Alzaim, M.D.



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1598

(617) 727-2200
www.ago.state.ma.us

THOMAS F. REILLY
ATTORNEY GENERAL

March 1, 2005

Daniel Greenwood
c/o Daniel W. Rice
Glynn, Landry, Harrington & Rice, LLP
Ten Forbes Road
Braintree, MA   02184-2605

Re:  Authorization for Immediate Private Suit - Yale Electric

Dear Mr. Greenwood:

Thank you for contacting the Office of the Attorney General's Fair Labor and Business Practices Division.

This letter is to inform you that we have carefully reviewed your complaint and have determined that the proper resolution of this matter may be through a private suit in civil court.  Accordingly, we are authorizing you to pursue this matter through a civil lawsuit immediately.

Massachusetts General Laws chapter 149, § 150, and chapter 151, §§ 1B and 20 establish a private right of action for employees who believe they are victims of certain violations of the state wage laws.  If you elect to sue in civil court, you may bring an action on your own behalf and others similarly situated, and you may obtain injunctive relief, treble damages for any loss of wages and other benefits, as well as the costs of litigation and reasonable attorneys' fees.

Without making a judgment on the merits of your complaint, this correspondence represents this office's written assent to sue and grants you the authority to pursue this matter against your employers immediately, as permitted by Massachusetts General Laws chapters 149 and 151.  This office will not take further enforcement action at this time.

Thank you for your attention to this matter.

Sincerely,

Bruce Trager
Assistant Attorney General
Fair Labor and Business Practices Division
(617) 727-2200, extension 2336

BT/pk

NewPRA.frm (11/22/02)


**YALE ELECTRIC SALES, CO.**

## Employee Acknowledgment of
## Yale Electric Sales
## Handbook

**Employee acknowledgement:**

This certifies that I have received, read, and understand the Yale Electric Sales Handbook dated _____, outlining current policies and general information. I understand that nothing in this handbook is intended to create an express or implied employment contract. Rather, it is an overview of policies and procedures in effect at the time it was prepared and can be interpreted and changed at any time in the discretion of Yale Electric Sales. I further understand that I am an employee at-will.

_Daniel Greenwood_
Employee Name

_[signature]_
Employee Signature

Date: 1/21/07

**DEF 0343**

HANDBOOK

I have read and understood the company handbook

Signed

Witness



YALE APPLIANCE + LIGHTING

POLICIES AND PROCEDURES

DEF 0032

# TABLE OF CONTENTS

Page

I.   WELCOME TO YALE ................................................................... 1

II.  ABOUT YALE APPLIANCE + LIGHTING/THIS HANDBOOK ................... 2

III. INTRODUCTORY PERIOD .......................................................... 2

IV.  LEAVE BENEFITS ..................................................................... 3
   A. Leave Under the Federal Family and Medical Leave Act of 1993, the
      Massachusetts Maternity Leave Act and the Small Necessities Leave Act. ..... 3
      (i)   Family and Medical Leave. .................................................... 3
      (ii)  Employees Who Are "Eligible". ............................................. 4
      (iii) Meaning of "Twelve (12) Month Period". ................................. 4
      (iv)  Advance Notice Requirement. .............................................. 4
      (v)   Mandatory Medical Certification. .......................................... 5
      (vi)  Intermittent or Reduced Leave. ............................................ 5
      (vii) Benefits. ....................................................................... 5
      (viii) Health Insurance Coverage. ................................................ 6
      (ix)  Failure to Return to Work. ................................................. 6
      (x)   Employee Reporting Requirements During Leave. ....................... 6
      (xi)  Medical Certification of Fitness to Return to Work. .................... 7
      (xii) Restoration to Position/Key Employees/Limitations on Job Restoration... 7
      (xiii) Husband and Wife both Employed by the Company. ..................... 7
      (xiv) Worker's Compensation Absence May Count as FMLA Leave. ............ 7
   B. Leave Under the Massachusetts Small Necessities Leave Act ("SNLA"). ....... 8
      (i)   Employees who are "Eligible" for Leave. ................................ 8
      (ii)  Meaning of "12-Month Period". ........................................... 8
      (iii) Intermittent SNLA Leave. .................................................. 8
   C. Leave Under the Massachusetts Maternity Leave Act. ......................... 9
   D. Parental Leave Policy. ............................................................ 10
   E. Military/Reservists Leaves of Absence. .......................................... 10
   F. Absences. ........................................................................... 11
      (i)   Personal/Sick Leave (Paid Time Off) -- Full-Time Hourly Employees... 11
      (ii)  Personal/Sick Leave (Paid Time Off) – Part-Time Hourly Employees.... 11
      (iii) Personal/Sick Leave (Paid Time Off) -- Salaried Employees. ........... 12
      (iv)  Requests for Paid Time Off for Use as Personal Leave. ................. 12

DEF 0033

(v)    Notification/Unexcused Absences. ................................................. 12
(vi)    Mid-day Departure. ............................................................................ 13
(vii)    Verification Regarding Sick Leave. ................................................. 13
(viii)   Unused Personal/Sick Leave (Paid Time Off). ............................. 13
G.    Bereavement Leave. ..................................................................................... 14
H.    Holiday Leave. .............................................................................................. 14
I.    Religious Needs and Beliefs. ...................................................................... 14
J.    Jury/Required Witness Duty. ...................................................................... 14
K.    Paid Vacation Leave. ................................................................................... 15
(i)    Maximum Accrual of Three Weeks. ............................................... 15
(ii)    Vacation Guidelines. ....................................................................... 15

V.    CURRENT BENEFITS ............................................................................... 16
A.    401(k). ............................................................................................................ 16
B.    Insurance Benefits. ....................................................................................... 16

VI.    ANTI-DISCRIMINATION AND SEXUAL HARASSMENT
WORKPLACE POLICY ............................................................................... 16
A.    Definition of Sexual Harassment. .............................................................. 16
B.    Examples of Inappropriate Behavior. ........................................................ 17
C.    Reporting and Investigatory Procedures Regarding Claims of Illegal
Discrimination, Including Sexual Harassment. ......................................... 18
D.    Sanctions for Discrimination. ..................................................................... 18
(i)    Third Party Discrimination or Sexual Harassment. ..................... 19
(ii)    Yale's Prohibition Against Retaliation. ......................................... 19
(iii)   Questions Regarding Yale's Anti-discrimination and Sexual Harassment
Workplace Policy. ............................................................................ 19
(iv)   Directions for Contacting State or Federal Enforcement Agencies. .......... 19

VII.    DISABLED EMPLOYEES/REASONABLE ACCOMMODATIONS. .......... 20

VIII.   ADMINISTRATIVE/SAFETY RULES AND WORKPLACE RULES ........ 21
A.    Employee and Customer Safety. ................................................................ 21
B.    Lunch. ............................................................................................................ 21
C.    Overtime - Hourly Employees. ................................................................... 21
D.    Attendance/Tardiness. ................................................................................. 21
(i)    Unexcused Absences of Three (3) or more Days. ......................... 22
(ii)    Regular Attendance. ........................................................................ 22
E.    Time Sheets: Rules For Hourly Employees. ............................................. 23
F.    Bulletin Boards/E-Mail. .............................................................................. 23

G.   Personnel Records. ................................................................. 23
H.   Performance Appraisals. .......................................................... 23
I.    Inclement Weather Closings. .................................................... 24
      (i)    If the office is closed the day before. ............................ 24
      (ii)   If the office is closed during the day. ........................... 24
      (iii)  If the office is not closed but employees choose not to come in. ............ 24

IX.   EMPLOYEE CONDUCT/EMPLOYMENT POLICIES .................................. 24
A.   Confidentiality/Proprietary Information. ................................... 25
B.   Legal or Media Inquiries. ....................................................... 25
C.   Outside Employment and Employment or Business with Family
      Members/Conflict of Interest. ................................................ 25
D.   Workplace Conduct/Corrective Action/Disciplinary Action. ........... 25
E.   Smoke-Free Workplace. ......................................................... 27
F.   Boston Public Health Commission Policy Prohibiting Smoking in the
      Workplace. ......................................................................... 27
      (i)    Purpose. .............................................................. 27
      (ii)   Policy. ................................................................ 27
      (iii)  Procedure. ........................................................... 28
      (iv)   Smoking Cessation Opportunities. ................................ 28
      (v)    Questions. ........................................................... 28
G.   Dress Code. ........................................................................ 28
      (i)    Warehouse Employees. ............................................. 29
      (ii)   T-Shirts. ............................................................. 29
H.   Use of Yale's Equipment, Electronic and Telephonic Communications
      And Other Systems. .............................................................. 29
I.    Use of Yale Vehicles. ............................................................ 30
J.    Criminal Offender Record Information ("CORI"). ......................... 31

X.    DRUG-FREE WORKPLACE ......................................................... 32
A.   Drug and Alcohol Workplace Policy. ....................................... 32
      (i)    Drug Testing Policy ................................................. 33
      (ii)   Type of Tests. ....................................................... 33
B.   Employee Testing. ................................................................ 34

XI.   WORKPLACE SEARCHES ............................................................ 34

## I.   WELCOME TO YALE

Welcome to Yale Appliance + Lighting ---

As an employee of Yale Appliance + Lighting ("Yale" or "the Company") you have joined a well-established retail business company. Each employee has the opportunity to grow with the Company by being eager to learn and adaptable to change. Every position is critical to Yale. Each of us has an opportunity to contribute to the success of Yale.

This handbook is our attempt to provide sufficient guidance without overburdening our employees with needless bureaucracy. This handbook is intended as a guide and is not intended to provide all information necessary regarding your employment with Yale. The management of Yale from time to time will provide other information regarding your employment, through oral, written, electronic or telephonic communications. It will be continuously updated to reflect our changing business and business practices. Changes also will be provided in hard copy or on-line. and all employees are asked to insert all changes into his/her handbook.

Yale has an open door communications policy. Employees are encouraged to bring any questions or comments regarding this handbook, or our policies to the Director of Sales, Steve Sheinkopf, telephone number (617) 822-6150. I welcome your input and I am happy that you are part of the Yale Team.

Cordially,

Steven Sheinkopf
Director of Sales

## II.    ABOUT YALE APPLIANCE + LIGHTING/THIS HANDBOOK

YALE APPLIANCE + LIGHTING ("Yale") reviews its rules, policies and operating procedures periodically. Information contained in this document is, therefore, subject to change at any time, and with or without notice by Yale. This document is intended as a guide and is not intended to provide all the information necessary regarding your employment with Yale. Other information regarding your employment will be provided by the management of Yale from time to time, through oral, written, electronic, or telephonic communications.

The highlights of benefits contained in this handbook are not intended to take the place of more detailed benefit plan documents. In the event that information presented in the handbook is inconsistent with information in the plan documents, descriptions in the plan documents will override the information in this handbook.

This document does not create an employment agreement or contract with you.

*Your employment is as an employee at will and as such can be terminated either by Yale or you at any time, with or without notice and with or without cause.*

Please read this handbook carefully. Should you have any questions regarding this handbook, please contact the General Manager, Robert Joyce, (617) 822-6131.

## III.    INTRODUCTORY PERIOD

Every employee who joins Yale is considered an "Introductory Employee". During the introductory period employees are not entitled to benefits and vacation and other paid leave. Generally, introductory periods are for four (4) consecutive months. In the discretion of Yale, an introductory period may be extended or terminated. An employee may also choose to leave before the completion of an introductory period. Nothing in this section shall be construed as modifying an employee's at-will status.

Upon successful completion of the introductory period, employees will be credited with time worked for purposes of determining eligibility for benefits currently offered by Yale.

**THIS HANDBOOK SUPERSEDES ALL PREVIOUS HANDBOOKS AND/OR POLICY DOCUMENTS.**

## IV.    LEAVE BENEFITS

### A.    Leave Under the Federal Family and Medical Leave Act of 1993, the Massachusetts Maternity Leave Act and the Small Necessities Leave Act.

Employees may be entitled to family leave in accordance with the Federal Family and Medical Leave Act of 1993 ("FMLA"), the Massachusetts Maternity Leave Act or the Small Necessities Leave Act. These laws permit eligible employees to take unpaid leaves to tend to certain family and health matters. Eligible employees also may be permitted, or in certain instances, required to substitute any accrued paid leave for unpaid leave permitted by either law.

Information regarding leaves allowed under these laws and the obligations of employees and Yale under these laws are stated in the notice to employees of rights under the FMLA, the Massachusetts Commission Against Discrimination Fact Sheet on Parental Leave and the Small Necessities Leave Act notice. Copies of these notices are posted on the bulletin board. *Additional copies of these notices also may be obtained from the General Manager.*

Leave benefits are also explained below.

### (i)    Family and Medical Leave.

In compliance with the Family and Medical Leave Act of 1993, Yale will grant up to twelve (12) weeks of unpaid leave, as explained below, to an eligible employee for one or more of the following reasons:

*The birth, adoption or foster care placement of the employee's child;*

*To care for a child during the twelve (12) month period following the birth or placement of a child for adoption or foster care;*

*To care for the employee's child, spouse or parent, if the child, spouse or parent has a serious health condition; and*

*To tend to the employee's own serious health condition that renders the employee unable to perform the functions of his or her job.*

Except as otherwise stated, if an employee wishing to take family or medical leave is eligible under the existing Yale policy to take paid leave (For example: vacation, or paid time off), Yale will require that all available paid leave be taken and exhausted before unpaid family or medical leave may be used.

For example: Yale's present policy allows employees to take paid time off ("PTO") when they have a serious health condition that prevents them from working or when a dependent child or elderly relative who resides with them is ill. Therefore, employees eligible for FMLA leave, in these cases must exhaust all accrued paid time off to which they are entitled during the family or medical leave period and then take unpaid leave for any balance of the twelve (12) week leave period.

### (ii)    Employees Who Are "Eligible".

Employees are "eligible" to take family or medical leave only if they have worked for Yale for at least twelve (12) months and for at least 1,250 hours during the previous twelve (12) months and only if there are at least fifty (50) employees of Yale within seventy-five (75) miles of the employee's work site.

### (iii)    Meaning of "Twelve (12) Month Period".

The twelve (12) month period during which an eligible employee can take a leave under this policy is a rolling period. This period is measured backward from the date an employee uses FMLA leave. An eligible employee's leave entitlement consists of up to twelve (12) weeks of FMLA leave during this rolling twelve (12) month period. If you have any specific questions regarding the twelve-month period, please contact the General Manager.

### (iv)    Advance Notice Requirement.

Whenever the need for leave is foreseeable, for example, when the need for the leave is based upon an expected birth, placement for adoption or foster care, or planned medical treatment for a serious health condition of the employee or of a family member, an employee must give Yale at least thirty (30) days advance notice before leave will commence. A form for requesting leave is available from the General Manager, Robert Joyce, (617) 822-6131. Employees must also advise Yale, as soon as practicable, if the date(s) of scheduled leave changes. When the need for leave is not foreseeable thirty (30) days in advance, an employee must give notice to Yale within two (2) working days of learning of the need for leave,

absent extraordinary circumstances. If an employee knew about the need for leave, but failed to give timely notice to Yale, Yale may delay the taking of leave until thirty (30) days after the date of the employee's request.

### (v)    Mandatory Medical Certification.

Any employee requesting leave because of a serious health condition of the employee or the employee's parent, spouse or child, must furnish Yale with an appropriate medical certification. The certification must be signed by the appropriate health care provider on the form provided by the General Manager. Employees should submit the medical certification form along with their leave request. Yale may deny the taking of leave until the certification is provided. In cases of unforeseen leave, medical certification must be submitted to Yale as soon as possible. Yale may, in its discretion, require any employee seeking leave because of a serious health condition to obtain a second and possibly a third opinion at Yale's expense.

When an employee is on leave, subsequent recertifications of a medical condition may be required every thirty (30) days or when Yale requests certification in appropriate circumstances. For example: when an employee seeks to extend the leave or there is a change in the circumstances from those described by the previous certification.

### (vi)    Intermittent or Reduced Leave.

When medically necessary, an employee may take "intermittent" leave (two (2) or more separate leave periods) or "reduced" leave (where an employee continues to work, but for fewer hours per day or per week). In such cases, the total number of hours or days of leave taken by the employee is limited to the equivalent of twelve (12) work weeks for that employee. Employees must make a reasonable effort to schedule the leave in a manner that will not unduly disrupt Yale's operations. Yale may transfer an employee to an available alternative position with equivalent pay and benefits for which the employee is qualified, if that position can accommodate recurring periods of leave better than the employee's regular job.

### (vii)    Benefits.

Employees who take leave will not lose employment benefits that accrued prior to the date the leave commenced. However, employees will not accrue seniority or benefits during the leave period and will not be entitled to benefits that the

employees would have gained only if they had been in active employment. With the exception of health insurance coverage (see below), no employee benefits will be provided by Yale while an employee is on unpaid leave.

### (viii)  Health Insurance Coverage.

Employees who are out on leave will be maintained on Yale's health insurance plan at the same level, with the same coverage and under the same conditions as if they had not taken leave. *To avoid cancellation of health insurance coverage, employees on unpaid leave are responsible for making timely payments to Yale for their share of premium payments, in accordance with the schedule established by Yale prior to the unpaid leave. If the employee fails to make premium payments, Yale may terminate the employee's benefit coverage. The employee would then be eligible for continuation of these benefits under the terms of COBRA.*

### (ix)  Failure to Return to Work.

If an employee fails to return to work at the end of the leave period, and the failure to return is not due to circumstances beyond the employee's control (including the continuation, recurrence or onset of a serious health condition), the employee must reimburse Yale for health insurance premiums paid by Yale while the employee was on leave. Yale will require sufficient medical certification of an employee's inability to return to work because of a serious health condition before the employee will be released from the requirement to reimburse Yale for health insurance premiums paid during the employee's leave period.

### (x)  Employee Reporting Requirements During Leave.

Employees on FMLA leave must report to Yale every thirty (30) days on their status and intent to return to work. In addition, employees must give prompt notice of any change in circumstances resulting in a need for more or less leave than originally anticipated. Yale's obligations under the Family and Medical Leave Act of 1993 (including maintenance of health insurance coverage and restoration to an equivalent position) cease when an employee gives Yale notice of his or her intention not to return to work.

### (xi)    Medical Certification of Fitness to Return to Work.

If, an employee's FMLA leave is because of the employee's serious health condition, Yale may require the employee to obtain medical certification that he or she is able to resume work. Yale will notify the employee if such certification is required before the employee will be permitted to return to work.

### (xii)    Restoration to Position/Key Employees/Limitations on Job Restoration.

Upon return from FMLA leave, employees will be restored to either the same position they held when the leave commenced or to an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment, subject to any legal exceptions allowed. However, this guarantee of restoration shall not apply to certain highly compensated employees, "key employees" if necessary to avoid substantial and grievous economic injury to Yale's operation. In addition, an employee on FMLA leave has no greater right to reinstatement or to other employment benefits and conditions than if the employee had been in active employment. For example, if while on FMLA leave an employee's department is eliminated, this employee would not be entitled to return at the conclusion of the FMLA leave.

### (xiii)    Husband and Wife both Employed by the Company.

If both husband and wife are employed by the Company, they are together entitled to a maximum of twelve (12) work weeks of leave during any twelve (12) month period for the birth, adoption or foster care placement of a child or to care for a parent with a serious health condition.

### (xiv)    Worker's Compensation Absence May Count as FMLA Leave.

An on-the-job injury may result in a serious health condition for which FMLA leave may be taken. When this occurs, Yale may require that an employee's FMLA leave run concurrently with the employee's worker's compensation leave. Accordingly, in those instances when an employee's work-related injury qualifies as a serious health condition under the FMLA, the FMLA leave will run concurrently with the employee's worker's compensation leave.

**B.    Leave Under the Massachusetts Small Necessities Leave Act ("SNLA").**

Eligible employees may also take up to twenty four (24) hours of unpaid leave, during a twelve month period for the purpose of tending to certain family matters which include:

- Participating in school activities directly related to the educational advancement of an employee's son or daughter, for instance, a parent teacher conference or an interview at a new school;

- Accompanying an employee's son or daughter to a routine medical or dental check up, for instance; a check up or vaccination.

- Accompanying an elderly relative to a routine medical or dental appointment or one related to the elder's care, for instance, to an interview at a nursing or group home.

### (i)    Employees who are "Eligible" for Leave.

Employees are "eligible" to take SNLA leave only if they have worked for Yale for at least twelve (12) months, have worked 1,250 hours during the twelve (12) months and only if there are at least fifty (50) employees of Yale within 75 miles of the employee's work site.

### (ii)    Meaning of "12-Month Period".

The twelve (12) month period during which an eligible employee can take a leave under this policy is a rolling period. This period is measured backward from the date an employee uses SNLA leave. An eligible employee's leave entitlement consists of up to twenty-four (24) hours of SNLA leave during this rolling twelve (12) month period. If you have any specific questions regarding this, please contact the General Manager.

### (iii)    Intermittent SNLA Leave.

An eligible employee may take SNLA leave intermittently and need not use the entire twenty-four (24) hour leave at once. However, the leave taken cannot exceed twenty-four (24) hours during the twelve (12) month period.

The twenty-four (24) hours of unpaid leave are in addition to leave permitted by the FMLA and, the Massachusetts Maternity Leave Act. Whenever the need for leave is unforeseeable, employees must provide Yale with at least seven (7) days notice prior to taking the leave. In all other instances, employees are requested to provide as much leave as possible. Yale may request written certification confirming the necessity for the leave.

Employees are not required to, but may use accrued vacation, or paid time off when taking SNLA leave.

Employees are encouraged to seek additional information or bring any questions regarding these leave provisions to General Manager's attention.

### C.    Leave Under the Massachusetts Maternity Leave Act.

A full-time female employee who is ineligible for leave under the Family and Medical Leave Act but who has completed the introductory period, may be entitled to eight (8) weeks of maternity leave for the purpose of giving birth or adopting a child under eighteen (18) years of age or under twenty-three (23) years of age, if the child is mentally or physically disabled. For instance, a female employee who either has multiple births or adopts more than one child at the same time is entitled to eight weeks of leave for each child. In order to be eligible for this leave, an employee must give the General Manager, Robert Joyce, at least two (2) weeks notice of her anticipated date of departure and intention to return to work. This leave will be without pay, except that if an employee has accrued vacation or sick leave, an employee may voluntarily use any paid accrued leave time concurrently with all or part of her maternity leave.

At the conclusion of a maternity leave, the employee will be reinstated to her previous or a similar position with the same salary she received at the commencement of her leave. Yale, however, may not reinstate an employee on maternity leave to her previous or similar position if other employees of equal seniority or status in the same or similar position have been laid off due to economic conditions or have been otherwise affected by changes in employment conditions during the period of maternity leave. A maternity leave shall not affect an employee's ability to receive vacation leave, sick leave, bonuses, advancement, seniority or other benefits for which she was eligible on the date her leave began, however, the maternity leave period shall not be included in the computation of such benefits.

### D.    Parental Leave Policy.

A full-time male employee who is ineligible for leave under the Family and Medical and Leave Act but who has completed the introductory period may be entitled to eight weeks of parental leave upon the birth of a child by a spouse or partner or adoption of a child under eighteen (18) years of age or under twenty-three (23) years of age if the child is mentally or physically disabled. For instance, a male employee whose spouse either has multiple births or who adopts more than one (1) child at the same time is entitled to eight weeks of leave for each child. To be eligible for such leave, the employee must give the General Manager, Robert Joyce, at least two (2) weeks notice of his anticipated date of departure and intention to return to work. This leave will be without pay, except that if an employee has accrued vacation or sick leave, an employee may voluntarily use any paid accrued leave time concurrently with all or part of his parental leave.

At the conclusion of a parental leave, the employee will be reinstated to his previous or a similar position with the same salary that he received at the commencement of his leave. Yale, however, may not reinstate an employee on parental leave to his previous or to a similar position if other employees of equal seniority or status in the same or similar position have been laid off due to economic conditions or have been otherwise affected by changes in employment conditions during the period of parental leave. A parental leave shall not affect the employee's ability to receive vacation leave, sick leave, bonuses, advancement, seniority or other benefits for which he was eligible at the beginning date of the leave, however, the parental leave period shall not be included in the computation of these benefits.

### E.    Military/Reservists Leaves of Absence.

Yale provides leave and job protection benefits for eligible employees in accordance with Federal and State laws. For specifics regarding military leave and rights available to employees taking leave, please contact the General Manager, Robert Joyce. When you are called to active military duty or to Reserve or National Guard training or volunteer for military activities, you should submit copies of your military orders to the General Manager, Robert Joyce, as soon as reasonably practical.

**F.    Absences.**

**(i)    Personal/Sick Leave (Paid Time Off) -- Full-Time Hourly Employees.**

Paid personal/sick leave, paid time off ("PTO"), is intended to assist eligible employees, by providing paid leave, when either they or a member of their immediate family is ill, or when they must attend a parent – teacher conference, doctor's appointment, or tend to other personal matters.  Except as otherwise provided for by law, personal/sick leave (PTO) may not be used to extend any other leave.

Full-time employees, employed with Yale for a period of four (4) consecutive months will receive one day, eight (8) hours, of PTO, upon completion of four (4) consecutive months.  Thereafter, PTO accrues at the rate of one (1) day, (8 hours) at the conclusion of every two and one-half (2 1/2) consecutive months worked up to a maximum of five (5) days (40) hours during each subsequent twelve month period.  *Full-time hourly employees may only accrue up to five (5) days of PTO during any twelve month period and accrued PTO may not be carried over from one twelve month period to the next.  PTO may not be taken before it accrues.*

Any hourly employee who abuses this leave policy including requesting leave when neither the employee nor a dependent child is ill is subject to discipline, including, in the discretion of Yale, immediate termination. Except as otherwise provided for by law, paid time off may not be used to extend any other leave.

**(ii)    Personal/Sick Leave (Paid Time Off) – Part-Time Hourly Employees.**

Paid personal/sick leave, paid time off ("PTO"), is intended to assist eligible employees, by providing paid leave, when either they or a member of their immediate family is ill, or when they must attend a parent – teacher conference, doctor's appointment, or tend to personal matters except as otherwise provided for by law, paid time off may not be used to extend any other leave.

Part-time employees employed with Yale for a period of four (4) consecutive months will receive one day (8 hours) of paid time off. Thereafter, part-time hourly employees will accrue paid time off at the rate of one (1) day, (8 hours) at the conclusion of every four (4) consecutive months worked up to a maximum of three (3) days, (18 hours) during any twelve month period. *Part-time employees may*

*only accrue paid time off up to a maximum of three (3) days and paid time off may not be carried over from one twelve month period to the next. PTO may not be taken before it accrues.*

Any hourly employee who abuses this policy, including requesting leave when neither the employee nor a dependent child is ill is subject to discipline for the unexcused absence, including, in the discretion of Yale, immediate termination. Except as otherwise provided for by law, paid time off may not be used to extend any other leave.

### (iii)    Personal/Sick Leave (Paid Time Off) -- Salaried Employees.

Paid personal/sick leave, paid time off ("PTO"), is intended to assist eligible employees, by providing paid leave, when either they or a member of their immediate family is ill, or when they must attend a parent -- teacher conference, doctor's appointment, or tend to personal matters except as otherwise provided for by law, paid time off may not be used to extend any other leave. *PTO may not be taken before it accrues.*

After four (4) consecutive months of employment, salaried employees will receive five (5) days of paid time off. Any salaried employee who abuses this policy, including requesting sick leave when neither the employee nor a dependent child or elderly relative is ill, will be subject to disciplinary action for the unexcused absence including, in the discretion of Yale, immediate termination. Except as otherwise provided for by law, paid time off may not be used to extend any other leave.

### (iv)    Requests for Paid Time Off for Use as Personal Leave.

Requests for paid time off (PTO) for use as personal leave must be submitted in writing to an employee's supervisor at least seven (7) days before the desired day off. The supervisor, in his or her discretion, may decline a request which creates scheduling conflicts or other operational hardship.

### (v)    Notification/Unexcused Absences.

Yale realizes that there are times when an employee will be unable to report to work due to an illness, or otherwise, on those days employees must call their immediate supervisor as soon as possible, but at a minimum of no later than one hour prior to the employee's scheduled starting time on the first day and each

subsequent day the employee is absent.  When an employee is unable to connect with his/her immediate supervisor or that **supervisor's voicemail**, an employee must telephone the General Manager, Robert Joyce, (617) 822-6131. If the employee is unable to reach Robert, the employee must leave a message on Robert's voicemail or Steve Sheinkopf's voicemail.  An employee must leave a telephone number where the employee can be reached during the employee's absence.  An employee may not leave a message regarding an absence with a co-worker.  If proper notice is not given, the absence may be deemed an unexcused absence.

The failure of an employee to follow any of the rules or policies regarding paid time off, including providing the required notice(s) for absences may result in disciplinary action, including, in the discretion of Yale, immediate termination. *Unexcused absences and/or tardiness will be a major factor when considering an employee for a salary increase, bonus, and participation in an incentive program, promotion or transfer.*

### (vi)    Mid-day Departure.

Employees, who, due to illness, must leave their office during the work day, must notify their manager and follow the notice procedures listed above. Hourly employees must sign their timesheet before leaving.

### (vii)    Verification Regarding Sick Leave.

Sick leave in excess of three (3) consecutive days may require a written certificate from the employee's health care provider.  The certificate must state the employee's ability to return to work, the basis for the absence, as well as the accommodations, if any, which the employee may need to perform his or her job. Yale may also request a written certificate from an employee at other times.

### (viii)    Unused Personal/Sick Leave (Paid Time Off).

At the conclusion of each calendar year, Yale in its discretion may, but shall not be required to, purchase all, or a part of any unused paid time off from eligible employees. To be eligible to participate in the purchase program, an employee must not have an unexcused absence during the applicable calendar year. Yale will announce other program (eligibility requirements) at the appropriate times.

### G.    Bereavement Leave.

Full-time employees will receive up to two (2) days of paid bereavement leave upon the death of a child, spouse, named partner, parent, sibling, grandparent or mother-in-law, father-in-law or parent, grandparent or sibling of a named partner. Requests for bereavement leave must be made, in writing, to the General Manager, Robert Joyce (617) 822-6131.

### H.    Holiday Leave.

Currently full-time employees, who have been working at Yale for at least four (4) consecutive months and have successfully completed their introductory period, may be eligible for certain paid holidays. Employees are required to work their pre-scheduled day, shift or hours the day before, the day of (where appropriate) and the day after a Yale-designated holiday, to be eligible for holiday pay. Should an employee voluntarily resign, his or her last day can not fall on a Company designated holiday. Employees on an approved leave of absence are also not eligible for holiday pay. At the conclusion of each calendar year, or where otherwise appropriate, Yale will announce paid Company holidays for eligible employees.

### I.    Religious Needs and Beliefs.

Yale will also provide reasonable accommodations for the religious needs and beliefs of its employees, including providing employees with additional unpaid leave for religious observance(s), provided that such leave does not cause an undue hardship for Yale. Employees may also use accrued paid leave, for example, vacation or paid time off, when taking an unpaid religious leave. Requests for religious leave must be submitted at least ten (10) days before the desired leave. Questions regarding this policy should be directed to the General Manager, Robert Joyce, (617) 822-6131.

### J.    Jury/Required Witness Duty.

Employees will be given leave for jury duty or when required to appear in court as witnesses (except as plaintiff or defendant) and will be compensated for same in accordance with applicable law. Employees will receive the difference between the fee as a juror or witness and the earned rate of pay, for up to ten (10) working days per calendar year. Employees are required to notify their immediate supervisor upon receipt of a notice for jury or witness duty. Employees are expected to return

to Yale on any day or portion thereof when they are not required to remain in court. Employees seeking compensation for service shall present the applicable juror service certificate or summons to serve as a witness to his or her immediate supervisor within ten (10) business days of the termination of his or her term of jury duty or service as a witness.

### K.    Paid Vacation Leave.

Full-time employees begin to earn paid vacation leave after six (6) consecutive months of employment. At which time an employee receives one (1) week, (five (5) business days) of paid vacation leave. After six consecutive months, full-time employees accrue paid vacation leave at a rate of .83 days, at the end of each month worked; up to a maximum accrual of two (2) weeks (ten (10) business days) each year.

#### (i)    Maximum Accrual of Three Weeks.

Vacation leave is provided so that employees may have time off from their jobs with pay. Yale encourages its employees to use vacation leave in the period when it accrues. Employees may only accrue up to a maximum of three (3) weeks of paid vacation leave at any time. Please contact the Director of Sales, Steve Sheinkopf, at (617) 822-6150 with any questions regarding the accrual of paid vacation leave.

#### (ii)    Vacation Guidelines.

Vacation leave is granted on a first-come, first-serve basis and when consistent with the business needs of Yale. Requests for vacation leave must be submitted, in writing, at least one (1) week (seven (7) days) before the desired leave, to an employee's immediate supervisor. The supervisor, in his or her discretion, is authorized to decline vacation requests which create scheduling conflicts, are requested during busy periods, or which would otherwise create an operational hardship.

**Payment in lieu of scheduled vacation leave is prohibited.** Accordingly, employees are encouraged to take vacation leave during the year in which it accrues, to avoid loss of benefits resulting from having reached the maximum vacation accrual amount of three (3) paid weeks of vacation leave.

Vacation pay is paid at the employee's regular rate of pay. A minimum of one half (1/2) day, (four (4) hours) vacation leave must be taken at one time.

Questions regarding vacation leave should be directed to Robert Joyce, General Manager at (617) 822-6131.

## V.    CURRENT BENEFITS

### A.    401(k).

For information regarding any 401(k) programs which may be available to eligible employees, employees should confer with the General Manager, Robert Joyce, (617) 822-6131.

### B.    Insurance Benefits.

Yale employees should confer with the General Manager, Robert Joyce, (617) 822-6131 for specifics regarding health or life insurance benefits which may be provided by Yale.

## VI.    ANTI-DISCRIMINATION AND SEXUAL HARASSMENT WORKPLACE POLICY

Yale is an equal opportunity employer and does not discriminate based upon an individual's race, creed, national origin, sex, age, marital status, sexual orientation, handicap, disability, genetic information, veteran's status, national guard or reserve unit obligations or membership in any category protected by federal or state law. Any act of discrimination by employees will not be tolerated. Any employee, who engages in any act of illegal discrimination, including sexual harassment, will be subject to immediate disciplinary action including, in the discretion of Yale, immediate termination.

### A.    Definition of Sexual Harassment.

Sexual harassment is a form of sex discrimination that is illegal under Title VII of the Federal Civil Rights Act of 1964 and the Massachusetts Fair Employment Practices Act, Massachusetts General Laws, Chapter 151B. Both laws make it illegal for any employee, male or female, to sexually harass another employee when:

(a) submission to or rejection of sexual advances or requests for sexual favors, or other verbal or physical conduct of a sexual nature is made either explicitly or implicitly, a term or condition of another's employment or a basis for any employment decision affecting an employee; or

(b) sexual advances, requests or conduct have the purpose or effect of unreasonably interfering with an employee's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

**B. Examples of Inappropriate Behavior.**

Examples of behavior which are inappropriate and violative of our workplace policy *include, but are not limited to, the following:*

1. Conditioning an employee's raise or any condition of employment upon his or her submission to sexual favors;

2. Insinuating or threatening that an employee's lack of submission to sexual behavior will adversely affect an employee's employment;

3. Unwelcome and unwanted sexual advances;

4. Using sexually vulgar or explicit language in the workplace;

5. Displaying sexually suggestive objects, pictures or cartoons in the workplace;

6. Sending sexually inappropriate or offensive remarks through Yale's e-mail, voicemail, computer or electronic systems;

7. Displaying racist graffiti in the workplace;

8. Offensive conduct or harassment based upon an employee's race, religion, and sexual orientation, national origin, disability, military status or any other characteristics protected by applicable federal or state laws;

9. Accessing inappropriate internet sites on Yale's computer or electronic systems.

### C.     Reporting and Investigatory Procedures Regarding Claims of Illegal Discrimination, Including Sexual Harassment.

Yale realizes that situations involving illegal discrimination, including sexual harassment, are sensitive. Accordingly, Yale has established the following procedures for reporting and investigating claims of illegal discrimination, including sexual harassment. Any employee who feels that he or she has been illegally discriminated against or sexually harassed should and indeed is encouraged to utilize the following reporting procedure:

1.     An employee who believes that he or she has been the victim of illegal discrimination or sexual harassment, should and is encouraged to report the matter either to Donna Katapodis, Office Manager at Yale, (617) 825-9696 extension 112, 296 Freeport Street, Dorchester, MA 02122 or to Robert Joyce, General Manager at Yale, (617) 822-6131. Reports of sexual harassment should be made promptly. Upon receipt of an employee's report of illegal discrimination or sexual harassment, Yale will promptly investigate the matter and will report to the employee upon the conclusion of its investigation.

2.     If an employee believes that the matter needs to be discussed or investigated further or feels uncomfortable reporting the matter in the first instance to Donna Katapodis or Robert Joyce, then the employee should contact the Director of Sales, Steve Sheinkopf at (617) 822-6150. In either case, Steve Sheinkopf will promptly initiate an investigation and will report to the employee upon conclusion of the investigation.

3.     All complaints will be investigated as confidentially as possible.

### D.     Sanctions for Discrimination.

If it is determined that inappropriate conduct has been committed by one of Yale's employees, Yale will take such action as is appropriate under the circumstances. Action may range from counseling to immediate termination of employment.

### (i)    Third Party Discrimination or Sexual Harassment.

Employees should also utilize this reporting procedure to promptly report instances of discriminatory or sexually harassing behavior of customers, suppliers, vendors or any other person with whom an employee must deal or has dealt with as part of his or her employment with Yale.

Upon receipt of a report, Yale will promptly investigate the matter and will report to the employee upon conclusion of the investigation.

### (ii)    Yale's Prohibition Against Retaliation.

It is unlawful to retaliate against any employee who in good faith either files a complaint or cooperates in an investigation. Yale prohibits any form of retaliation against any employee who in good faith files a complaint or assists with an investigation. Any employee found to have retaliated against such an employee will be subject to immediate disciplinary action, including, in the discretion of Yale, immediate termination.

Upon receipt of a report of retaliatory behavior, Yale will promptly investigate the matter and will report to the employee upon conclusion of the investigation.

### (iii)    Questions Regarding Yale's Anti-discrimination and Sexual Harassment Workplace Policy.

Questions regarding our policy, reporting and investigatory procedures, or any concerns you have may be brought at any time to: Robert Joyce, General Manager at Yale, (617) 822-6131, 296 Freeport Street, Dorchester, MA  02122 or to Steve Sheinkopf, Director of Sales at Yale, (617) 822-6150.

### (iv)    Directions for Contacting State or Federal Enforcement Agencies.

Using our complaint and investigatory procedures does not prohibit an employee from contacting or filing a complaint with the appropriate governmental agency.

An employee may also contact the State or Federal agencies charged with enforcing anti-discrimination laws. The name, address, and telephone numbers of the state and federal enforcing agencies are as follows:

### (1)    The State Agency:

The Massachusetts Commission Against Discrimination (M.C.A.D.)
One Ashburton Place, Room 601
Boston, MA 02108
(617) 994-6000

**Their other addresses:**

436 Dwight Street, Room 220
Springfield, MA 01103
(413) 739-2145

22 Front Street, 5th Floor
P.O. Box 8038
Worcester, MA 01641
(508) 799-6379

### (2)    The Federal Agency:

Equal Employment Opportunity Commission (E.E.O.C.)
Room 1001
10th Floor
One Congress Street
Boston, MA 02114
(800) 669-4000

## VII.  DISABLED EMPLOYEES/REASONABLE ACCOMMODATIONS.

Consistent with applicable federal and state law, Yale will make reasonable accommodations to ensure equality of opportunities for individuals with disabilities or handicaps.

Questions regarding or requests for reasonable accommodations should be submitted to the General Manager, Robert Joyce, at Yale Appliance + Lighting, 296 Freeport Street, Dorchester, MA 02122; telephone number: (617) 822-6131.

# VIII.  ADMINISTRATIVE/SAFETY RULES AND WORKPLACE RULES

### A.    Employee and Customer Safety.

The safety of Yale's employees and customers is of utmost concern to Yale. Employees are therefore required to exercise care and caution in the performance of all job duties and related tasks. Consistent with Yale's concern for safety, it is the responsibility of each employee to promptly report any hazardous or unsafe condition or any injury to an employee's immediate supervisor or to the General Manager, Robert Joyce, at (617) 822-6131, irrespective of how slight it may appear. Safety guards on machines and protective equipment must be used as intended. Any unsafe conditions or actions observed by an employee must be promptly reported to his or her immediate supervisor so that corrective action can be promptly taken. Employees must not use or attempt to fix equipment or machines in need of repair, replacement or service.

### B.    Lunch.

Each Yale employee, who works more than six (6) hours per day, is entitled to one (1), thirty (30) minute unpaid lunch. Hourly employees who work more than six (6) hours per day must sign out before leaving for lunch.

### C.    Overtime - Hourly Employees.

Overtime at a rate of one and one-half times an employee's regular hourly rate will be paid for any hour worked by any non-salaried employee in excess of forty (40) hours during any weekly pay period. Overtime must not be worked unless specifically authorized by an employee's immediate supervisor in advance. Employees who work on Sundays will be paid at a rate of one and one-half times their regular hourly rate. Overtime will not be paid to salaried employees.

### D.    Attendance/Tardiness.

Absence is the failure of an employee to report to work on the date scheduled to work. This definition includes, but is not limited to, lost time due to illness, injury, personal business, or other reasons for which the Company is not responsible. Vacation, jury duty, and approved leaves of absence, including leaves of absence pursuant to federal or state law, are not counted as absences.

Tardiness is the failure of an employee to report to work at the starting time of the scheduled work shift, or to return promptly from a meal, break or rest period.

Every job at Yale is important to our employees and customers. Regular and prompt attendance is essential if you are to properly perform your assigned duties. Tardiness and absences place a burden on other employees who must then do your job. This affects their performance and ultimately, our service to our customers.

Yale realizes that due to sickness or other compelling reasons, you may find it necessary to be absent from work. On these occasions, you must call your supervisor as soon as possible, but at a minimum of no later than one hour prior to your scheduled starting time on the first day and each subsequent day you are absent. When an employee is unable to connect with his or her immediate supervisor or that supervisor's voicemail, an employee must telephone the General Manager, Robert Joyce (617) 822-6131. If an employee is unable to reach Robert, the employee must leave a message on Robert's voicemail or Steve Sheinkopf's voicemail. An employee must also leave a telephone number during the employee's absence. An employee may not leave a message regarding an absence with a co-worker. If proper notice is not given, the absence may be deemed an unexcused absence.

The failure of an employee to follow any of the rules or policies regarding absences may result in disciplinary action, including, in the discretion of Yale, immediate termination. Unexcused absences will be a major factor when considering an employee for a salary increase, a bonus, and participation in an incentive program, promotion, or transfer.

### (i)     Unexcused Absences of Three (3) or more Days.

An absence for three (3) consecutive days without notification or authorization from Yale will be considered a voluntary resignation and employment will be immediately terminated.

### (ii)     Regular Attendance.

Regular, on-time attendance is an essential function of all jobs at Yale.

### E.    Time Sheets: Rules For Hourly Employees.

Employees must follow all rules, policies and procedures regarding time sheets. For further information, contact your supervisor or the General Manager, Robert Joyce, (617) 822-6131. The failure to follow any rule, practice or procedure regarding time sheets may result in disciplinary action, including, in the discretion of Yale, immediate termination.

### F.    Bulletin Boards/E-Mail.

Bulletin boards and e-mail are for Yale business only. Employees must regularly check bulletin boards and e-mail for Yale's notices, announcements or memoranda regarding their employment with Yale. Employees may not use bulletin boards or e-mail for personal or non-business matters unless previous authorization is obtained from either from the Director of Sales or General Manager. Any improper use of bulletin boards or e-mail will subject an employee to disciplinary action, including, in the discretion of Yale, immediate termination. The definition of e-mail includes all INTERNET and INTRANET access methods including, but not limited to, direct dial-up methods, Yale internal e-mail packages and Web browsers.

### G.    Personnel Records.

Personnel records are confidential. Upon written request to Robert Joyce, General Manager, (617) 822-6131, you may review and copy your personnel record. If you disagree with any information contained in your personnel record, you may bring your concerns to the attention of Robert Joyce. If an agreement cannot be reached, you may submit a written statement explaining your position to Mr. Joyce. An employee's statement will become a part of the employee's personnel record, along with the original information. Employees will be provided with all other rights and protections regarding their personnel records, as may be required under applicable law. Employees are responsible for promptly notifying Robert Joyce of changes in address, telephone number(s), exemption(s), or withholding status.

### H.    Performance Appraisals.

Yale may conduct periodic employee performance reviews. These reviews consider, among other things, an employee's performance, attitude, commitment and contribution to Yale's rules, standards, objectives and goals during the period of time preceding the employee's review. Performance reviews provide a guide,

but are not the sole basis for making personnel decisions, including decisions regarding promotion, advancement, termination, disciplinary measures, assignments or salary changes.

I.    **Inclement Weather Closings.**

(i)    **If the office is closed the day before.**

If the Director of Sales decides the day before that the office will be closed the next day, Yale will put a message on extension 150. The message will be in place by 6:00 am. To find out if the office is open or closed, call (617) 825-9253, and check extension 150. If the office is closed, there will not be any work performed that day. Salaried employees will be paid and hourly employees will not be paid.

(ii)    **If the office is closed during the day.**

If the Director of Sales or General Manager decides to close the office during the day after employees have arrived to work, an announcement will be made via the intercom and e-mail. Employees who show up for work that day will be paid for the full day's work, regardless of the time Yale closes the office, as long as the employee leaves AFTER the office is closed. If an employee chooses to leave early, he/she will only be paid for the hours worked.

(iii)    **If the office is not closed but employees choose not to come in.**

If the office is open but an employee chooses not to come in, the employee will not be paid.

*Only the Director of Sales has the authority to decide if the office will be closed. However, if the Director of Sales is unavailable, the General Manager will make the decision.*

## IX.    EMPLOYEE CONDUCT/EMPLOYMENT POLICIES

Employees must conform to ethical and legal standards and abide by all applicable laws and preserve Yale's integrity and reputation. Employees may not use Yale property, equipment, including telecommunication equipment, assets, equipment or stock, or funds to engage in any activity which is either unlawful or is otherwise inconsistent with any rule, policy, practice or standard of Yale. Failure to adhere

to this policy, or any other policy, may result in disciplinary action, including, in the discretion of Yale, immediate termination. The following areas deserve particular attention by employees:

### A.    Confidentiality/Proprietary Information.

The confidentiality of information including financial, business and/or marketing plans, proprietary information and the identities of Yale's customers or prospects is important to Yale. Discussion of confidential company business with unauthorized personnel, or removal of confidential information, without proper authorization, is improper, irrespective of whether the employee benefits from the improper disclosure.

### B.    Legal or Media Inquiries.

For the protection of everyone, employees may not speak with inquiring attorneys or representatives of the media. When the employee is contacted by either an attorney or member of the media, the employee should obtain the person's name and telephone number and immediately bring this information to his/her manager. Managers will bring this to the attention of the General Manager. If the General Manager is unavailable, managers will contact the Director of Sales.

### C.    Outside Employment and Employment or Business with Family Members/Conflict of Interest.

For information governing outside employment and/or employment or business with relatives, please check with the Director of Sales.

### D.    Workplace Conduct/Corrective Action/Disciplinary Action.

Corrective and/or disciplinary action, including immediate termination, will be taken in any case in which an employee does not meet his or her responsibility, violates any workplace rule, policy, standard, guideline or directive (oral or written) of a supervisor or otherwise conducts him or herself in any way that is either detrimental to or inconsistent with any of Yale's practices, rules, policies or standards.

In appropriate cases and at the discretion of Yale, corrective action (including immediate termination) may be taken when an employee fails to meet his or her responsibility or otherwise violates or fails to conduct him or herself in accordance

with the standards, policies, rules and procedures of Yale. *Nothing in this section modifies or in any way changes an employee's at will or status, which is defined in Section II of the handbook.*

*The following list contains some, but not all examples of incidents or behavior which would warrant corrective action or discipline including in the discretion of Yale immediate discharge. This list is not all-inclusive.*

1.  Theft, vandalism, or careless destruction or use of company, employee, or customer property.
2.  Possession or use of firearms or other weapons.
3.  Possession, consumption, or sale of alcohol or illegal drugs on company property.
4.  Making false statements on employment applications, or job records or documents.
5.  Performing work of a personal nature on Yale's time or equipment.
6.  Gambling during working time or on Yale's property.
7.  Insubordination or fighting on company property or company work areas, assignments or functions.
8.  A violation of Yale's anti-discrimination and sexual harassment workplace policy or engaging in behavior inconsistent with these policies towards any employee, customer or supplier.
9.  Unexcused absences or tardiness.
10. A violation of Yale's workplace alcohol and drug policy, including its testing policy.
11. A violation of any Yale workplace rule, policy, procedure or guidance.

**A VIOLATION OF ANY OF YALE'S POLICIES, INCLUDING THE FAILURE TO COOPERATE WITH YALE AT ANY TIME, MAY RESULT IN CORRECTIVE OR DISCIPLINARY ACTION INCLUDING, IN THE DISCRETION OF YALE, IMMEDIATE TERMINATION.**

### E.    Smoke-Free Workplace.

For the health and well being of our employees and customers, smoking is not permitted in any Yale workplace or at any Yale work function. Currently, smoking is only permitted outside of the Yale building and then only during an employee's break or lunch period.

Employees who do smoke are asked to deposit cigarette butts and related debris in appropriate places.

### F.    Boston Public Health Commission Policy Prohibiting Smoking in the Workplace.

In addition to Yale's workplace smoking policy, Yale employees at our Boston facility must also comply with the following:

### (i)    Purpose.

It is recognized that smoking is dangerous to the health of the smoker and that involuntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers. The simple separation of smokers and nonsmokers within the same air space may reduce, but does not eliminate, the exposure of nonsmokers to environmental tobacco smoke. This applies to *all* smoking tobacco products, i.e., cigarettes, cigars, and pipes. This policy has been developed to protect all persons from the exposure to environmental tobacco smoke and to ensure a safe working environment.

### (ii)    Policy.

Smoking is prohibited in all facilities and areas of the entire workplace with no exceptions. Smoking is not permitted anywhere at Yale, including all common work areas, elevators, hallways, company vehicles, restrooms, cafeterias, employee lounges, conference and meeting rooms, and all other enclosed or outdoor areas in the workplace. The policy applies to all employees, clients, consultants, contractors, and visitors.

(iii)    **Procedure.**

A.    Compliance with the smoke-free policy is mandatory for all employees and persons visiting Yale.

B.    Any disputes involving smoking will be referred to your immediate supervisor.

C.    Employees who violate this policy are subject to disciplinary action up to and including termination.

D.    No person or employer shall discharge, refuse to hire, refuse to serve, or in any manner retaliate against any employee, applicant or customer because such employee, applicant or customer takes any action in furtherance of the enforcement of this regulation or exercises any right conferred by this regulation.

(iv)    **Smoking Cessation Opportunities.**

Yale. encourages all smoking employees to quit smoking. Yale is available to provide you with contact information for Smoking Cessation resources and self-help materials for those employees who want to quit.  For further information about these services please contact Steve Sheinkopf, Director of Sales, telephone number (617) 822-6150.

(v)    **Questions.**

Any questions regarding the smoke-free workplace policy should be directed to the Director of Sales, Steve Sheinkopf, telephone number (617) 822-6150.

G.    **Dress Code.**

Employees must dress in appropriate business attire which is clean and neat and is consistent with the high quality of products and services provided by Yale and which is also safe for an employee's work environment. We expect that employees will dress appropriately in the workplace and for all work-related assignments, meetings, functions or events both on and off site.  Examples of clothing that is not proper attire for Yale's office and sales employees include, but are not limited to: recreational attire (gym shorts, aerobic wear, etc.) jeans, tank tops, net shirts, t-shirts, and shorts.

### (i)    Warehouse Employees.

Warehouse employees must dress in a manner that is both appropriate and safe for their work environment. Clean and neat "t-shirts" may be worn.

### (ii)    T-Shirts.

T-shirts or any other article of clothing may not contain any language, which is inconsistent with any of Yale's workplace policies including, without limitation, Yale's workplace sexual harassment and discrimination policies.

A member of the senior management may ask an employee to change any article of clothing that is seen as inconsistent with any of Yale's workplace policies, including its dress code.

A violation of this policy may result in disciplinary action including, in the discretion of Yale, immediate termination.

### H.    Use of Yale's Equipment, Electronic, and Telephonic Communications and Other Systems.

All electronic and telephonic communication systems including electronic and voicemail systems and all communications and information stored, transmitted, received, or contained in Yale's information systems are the property of Yale and, as such, are to be used for Yale related purposes, except as otherwise provided in this policy. Employees shall not use or allow the use of Yale's equipment or property by anyone other than for Yale's official business. Employees shall not remove, falsify or alter any information contained on any Yale computer, office equipment, book or other document. Further, employees shall not use a code, access a file, or retrieve any stored information, other than where authorized, unless there has been prior clearance by an authorized Yale representative.

All passwords and codes are the property of Yale and may not be disclosed to anyone outside of Yale. Employees shall not disclose their password or code to any other employee except where expressly permitted by a member of management.

Employees should not think that e-mail is a completely secure means of communication. As with any form of communication, there is no guarantee of confidentiality. For this reason, employees are expected to exercise care and caution in using e-mail and realize that e-mail may not be appropriate for the transmission of confidential, proprietary, or personnel information.

To ensure that the use of electronic, computer, communication, telephonic systems and business equipment is consistent with Yale's legitimate business interests, authorized representatives of Yale may monitor the use of the equipment and may copy or disclose any information on any of Yale's electronic, communication, or computer systems or business equipment or records.

*An employee should not have any expectation of privacy regarding any information that he or she creates, stores, accesses, sends or receives through Yale's electronic, telephonic, communication and computer systems. An employee's use of Yale's systems or equipment will be considered consent to this policy and a waiver of any expectation of privacy.*

In addition, the content of all email, other communications sent through Yale's email and communications systems and of any visited websites must be consistent with all of Yale's workplace policies, including its anti-discrimination and sexual harassment policies.

Generally, personal telephone calls are not permitted on Yale telephones. However, Yale recognizes that there will be times when a call needs to be made or received; please keep these calls to a minimum. If your call is a toll call, report the call to your supervisor and whenever practicable, prior to making the call. Employees are required to answer telephones in a prompt and courtesy manner and to direct the caller to the appropriate individual or individual's voicemail.
*Violations of this policy are subject to disciplinary action, including, in the discretion of Yale, immediate termination.*

### I.     Use of Yale Vehicles.

Operators of company vehicles are responsible for the safe operation and cleanliness of vehicles entrusted to their use. Accidents or moving violations involving company vehicles must be immediately reported to immediate supervisor. Employees are responsible for any moving and parking violations and fines which may result when operating a company vehicle. In addition, only Yale employees or authorized guests may be passengers in company vehicles. Except as otherwise permitted, vehicles owned, leased or rented by Yale may only be used for job-related travel. Employees who are involved in an accident while traveling on business must promptly report the incident to their immediate supervisor.

In addition, and for safety reasons, Yale or its insurer may perform background checks on the driving record of all employees who use vehicles either owned or leased by Yale. These employees will also be asked to provide a copy of their driver's license annually or as otherwise required by law or for insurance or other requirements.

Employees who do use Yale vehicles are responsible for keeping their vehicles filled with gas and serviced when appropriate. Questions regarding the use of vehicles either owned or leased by, or used for Yale business should be directed to the Director of Sales, Steve Sheinkopf, (617) 822-6150 (Boston) or the Chief Operating Officer, Lewis Frazer (617) 822-5341 (Norwood).

The use of seatbelts is mandatory for operators and passengers of Yale vehicles.

*Employees who operate commercial motor vehicles are subject to additional workplace rules or requirements.* Employees with questions regarding these requirements should contact the Director of Sales, Steve Sheinkopf, (617) 822-6150 (Boston) or Chief Operating Officer, Lewis Frazer (617) 822-5341 (Norwood).

*Violation of any of these policies may result in disciplinary action including, in the discretion of Yale, immediate termination.*

### J.    Criminal Offender Record Information ("CORI").

Yale may request Criminal Offender Record Information ("CORI") from the Criminal History Systems Board ("CHSB") of the Commonwealth of Massachusetts for employees in the positions of delivery drivers, delivery helpers or service technicians who work in private residences. Prior to requesting CORI, Yale will give employees a CORI request form.

Employees with questions regarding this policy, should contact the Chief Operating Officer, Lewis Frazer, at (617) 822-5341.

## X.    DRUG-FREE WORKPLACE

### A.    Drug and Alcohol Workplace Policy.[1]

Consistent with the Federal Drug Free Workplace Act, it is Yale's policy that the manufacture, sale, distribution, possession or use of illegal or illicit drugs or alcohol is strictly and absolutely prohibited on or surrounding Yale owned or leased property and at any worksite. An employee who violates this policy will be subject to disciplinary action, including in the discretion of Yale, immediate termination.

Additionally, for the safety and well being of all employees, the consumption or possession of alcohol or illegal drugs in the workplace or during Yale sponsored or related assignments is absolutely forbidden. Employees are also prohibited from reporting to work or for any work-related assignment under either the influence of alcohol or illegal drugs and from operating any Yale vehicles or other equipment under either the influence of alcohol or illegal drugs.

It is a condition of your continued employment that you not violate the workplace drug policy and that you notify Yale of any criminal drug statute conviction no later than five (5) days following the conviction.

*Any violation of the policy may result in disciplinary measures including, in the discretion of Yale, immediate termination.*

Exceptions may be made for the consumption of alcohol, in moderation, at Company sponsored or Company authorized events, or during business-related meals or social occasions. *Even then, however, employees and their guests must act responsibly and exercise reasonable care and good judgment regarding the consumption of any alcoholic beverages.* Employees are representatives of Yale and their actions can directly affect Yale's positive image and reputation among customers, clients and the community at large. Employees must limit the consumption of alcohol so as to not to pose a risk to the safety of themselves or others and must always conduct themselves in a professional and responsible manner.

---

[1]    Certain employees in positions covered by Federal Regulations, for example, Commercial Motor Vehicle Operators are subject to additional workplace rules and requirements regarding the consumption and/or possession of alcohol and/or drugs. Employees with questions regarding the additional requirements or this policy generally should contact Steve Sheinkopf, Director of Sales, (617) 822-6150 (Boston) or Lewis Frazer, Chief Operating Officer, (617) 822-5341 (Norwood).

*Any employee who violates this policy will be subject to discipline, including in the discretion of Yale immediate removal from the Yale function and/or immediate termination.*

### (i)    Drug Testing Policy.[2]

Consistent with this policy, Yale may also test applicants and/or employees as described below. Questions regarding Yale's drug and alcohol testing policy should be directed to: Steve Sheinkopf, Director of Sales, (617) 822-6150 (Boston) or Lewis Frazer, Chief Operating Officer, (617) 822-5341 (Norwood).

### (ii)    Type of Tests.

To the extent possible, all tests will be conducted during employees' normally scheduled work hours. Employees will be provided with written details of the testing mechanisms at the time of testing and requisite drug or alcohol levels for a positive result. The following tests are required:

1.    <u>Post-Accident</u>:  Drug and alcohol testing may be required following any work related accident or any violation of a safety precaution or standard, rule or policy, whether or not an injury resulted from the accident or violation for which there is reasonable suspicion to believe that the accident or workplace violation resulted from an employee's consumption of either drugs or alcohol. Post-accident alcohol testing will occur as soon as practicable following the accident. Employees must refrain from using all alcohol and drugs until the test is complete absent compelling medical or other reasons. In these cases, employees should notify Steve Sheinkopf, Director of Sales, (617) 822-6150 (Boston) or the Chief Operating Officer, Lewis Frazer, (617) 822-5341 (Norwood).

2.    <u>Reasonable Suspicion</u>:  An employee will be required to undergo a drug and alcohol testing if a supervisor or manager observes behavior or appearance that is characteristic of alcohol or illicit drug use or possession of alcohol, drugs, or drug paraphernalia or there is reasonable suspicion to believe that the employee consumed either drug(s) or alcohol during the work day. The employee will be removed from performing his or her duties until a test can be

---

[2]    Certain employees in positions covered by Federal Regulations, for example, Commercial Motor Vehicle Operators are subject to additional testing and screening requirements regarding drug and alcohol testing as required by applicable federal law. Employees with questions regarding these requirements or this policy generally should contact should contact Steve Sheinkopf, Director of Sales, (617) 822-6150 (Boston) or Lewis Frazer, Chief Operating Officer, (617) 822-5341 (Norwood).

completed. Testing will occur as soon as practicable following the reasonable suspicion of a manager or supervisor. Employees must refrain from using all alcohol and drugs until the test is complete absent compelling medical or other reasons. In these cases, employees should notify Steve Sheinkopf, Director of Sales, (617) 822-6150 (Boston) or Lewis Frazer, Chief Operating Officer, (617) 822-5341 (Norwood).

3.    Random Drug Testing:  Employees in safety-sensitive positions or where required by applicable Federal of State law are subject to random drug and alcohol testing. Yale will administer a random testing procedure that is spread evenly throughout the twelve (12) month period. The selection process will be based on the application of a computer based random selection process, uninfluenced by any characteristics other than job category.

**B.    Employee Testing.**

Any refusal to participate in any of the types of alcohol or drug tests announced in this policy will be treated as indicative of a positive result. Any attempt to tamper with or adulterate a specimen will be treated as a positive test result.

If the employee receives notice that the employee's test results were confirmed positive, the employee will be given the opportunity to explain the positive result. In addition, the employee may have the same sample retested at a laboratory of the employee's choice and at the employee's expense.

*Any violation of this policy may result in disciplinary measures including, in the discretion of Yale, immediate termination.*

## XI.    WORKPLACE SEARCHES

To safeguard our employees, their property, Yale's customers and Yale's property, and to enforce Yale's policies prohibiting misconduct, including theft and the unlawful use or sale of illegal drugs or alcohol, Yale may question employees and/or inspect any personal property or any area from which Yale conducts business, including any leased spaces, facilities and/or vehicles. (For example: vehicles, brief cases, suitcases, tool boxes, computer bags, backpacks, lunch boxes, purses or any other container or object brought to and from Yale's offices, property, worksites or Yale-sponsored functions) whenever there is reasonable suspicion to believe that any Yale policy is being, or has been, violated.

Yale may provide offices, desks, vehicles, computers or computer containers, lockers, tools and other items for the use of Yale's employees. At all times, these items remain the property of Yale. Yale may also search any work area and/or item whenever there is reasonable suspicion to believe that a Yale policy is being, or has been, violated. Employees are expected to cooperate with Yale's workplace searches.

*Violations of this policy are subject to disciplinary action, including, in the discretion of Yale, immediate termination. Employees with questions regarding this policy should contact their immediate supervisor.*



**YALE**

**APPLIANCE + LIGHTING**

### Employee Acknowledgment of
### Yale Employee Handbook

**Employee acknowledgement:**

This certifies that I have received, read, and understand the Yale Appliance + Lighting Handbook dated _____, outlining current policies and general information. I understand that nothing in this handbook is intended to create an express or implied employment contract. Rather, it is an overview of policies and procedures in effect at the time it was prepared and can be interpreted and changed at any time in the discretion of Yale Appliance + Lighting.

I further understand that I am an employee at-will.

_____
Employee Name

_____
Employee Signature

Date: _____

Handbook Receipt

**DEF 0071**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DANIEL GREENWOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-10605 JLT |
| v. ) | |
| ) | |
| YALE APPLIANCE AND LIGHTING, INC., ) | |
| ) | |
| Defendant. ) | |

**AFFIDAVIT OF MARY T. CONLEY SUBMITTED IN SUPPORT OF**
**DEFENDANT YALE APPLIANCE AND LIGHTING, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

I, Mary T. Conley, hereby state under the pains and penalties of perjury:

1.      I am the Human Resources Coordinator of Yale Appliance and Lighting,

Inc. ("Yale"). I have held this position since March 17, 2003. In this capacity, my

responsibilities include maintaining Yale's employee records.

2.      A true and accurate copy of Yale's 2004 employee handbook is attached

to the Statement Of Material Facts As To Which No Genuine Issue Remains To Be Tried

as Exhibit 7.

3.      Dan Greenwood was absent due to an on-the-job injury, surgery, and

recuperation from November 12, 2003 through January 22, 2004. Mr. Greenwood

returned to work on a light duty basis and remained on light duty through February 13,

2004, returning to work full-time with no restrictions on February 17, 2004. The total

time of Mr. Greenwood's absence related to his on-the-job injury, including his light duty

work, lasted from November 12, 2003 through February 13, 2004, a total of thirteen weeks and two days.

4.      In August 2004, Philip Conroy was forty-two (42) years old, which means he was older than Mr. Greenwood.

5.      In August 2005, Mr. Conroy was injured and was on workers' compensation leave from August 28, 2005 until he returned on light duty status in a different position on December 13, 2005.  To date, Mr. Conroy still is working light duty.

6.      At the time of Mr. Greenwood's termination, Richard Boultenhouse was the oldest delivery driver employed at Yale.  In August 2004, Mr. Boultenhouse was fifty-three (53) years old.  On October 17, 2004, Mr. Boultenhouse began an FMLA-protected leave of absence due to a heart attack and related surgery.  Mr. Boultenhouse returned successfully to his employment at Yale thereafter on December 13, 2004 and remains employed with Yale.

7.      Mr. Boultenhouse also has suffered two workers' compensation injuries and has returned to his employment as a driver with Yale from both absences.  First, Mr. Boultenhouse was absent from August 12, 2002 until September 9, 2002 due to an ankle sprain, at which time he was fifty-one years old.  Second, Mr. Boultenhouse was absent from October 29, 2003 until November 3, 2003 due to a back strain, at which time he was fifty-two years old.

8.      Michael Bartlett was a delivery driver for Yale from November 2001 to July 2002.  Mr. Bartlett was terminated for his violation of the Attendance/Tardiness policy when he failed to appear for work on two consecutive days, after previously being told he could not have those days off.  Insurance documentation confirms Mr. Bartlett's

2

date of birth is March 20, 1976. Mr. Bartlett was terminated in August 2002, at which

time he would have been twenty-eight years old.

Signed under the pains and penalties of perjury this _22_ day of January, 2007.

_Mary T. Conley_

Mary T. Conley

3

FORM 101

**The Commonwealth of Massachusetts**
**Department of Industrial Accidents – Department 101**
600 Washington Street – 7th Floor, Boston, Massachusetts 02111
**Info.** Line 800-323-3249 ext. 470 in Mass. Outside Mass. - 617-727-4900 ext. 470
http://www.state.ma.us/dia

DIA USE ONLY

# EMPLOYER'S FIRST REPORT OF INJURY OR FATALITY

THIS FORM MUST BE FILED BY THE *EMPLOYER* IN THE EVENT OF AN INJURY THAT RESULTS IN DEATH OR FIVE OR MORE CALENDAR DAYS OF TOTAL OR PARTIAL INCAPACITY FROM EARNING WAGES.
INSTRUCTIONS AND CODES ON THE REVERSE SIDE - Please Print Legibly or Type - Unreadable forms will be returned.

**EMPLOYEE**

1. Employee's Name (Last, First, MI): Greenwood Daniel
2. Home Telephone Number: 02382
3. Social Security Number*: 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
4. Sex: ☑M ☐F
5. Home Address (No., Street, City, State & Zip Code): 143 High Street Whitmor MA
6. Marital Status: ☐M ☐S
7. No. of Dependents:
8. Date of Hire (mm/dd/yyyy): 11-19-1999
9. Date of Birth (mm/dd/yyyy): 5-03-1963
10. Average Weekly Wage: $975.00 ☑Estimated ☐Actual

**EMPLOYER**

11. Employer's Name: Yale Electron Sales
12. Federal Tax I.D. Number: 042-457-546
13. Employer's Address (No., Street, City, State & Zip Code): 296 Freeport Street Dov. MA 02128
14. Employer's Telephone Number: 617-825-9253
15. Industry Code (See Reverse Side):
16. Workers' Compensation Insurance Carrier and Tel. No.(NOT LOAN AGENT/ADMINISTRATOR): A.I.M. 781-275-1599
17. W.C. Policy Number: QQ 01631-2531
18. Self-Insured? ☐Yes ☐No
19. Business Type: ☐Service ☐Wholesale ☐Mfg. ☑Retail ☐Other
If Yes, Self-Insurer Number:

**INJURY INFORMATION**

20. DATE OF INJURY (mm/dd/yyyy): 11-12-03
21. Was Employee Injured on Employer's Premises? ☐Yes ☑No
22. Location of Injury if not on Employer's Premises: Delivering Appliances
23. FIRST day of Total or Partial Incapacity to Earn Wages (mm/dd/yyyy): 11-13-03
24. FIFTH day of Total or Partial Incapacity to Earn Wages (mm/dd/yyyy): 11-19-03
25. If Employee has Died, Date of Death (mm/dd/yyyy):
26. Source of Injury (Chemicals, Machinery, etc.):
27. Briefly Describe How Injury/Exposure Occurred and Body Part(s) involved: While delivering appliances, developed a Hernia
28. Person to Whom Injury was Reported (list position): JAMES REPOZA - SUPERVISOR
29. Date Reported (mm/dd/yyyy): 11-13-03
30. Date Reported as work related (mm/dd/yyyy): 11-13-03
31. Injury Code(s): a. 250 b. NOT RUPTURED c.  Body Part Code(s): a. 410 b. c.  to body part
32. Witness(es) to Injury - Give Full Name(s), if none state as such:
33. Has Employee Returned to Work? ☐Yes ☑No
34. Date Employee Returned to Work(mm/dd/yyyy):
35. Employee's Regular Occupation: Delivery Man
36. Has Employee Returned to Regular Occupation: ☐Yes ☑No
37. EMPLOYER'S Name (SEE INSTRUCTIONS ON REVERSE SIDE): Yale Sales
38. Title: Operations Manager
39. EMPLOYER'S Signature (SEE INSTRUCTIONS ON REVERSE SIDE): Lewis Frazer
40. Date Prepared (mm/dd/yyyy): 11-17-03

*Disclosure of Social Security Number is Voluntary. It will aid in the processing of your report. Form 101 - Revised 8/2001 - Reproduce as needed.
**THIS FORM DOES NOT CONSTITUTE AN EMPLOYEE'S CLAIM FOR BENEFITS UNDER WORKERS' COMPENSATION.**

DEF 0098



10/13/2006

DRIVER WORK SCHEDULE

Week Ending 11/18/03

| Name | | Rate(s) | 11/12/03 Wednesday | 11/13/03 Thursday | 11/14/03 Friday | 11/15/03 Saturday | 11/17/03 Monday | 11/18/03 Tuesday | Totals |
|---|---|---|---|---|---|---|---|---|---|
| 000165 Boultenhouse,Richard | Rate 1 | | | | | | | | |
| 000165 Butler,Gregory | Rate 1 | | | | | | | | |
| 000113 Casso,Amaury | Rate 1 | | | | | | | | |
| Chase,Scott | Rate 1 | | | | | | | | |
| 000144 Chaum,Robert | Rate 1 | | | | | | | | |
| 000189 Conroy,Phil | Rate 1 | | | | | | | | |
| 000163 Figueroa,Elvis | Rate 1 | | | | | | | | |
| 000168 Greenwood,Daniel | Rate 1 | 195.00 | 1 | 0 | - | - | 0 | - | 195.00 |
| 000167 Greenwood,Peter | Rate 1 | | | 0 | 0 | 0 | | 1 | |
| 000132 Hankins,Daniel | Rate 1 | | | | | | | | |
| 000108 Lewis,Darell | Rate 1 | | | | | | | | |
| 000178 Moore,Perry | Rate 1 | | | | | | | | |
| 000191 Pohl, Sean | Rate 1 | | | | | | | | |
| 000153 Silva,Adam | Rate 1 | | | | | | | | |
| 000203 Zinc,Jason | Rate 1 | | | | | | | | |

REDACTED

Drivers Total

| 000112 Monaco,Thomas | Rate 1 |
| 000116 Nogueira,Jeffrey | Rate 1 |

REDACTED

Techs and Installs Total

Grand Totals

G:\
Trucking Payroll.xls

Page 1

DEF 0073

DRIVER WORK SCHEDULE

| Week Ending | 11/23/03 Sunday | 11/24/03 Monday | 11/25/03 Tuesday | 11/26/03 Wednesday | 11/27/03 Thursday | 11/28/03 Friday | 11/29/03 Saturday | Totals |
|---|---|---|---|---|---|---|---|---|
| Name | | | | | | | | |
| 000165 Boultenhouse,Richard | | | | | | | | |
| 000165 Butler,Gregory | | | | | | | | |
| 000113 Casso,Amaury | | | | | | | | |
| 000144 Chauni,Robert | | | | | | | | |
| 000189 Conroy,Phil | | | | | | | | |
| 000163 Figueroa,Elvis | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |
| 000168 Greenwood,Daniel | | | | | | | | |
| 000167 Greenwood,Peter | | | | | | | | |
| 000132 Hankins,Daniel | | | | | | | | |
| 000108 Lewis,Darell | | | | | | | | |
| 000178 Moore,Perry | | | | | | | | |
| 000191 Pohl, Sean | | | | | | | | |
| 000153 Silva,Adam | | | | | | | | |
| 000203 Zine,Jason | | | | | | | | |
| Drivers Total | | | | | | | | |
| 000112 Monaco,Thomas | 0 | 0 | | | | | | |
| 000116 Nogueira,Jeffrey | | 1 | | | | | | |
| Techs and Installs Total | | | | | | | | |
| Grand Totals | | 7 | | | | | | |

REDACTED

DRIVER WORK SCHEDULE

Week Ending 12/6/03

| Name | 11/30/03 Sunday | 12/1/03 Monday | 12/2/03 Tuesday | 12/3/03 Wednesday | 12/4/03 Thursday | 12/5/03 Friday | 12/6/03 Saturday | Totals |
|---|---|---|---|---|---|---|---|---|
| 000165 Boultenhouse,Richard[1] | | | | | | | | |
| 000165 Buttler,Gregory | | | | | | | | |
| 000113 Casso,Amaury | | | | | | | | |
| 000144 Chaunt,Robert | | | | | | | | |
| 000189 Conroy,Phil | | | | | | | | |
| 000163 Figueroa,Elvis | | | | | | | | |
| 000168 Greenwood,Daniel | | | | | | | | |
| 000167 Greenwood,Peter | | | | | | | | |
| 000132 Hankins,Daniel | | | | | | | | |
| 000108 Lewis,Darell | | | | | | | | |
| 000178 Moore,Perry | | | | | | | | |
| 000191 Pohl, Sean | | | | | | | | |
| 000153 Silva,Adam | | | | | | | | |
| 000203 Zine,Jason | | | | | | | | |

REDACTED

Drivers Total

| 000112 Monaco,Thomas | | | | | | | | |
| 000116 Nogueira,Jeffrey | | | | | | | | |

REDACTED

Techs and Installs Total

Grand Totals

G:\
Trucking Payrolls

Page 1

10/12/2006

**DEF 0075**

**DRIVER WORK SCHEDULE**

Week Ending 12/13/03

| Name | Sunday 12/7/03 | Monday 12/8/03 | Tuesday 12/9/03 | Wednesday 12/10/03 | Thursday 12/11/03 | Friday 12/12/03 | Saturday 12/13/03 | Totals |
|---|---|---|---|---|---|---|---|---|
| 000165 Boultenhouse,Richard | 0 | | | | | | | |
| 000165 Buttler,Gregory | 0 | | | | | | | |
| 000113 Casso,Amaury | 0 | | | | | | | |
| 000144 Chaunt,Robert | 0 | | | | | | | |
| 000189 Conroy,Phil | 0 | | | | | | | |
| 000163 Figueroa,Elvis | 0 | | | | | | | |
| 000168 Greenwood,Daniel | 0 | - | | 0 | - | | | |
| 000167 Greenwood,Peter | 0 | | | 0 | | 0 | 0 | |
| 000132 Hankins,Daniel | 0 | | | | | | | |
| 000108 Lewis,Darell | 0 | 0 | 0 | 0 | - | 0 | 0 | 0 |
| 000178 Moore,Perry | 0 | | | - | | | | |
| 000191 Pohl, Sean | 0 | | | | | | | |
| 000153 Silva,Adam | 0 | | | | | | | |
| 000203 Zine,Jason | 0 | | | | | | | |
| **Drivers Total** | - | - | - | | - | - | - | 0 |
| | | | | | | | | |
| 000112 Monaco,Thomas | 0 | | | | | | | |
| 000116 Nogueira,Jeffrey | 0 | | | | | | | |
| | | | | | | | | |
| **Techs and Installs Total** | - | | | | | | | |
| **Grand Totals** | | | | | | | | |

Dan Hankins vacation - T,W-Th,F

G:\
Trucking Payroll.xls

Page 1

10/12/2006

**DEF 0076**

**DRIVER WORK SCHEDULE**

Week Ending 12/20/03

REDACTED

| Name | 12/14/03 Sunday | 12/15/03 Monday | 12/16/03 Tuesday | 12/17/03 Wednesday | 12/18/03 Thursday | 12/19/03 Friday | 12/20/03 Saturday | Totals |
|---|---|---|---|---|---|---|---|---|
| 000165 Boultenhouse,Richard | 0 | | | | | | | |
| 000165 Butler,Gregory | 0 | | | | | | | |
| 000113 Casso,Amaury | 0 | | | | | | | |
| 000144 Chaunt,Robert | 0 | | | | | | | |
| 000189 Conroy,Phil | 0 | | | | | | | |
| 000163 Figueroa,Elvis | 0 | | | | | | | |
| 000168 Greenwood,Daniel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 000167 Greenwood,Peter | 0 | | | | | | | |
| 000132 Hankins,Daniel | 0 | | | | | | | |
| 000108 Lewis,Darell | 0 | | | | | | | |
| 000178 Moore,Perry | 0 | | | | | | | |
| 000191 Pohl, Sean | 0 | | | | | | | |
| 000153 Silva,Adam | 0 | | | | | | | |
| 000203 Zine,Jason | 0 | | | | | | | |
| Drivers Total | | | | | | | | |
| 000112 Monaco,Thomas | 0 | | | | | | | |
| 000116 Nogueira,Jeffrey | 0 | | | | | | | |
| Techs and Installs Tr | | | | | | | | |
| Grand Totals | | | | | | | | |

REDACTED

Page 1

G:\
Trucking Payroll.xls

10/12/2006

DEF 0077

DRIVER WORK SCHEDULE

Week Ending    12/27/03

| Name | 12/21/03 Sunday | 12/22/03 Monday | 12/23/03 Tuesday | 12/24/03 Wednesday | 12/25/03 Thursday | 12/26/03 Friday | 12/27/03 Saturday | Totals |
|---|---|---|---|---|---|---|---|---|
| 000165 Boultenhouse,Richard | | | | | | | | |
| 000165 Butler,Gregory | | | | | | | | |
| 000113 Casso,Amaury | 0 | | | | | | | |
| 000144 Chauri,Robert | 0 | | | | | | | |
| 000189 Conroy,Phil | 0 | | | | | | | |
| 000163 Figueroa,Elvis | 0 | | | | | | | |
| 000168 Greenwood,Daniel | 0 | 0 | 0 | 1 | 0 | | 0 | 0 |
| 000167 Greenwood,Peter | | | | | | | | |
| 000132 Hankins,Daniel | 0 | | | | | | | |
| 000108 Lewis,Darell | | | | | | | | |
| 000178 Moore,Perry | 0 | | | | | | | |
| 000191 Pohl,Sean | 0 | | | | | | | |
| 000153 Silva,Adam | 0 | | | | | | | |
| 000203 Zine,Jason | 0 | | | | | | | |
| Drivers Total | | | | | | | | |
| | | | | | | | | |
| 000112 Monaco,Thomas | 0 | | | | | | | |
| 000116 Nogueira,Jeffrey | 0 | | | | | | | |
| Techs and Installs Total | | | | | | | | |
| Grand Totals | | | | | | | | |



REDACTED

Greg Butler Vacation Days T,W,Th,F,S
Peter Greenwood PTO Saturday

G:\
Trucking Payroll.xls

Page 1

10/12/2006

DEF 0078

DRIVER WORK SCHEDULE

Week Ending    1/3/04

| Name | Sun 12/28/03 | 12/29/03 | 12/30/03 | 12/31/03 | 1/1/04 | 1/2/04 | 1/3/04 Saturday | Totals |
|---|---|---|---|---|---|---|---|---|
| 000165 Boultenhouse,Richar | 0 | | | | | | | |
| 000165 Buttler,Gregory | 0 | | | | | | | |
| 000113 Casso,Amaury | 0 | | | | | | | |
| 000144 Chaunt,Robert | 0 | | | | | | | |
| 000189 Conroy,Phil | 0 | | | | | | | |
| 000163 Figueroa,Elvis | 0 | | | REDACTED | | | | |
| 000168 Greenwood,Daniel | - | 0 | 0 | 0 | - | - | 0 | |
| 000167 Greenwood,Peter | 0 | | | | | | | |
| 000132 Hankins,Daniel | 0 | | | - | | | | |
| 000108 Lewis,Darell | 0 | | | - | | | | |
| 000178 Jennette, Columbus | 0 | | | - | | | | |
| 000191 Pohl, Sean | 0 | | | 0 | 0 | | 0 | |
| 000153 Silva,Adam | 0 | | | | | | | |
| 000203 Zine,Jason | 0 | | | | | | | |
| | | | | | | | | |
| Drivers Total | - | - | | | | | | |
| | | | | REDACTED | | | | |
| 000112 Monaco,Thomas | 0 | - | | | | | | |
| 000116 Nogueira,Jeffrey | 0 | - | | | | | | |
| Johnson, Jerome | 0 | 0 | | | | | | |
| Tavares, Christopher | 0 | 0 | | | | | | |
| | | | | | | | | |
| Techs and Installs Total | - | - | | | | | | |
| | | | | | | | | |
| Grand Totals | - | - | | | | | | |

Phil Conroy PTO days M,T,W

Friday PTO Day for Dan Hankins and Adam Silva

G:\
Tracking Payroll.xls

Page 1

10/12/2005

DRIVER WORK SCHEDULE

Week Ending 1/10/04

| Name | Sunday 1/4/04 | Monday 1/5/04 | Tuesday 1/6/04 | Wednesday 1/7/04 | Thursday 1/8/04 | Friday 1/9/04 | Saturday 1/10/04 | Totals |
|---|---|---|---|---|---|---|---|---|
| 000165 Boullenhouse,Richar | 0 | - | | | | | | - |
| 000165 Butler,Gregory | 0 | - | | | | | | - |
| 000113 Casso,Amaury | 0 | | | | | | | |
| 000144 Chaunt,Robert | 0 | | | | | | | |
| 000189 Conroy,Phil | 0 | | | | | | | |
| 000163 Figueroa,Elvis | 0 | | | | | | | |
| 000168 Greenwood,Daniel | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 000167 Greenwood,Peter | 0 | - | | - | - | - | - | - |
| 000132 Hankins,Daniel | 0 | | | | | | | |
| 000108 Lewis,Darell | 0 | - | | - | - | - | 0 | - |
| 000178 Jennette, Columbus | 0 | | | | | | | |
| 000191 Pohl, Sean | 0 | | | | | | | |
| 000153 Silva,Adam | 0 | | | | | | | |
| 000203 Zine,Jason | 0 | | | | | | | |
| Drummey, Daniel | - | | | | | | | |
| Drivers Total | - | | | | | | | |
| | | | | | | | | |
| 000112 Monaco,Thomas | 0 | | | | | | | |
| 000116 Nogueira,Jeffrey | 0 | | | | | | | |
| Johnson, Jerome | 0 | | | | | | | |
| Tavares, Christopher | 0 | | | | | | | |
| Techs and Installs Total | - | | | | | | | |
| Grand Totals | - | | | | | | | |

PTO GREG BUTLER JAN 9 - FRIDAY

REDACTED

GA
Trucking Payroll.xls

10/12/2006

**DEF 0080**



DRIVER WORK SCHEDULE

Week Ending 1/17/04

| Name | 1/11/04 Sunday | 1/12/04 Monday | 1/13/04 Tuesday | 1/14/04 Wednesday | 1/15/04 Thursday | 1/16/04 Friday | 1/17/04 Saturday | Totals |
|---|---|---|---|---|---|---|---|---|
| 000165 Boultenhouse,Richar- | 0 | | | | | | | |
| 000165 Butler,Gregory | 0 | | | | | | | |
| 000113 Casso,Amaury | 0 | | | | | | | |
| 0001-44 Chaunt,Robert | 0 | | | | | | | |
| 000189 Conroy,Phil | 0 | | | | | | | |
| 000163 Figueroa,Elvis | 0 | | | | | | | |
| 000168 Greenwood,Daniel | 0 | 0 | | | | | | |
| 000167 Greenwood,Peter | 0 | | | | | | | |
| 000132 Hankins,Daniel | 0 | | | | | | | |
| 000108 Lewis,Darell | 0 | | | | | | | |
| 000178 Jennette, Columbus | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |
| 000191 Pohl, Sean | 0 | | | | | | | |
| 000153 Silva,Adam | 0 | | | | | | | |
| 000203 Zine,Jason | 0 | | | | | | | |
| Drummey, Daniel | | | | | | | | |
| Drivers Total | | | | | | | | |
| 000112 Monaco,Thomas | 0 | | | | | | | |
| 000116 Nogueira,Jeffrey | 0 | | | | | | | |
| Johnson, Jerome | 0 | | | | | | | |
| Tavares, Christopher | 0 | | | | | | | |
| Techs and Installs Total | | | | | | | | |
| Grand Totals | | | | | | | | |

REDACTED

REDACTED

PTO Rob Chaunt Fri 1/16
PTO Darrell Lewis Fri 1/16

G:\
Tracking Payroll.xls

Page 1

10/17/2006

**DEF 0081**

**DRIVER WORK SCHEDULE**

Week Ending 1/24/04

| Name | 1/18/04 Sunday | 1/19/04 Monday | 1/20/04 Tuesday | 1/21/04 Wednesday | 1/22/04 Thursday | 1/23/04 Friday | 1/24/04 Saturday | Totals |
|---|---|---|---|---|---|---|---|---|
| 000165 Boultenhouse,Richard | 0 | | | | | | | |
| 000165 Buttler,Gregory | 0 | | | | | | | |
| 000113 Casso,Amaury | 0 | | | | | | | |
| 000144 Chaunt,Robert | 0 | | | | | | | |
| 000189 Conroy,Phil | 0 | | | | | | | |
| 000163 Figueroa,Elvis | 0 | | | | | | | |
| 000168 Greenwood,Daniel | 0 | 0 | - | 0 | 0 | - | 0 | - 0 |
| 000167 Greenwood,Peter | 0 | | | | | | | |
| 000132 Hankins,Daniel | 0 | | | | | | | |
| 000108 Lewis,Darell | 0 | | | | | | | |
| 000178 Jennette, Columbus | 0 | | | | | | | |
| 000191 Pohl, Sean | 0 | | | | | | | |
| 000153 Silva,Adam | 0 | | | | | | | |
| 000203 Zine,Jason | | | | | | | | |
| Drummey, Daniel | | | | | | | | |
| Drivers Total | | | | | | | | |
| 000112 Monaco,Thomas | | | | | | | | |
| 000116 Nogueira,Jeffrey | | | | | | | | |
| Johnson, Jerome | 0 | | | | | | | |
| Tavares, Christopher | 0 | | | | | | | |
| Techs and Installs Total | | | | | | | | |
| Grand Totals | | | | | | | | |

REDACTED

REDACTED

Adam Silva PTO 1/23/

Page 1

G:\
Trucking PayrollAn

10/12/2006

# DEPOSITION OF LEWIS FRAZER

November 22, 2006

Daniel Greenwood v. Yale Appliance and Lighting, Inc.
United States District Court
District of Massachusetts
C.A. No. 05-10605 JLT
Linda M. Thomas, Registered Merit Reporter

KATHLEEN A. GARDNER
Registered Professional Reporter
11 Roman Avenue
Danvers, MA  01923
(978) 777-3574

13

1     A.   Steve Sheinkopf.
2     Q.   Did you interact on a daily basis with
3 Greenwood while you worked there?
4     A.   On and off, yes.
5     Q.   Okay.  Prior to August of 2004, let's make
6 it prior to July of 2004, had you had any occasion to
7 discipline Greenwood?
8     A.   He had received reviews that were not
9 positive for his behavior, if you would.
10    Q.   Do you consider that disciplinary?
11    A.   I don't consider it disciplinary.  I
12 consider it a non -- not a positive review.
13    Q.   Okay.  But, had he been disciplined?
14    A.   He had not been disciplined.
15    Q.   Now, do you keep attendance records at Yale?
16    A.   Yes.
17    Q.   Have you ever -- let's leave Dan out of this
18 for now and what happened to him.  But, had you
19 disciplined any employees yourself for attendance
20 issues?
21    A.   Yes.
22    Q.   Okay, who?
23    A.   Again, are you talking prior to Dan?
24    Q.   Yeah.

14

1     A.   Off the top of my head, I can't remember the
2 names of the employees.  There is, obviously, Mike
3 Bartlett was an issue -- was a disciplinary issue.
4 There would have been Mike Johnson.  There would have
5 been Daryl Lewis.  I'm not sure about the timing of
6 these people.
7     Q.   Okay.  Bartlett, did he get fired?
8     A.   Yes.
9     Q.   Why did he get fired?
10    A.   For failure to show up for work.
11    Q.   Okay.  And, did you ever have any
12 conversations with Bartlett about his failure to show
13 up for work?
14    A.   I did not personally.  There were managers
15 who discussed it with Mike at the time.
16    Q.   Based on -- so, did you have some
17 conversations with the managers about what happened
18 with Bartlett?
19    A.   Yes.
20    Q.   Was it a medical issue?
21    A.   No.
22    Q.   Did you arrive at some conclusion as to why
23 Bartlett didn't show up for work?
24    A.   We did not arrive at any conclusion as to

15

1 why he did not show up at work.  We know he did not
2 show up at work when he was supposed to show up at
3 work.
4     Q.   Did Bartlett offer some excuse as to why he
5 should be excused from work and try to get his job
6 back?
7     A.   No, he did not.
8     Q.   How about Johnson?  Was he fired?
9     A.   Yes.
10    Q.   Was it for attendance reasons?
11    A.   Yes.
12    Q.   And were you the one who decided to fire
13 him?
14    A.   Yes.
15    Q.   Did he ever offer any explanation as to why
16 he -- was it again because he didn't show up at work?
17    A.   Yes.
18    Q.   Did he ever give you a reason for why he
19 didn't show up for work?
20    A.   He gave various reasons, but he never
21 provided any type of documented proof as to where he
22 was and why he could not work.
23    Q.   Did he claim he had a medical reason?
24    A.   No.

16

1     Q.   What did he say it was?
2     A.   Car broke down; you know, got something I
3 got to go do.
4     Q.   Okay.  And is it Daryl Lewis?
5     A.   Yes.
6     Q.   What happened with him?
7     A.   He was terminated for pretty much a lot of
8 the same, or under the same part of our handbook that
9 Dan was of no-call no-show for three days.
10    Q.   Did he ever come up with a reason for not
11 doing that, like try to get his job back?
12    A.   He called and gave excuses.  But, again, he
13 never came forward and presented any documentation as
14 to where he was and why he could not come in.
15    Q.   Now, you testified earlier that you are
16 aware that Greenwood got Workers' Compensation
17 benefits?
18    A.   Yes.
19    Q.   And, is it your understanding that an
20 employee's entitlement to get those arises if they
21 suffer an injury arising out of work?
22    A.   Yes.
23    Q.   Do you, as you sit here today, think that
24 Greenwood did not suffer an injury that arose out of

17

1　his work with Yale?
2　　A.　I can't comment. I don't know medically
3　where his hernia came from. I am not qualified to
4　talk about that. I know he had an injury, a hernia,
5　that was qualified as a Workmen's Comp under the way
6　the law works. If you are asking me to say whether
7　his hernia was related to his job, I am not qualified
8　to do that.
9　　Q.　Well, you have seen -- other employees since
10　you have been there have filed Workers' Comp claims,
11　haven't they?
12　　A.　We have had accidents on the job that have
13　resulted in Workmen's Comp claims, yes.
14　　Q.　Have you ever seen a Notice of Injury come
15　in?
16　　A.　Yes, Form 301, or something like that --
17　101, or 100?
18　　Q.　I don't know. But, it is fair to say on
19　those forms the employee has to describe what
20　happened?
21　　A.　Yes.
22　　Q.　Do you recall seeing something like that for
23　Greenwood?
24　　A.　I recall it would be -- I recall seeing

18

1　something. It would be in the file, yes.
2　　Q.　Your best memory of what it alleged?
3　　A.　I can't -- I don't remember.
4　　Q.　Did he allege that he hurt his back
5　delivering a refrigerator?
6　　　MS. KUGELL: Objection.
7　　　THE WITNESS: Are we talking about his
8　back, or are we talking about his hernia?
9　BY MR. RICE:
10　　Q.　Did he allege he sustained that delivering
11　an appliance?
12　　A.　I can't comment. Again, without the
13　document in front of me, I just don't remember.
14　　Q.　Do you have an insurer for that?
15　　A.　Yes, we do.
16　　Q.　Do you know whether or not the insurer
17　contested the claim?
18　　A.　I don't believe they did, but again, without
19　going back and reviewing that part of the file, I
20　don't know. I don't believe they did.
21　　Q.　How long was Greenwood out?
22　　A.　For his hernia, I believe he was out 13-14
23　weeks, something like that. Again, we would have to
24　go back and look at the payroll records, and we could

19

1　put that together.
2　　Q.　And then he returned to work?
3　　A.　Yes.
4　　Q.　Did he return with any restrictions?
5　　A.　He returned to work with restrictions and
6　was put to work on light duty.
7　　Q.　Okay. What was his light-duty assignment?
8　　A.　At the time I believe he was doing some
9　paperwork in the office. He was doing some small
10　light construction for a training facility that we
11　used. Building -- when you talk about Sub-Zeros,
12　building a sort of cabinet in the warehouse for us to
13　do training. He was helping as a runner in the office
14　is what I remember.
15　　Q.　How long did he stay on light duty?
16　　A.　I don't remember.
17　　Q.　Did you get a vocational assessment from his
18　doctor about what restrictions he might have been
19　under?
20　　A.　I believe so, yes.
21　　Q.　Okay. Who asked, or how did it come about
22　that a vocational assessment was given?
23　　A.　We require that from any employee returning
24　to work from an injury so that we know what they're

20

1　capable of doing as a matter of policy.
2　　Q.　You get that before you formulate light
3　duty?
4　　A.　Absolutely.
5　　Q.　Now, going to July of 2004, at some point
6　did you become aware that Greenwood was not going to
7　report to work?
8　　A.　Yes.
9　　Q.　And by the way, that is a busy time of year
10　for Yale Electric?
11　　A.　Very busy.
12　　Q.　Just out of curiosity, why is that?
13　　A.　Because it is the summer time, and
14　everybody's refrigerator seems to expire. And the
15　refrigerator is sort of the one thing that you can't
16　live without for very long. You can live without a
17　washer, a dishwasher, a stove, but you can't live
18　without a refrigerator -- very busy time.
19　　Q.　Okay. And as part of the business is people
20　come in -- and I volunteer at Bob's. So, you come in
21　and people see it and they want to have the thing at
22　their house as soon as they can, right?
23　　A.　You need it right away.
24　　Q.　So, meeting customer demand in the summer is

Deposition of Lewis Frazer    November 22, 2006
Case 1:05-cv-12605-JLT    Document 24-12    Filed 01/22/2007    Page 4 of 16
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

25

1    Q.    Was it before, or after his employment was
2    terminated?
3    A.    It was before.
4    Q.    And, how did you become aware of that fact?
5    A.    In the absolute I became aware of that fact
6    when he handed me his discharge note, I believe, from
7    the hospital.
8    Q.    Okay.  Had you ever heard of diverticulitis
9    at the time you got the discharge note?
10    A.    Yes.
11    Q.    How have you heard of it before?
12    A.    General conversation.
13    Q.    With -- just I mean did you know what it
14    was?
15    A.    No.  I'm not a doctor.  I don't know
16    exactly, specifically, medically what diverticulitis
17    was.
18    Q.    At the time, though, you -- I guess I just
19    want to clear this up a little.  It says that on the
20    discharge paper that he had diverticulitis, you think?
21        MS. KUGELL:  Objection.
22        THE WITNESS:  I would like to look at
23    the document to say that.  I'm not sure.
24    BY MR. RICE:

26

1    Q.    I don't have it here.  I don't know if Ms.
2    Kugell has it, but I will stay away from that for the
3    time being.  But, you believe it was around that time
4    that you were notified that he had been hospitalized
5    for diverticulitis?
6    A.    I had been notified that he was hospitalized
7    on the Wednesday morning.  As to what his condition
8    was, I don't remember exactly what point in time I
9    learned of that fact.
10    Q.    Okay.  As you sit here today, do you know
11    what diverticulitis is?
12    A.    I am aware that it is a problem with the
13    bowel.  Beyond that, no.
14    Q.    When you got the discharge notice, or
15    whatever else it was before Greenwood got fired, did
16    you know what diverticulitis was?
17    A.    No.
18    Q.    Did you -- at some point Greenwood gave you
19    a note from his physician?
20    A.    Yes.
21    Q.    Okay.  And, did you ask him to bring a note?
22    A.    Absolutely.
23    Q.    And he brought you one?
24    A.    I asked him -- at what point in time are we

27

1    talking about?  He first brought me a discharge.
2        MS. KUGELL:  Dan, before we start down
3    this road of questioning, can we take a short break?
4        MR. RICE:  If you want one, sure.
5
6    (Deposition Exhibit No. 1, the
         above-referred to Return-to-Work
7         form of Aboualkheir Alzaim, M.D.
         dated 8/9/04 was marked for
8         identification.)
9
10    BY MR. RICE:
11    Q.    We are talking about diverticulitis.  At the
12    time you found out that that was the reason Greenwood
13    -- Mr. Greenwood missed work, you didn't know what it
14    was?
15    A.    No.
16    Q.    Okay.  Now, we have got this Exhibit here,
17    Exhibit 1, which you have committed to memory, but I
18    will give you one anyway.
19        MS. KUGELL:  Thank you.
20    BY MR. RICE:
21    Q.    We have marked this as Exhibit 1.  Do you
22    recognize this document?
23    A.    Yes.
24    Q.    And it is a doctor's note, right?

28

1    A.    Yes.
2    Q.    From an individual, we will just call him
3    "AA" because that name was a little hard to pronounce.
4    A.    Fair enough.
5    Q.    Okay.  Did Mr. Greenwood give you this
6    document?
7    A.    Yes.
8    Q.    And, it does represent on this that
9    Greenwood has been under care -- excuse me -- "has
10    been under my care, and will be able to return to work
11    on the following date:  Tuesday, August 9, 2004,"
12    right?  It says that?
13    A.    That is what it says.
14    Q.    Did you ask Mr. Greenwood to get you a note?
15    A.    No.
16    Q.    Are you aware of anybody else asking him to
17    get you a note?
18    A.    What we asked Mr. Greenwood for was
19    documentation as to his condition and what he could do
20    and what he could not do.
21    Q.    Okay.  Now, but he did give you this?
22    A.    Correct.
23    Q.    So, I take it from the way you answered my
24    question that you don't think that this note was

29

1  responsive to your request?
2       A.   It did not answer what we had requested from
3  Mr. Greenwood.
4       Q.   So, what other kinds of things were you
5  looking for?
6       A.   We were looking for, as we require from any
7  employee who was going out on either an injury, or a
8  medical issue, documentation as to what they can and
9  cannot do and their condition. We, at the time,
10 needed Danny greatly, as we have stated, and were
11 looking for him to do any type of work. So, this does
12 not tell me what he could, or could not do.
13      Q.   And when did you conclude that this note was
14 not responsive to what you were looking for?
15      A.   The moment he gave it to me.
16      Q.   And so, did you tell him that?
17      A.   Absolutely.
18      Q.   What did you say?
19      A.   I said, "This does not excuse you from where
20 you have been for the last week."
21      Q.   And what did you say? Anything else?
22      A.   I said that I would be back in touch with
23 him.
24      Q.   Did you say, "Go back to your doctor and

30

1  come back with a Vocational Assessment?
2       A.   No.
3       Q.   Well, he had given you one before, though,
4  hadn't he?
5       A.   No.
6       Q.   When he came back from Comp the first time,
7  you didn't get a Vocational Assessment?
8       A.   That was way previous to this.
9       Q.   Okay. But, your company, you get those
10 things, Vocational Assessments?
11      A.   Yes.
12      Q.   Typically, those are put together by
13 doctors?
14      A.   Correct.
15      Q.   And a doctor would be capable, or that is
16 because a doctor has a medical opinion as to what
17 someone can and can't do? You are saying "yes" to
18 that?
19      A.   Is that a question?
20      Q.   Maybe I didn't inflect it. I will withdraw
21 it. Now, AA, the doctor here, did you ask Greenwood
22 if you could talk to him?
23      A.   No.
24      Q.   Have you, as a manager, ever had

31

1  conversations with an employee's doctor about their
2  ability to work?
3       A.   No.
4       Q.   Have you ever had an employee consent to
5  permitting you to get medical records?
6       A.   Me, personally, or the HR Department?
7       Q.   Your HR Department.
8       A.   I don't know the answer to that. I am not
9  familiar with some of the medical records required
10 with Workmen's Comp claims, or other situations. So,
11 I don't know how to answer that. I have not, no.
12      Q.   Okay. Now, on the discharge note that you
13 saw, was Greenwood's physician identified?
14      A.   I don't recall.
15      Q.   At the time you saw that, did you have any
16 doubt in your mind that Greenwood had, in fact, been
17 hospitalized?
18      A.   No.
19      Q.   Had he told you that he wasn't capable of
20 working?
21      A.   He had not told us he was not capable of
22 working.
23      Q.   Had he had any conversations with you
24 directly between the time you first found out that he

32

1  wasn't reporting to work, up until the time he gave
2  you this note?
3       A.   I don't understand the question.
4            MS. KUGELL: Objection.
5  BY MR. RICE:
6       Q.   Did you meet with Greenwood? I will define
7  a time span here for you, okay?
8       A.   Yeah.
9       Q.   There is the first time you hear that
10 Greenwood is not going to report to work?
11      A.   Correct.
12      Q.   And I think you have testified that was
13 Wednesday?
14      A.   Yes.
15      Q.   And then he gave you this note, right?
16      A.   Correct.
17      Q.   Do you remember when he gave you the note?
18      A.   He gave us the note, I believe, on -- I
19 would have to look back at the record. I'd want to
20 look back at the record exactly. We documented when
21 he gave us this note. I think it was on this date.
22      Q.   August 9th?
23      A.   Yes.
24      Q.   Okay. So, in between the Wednesday --

Deposition of Lewis Frazer
Case 1:05-cv-10605-JLT    Document 24-12    Filed 01/22/2007    Page 6 of 10    November 22, 2006
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

**33**

1      A.    Yes.

2      Q.    August 9th, did you have any conversations

3  with Greenwood?

4      A.    Yes.

5      Q.    And in any of those conversations, did you

6  discuss his ability to come back and work?

7      A.    Yes.

8      Q.    Okay.  And what was the first such

9  conversation you had with him?

10     A.    The first conversation I directly had with

11 Danny would have been when he was discharged from the

12 hospital and showed up at work with his discharge that

13 indicated no restrictions on his activity.  I would

14 have discussed with him, "This does not tell us any

15 restrictions on you Danny.  Where have you been and

16 what can you do?  We need you for light duty."

17     Q.    And what did he say?

18     A.    He said, "I am seeing my doctor.  I'll be in

19 touch."

20     Q.    And then was he in touch?

21     A.    No.

22     Q.    Did you talk to him in the interim?

23     A.    No.

24     Q.    And, when was the next time -- was the next

**34**

1  time you saw him --

2      A.    It's correct that I talked to him prior to

3  receiving this note Friday, I believe, Friday.

4  Actually, there is a document that outlines the time

5  line, Dan, that we could look at that would refresh my

6  memory as to the exact dates that all of this

7  occurred.

8      Q.    I will volunteer this:  I am not looking for

9  specific dates.  I am just looking for the sequence of

10 events here.

11     A.    The document we have created for Danny's

12 file would outline the exact specific sequence of

13 events.

14     Q.    Just without that, to move this thing along,

15 you talked to him before he brought in the note from

16 AA here, correct?

17     A.    Yes.

18           MS. KUGELL:  You're referring to

19 Exhibit 1?

20 BY MR. RICE:

21     Q.    Yes, Exhibit 1.  Did you tell him to get

22 documentation in the conversation you had?

23     A.    Yes.

24     Q.    And this is what he brought?

**35**

1      A.    Yes.

2      Q.    And your opinion was that this was not

3  responsive to what you wanted?

4      A.    This is not what we asked for.

5      Q.    That day, after you concluded that, okay,

6  and your testimony is you told him that then the

7  decision was made to fire Greenwood?

8           MS. KUGELL:  Objection.

9           THE WITNESS:  Can you rephrase that?

10 BY MR. RICE:

11     Q.    Okay.  Your testimony -- we will just go by

12 the dates, and we won't hold them to you if it turns

13 out to be different.  You can prove that it wasn't.

14 You think it was August 9th, he gave you this note?

15     A.    Yeah.

16     Q.    August 9th, is also the day that Greenwood

17 got fired, right?

18           MR. RICE:  Can you just identify this?

19           THE WITNESS:  I wanted to look at the

20 dates because this says "Tuesday, August 9th," but

21 this says "August 9th," and this says "Monday, August

22 9th."  If we looked at a calendar, that date should

23 actually be August 10th.  Monday was the 9th.

24           MR. RICE:  Could we mark this as

**36**

1  Exhibit 2?

2

3           **(Deposition Exhibit No. 2, the**

4           **above-referred to Memo dated 8/9/04**

5           **to Daniel Greenwood from Lewis**

6           **Frazer, was marked for**

7           **identification.)**

7  BY MR. RICE:

8      Q.    I am placing a document before you, and this

9  is Exhibit 2?

10     A.    Yes.

11     Q.    This is a memo to Greenwood from you, right?

12     A.    Correct.

13     Q.    And, you say in here that Greenwood

14 resigned, right?

15     A.    As per our handbook stipulates three days no

16 call, no show, unauthorized absence is considered a

17 voluntary resignation.  So, yes.

18     Q.    I know what you wrote there, but, in fact,

19 Greenwood didn't raise his hand and say "I'm

20 quitting"?

21     A.    Correct.

22     Q.    You decided that he should be terminated

23 from employment?

24     A.    He violated a work-place rule that is

November 22, 2006

Case 1:05-cv-10605-JLT    Document 24-12    Filed 01/22/2007    Page 7 of 11

Deposition of Lewis Frazer
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

**37**

1 uniformly enforced, and I had no choice.
2 Q. Okay. You had no choice?
3 A. It is a rule.
4 Q. You could have taken his note, though,
5 right?
6 A. The note did not provide what we had asked
7 for.
8 Q. Okay. What time was it -- what time of day
9 was it when he gave you that note?
10 A. I don't remember.
11 Q. Morning?
12 A. Don't remember.
13 Q. Did you consult with anybody before you --
14 first of all, before I ask that, is this date the date
15 you actually wrote this up, August 9th?
16 A. Yes.
17 Q. Did you talk to somebody before you wrote
18 that up?
19 A. Yes.
20 Q. Who?
21 A. Obviously, I would have talked to Jimmy
22 Rapoza because he had signed it. I would have talked
23 to Steven Sheinkopf, the owner of the company, and I
24 would have spoken to Maria Moynihan.

**38**

1 Q. We will leave the conversations with Maria
2 out of this, obviously. But, what did you talk to Mr.
3 Sheinkopf about?
4 A. I explained the situation as -- I explained
5 the situation with Danny as per the details that were
6 documented, and that would have been it.
7 Q. What did you say?
8 A. I said, "Here are the details; Danny was
9 released from the hospital with a release with no
10 restrictions. We asked him for medical documentation
11 where he has been this following week. He has gone
12 out of communication -- is not communicating with us
13 at all; not providing us with any documentation. I
14 have no choice under the policies we enforce but to
15 send him a resignation letter."
16 Q. Okay. And what did you say to Mr. Rapoza?
17 A. The same. It would have been the same
18 conversation.
19 Q. Were you a little steamed that this was
20 going on during the busy time?
21 A. Define "steamed."
22 Q. Were you upset by the fact that Greenwood
23 was not there during the busy period?
24 A. I was -- at the time we needed all hands on

**39**

1 deck. It was very busy. So, whatever Danny could
2 have done, we would have used him in that capacity.
3 Q. What was your belief as to what he could do?
4 A. I have no idea what he could do.
5 Q. Did you ask him what he could do?
6 A. Absolutely.
7 Q. When?
8 A. Throughout the process.
9 Q. Okay. I have heard about three
10 conversations you had with him, I think.
11 A. Correct.
12 Q. Actually, two. When was the first time that
13 you asked him what he could do?
14 A. It would have been when he provided me with
15 the release from the hospital with no restrictions.
16 Q. Okay. By the way, did his doctor write
17 that, no restrictions?
18 A. I have no idea.
19 Q. Have you ever talked to this doctor?
20 A. No.
21 Q. Did you say, when you got that note, to Dan,
22 "Hey, it looks like you have no restrictions"?
23 A. Absolutely.
24 Q. And what did he say?

**40**

1 A. He never read it.
2 Q. Did you tell you that he did not think he
3 could perform the job of whatever he was, driver?
4 A. I don't remember.
5 Q. Well, in the past had he ever not shown up
6 for work without explaining why he couldn't go?
7 A. To my knowledge, no.
8 Q. Did you have -- did you, in your mind, have
9 some opinion as to why he suddenly was being difficult
10 about going to work?
11 A. No.
12 Q. Was he -- did he get paid time off during
13 this period?
14 A. During which period?
15 Q. Well, I think the end of July, and then he
16 comes back in August, or he presented a note. Was he
17 getting paid sick time?
18 A. He had, actually, exhausted all his paid
19 time off, if that is to what you are referring. He
20 had requested to use vacation time for paid time off,
21 which is not according to our policies. He'd
22 exhausted all his (inaudible) time.
23 Q. So, he wasn't getting paid?
24 A. Correct.

Deposition of Lewis Frazer                    November 22, 2006
Case 1:05-cr-10605-JLT    Document 24-12    Filed 01/22/2007    Page 8 of 11
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

41

1    Q.    And he had never had an absenteeism like
2    this before?
3    A.    No.
4    Q.    So, did you think he was malingering?
5    A.    At the time, I don't remember what I
6    thought.  Sitting here today I don't remember what I
7    thought.  What I do know is that he was not providing
8    documentation as to his condition and what he can and
9    cannot do, which is what we asked him for.
10   Q.    Okay.  So, on the 9th, he gave you the note,
11   and this is a note from a doctor?
12   A.    Yes.
13   Q.    Okay.  Have you seen notes like this before?
14   A.    Have I seen notes like this before?  I have
15   seen doctors' notes before.
16   Q.    And you wanted something along the lines of
17   a Vocational Assessment?
18   A.    Correct.
19   Q.    Did you tell him, "Get me a Vocational
20   Assessment"?
21   A.    In those specific words, no.
22   Q.    Do you have any idea what this doctor's work
23   load is?
24   A.    No.

42

1    Q.    In your experience, is it easy to go to a
2    doctor and get them to write up some specific
3    statement?
4    A.    Yes.
5    Q.    Had you provided Greenwood any documents
6    from Yale by which AA, this doctor here, might be able
7    to come up with an assessment for him?
8    A.    No.
9    Q.    And it was on the 9th, that you wrote up
10   that note?
11   A.    Yes.
12   Q.    To fire him, or you say to confirm that he
13   voluntarily resigned?
14   A.    Correct.
15   Q.    Now, after -- did you hand deliver that to
16   Greenwood?
17   A.    No.  As indicated on the bottom, it is
18   transmitted via Regular mail and Certified Mail Return
19   Receipt Requested.
20   Q.    Did you have any conversations with
21   Greenwood after?
22   A.    No.
23   Q.    Why didn't you give Greenwood a chance to go
24   back to his doctor and get a Vocational Assessment?

43

1    A.    This note he provided us with did not do
2    what we had asked him for, which is, under your terms
3    a Vocational Assessment, which we asked him for all
4    week long.
5    Q.    But, he had been there for seven years,
6    right?
7    A.    A direct employee of Yale, I don't know if
8    it was seven years, or five years.  Again, there was
9    company changes that went on.
10   Q.    Why is that the last straw that he gives you
11   this note?  Why don't you say, "We need more"?  Your
12   testimony here is this note is just insufficient,
13   right?
14   A.    Because we had been asking all week for
15   more.
16   Q.    When did you ask?
17   A.    I asked him when he provided me with the
18   release from the hospital with no restrictions.
19   Q.    What did you say?
20   A.    I said, "This confirms you were in the
21   hospital, Danny, and were released with no
22   restrictions.  This does not excuse you for the entire
23   week that you have been gone and that we have been
24   asking you for what you can do.  We need your help in

44

1    light duty."
2    Q.    Now, the note you did get, in fact, AA does
3    state, and he is a doctor, that in his medical opinion
4    Greenwood is excused up until Tuesday, August 9th?
5          MS. KUGELL:  Objection.
6          THE WITNESS:  No, it does not say that.
7    BY MR. RICE:
8    Q.    What does that say?
9    A.    It says, "has been under my care and will be
10   able to work on the following day:"  It does not say
11   where he was the previous week at all.
12   Q.    So, was that something you concluded at the
13   time you got it that that question was left
14   unanswered?
15   A.    Absolutely.
16   Q.    Were you interested in what his status was
17   for that week?
18   A.    Absolutely.
19   Q.    So, in order to satisfy curiosity at that
20   point, what did you do?
21   A.    I said, "Danny, this does not --" If you are
22   asking me what I did when Danny -- what are you asking
23   me, specifically?
24   Q.    You testified that he gave you the note

45

1   here, and in your view it didn't answer the question
2   as to where the heck Greenwood was for the previous
3   week basically, right?
4     A.   It did not answer what we had asked him,
5   which was, "What can you do under what restrictions?
6   We need you for light duty."
7     Q.   Okay. So, prospectively, are you talking
8   about what is going on after this date, what can you
9   do and what can't you do?
10     A.   No. We are talking about the week of the
11   second, third, fourth, five and sixth.
12     Q.   This note, in your view, doesn't -- didn't
13   clear up that ambiguity?
14     A.   It makes no representation about that week
15   at all.
16     Q.   Okay. And you wanted to see something that
17   did?
18     A.   We asked for, and he is required to under
19   the terms of our handbooks, provide that for an
20   absence medical documentation.
21     Q.   So, as a result --
22     A.   Unexcused absence.
23     Q.   So, the note isn't clear, in your view. So,
24   as a result of that --

46

1     A.   It is not that the note is not clear. The
2   note doesn't provide documentation.
3     Q.   Okay.
4     A.   It only makes a statement that he has been
5   under my care and able to return to work on a day.
6     Q.   At the time you got the note from Greenwood,
7   and as you are sitting here today, you can, in your
8   mind, hypothesize about a note that actually would
9   have said something about that, correct?
10     MS. KUGELL: Objection.
11   BY MR. RICE:
12     Q.   For example, if the doctor said, "Dan
13   Greenwood has diverticulitis, which is this really
14   painful condition that affects somebody's bowels and
15   debilitated him from the ability to move heavy
16   appliances around in the middle of the summer," that
17   would have been satisfactory?
18     MS. KUGELL: Objection.
19     THE WITNESS: Rephrase the question, if
20   you would, please.
21   BY MR. RICE:
22     Q.   I couldn't possibly do it. But, if he -- in
23   your view, there is a lack of information on this as
24   to what his status was up until August 9th, 2004?

47

1     A.   We had asked Dan, once presented with
2   information that he was released with no restrictions,
3   to provide additional documentation about his
4   condition and what he was able to do, whether it be
5   light duty, whether it be answer the phone, file
6   paperwork, and this does not address that.
7     Q.   Okay. But, it could have in your view?
8     A.   No.
9     Q.   No note could have done that?
10     A.   No. A note could have done that; this did
11   not.
12     Q.   Why not just, instead of firing Greenwood,
13   why don't you just say, "Dan, go back to your doctor
14   and have him answer the question"?
15     A.   Because we had asked for that all week long.
16     Q.   You had asked once?
17     A.   I had asked. Jim Rapoza had asked every
18   time he spoke or left a message with Dan.
19     Q.   Have you -- actually, let's go on to the pig
20   roast. There has been a lot of talk about the pig
21   roast in this case. You sure weren't at the pig
22   roast, right?
23     A.   No.
24     Q.   Do you think Greenwood was partying and

48

1   having a great time at this pig roast and pretending
2   to be sick and not able to work at Yale Electric?
3     A.   I have no idea.
4     Q.   There hasn't been some guest from the pig
5   roast that has come to you, or somebody else that you
6   know and say, "Hey, in fact, Greenwood was knocking
7   them back and eating the pig," that kind of thing?
8   That hasn't happened?
9     A.   What is your question?
10     Q.   I am asking you -- I keep hearing about the
11   pig roast. Is there some information that you have
12   that Dan here had a jolly old time at the pig roast
13   and, therefore, he could have been lugging
14   refrigerators around that week?
15     A.   I didn't go to the pig roast. I can't make
16   any representation about it.
17     Q.   Have you had conversations with somebody
18   that was at the pig roast?
19     A.   No.
20     Q.   Are you aware of Yale Electric having
21   knowledge of somebody who was at the pig roast who
22   claims to have observed Dan Greenwood acting in a
23   manner inconsistent with somebody who was just
24   discharged from the hospital with diverticulitis?

**49**

1    A.  It is a pretty long question.
2    Q.  Is there somebody out there telling Yale
3  Electric, to your knowledge, that Greenwood was at the
4  pig roast and not acting consistent with somebody who
5  couldn't report to work?
6    A.  There was an employee of Yale who was at the
7  pig roast who was Dan's nephew. Beyond that, I don't
8  understand your question. Peter Greenwood.
9    Q.  To your knowledge, has Peter told somebody
10  at Yale Electric, or representing Yale Electric that
11  Dan was at the pig roast and not acting in a manner
12  consistent with somebody who just got discharged from
13  the hospital?
14    A.  Ask the question again.
15    Q.  I will try to simplify it. Has Peter
16  Greenwood told you, or anybody that you know of, that
17  Dan was enjoying himself at the pig roast?
18    A.  What do you mean "enjoying himself"?
19    Q.  How do you enjoy yourself at a pig roast?
20  Drinking beer, eating the pig, eating pig?
21    A.  I can't comment as to what Peter Greenwood
22  will say.
23    Q.  What is your knowledge of it? I don't know
24  what Peter is going to say, either, but what is your

**50**

1  knowledge?
2    A.  I have no knowledge what occurred at the pig
3  roast.
4    Q.  During the time that Dan was out of work,
5  were you aware --
6    A.  Which point in time out of work?
7    Q.  Between July and August right before August
8  9th when he got fired?
9    A.  Yes.
10    Q.  Had you received information that he was at
11  the pig roast?
12    A.  No.
13    Q.  So, the fact that he might have had a pig
14  roast at his house, did that have any impact at all on
15  your decision to fire him?
16    A.  None.
17    Q.  Have you ever heard of a law called, "The
18  Family Medical Leave Act?
19    A.  Yes.
20    Q.  Before you fired Greenwood, or before he
21  voluntarily resigned, in your view, did you consider
22  whether or not Greenwood's absences might have been
23  excused under the Family Medical Leave Act?
24    A.  Yes.

**51**

1    Q.  Did you conclude that they were not?
2    A.  Yes.
3    MS. KUGELL: Objection. I don't want
4  to get into discussion with counsel.
5    MR. RICE: Okay. That is probably
6  enough.
7  BY MR. RICE:
8    Q.  Did you make a review of his attendance file
9  before you decided to fire him?
10    A.  I don't remember.
11    MR. RICE: Can we go off the record?
12    **(Off-the-record discussion)**
13    MR. RICE: I don't have any further
14  questions for you, Mr. Frazer.
15    MS. KUGELL: I have just a couple of
16  small questions.
17
18      **CROSS EXAMINATION**
19  BY MS. KUGELL:
20    Q.  In July of 2004, do you recall what position
21  Mr. Phil Conroy was in?
22    A.  Phil Conroy was in a helper position at that
23  point in time.
24    Q.  And, at some point in August of 2004, or

**52**

1  thereabouts, did he assume another position?
2    A.  He was Dan Greenwood's direct replacement as
3  a delivery driver.
4    Q.  Now, there has been a whole lot of
5  discussion about something called a "Vocational
6  Assessment" during your deposition, Mr. Frazer.
7  Before today, was that a term that you were familiar
8  with?
9    A.  No.
10    Q.  Is "Vocational Assessment" a term that is
11  regularly used at Yale Electric?
12    A.  No.
13    Q.  Specifically, what is it that you asked Mr.
14  Greenwood for relative to his ability to perform work?
15    A.  We had asked him, specifically, as to what
16  he can and cannot do in terms of light duty, in terms
17  of full duty. What were the restrictions on his
18  activity? What we were provided with, and after
19  asking for numerous times, was first the release from
20  the hospital that provided no restrictions on his
21  activity; and then secondly, a doctor's note that
22  provided no information as to the restrictions on his
23  activity.
24    Q.  And, the second document you are referring

Deposition of Lewis Frazer
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

57

1

2    PLEASE NOTE:

3       THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
4    SAME BY ANY MEANS UNLESS UNDER THE DIRECTION OF THE
     CERTIFYING REPORTER.
5                      C-E-R-T-I-F-I-C-A-T-E

6
          I, LEWIS FRAZER, do certify that I
7    have read the foregoing deposition and that, to the
     best of my knowledge, said deposition is true and
8    accurate.

9    _____

10   LEWIS FRAZER
11
12
13
14   Subscribed and sworn before me this ___ day of
15   _____, 2006.
16

17
     DATE _____    _____
18                   NOTARY PUBLIC

19
20
21   WITNESS SIGNATURE _____
22
23   My Commission expires: _____
24

58

1       ERRATA SHEET

2

3       In accordance with the rules of procedure

4    governing depositions, you are entitled to read and

5    correct your deposition.

6       Accordingly, please carefully read your

7    deposition and, on this errata sheet, make any changes

8    or corrections in form or substance to your deposition

9    that you feel should be made.  PLEASE DO NOT MARK THE

10   TRANSCRIPT.

11       After completing this procedure, sign at the

12   conclusion of such changes/corrections (if any) and

13   return it in accordance with your instructions.

14

15   PAGE  LINE    CHANGE
16   21    9    "No Attendance Related Disciplinary Issues to my knowledge"
17   23    5    Replace "In the Absolute" to "As I remember today"
18   28    15   ~~and~~ Strike "No" replace with the "Yes. Both Jim and I asked for doctors notes"
19   40    22   Replace "(inaudible)" with "Paid Time Off"
20   45    19/20 Replace starting with "That" with "Medical Documentation for an absence"
21   45    22   Insert at the beginning "without ~~Documentation~~ sufficient medical documents It is considered an unexcused Absence"

22   SIGNATURE: _____    DATE: _____
23   [signature]  1/9/07
24

Page 57 - Page 58

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL GREENWOOD,         ) | |
| ) | |
| Plaintiff,     ) | |
| ) | Civil Action No. 05-10605 JLT |
| v.                  ) | |
| ) | |
| YALE APPLIANCE AND LIGHTING, INC., ) | |
| ) | |
| Defendant.     ) | |

## AFFIDAVIT OF MICHAEL KELLEY SUBMITTED IN SUPPORT OF DEFENDANT YALE APPLIANCE AND LIGHTING, INC.'S MOTION FOR SUMMARY JUDGMENT

I, Michael Kelley, hereby state under the pains and penalties of perjury:

1.      I am Vice President and Claim Manager for A.I.M. Mutual Insurance Company.  I held this position during the relevant time period of 2003 and 2004.

2.      A.I.M. Mutual Insurance Company was the workers' compensation carrier for Yale Appliance and Lighting, Inc. on November 13, 2003.

3.      On November 13, 2003, Daniel Greenwood sustained an industrial accident.

4.      As a result of Mr. Greenwood's injury on November 13, 2003, Mr. Greenwood was classified as having a temporary, total disability, and was paid temporary, total disability benefits as a result, from November 13, 2004 through January 25, 2004.

Signed under the pains and penalties of perjury this _17_ day of January, 2007.

_____
Michael Kelley

# A·M·I
## LEASING

July 6, 2004

Yale Electrical Supply Co.
296 Freeport Street
Boston, MA 02122-3513

RE:     Driver Name: DANIEL GREENWOOD
        3rd Accident Date:  3/11/04
        Vehicle No.: TOR3284                    Claim: 0401104

        2nd Accident Date:  3/02/03
        Vehicle No.: TOR4179                    Claim: 0301159

        1st Accident Date:  9/05/01
        Vehicle No.: TOR3044                    Claim: 0101940

Dear Mr. Lewis Frazer,

Within the past thirty-six months, your company was notified
that the above mentioned driver was involved in "two avoidable
accidents". Please be advised that this driver has been involved
in a third avoidable accident.

Please consider this a formal request to have this driver removed
from operating Trucklease owned equipment. A thirty day grace
period is offered to allow a smooth transition (8/05/04), after
which we cannot be responsible for any expenses incurred for
incidents involving this driver. In the event your firm would
prefer this driver to continue to operate Trucklease equipment
you may elect to insure a specific vehicle for him/her to drive.
Please contact the Safety Department for further details
concerning this option.

Your attention to this matter is greatly appreciated. Should
you have any questions concerning this matter, please feel
free to contact me.

Thank you.

TRUCKLEASE CORPORATION

Jim Drackley
Safety Coordinator

(3)

Corporate Headquarters:
46 West Boylston Street ● P.O. Box 986, Worcester, MA   01613
Local 508-852-5311, Nationwide 1-800-382-6990

**DEF 0168**

# D. OVERALL PERFORMANCE

Overall Performance Evaluation

Provide in narrative form, your overall evaluation for this employee (supervisor's opinion).

- Keep up the positive leadership
You have matured a lot in the
last 12 months. Keep it up.
Watch your driving Record.

My signature means I have reviewed the performance appraisal and discussed the contents with my immediate supervisor. It does not necessarily imply that I agree with this evaluation.

Employee's Signature: _____ Date: 7/16/04

Employee's Comments: _____

_____

_____

_____

*You may continue on additional pages, if you wish.*

Appraiser's Signature: _____ Date: 7/16/04

Reviewer's Signature: _____ Date: 7/16/04

Human Resources: _____ Date: _____

#302323

- 8 -

**DEF 0173**

**MEMO**

Date:   Tuesday, August 10th, 2004

From:  Lewis Frazer

TO:     Employee File, Daniel Greenwood

RE:     Violation of Yale Policy

On Tuesday evening August 27th, 2004, delivery driver Daniel Greenwood called his direct supervisors, James Rapoza and James Oneill, to inform him that he was going to the doctors due to stomach pains and would not be at work the following day.

James Rapoza received a message from Mr. Greenwood indicating that he was admitted to the hospital. Mr. Rapoza called him back and Mr. Greenwood informed Mr. Rapoza that he was admitted to the hospital with an intestinal infection and his doctor wanted him to stay in the hospital through the weekend. During the conversation, Mr. Greenwood indicated that he was planning on signing himself out of the hospital on Friday due to a scheduled court date and a weekend long party at his home.

On Friday, Mr. Rapoza spoke with Mr. Greenwood who informed him that he had signed himself out that day and that his doctor wanted to see him on Monday. Mr. Greenwood was scheduled to work on that Monday, August 2nd, 2004. Mr. Rapoza and Mr. Greenwood agreed to speak on Monday after Mr. Greenwood's appointment with his doctor. Mr. Rapoza offered Mr. Greenwood light duty as we were short handed in the warehouse.

On Monday, Mr.Rapoza did not hear from Mr. Greenwood. Mr. Rapoza called Mr. Greenwood Monday afternoon. At that time, Mr. Greenwood informed us that his doctor's appointment was cancelled and was rescheduled for Tuesday. At that point, an agreement was made between Mr. Greenwood and Mr. Rapoza that Mr. Greenwood would come to the office after his doctor's appointment.

On Tuesday afternoon, around 1:00pm, having not heard from Mr. Greenwood, Mr. Rapoza called the house and was informed by Mr. Greenwood's wife that he was sleeping. She also indicated that his doctor's appointment was scheduled for the afternoon. Mr. Greenwood appeared at the office around 3:00pm and verbally informed Mr. Rapoza that his doctor required him to be absent from work until his next appointment, which was scheduled for the following Monday. Mr. Greenwood provided no documentation from his doctor to explain his absence or current physical condition despite our request.

During this conversation, Mr. Greenwood inquired if he could use vacation time as PTO since he had already exhausted all of this PTO days. Mr. Rapoza informed Mr.

**DEF 0152**

Greenwood that he would have to check with Lewis Frazer, Director of Operations, regarding this issue since it was against company practice.

After conferring with Mr. Frazer regarding the use of vacation time, Mr. Rapoza called Mr. Greenwood at home and informed him that he would not be able to use vacation time as PTO time and would therefore not be paid. During this conversation, Mr. Rapoza again requested documentation from Mr. Greenwood's doctor regarding his health issues and current condition to see if he was capable of performing limited duties. Mr. Rapoza made the offer to have Mr. Greenwood work inside the warehouse or office on limited duty. At that time, Mr. Greenwood agreed to check with his doctor and provide us with documentation from his doctor on Wednesday.

On Wednesday, Mr. Greenwood did not contact Mr. Rapoza as agreed. On Thursday, Mr. Rapoza approached Mr. Frazer regarding the lack of contact. On Thursday afternoon, Mr. Frazer called Mr. Greenwood and left a message on his answering machine. Mr. Frazer also inquired if other employees had heard from Mr. Greenwood. No one had heard from Mr. Greenwood at that point.

On Friday morning, Mr. Greenwood called the office to inquire about his paychecks and spoke with Mr. Frazer. Mr. Frazer requested that Mr. Greenwood stop by the office and bring documents from his doctor to explain his absence and current physical condition. Mr. Greenwood appeared at the office and provided Mr. Frazer with his hospital release from the previous Friday. This was the only documentation Mr. Greenwood provided.

The release statement indicated "No restrictions on activities". When Mr. Frazer questioned Mr. Greenwood on the fact that this release did not prescribe restrictions on his activities, he stated that he did not read the release. Mr. Frazer advised Mr. Greenwood of the potential violation of Yale Policies regarding verification of sick leave and unexcused absences of three or more days. Mr. Greenwood agreed with Mr. Frazer that he would see his doctor and provide Yale with the proper documentation.

On Monday morning, Mr. Greenwood arrived at the office and provided Mr. Frazer with a note that did not explain his absence or his current physical condition regarding work. Mr. Frazer asked Mr. Greenwood if he had any other documentation to support his absence and Mr. Greenwood replied "I should be all set..". At that point, Mr. Frazer advised Mr. Greenwood that he not provided sufficient documentation regarding his absence and was in violation of Yale's policy regarding unexcused absences of three or more days. Mr. Frazer indicated that he would speak with Yale's employment attorney and advise Mr. Greenwood of any change in his status. Upon speaking with council, Mr. Frazer informed Mr. Greenwood via regular mail and certified mail, return receipt requested, that he had violated Yale's policy of unexcused absences of three or more days and was considered to have voluntarily resigned.

DEF 0153

# DEPOSITION OF JAMES RAPOZA

November 22, 2006

Daniel Greenwood v. Yale Appliance and Lighting, Inc.
United States District Court
District of Massachusetts
C.A. No. 05-10605 JLT
Linda M. Thomas, Registered Merit Reporter

KATHLEEN A. GARDNER
Registered Professional Reporter
11 Roman Avenue
Danvers, MA   01923
(978) 777-3574

**5**

1  years.

2    Q.  And prior to that, did you also work for

3  Yale?

4    A.  I have.

5    Q.  And, what was your job before that?

6    A.  I, initially, started out at Yale as a

7  helper on the delivery trucks, and then became a

8  driver.

9    Q.  And then you rose to a management-level

10  position?

11    A.  Not initially.  I did move inside and had

12  some responsibilities inside, and ultimately into the

13  management position, but not directly from the road.

14    Q.  In August of 2004, did you have a job in

15  which you had some supervisory authority over Dan

16  Greenwood?

17    A.  Yes.

18    Q.  What was the name of the job you had?

19    A.  I would say Delivery Manager.

20    Q.  So, you were in charge of supervising all of

21  the individuals employed by Yale who were involved in

22  delivering appliances?

23    A.  Correct.

24    Q.  Of those employees, which employee on July

**6**

1  of 2004, had been employed by Yale the longest and

2  assigned to work in the delivery area?

3    A.  That would be difficult to answer.  When I

4  came on to Yale, when I was initially employed, there

5  were a few employees there previous to me.  I could

6  certainly speak to them.  When they were actually

7  hired, and who was there first, I couldn't really

8  speak to.

9    Q.  Well, was Greenwood up there in the top

10  echelon of drivers?

11    A.  In terms of seniority, yes, I would say so.

12    Q.  How long had you been supervising him in the

13  2004 time frame?

14    A.  That would have been roughly -- trying to go

15  back and get specific dates is difficult.  At that

16  point in time, I would say somewhere around a year.

17    Q.  Had he had any attendance problems?

18    A.  Not that I recall.

19    Q.  Obviously, attendance is important?

20    A.  Very, very important at Yale, yes.

21    Q.  And Mr. Frazer identified three individuals

22  who had been fired for attendance issues?

23    A.  I believe so.

24    Q.  Bartlett, Johnson and Lewis?

**7**

1    A.  Correct.

2    Q.  At some point in July of 2004, did you learn

3  that Mr. Greenwood was not going to be reporting to

4  work?

5    A.  Yes.

6    Q.  Okay.  How did you learn that?

7    A.  Either on a Tuesday -- I am not sure about

8  the date -- Tuesday evening, I don't recall whether I

9  spoke with Mr. Greenwood, or received a message from

10  him that he was going to the doctor's, or might have

11  been at the doctor's already, and that he would not be

12  at work the next day.  That was the initial moment

13  that I learned about it.

14    Q.  As a result of being notified of that, what

15  did you do?

16    A.  I, at that point, would have let Lewis

17  Frazer know, and Jim O'Neill, most likely.  He was the

18  dispatcher at the time for the delivery trucks.  I

19  would have let him know that Dan wouldn't be in and we

20  would need to find a substitute for him.

21    Q.  How do you find a substitute?

22    A.  Back in '04, it was probably, and I can say

23  with almost certainty, it was someone out of the

24  warehouse.  We didn't have, if I remember correctly,

**8**

1  many spare people back then.

2    Q.  Is that something that is difficult to do?

3  Does that hurt your operation to take someone from the

4  warehouse?

5    A.  Certainly.

6    Q.  Why is that?

7    A.  Because it leaves them shorthanded, also,

8  and they have responsibilities they need to meet.

9    Q.  What pays more, warehouse or driver?

10    A.  Oh, driver certainly.

11    Q.  Okay.  At the time you got the notice that

12  Greenwood was not going to report to work, did you

13  have an understanding as to how long he would be out

14  of work?

15    A.  Not at that initial -- not on that Tuesday

16  evening.

17    Q.  Did you take steps to -- were you later, or

18  subsequently able to ascertain how long he'd be out of

19  work?

20    A.  Yes.  I called Dan the next day, Wednesday.

21    Q.  Did you call him in the hospital?

22    A.  Correct.

23    Q.  Okay.  And what did he tell you?

24    A.  He told me that he was admitted to the

Deposition of James Rapczak 22, 2006
Case 1:05-cv-02605-JLT    Document 24-17    Filed 01/22/2007    Page 3 of 7
Daniel Greenwood v. Yale Appliance and Lighting, Inc.
November 22, 2006

**9**

1  hospital; that his doctor, at that point in time,
2  thought that he might be in the hospital through the
3  weekend, but that he had planned on checking himself
4  out on Friday. He had a Court date and some events
5  planned at his house on the weekend; that he would
6  need to check himself out on Friday. I asked him to
7  call me on Friday to let me know what his status was.
8      Q.    Did he call you?
9      A.    I did speak with Dan on Friday. I believe I
10  called Dan. He did let me know he was checking
11  himself out of the hospital and going to his Court
12  date.
13          At that point he told me he had a doctor's
14  appointment on the following Monday. And I asked him
15  to please call me after the doctor's appointment to
16  let me know what his status was in terms of work, if
17  he would be able to work, full duty, light duty, but
18  to please call me after the appointment.
19      Q.    Did he call you?
20      A.    No.
21      Q.    When was the next contact you had with him?
22      A.    I called Dan on Monday, Monday afternoon at
23  some point, because I hadn't heard from him. He told
24  me that his appointment had been cancelled; that he

**10**

1  had an appointment the very next day on Tuesday. And
2  I reiterated to please get me some documentation --
3  medical documentation as to what his condition was in
4  terms of his work status. Can he work full duty,
5  light duty? We certainly needed him, if we were going
6  to replace him with someone out of warehouse, there
7  are some functions in the warehouse that potentially
8  he could have helped us out with, and to please
9  provide that to us.
10      Q.    Well, did you say all that, what you just
11  said in the conversation you had with him or --
12      A.    No, I absolutely said that to him.
13      Q.    And what did he say?
14      A.    He said "okay," he will call me on Tuesday
15  after his appointment.
16      Q.    And did he call you on Tuesday?
17      A.    No.
18      Q.    Did you have contact with him on Tuesday?
19      A.    I called Dan's house on Tuesday afternoon,
20  again, I would say early afternoon at some point;
21  spoke with his girlfriend; did not speak with Dan;
22  asked if Dan was there, and she said he was
23  sleeping; that the appointment was in the afternoon.
24  And I asked that he call when the appointment was

**11**

1  done.
2      Q.    At the time you had the conversation with
3  his girlfriend, what was your understanding as to the
4  medical reasons?
5      A.    I didn't have any understanding at that
6  point. I'm sorry for speaking over you.
7      Q.    She probably got it anyway. What was your
8  understanding as to the medical reasons. You had no
9  understanding? That is your answer?
10      A.    Not in terms of exactly what his condition
11  was. When I spoke with Dan the previous week at the
12  hospital, he said there was something going on with
13  Dan -- to use Dan's words -- his belly.
14      Q.    Did you consider it unusual that he had been
15  admitted to the hospital for something?
16      A.    Did I as compared to what?
17      Q.    Well, just in your general experience did
18  you consider it unusual that somebody had been -- that
19  Greenwood had been admitted to the hospital?
20      A.    No, I wouldn't consider it unusual. It was
21  the first time Dan, to my knowledge, had been admitted
22  to the hospital. But, I mean as compared to what, I
23  really can't answer that question whether I consider
24  it unusual or not.

**12**

1      Q.    What is your belief -- I withdraw that
2  question. Did he discuss with you what -- okay.
3  Actually, let me withdraw this. This is Wednesday.
4  We moved up to Wednesday now?
5      A.    Well, this is the previous Wednesday when he
6  was admitted to the hospital.
7      Q.    And then you have a conversation with his
8  girlfriend?
9      A.    On Tuesday.
10      Q.    At that point you don't know why it was that
11  he was admitted to the hospital?
12      A.    No. Again, the only knowledge I had at the
13  time was something, again to use Dan's words at the
14  time, with his belly. That is all that I knew that
15  was happening at the time.
16      Q.    Was it your understanding when you had that
17  conversation that the reason he hadn't reported to
18  work was related to the medical issue that had caused
19  his hospitalization?
20      A.    Well, as per our conversation on Friday, Dan
21  told me he had a doctor's appointment, a follow-up
22  appointment after his release from the hospital to see
23  his doctor pertaining to his hospitalization. I mean
24  that was my understanding that it had to do with his

13

1   hospitalization.
2       Q.   Were you aware that he had used up all his
3   paid sick leave at the time?
4       A.   I believe so, yes.
5       Q.   Could you think of any reason then, or now,
6   that Greenwood would not report to work if he were
7   able to?
8       A.   Can you rephrase that question for me,
9   please?
10      Q.   Did you think -- let's cut to the chase
11  here.  Did you think when you were talking to his
12  girlfriend on Tuesday that he just plain-old didn't
13  want to show up to work?
14      A.   All I was looking for at that time was that
15  Dan was going to be out of work, as to why, and some
16  medical documentation that had been at that point.
17  You know, the three previous days, the Wednesday,
18  Thursday, Friday, Monday, and then Tuesday at that
19  point.  So, five days for medical documentation as to
20  why he was out of work.  Being the summer time, and
21  needing people, whether or not he was capable of
22  performing any functions for us, whether that be light
23  duty, full duty, and if he wasn't capable of
24  performing any functions.  That is all I was looking

14

1   for at the time.
2       Q.   After you had the conversation with his
3   girlfriend on Tuesday, what was the next contact you
4   had with anybody about Greenwood's status?
5       A.   I would have, at that point, informed Lewis
6   Frazer of my conversations on the phone, and I would
7   assume, again, that I spoke with Jim O'Neill, again
8   who does the routing for the trucks and dispatching,
9   that Dan was still not available.  So, we would have
10  to continue with the sub.
11      Q.   How about in terms of getting in touch with
12  Greenwood and trying to figure out if and when I was
13  going to come back?
14      A.   After I spoke with his girlfriend on that
15  Tuesday afternoon, Dan came into the office later on
16  that Tuesday probably a couple of hours later saying
17  that he was at the appointment; that he had to be out
18  for the week per his doctor; that he couldn't perform
19  any functions.  I asked him if he was able to do any
20  light duty; that we could use his help in the office,
21  or in the warehouse and if he had any documentation
22  with him for us.  And he didn't have any at the time.
23  I told him we would need that.
24      Q.   Okay.

15

1       A.   At that point in time --
2       Q.   Did he say that he couldn't do light duty?
3       A.   He said he wasn't up for it, if I remember
4   correctly.
5       Q.   And okay, so then he left?
6       A.   He left and told me he would be back in
7   touch with me on Wednesday with some paperwork from
8   his doctor.
9       Q.   And, in fact, was he back in touch with you
10  on Wednesday?
11      A.   I did not hear from Dan on Wednesday.
12      Q.   When did you hear from him next?
13      A.   The next time I personally spoke with Dan
14  would have been on Friday, that following Friday.  And
15  that would have been at the office.  I don't believe I
16  spoke with him personally on the phone that day.
17      Q.   And you met with him?
18      A.   I met with him and Lewis Frazer.
19      Q.   And what did Greenwood say at that meeting?
20      A.   He had -- he had come in.  I believe at that
21  point in time he had called and spoke with Lewis
22  looking if he had a pay waiting for him for the
23  previous week.  And Lewis had asked him to come in to
24  bring some documentation again to explain this past

16

1   week and, you know, some medical documentation
2   supporting his position.  And Dan turned in his
3   release form from the hospital at that point in time.
4       Q.   Okay.  And, did you say anything about that?
5       A.   I personally did not, no.
6       Q.   Did Mr. Frazer say something about it?
7       A.   Yes.
8       Q.   What did he say?
9       A.   He asked Dan if he read the release
10  document, and Dan said, "No."  Lewis then said that
11  this released you on Friday, the previous Friday with
12  zero restrictions, and that didn't, at that point in
13  time, explain his absence for the week.
14      Q.   Did Mr. Frazer ask him to get another note?
15      A.   We had asked that he provide further
16  documentation as to what his restrictions were for
17  work for this previous week to explain or, again, to
18  support whether or not we could have used him in the
19  warehouse or in the office.
20      Q.   Did you have any conversations about his
21  future with the company at that point?
22      A.   Not at that point in time.  We wanted to
23  wait and see what documentation he provided to us.
24      Q.   Did you discuss with him getting off the

Deposition of James Rapoza                              November 22, 2006
Case 1:05-cv-10605-JLT    Document 24-17    Filed 01/22/2007    Page 5 of 7
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

---

**17**

1 trucks and moving inside and working?

2     A.   Did I discuss with who?

3     Q.   With Greenwood. Did that ever come up?

4     A.   It came up throughout the week.

5     Q.   And you had discussions with Greenwood in

6 which you said, "Why don't you consider getting off

7 the trucks and taking an inside job?"

8     A.   Oh, no, certainly not, not myself.

9     Q.   Are you aware was that ever something that

10 was on the table, Greenwood moving off the trucks and

11 going inside?

12     A.   Dan had mentioned it in various

13 conversations over time. I don't recall any

14 conversation specifically with myself where we spoke

15 about that with official, professional level.

16     MS. KUGELL: Objection. I'm sorry.

17 You don't have a question pending. I think you guys

18 are not talking about the same thing.

19     MR. RICE: Okay.

20 BY MR. RICE:

21     Q.   So, there is a meeting on Friday. And is it

22 fair to summarize that to say that Mr. Frazer asked

23 Greenwood to bring in some other documentation?

24     A.   Correct.

---

**18**

1     Q.   And were you involved in any other meetings

2 with Greenwood after that?

3     A.   The next contact with Dan would have been on

4 the following Monday when he returned to the office

5 and provided -- can I refer to this Exhibit?

6     Q.   Sure.

7     A.   Exhibit 1.

8     Q.   Were you there when he handed it in?

9     A.   I was there in the office. I don't know if

10 I was in the office when he, specifically, handed it

11 to Lewis, but I was certainly there at one point in

12 time.

13     Q.   Were you involved in a conversation with

14 Greenwood that day?

15     A.   I, personally, did not have a conversation

16 with Dan.

17     Q.   Did you have a conversation with Mr. Frazer

18 about Exhibit 1?

19     A.   Yes, we did.

20     Q.   Was Greenwood present?

21     A.   No.

22     Q.   Okay. What was expressed in the

23 conversation you had with Mr. Frazer about Exhibit 1?

24     A.   It would have been, basically, that it

---

**19**

1 didn't support his absence in the previous week as to

2 what we were seeking, which was again any type of

3 documentation that would have shown us that he was

4 able to work full duty, light duty, or not at all.

5     Q.   When was the last time you read that

6 document?

7     A.   I reviewed that would have been last week.

8     Q.   Take a second and just look at it again. It

9 is kind of short.

10     A.   Certainly, yeah.

11     Q.   Does this document indicate that Dan

12 Greenwood has been under a doctor's care?

13     A.   Yes, it does.

14     Q.   Does it indicate a date that he can return

15 to work?

16     A.   It does.

17     Q.   And as you have just read that, do you still

18 think that it doesn't indicate that he was incapable

19 of working for a period of time up until August 9th?

20     A.   It doesn't indicate what we were seeking

21 from Dan. It does not indicate, or fulfill our

22 request for that previous week, again, where he had

23 been absent for the week of whether or not he would

24 have been capable of performing some functions for us

---

**20**

1 because it was needed, and again whether or not that

2 would have been full duty, light duty, office work,

3 whatever the case may have been. We needed the help,

4 and we were looking for some help from Dan, and if he

5 was capable of it at all.

6     Q.   Well, he gave this note to you on Monday,

7 August 9th, right?

8     A.   Yeah. There is some discrepancy in the date

9 there, but it was that Monday.

10     Q.   And he had been out of work since, or he had

11 missed his scheduled days of work starting on the last

12 Thursday in July, right?

13     A.   It would have been that Wednesday.

14     Q.   So, what difference did it make at that

15 point as to what he might have been able to do during

16 the period he was out? Why did you care at that

17 point?

18     A.   Again, it is a busy season. Dan was off the

19 trucks. We needed to substitute his position with

20 somebody else, further burdening the warehouse at that

21 point in time. I am assuming that is where the help

22 came from. And without the proper documentation

23 stating why he couldn't have provided those functions,

24 this is what this does not satisfy for us.

November 22, 2006  Case 1:05-cv-10605-JLT    Document 24-17    Filed 01/22/2007    Page 6 of 7

Deposition of James Rapoza
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

29

1 because of the condition that caused his
2 hospitalization?
3      A.   I believe that is what his doctor told him
4 on Tuesday.
5      Q.   Okay.  But, in your own mind were you
6 thinking, well, the reason he is saying he has got to
7 take the week off must be because of whatever it was
8 that kept him in the hospital for two days?
9      A.   I would assume he is seeing his doctor
10 because of his hospitalization.
11      Q.   That is normally how it goes.  You go to the
12 hospital and you go see the doctor?
13      A.   Right.  So, I think we are stating the
14 obvious.
15      Q.   Then you wanted to see some documentation
16 about that?
17      A.   Correct.
18      Q.   From his doctor?
19      A.   From his doctor.
20      Q.   Is that what you said?
21      A.   Yes.  And, again, stating again because on
22 Tuesday when he showed up, we did not have the release
23 form from the hospital stating he needed to be out of
24 work, and we did not have anything from that Tuesday

30

1 appointment stating he needed to be out of work.  So,
2 I asked him again, you know, we just have some medical
3 documentation, if you are going to be out the week,
4 and again, talked to him about light duty if he was
5 capable, that we could use it.
6      Q.   Did you cite the personnel policy like
7 chapter and verse in your conversations with him?
8      A.   I don't recall doing so, no.
9      Q.   And all your communications with him were
10 over the phone, or they were oral, right?  There is no
11 letter out there that I haven't seen that says
12 something like, you know, Greenwood per the personnel
13 policy you have to provide X, Y and Z?
14      A.   No, no.
15      Q.   Well, during the week that he was out before
16 he got fired on that Monday, was there some
17 conversation between you and anybody else at Yale in
18 which it was suggested that Greenwood might get fired
19 for being out of work?
20      A.   No, not during that week, no.
21      Q.   So, the only time that came up, as far as
22 you know anyway, was on Monday.
23           MS. KUGELL: Objection.
24 BY MR. RICE:

31

1      Q.   Monday, the 9th?
2      A.   Sitting here today, we spoke about it
3 certainly on Monday.  Prior to that, I can't recall if
4 that was talked about.
5           MR. RICE:  All right, thanks.
6           MS. KUGELL:  I definitely will need one
7 question, but I want to look at something.  Dan, you
8 have a copy of this document, right?
9           MR. RICE:  Can I see it, and I can tell
10 you?
11           MS. KUGELL:  I know you have a copy of
12 it.
13           MR. RICE:  You know what, I don't know.
14           MS. KUGELL:  I know it is in the
15 production.  I wanted to mark it, and I don't have
16 extra copies of it.
17           MR. RICE:  Here you go.
18
19           **(Deposition Exhibit No. 1, the
           above-referred to Memo dated August
20           10, 2004 from Lewis Frazer to
           Employee File, Daniel Greenwood,
21           was marked for identification.)**
22
23
24           <u>CROSS EXAMINATION</u>

32

1      Q.   Mr. Rapoza, I am going to show you a
2 document that has been marked Exhibit 1 to your
3 deposition.  Have you ever seen that document before?
4      A.   Yes.
5      Q.   Did you, in any way, participate in putting
6 this document together?
7      A.   Yes.
8      Q.   And, how did you do that?
9      A.   Myself and Lewis Frazer sat in his office
10 and went over the sequence of events, you know, of
11 that period and put as much detail down on paper as we
12 could.
13      Q.   And when did you sit down and do that and
14 put this document together?
15      A.   That, I don't recall.  It was some time
16 after Dan's, you know, after Dan voluntarily resigned.
17      Q.   This memo is dated August 10th.  Is that
18 when you did it?
19      A.   Yes, that would be accurate.
20      Q.   So, the date on the memo is about --
21      A.   Yes.
22      Q.   Is it fair to say that you might have
23 started doing it on the 9th, but it was completed on
24 the 10th?

1

## ERRATA SHEET

2

3     In accordance with the rules of procedure

4 governing depositions, you are entitled to read and

5 correct your deposition.

6     Accordingly, please carefully read your

7 deposition and, on this errata sheet, make any changes

8 or corrections in form or substance to your deposition

9 that you feel should be made.   PLEASE DO NOT MARK THE

10 TRANSCRIPT.

11     After completing this procedure, sign at the

12 conclusion of such changes/corrections (if any) and

13 return it in accordance with your instructions.

14

15 PAGE  LINE          CHANGE

16  17    4     Delete: "It came up throughout the week."
            Insert: "It had been mentioned by Mr. Greenwood periodically
17                during his employment."

18  15    3     Delete: "He said he wasn't up for it if I remember
19                correctly"
            Insert: "He said he would get documentation
20                from his doctor."

21  20   22-24 *

22 SIGNATURE: _James Regan_____        DATE: _1/10/07___

23 * Delete: "And without the proper documentation stating why he couldn't
             have provided those functions, this is what this does not
24           satisfy for us."
   Insert: "And we were not satisfied with this note because it did
            not explain why he couldn't provide that function."

EXHIBIT
14
Greenwood
MLC 10/13/06

(2) 7-30-00
373B

## South Shore Hospital

55 Fogg Road
South Weymouth, MA 02190
781-340-8000

### INPATIENT RECORD

**DEMOGRAPHICS**

| ADMISSION NUMBER | ADM SER | MEDICAL RECORD NO. |
|---|---|---|
| V06157247658 | | M000469471 |

LAST NAME, FIRST, M.I.
GREENWOOD, DANIEL P

| ADDRESS | HOME PHONE NO. |
|---|---|
| 143 HIGH STREET WHITMAN, MA 02382 | 781-447-0658 |

| SEX | RACE | MAR |
|---|---|---|
| M | CA | D |

| BIRTHDATE | AGE | SOCIAL SEC. NO. | RELIGION | ARRIVAL MODE | ACCIDENT DATE / TIME |
|---|---|---|---|---|---|
| 05/03/1963 | 41 | 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 | CATHOLIC | WALK IN | 07/28/04 |

**ADMISSION DATA**

| PT STATUS | DATE | TIME | REGISTRAR | LOCATION | ROOM / BED | PREV ADMISSION |
|---|---|---|---|---|---|---|
| ADM IN | 07/28/04 | 03:56 | GILBERTB | EDOV | EDOV  ED003-A | |

| PATIENT'S EMPLOYER NAME | EMPLOYER'S ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| YALE ELECTRIC | 296 FREEPORT STREET | DORCHESTER | MA | 00000 |

| ATTENDING / ADMITTING PHY | PCP |
|---|---|
| Alzaim, Aboualkheir | No Family Doctor |

REASON FOR ADMISSION (ADMISSION DIAGNOSIS/ES)
DIVERTICULITIS

**NOTIFICATION FINANCIAL DATA**

| NEXT OF KIN | RELATIONSHIP | HOME PHONE NO. | BUSINESS PHONE NO. |
|---|---|---|---|
| CALADO, DONNA | FR | 781-447-0658 | |

| ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 143 HIGH STREET | WHITMAN | MA | 02382 |

| PERSON TO NOTIFY | RELATIONSHIP | HOME PHONE NO. | BUSINESS PHONE NO. |
|---|---|---|---|
| CALADO, DONNA/NO OTHER | FR | 781-447-0658 | |

| ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 143 HIGH STREET | WHITMAN | MA | 02382 |

| GUARANTOR | RELATIONSHIP | SOC. SEC. NO. | HOME PHONE NO. | BUSINESS PHONE NO. |
|---|---|---|---|---|
| GREENWOOD, DANIEL P | | 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 | 781-447-0658 | |

| ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 143 HIGH STREET | WHITMAN | MA | 02382 |

GUARANTOR'S EMPLOYER NAME
YALE ELECTRIC

**INSURANCE**

| INSURANCE PLAN | POLICY NO. | POLICYHOLDER | RELATIONSHIP |
|---|---|---|---|
| SELF PAY INSURANCE | | GREENWOOD, DANIEL P | SP |

**PATIENT INFORMATION**

| DO YOU HAVE AN ADVANCED DIRECTIVE? | N | IF YES, DOES THIS FACILITY HAVE A CURRENT COPY? | ☐ |
|---|---|---|---|
| HAS YOUR HCP AGENT CHANGED? | ☐ | WOULD YOU LIKE INFORMATION ON AN ADVANCED DIRECTIVE? | ☐ |

| DO YOU LIVE ALONE? | N | VNA SERVICES? | No |
|---|---|---|---|
| PRIMARY LANGUAGE? | English 17 | DOES PATIENT NEED INTERPRETER SERVICES? | N |

Page 1

```
 1                                    VOLUME I

 2                                    PAGES 1 - 41

 3                                    EXHIBITS 1 - 7

 4          UNITED STATES DISTRICT COURT

 5             District of Massachusetts

 6     ---------------------------

 7  DANIEL GREENWOOD,

 8                    Plaintiff        Civil Action

 9  v.                                No. 05-10605

10

11  YALE APPLIANCE AND LIGHTING, INC.,

12                    Defendant

13     ---------------------------

14

15       DEPOSITION of ABOUALKNEIR ALZAIM, M.D.

16            Thursday, October 26, 2006

17      Medical Office of Aboualkneir Alzaim, M.D.

18                540 Main Street

19             Weymouth, Massachusetts

20           11:18 a.m. to 12:05 p.m.

21

22

23

24      ----------- CAROL A. CARUSO, CSR -----------
```

Aboualkneir Alzaim, M.D.

Page 6

1    A. I am a practicing physician in Weymouth,
2 Massachusetts.
3    Q. And do you have a specialty?
4    A. Internal medicine, primarily.
5    Q. And are you on staff at any hospitals?
6    A. South Shore Hospital.
7    Q. Anywhere else?
8    A. That's it.
9    Q. Do you remember Daniel Greenwood, the
10 plaintiff in this case?
11    A. The face, no.
12    Q. Do you remember when you met him?
13    A. Only according to the paper documentation.
14    Q. Did you review some documents in preparation
15 for today?
16    A. Yeah.
17    Q. Which documents, just by memory, not by
18 showing me, can you tell me what documents you
19 reviewed, just generally?
20    A. The copy from, his copy, the file copy from
21 South Shore Hospital and what I have.
22    Q. And what you have here in the office?
23    A. Yes.
24    Q. Okay. After having reviewed those documents

Page 7

1 in preparation for today, can you tell me when you
2 met Mr. Greenwood?
3    A. I can give you --
4    Q. You don't need to refer to it.
5    A. -- synopsis, you know. I met him, I
6 believe, I can't tell you exactly where, but he came
7 to my service through the emergency room, he was
8 admitted with diverticulitis.
9    Q. At South Shore Hospital?
10    A. At South Shore Hospital.
11    Q. Let me just --
12    A. Now exact location, is it the emergency room
13 or the floor, I can't tell you.
14    MS. BOLAND: Okay, that's fine. Just
15 for the record, I am going to -- would you hand this
16 to the stenographer, would you mark this as Exhibit
17 1.
18       (Document was marked Exhibit No. 1 for
19 identification.)
20    Q. Dr. Alzaim, I will give you what has been
21 marked Exhibit 1, could you just take a minute to
22 review that, please?
23    A. (Witness reviews exhibit.)
24    Q. Have you seen that before?

Page 8

1    A. I have a copy of it from South Shore
2 Hospital, but yours is the same, so.
3    Q. In the upper right-hand corner, do you see
4 where it indicates July 28, 2004?
5    A. Yeah.
6    Q. That would -- does that refresh your memory
7 as to the day he was admitted to the hospital?
8    A. You know, put it this way, I can only read
9 it through my documentation.
10    Q. Do you have any reason to doubt that July
11 28, 2004 is the date?
12    A. No, no, he was admitted July 28th, that's
13 when I saw him at the hospital.
14    Q. And a couple of lines down from there you
15 will see where it reflects that you were the
16 attending/admitting physician?
17    A. Mm-hmm.
18    Q. Okay.
19    A. That's true.
20    Q. You can put that down for now. Just going
21 back to what you started to testify to a few minutes
22 ago, tell me what you remember about his condition
23 when you first saw him at the hospital?
24    A. I can tell you according to my records I saw

Page 9

1 this patient at 8:30 on July 28, '04. He was
2 referred to me by emergency room physician
3 Dr. Stephen Hartlaub saw him first before me.
4 Through that he has no physician at South Shore
5 Hospital, so he came unassigned service to my
6 service, because I take hold at South Shore
7 Hospital, so that's how he came to my service. So
8 he was initially evaluated at the emergency room,
9 and then I was notified about that admission, and I
10 accepted that admission, and he was admitted to my
11 service.
12    Q. Okay.
13    A. So I saw him, according to my time, at 8:30
14 on July 28, '04, that's when I saw him. I
15 interviewed him, in fact, and took notes and I went
16 from there.
17    Q. Do you recall if you saw him every day of
18 his stay in the hospital?
19    A. Yes.
20    Q. You did?
21    A. He was until I believe until the 30th.
22    Q. Okay.
23    A. Then he left.
24    Q. Prior to his discharge, did Mr. Greenwood

3 (Pages 6 to 9)

Aboualkneir Alzaim, M.D.

Page 10

1  ever say anything to you about wanting to be
2  discharged by the weekend?
3      A. I tell you one thing, to my recollection, it
4  does not reflect anything here about it, only to me
5  and the specialist, the consultant with his
6  condition, but I'm looking at the nurse's things
7  plus what the case manager noted in the chart, from
8  day one he wants to leave the hospital, he doesn't
9  want to stay, and according to the notes, which also
10  reflected here by nursing, he had a court
11  appointment the 30th of July. That was mentioned,
12  but do I know about him? No. Do he tell me? No.
13      Q. You don't recall talking to him about that?
14      A. I don't deal with these things.
15      Q. So you only know what you just testified to
16  from reviewing the records that you have of
17  Mr. Greenwood?
18      A. Just the medical records, yeah, but I know
19  the last day before he leaves, you know, in a way he
20  wants to leave. I can take you through the notes.
21      Q. Yeah, we will do that in one minute.
22          Do you know of, do you know of, through
23  your own knowledge or by reviewing the notes,
24  whether Mr. Greenwood ever made any indication about

Page 11

1  the need to leave the hospital by the weekend
2  because of some sort of party that was going on at
3  his house?
4      A. No.
5          MS. BOLAND: Let's go off the record for
6  a minute, if you don't mind.
7          (Off the record.)
8          MS. BOLAND: Mark this as Exhibit 2,
9  please.
10          (Document was marked Exhibit No. 2 for
11  identification.)
12      Q. Giving you what has been marked as Exhibit
13  2 --
14      A. That's yours, right, not mine?
15      Q. I just marked the exhibit copy for the
16  record, it's the same as what you were just
17  referring to, but I just want you to refer to the
18  one marked as Exhibit 2 for my question. You see
19  the entry for 7/28/04, there?
20      A. Yes.
21      Q. Just for purposes of the record, I know we
22  already discussed this off the record, can you tell
23  me whether that is your handwriting or not?
24      A. No.

Page 12

1      Q. Do you know whose handwriting it is?
2      A. This is to, you know, his nurse, R.N., so I
3  know from the initials. It's not me, no.
4          MS. BOLAND: Okay, thank you. Would you
5  mark this as Exhibit 3, please.
6          (Document was marked Exhibit No. 3 for
7  identification.)
8      Q. Giving you what has been marked Exhibit 3,
9  have you seen that before, Doctor?
10      A. This, no.
11      Q. I'm sorry?
12      A. I don't have a signature on it, but this is
13  done by the discharge.
14      Q. By the discharge nurse?
15      A. Case manager and the nurse.
16      Q. So you have not seen this document before?
17      A. Oh, no.
18      Q. No?
19      A. I mean, it's not like something unusual for
20  me, it's giving the patient a discharge.
21      Q. Okay. But did you see Mr. Greenwood on the
22  day of his discharge on July 30th?
23      A. Yes, I did, yeah.
24      Q. And as his treating physician while he was

Page 13

1  in the hospital, presumably you would have had input
2  in his discharge instructions such as those
3  contained in Exhibit 3, is that right?
4      A. Oh, yeah, about medication, about dieting,
5  everything, from A to Z.
6      Q. So although you did not write up Exhibit 3,
7  it's based on your input as Mr. Greenwood's treating
8  physician?
9      A. This basically copy off the orders in the
10  chart.
11      Q. Which you write?
12      A. Which we write, and they take the plans, so
13  that's how it's interpreted taken to this, that's
14  how it works.
15      Q. All right. Do you recall how Mr. Greenwood
16  was feeling on the day of his discharge, without
17  looking at your notes?
18          MR. RICE: Objection. You can answer
19  that. I can object to the form of her questions.
20      Q. But you can still answer it, it's just for
21  the record, without referring to any document, I am
22  not referring to the documents anymore.
23      A. Let me tell you one thing, just to clear one
24  thing.

4 (Pages 10 to 13)

Page 18

1    Q. Okay.
2    A. So the point is to continue treatment, but
3  he has to go. You see if you look at the notes from
4  day one, day of admission, they reflected that on
5  the 28th he wants to go home.
6    Q. Okay.
7    A. And that's cleared by nursing.
8    Q. So the restrictions you recall related to
9  you following up with you in your office, diet and
10  antibiotics, is that correct?
11    A. Yes, but he still have diarrhea, and we are
12  trying just to control it.
13    Q. Okay. Did you advise Mr. Greenwood in any
14  way regarding his return to work, any -- go ahead.
15    A. He was off work because he was sick because
16  of diverticulitis, and he was told to come back to
17  the office and I will evaluate him.
18    Q. You told him to come back to your office?
19    A. Yes, and that's reflected in your things
20  there.
21    Q. It's reflected in Exhibit 3.
22    A. In this one here.
23    Q. Exhibit 3.
24    A. To follow up, it's reflected there. He was

Page 19

1  given instruction by me, case manager, and by the
2  nursing to follow.
3    Q. Do you recall when you told him to follow up
4  with you?
5    A. Recalling, no, but the only thing always I
6  write here, if you see it --
7    Q. Referring to Exhibit 4.
8    A. -- call my phone number for follow-up, so
9  that's now up to the patient to follow.
10    Q. Okay. But does it refer -- is there any
11  reference in Exhibit 4 or elsewhere to the time
12  period that should pass before he comes to see you
13  after his discharge?
14    A. Here is nothing mentioned, there is no time
15  on it.
16    Q. No time on Exhibit 4 or otherwise that you
17  recall?
18    A. I can only read through this. So supposedly
19  if you look at it here, he is taking antibiotics for
20  seven days, the bottom of the list.
21    Q. The bottom of Exhibit 4, yes.
22    A. So this means he should be seen, I mean
23  that's with common sense, but left open to him, I
24  can't force him with the time, he should be seen

Page 20

1  probably within that time.
2    Q. There is no reference, though, on Exhibit 4
3  on his discharge form as to a specific time period
4  by which he should come see you, is that correct?
5    A. It's not listed there.
6    Q. Okay. Back to Mr. Greenwood's work
7  schedule, though, did you, do you recall or is there
8  any reference in the paperwork that you reviewed to
9  suggest that you gave Mr. Greenwood any direction
10  with regard to whether he could return to work?
11    A. You mean on discharge?
12    Q. After his discharge?
13    A. That's what the only thing given to him,
14  basically it's you go home, continue with the diet,
15  continue with your liquid, everything reflected
16  there for another 24 hours, and to advance your
17  diet, take the antibiotics, and see me in the
18  office, those are the instructions.
19    Q. Okay.
20    A. Now, if you look at the, to add, if you look
21  at the consultant's, Dr. Senatore's notes, you have
22  it with you, he is still raising question this
23  patient needs to be monitored and continue, but the
24  patient wants to go. Now, why? We did not go that

Page 21

1  far, it's not like you have to discuss all these
2  issues, we taking the medical aspect of it. So the
3  reason we said here, continue with your liquid
4  another 24 hours and take the antibiotic and be
5  followed and call if there is anything unusual.
6    Q. Okay. If you were giving a patient who is
7  being discharged direction not to return to work
8  yet, would that typically be reflected in the
9  discharge instruction form?
10    A. This one here, I can't tell you yes or no if
11  it's not written. The only thing in here is to come
12  and see me. He is still ill, basically, he needs to
13  continue treatment and to see me as soon as he can.
14    Q. You are referring to Exhibit 4 again, just
15  for purposes of the record. I will just refer
16  to -- sorry, that was Exhibit 3, sorry, my mistake.
17      Referring back to Exhibit 3, which is
18  the discharge form, Doctor, in the section
19  entitled --
20    A. Remember this, I told you I didn't see, so I
21  am not going to comment on it.
22    Q. I believe you did testify that Exhibit 3 is
23  written up based on your treatment and discharge
24  recommendations, correct?

Page 22

1    A.  Yes.  According to this, this said call for
2    appointment with Dr. Alzaim, and they give him the
3    phone number, patient signed, nurse signed, and this
4    was July 30, '04.  It does not say when to see me
5    exact date, they gave him the phone number.  They
6    followed exactly the direction.  Now, of course,
7    it's an individual basis, it's up to the patient's
8    timing, schedule, or whatever, to call for
9    appointment, so it's individual effort on the side
10    of a patient.
11    Q.  Do you see where Exhibit 3 it says
12    activities and restrictions, the section that's
13    titled Activities/Restrictions?
14    A.  Yeah.
15    Q.  And it says, "0 restriction on activity"?
16    A.  Yeah.
17    Q.  If this patient was being told not to return
18    to work, wouldn't it be reflected there in that
19    section?
20    A.  Remember, this I'm not familiar with, I am
21    talking about this medical restriction is not
22    reflected in my notes, so I can't make a comment on
23    it.
24    Q.  Meaning you didn't give him any restrictions

Page 23

1    on activity?
2    MR. RICE:  Objection.
3    Q.  Is that fair to say?
4    A.  What I am saying here, if it's not in my
5    note, this means I don't know.
6    Q.  Okay.  Well, based on all of the notes that
7    you've reviewed in preparation for today, is there
8    anything in it that would suggest that you ever told
9    Mr. Greenwood he should not return to work after he
10    was discharged from the hospital?
11    A.  If it's not reflected, I can't tell you.
12    Q.  That's what I am asking you, though, based
13    on after everything that you've seen and you've
14    reviewed, you've told me today you reviewed all the
15    records that you have of Mr. Greenwood, correct, so
16    after reviewing all of those, did you review
17    anything in any of those documents that would
18    reflect that you ever told Mr. Greenwood --
19    A.  The word --
20    Q.  -- to return back to work?  Just let me
21    finish.
22    A.  The word restriction doesn't really come in,
23    it's a matter you are sick.  Let's say you have a
24    heart attack or you have, let's say, pneumonia, for

Page 24

1    example, you take the medication, you go home, you
2    continue the course.  There is nothing to say I am
3    restricting you not to walk outside or not to do
4    this, it doesn't come at all.  You follow the
5    instructions, you take this, you are going home, and
6    you call for appointment for follow-up.
7    Q.  And the only instructions you gave him
8    related to his diet, following up with you in your
9    office and taking his antibiotics?
10    MR. RICE:  Objection.
11    A.  True, true.
12    Q.  Okay.  Do you -- strike that.
13    Mr. Greenwood was discharged on July
14    30th, as we've discussed.  Do you recall when you
15    next saw him in follow-up in your office?  I will
16    give you a document to look at.
17    (Document was marked Exhibit No. 5 for
18    identification.)
19    Q.  I am giving you what has been marked Exhibit
20    5, just take a minute to look at that and tell me if
21    you have seen it before?
22    A.  Yes.
23    Q.  And is that your office note from your first
24    follow-up appointment with Mr. Greenwood?

Page 25

1    A.  Yes.
2    Q.  And that's dated August 3, 2004?
3    A.  Mm-hmm.
4    Q.  Okay.  Now, do you see in the chief
5    Complaints Category where it refers to "back to fat
6    rich diet"?
7    A.  What I said is, "Came today.  Discharged
8    recently from South Shore Hospital with hx
9    diverticulitis.  On antibiotics with no problems.
10    Noted loose BM at times.  Back" -- he changed now,
11    he didn't follow the advice, of course, the
12    instruction.
13    Q.  Just slow down for the stenographer.  If you
14    can just slow down a little bit for the
15    stenographer.  Let me just ask you a question.
16    A.  I said, "Noted loose bowel movement at
17    times.  Back to fat rich diet."  The explanation
18    here I am saying he did not follow the instruction.
19    In fact it's explained after that, "Advised low fat
20    one in addition to stool softener/binder."
21    Q.  So when you, when you say here, "Back to fat
22    rich diet," that was based on what Mr. Greenwood
23    reported to you he was eating, correct?
24    A.  Yes, yes.  I remember on discharge we said

7 (Pages 22 to 25)

Aboualkneir Alzaim, M.D.

Page 26

1  low fat diet, in fact the first 24 hours clear
2  liquid, then he will go to full liquid, then after
3  full liquid he has to go to low fat diet and stay on
4  low fat diet until I see him and evaluate him. Now,
5  what happened here, he changed the whole thing, he
6  went to full fat, everything.
7      Q. Okay. Do you see below there there is a
8  list of things that you can circle yes or no, and in
9  the third column there is a indication for whether
10 the patient has diarrhea, do you see that?
11     A. Yeah.
12     Q. And you indicated no. Can you just answer
13 audibly for the stenographer? Let me just restate
14 the question, Dr. Alzaim.
15         You see the reference to diarrhea, and
16 you circled "No," correct?
17     A. Yes.
18     Q. Okay.
19     A. But let me add, if I can.
20     Q. Sure.
21     A. That is at the time of the interview.
22     Q. On August 3rd?
23     A. At the time of you are like now sitting with
24 me, when I talk to you, you say, yeah, I don't have

Page 27

1  diarrhea this morning, that's reflection of this.
2      Q. Okay.
3      A. The chief complaint is what you came to me
4  with, and I am investigating. When I ask you if you
5  have chest pain right now, you say I have no chest
6  pain. This is what I'm reflecting here. Do you
7  have shortness of breath? You say I don't have
8  right now at the time of the interview.
9      Q. Okay.
10     A. Just to clarify that.
11     Q. Okay, that's fine. So is there anything in
12 your office notes that would reflect the general
13 condition of the patient versus how he is feeling
14 the moment you are asking him the question?
15     A. Yeah, the chief complaint, what he presented
16 to me.
17     Q. Okay. In the Chief Complaint section on
18 Exhibit 5, you see the reference to "stool
19 softener"?
20     A. Yes, stool softener/binder. Are you talking
21 about this one?
22     Q. On Exhibit 5, yes. So if Mr. Greenwood had
23 reported that he was still experiencing diarrhea,
24 why would you prescribe a stool softener?

Page 28

1      A. I am telling him, you know, first he has to
2  go back to the instruction, No. 1. No. 2, to take
3  stool softener to lessen the frequency.
4      Q. Okay, thank you.
5      A. You know, you might have diarrhea over
6  night, but when you come to me, let's say you eat
7  anything, you are fine. You say it's not like it
8  has to be on exact time just like this. This is
9  what's reported to me when I asked you when did you
10 have this, I had it yesterday, I have it today, or I
11 felt it, now I don't have any. Now, it's my job to
12 interpret your symptoms and to work with you, but
13 you could be fine, like we see patients in the
14 emergency room, I had chest pain, but now, you know,
15 they brought me by ambulance, I am fine, I want to
16 go home. Now, that's where now we try to go
17 backward and find out why. So that's what I am
18 doing here, he reported to me, and I am trying to
19 address again the issues with him to remind him what
20 to do.
21     Q. I am just trying to get a sense, and maybe
22 you can answer this, from Exhibit 5 whether
23 Mr. Greenwood was still as of August 3rd generally
24 experiencing diarrhea, can you tell from your office

Page 29

1  note whether that was still part of his condition?
2      A. I tell you one thing, from someone reading
3  it, you see his compliance is not 100 percent with
4  instructions.
5      Q. So if he was still having diarrhea, your
6  assumption would be that that might be in part or
7  wholly because he wasn't following the diet you
8  instructed?
9      A. Yeah, when you say back to fat rich diet,
10 this is answering you that question.
11     Q. Okay.
12     A. Because he left with specific instructions
13 to follow, but he didn't, specifically didn't, he
14 went opposite with it.
15     Q. Now, do you see in the last column, the
16 fourth column where it says "weakness" on Exhibit 5?
17     A. Yeah.
18     Q. And you circled "No"?
19     A. Mm-hmm.
20     Q. Again, is that representative of
21 Mr. Greenwood's condition at the moment he was in
22 your office or generally how he was feeling?
23     A. Oh, at that time exactly, everything is
24 reflecting that moment of interview.

8 (Pages 26 to 29)

Aboualkneir Alzaim, M.D.

Page 30

1    Q.  Okay.  So am I correct that you can't draw
2  any opinions or memory as to whether Mr. Greenwood
3  was still experiencing weakness generally as of
4  August 3rd?
5    A.  You know, everything this is the way, you
6  know, exactly the moment I see you, and I document
7  it.  I asked him this question, I go over
8  everything.  You have this or this?  No, no, that's
9  it, at this time, it's not reflected.
10    Q.  So if you ask a patient like Mr. Greenwood
11  whether he is feeling weakness as he sits in your
12  office and he answers no, do you inquire as to
13  whether he has been experiencing weakness since he
14  has been discharged from the hospital otherwise as
15  part of his condition as a whole?
16    A.  Keep in mind one thing, he was admitted,
17  this is a continuum of his condition, it's not like
18  it's a new chapter, I am following the case from day
19  one, and I am interested to know how he is feeling
20  and investigating how his response is and how he is
21  acting on the instructions given, you know, it's not
22  like one time no.  It started there, you follow.
23    Q.  Okay.
24    A.  And I notice, "Came today.  Discharged

Page 31

1  recently from South Shore Hospital."  I am trying to
2  make the comment that it's a continuing thing, it's
3  not like I am seeing the patient the first time in
4  my office, I am following up on his case.
5        MS. BOLAND:  Okay.  I will give you one
6  more document.
7        (Document was marked Exhibit No. 6 for
8  identification.)
9    Q.  Giving you what's been marked Exhibit 6,
10  take a minute to review it, please.
11    A.  Yes.
12    Q.  Have you seen it before?
13    A.  Yes.
14    Q.  Is this your office note from the next time
15  that you saw Mr. Greenwood?
16    A.  Yes.
17    Q.  And that was on August 9?
18    A.  Yes.
19    Q.  Would you mind just referring back to
20  Exhibit 5 briefly, the office note from August 3.
21  Can you tell me if there is any indication on the
22  August 3rd note as to whether Mr. Greenwood should
23  follow up with you again after that appointment?
24    A.  You mean this?

Page 32

1    Q.  This August 3rd note, this one, Exhibit 5?
2    A.  Oh.  Yes, I ordered him return to my office
3  in one week.
4    Q.  Show me that.  Oh, so in the block at the
5  top of Exhibit 5 where it says "RTC 1 week"?
6    A.  Return to office in one week.
7    Q.  Okay, that's what it stands for.  Going back
8  to Exhibit 6, which is the office note from August
9  9th.
10    A.  Can I add one point?
11    Q.  There is no question pending, Doctor, I just
12  want to move this along.
13    A.  Okay.
14    Q.  Exhibit 6, which is the August 9th note, so
15  this is the next time that you saw Mr. Greenwood,
16  correct?
17    A.  Yes.
18    Q.  And in the Chief Complaint section of
19  Exhibit 6, the second -- I'm sorry, the third
20  sentence which begins with "No," do you see that?
21    A.  "No chest pain, nausea, vomiting, abdominal
22  pain, cough, wheeze, diarrhea."
23    Q.  Meaning no diarrhea?
24    A.  Yes.

Page 33

1    Q.  Now, go ahead, you wanted to add something?
2    A.  No, no, just to make, those now is
3  continuing from the 3rd, August 3rd.  When I went
4  back and talked to the patient about following all
5  the instructions and alert him to all what he did,
6  and to continue antibiotics and continue all the,
7  follow all those recommendations, by following this,
8  this came after now, by saying no more now, this
9  mean the reading he followed these things.
10    Q.  Okay.
11    A.  Just to clarify it.
12    Q.  Okay.  And do you see a reference in the
13  Chief Complaint section "Going back to work
14  tomorrow"?
15    A.  Yes.
16    Q.  Do you recall any discussions with
17  Mr. Greenwood about his return to work?
18    A.  No, he wants to go back to work, and in fact
19  the same day, nothing much, he said he wants to go
20  back to work, so I gave him even a note from my
21  office to go back to work.
22    Q.  Okay.  Go ahead.
23    A.  Two issues left at that time was really
24  smoking and the weight loss, and to follow with me

9 (Pages 30 to 33)

Aboualkneir Alzaim, M.D.

Page 34

1  in two weeks, and at that time he went, he was
2  counseled in length on both, and he agreed on
3  Wellbutrin, so I am starting him on new medication
4  for smoking, and I would like to see how he is
5  doing.
6      Q.  Okay.
7      A.  And he says he wants to go back to work, so
8  it's okay with me.
9          MS. BOLAND:  I will have this marked.
10         (Document was marked Exhibit No. 7 for
11  identification.)
12     Q.  I am giving you what has been marked as
13  Exhibit 7, is that the return to work note that you
14  just referenced?
15     A.  Yes.
16     Q.  Did Mr. Greenwood ask you for this?
17     A.  Yes.
18     Q.  Had he asked you for such a note on any
19  prior occasion?
20     A.  No.
21     Q.  So the first time he asked for it was at
22  your office appointment on August 9, correct?
23     A.  Yes.
24     Q.  Okay.  Has Mr. Greenwood asked you to be a

Page 35

1  witness in this case for him?
2      A.  No.
3      Q.  Has anyone on his behalf asked you to be a
4  witness?
5      A.  No.
6          MS. BOLAND:  Okay, I don't have any
7  further questions.  Do you have questions?
8          MR. RICE:  Doctor, I have a few
9  questions for you.
10         CROSS-EXAMINATION
11     Q.  (By Mr. Rice)  First of all, could you just
12  give us a layperson's definition of what
13  diverticulitis is?
14     A.  Diverticulitis was in fact the inflammation
15  of the mucosa of the sigmoid colon, that's what the
16  CAT scan showed us.
17     Q.  So he was diagnosed, Mr. Greenwood was
18  diagnosed with that, with diverticulitis based on a
19  CAT scan?
20     A.  Let me take you back, if I can.  He
21  presented to the South Shore Hospital Emergency Room
22  with 36 hours prior to that presentation with severe
23  pain in the left lower quadrant, and he was taking,
24  because he wasn't moving his bowel, according to the

Page 36

1  note he took some kind of laxative, and it didn't
2  work.  When pain persisted, getting worse, the
3  patient came to emergency room, was evaluated, he
4  had KUB first.  KUB means plain X-ray of his
5  abdomen, and that didn't show much except some mild
6  ileus at the beginning.  Now the practice of
7  medicine is to go further, try to identify what's
8  going on, why this pain could be something
9  different, because he is not that old, because
10  basically we know it could be this, but we want also
11  to explore, that's why we went with CAT scan, pelvic
12  scan, and that's basically standard these days to
13  diagnose these things, and that's what showed
14  thickening of the mucosa of the wall of the colon,
15  when you look at the report of the radiologist, and
16  that's where the inflammation took place.
17     Q.  And in your experience as a physician, have
18  patients reported subjective complaints of pain if
19  they have diverticulitis?  Is it painful?
20     A.  Very painful, and the complication we were
21  concerned, and if you look at Dr. Senatore's and
22  Dr. Cox's notes, we are concerned about phlegmon,
23  this means it would spread around and cause an
24  abscess, that's what we were concerned about, and

Page 37

1  that's the reason, if you read the notes also, we
2  were concerned about his discharge on the 30th, his
3  blood count is still up at that time, according to
4  the notes.
5      Q.  Is it fair to say based on your review of
6  the records, your memory of what took place at the
7  time that if it were not for Greenwood asking to be
8  discharged he would not have been?
9      A.  No, he felt better at that time, but as long
10  as he is going to follow the instructions.  He was
11  on intravenous antibiotic fluids, we kept him
12  nothing by mouth initially, and he moved his bowel
13  in fact, and that's an indication that, yes, the
14  bowel is coming back functioning.  So the data came
15  back to us from GI from surgery that he is okay to
16  be discharged, but take this instruction and follow
17  it so you will not have any other problem.  He has
18  no fever, his bowel is no pain at that time,
19  minimal, and he was going home.
20     Q.  Do you know as we sit here today what line
21  of work Dan Greenwood was involved in at the time he
22  was admitted?
23     A.  No, my notes reflected only he told me he
24  worked for Yale Electric, that's what my admission

10 (Pages 34 to 37)



**South Shore Hospital** — **Department of Nursing**

**PATIENT DISCHARGE INSTRUCTION AND INFORMATION FORM**

```
1469471 V6157247658
GREENWOOD,DANIEL P
143 HIGH STREET  WHITMAN
                ,ABDUALKHEIR
DOB 05/03/1965   41 Y  M   OTH
                07/28/04
```
Patient Identification

## I. HOME CARE / DISCHARGE INSTRUCTIONS

**TOPIC: To Whom**
☐ PT  ☐ Family

Reportable signs and symptoms

*Call your doctor with increased abd. pain, increased diarrhea or any questions*

Discharge Medication Booklet Given: (Please List)

Procedures (dressing changes, self cath etc)

Diagnosis specific teaching (eg, diabetes)

Discharge referrals / Community resources

Instruction Sheet given

## II. ACTIVITIES / RESTRICTIONS

*∅ restriction on activity*

RESTRICTIONS:                                    DEVICES:

## III. NUTRITION

DISCHARGE DIET: *Clear liq. another 24 hours*

WRITTEN INSTRUCTION PROVIDED BY NUTRITION & FOOD SERVICES:
YES _____ NO _____

SPECIAL DIETARY INSTRUCTIONS: *then full liq. (milk prod.) then low*

Food & Drug Interaction book provided
YES _____ NO _____ N/A _____

## IV. NEW MEDICATIONS TO BE TAKEN AT HOME  *fat diet no kts*

| DRUG / DOSE / FREQUENCY | TIMES | PRESCRIPTIONS GIVEN | |
|---|---|---|---|
| | | YES | NO |
| *Flagyl 500 mg by mouth three times a day* | | | |
| *Cipro 500 mg by mouth twice a day* | | | |
| | | | |

## V. ACKNOWLEDGEMENT

DISCHARGE UNIT: *Emerson 3*

TELEPHONE NUMBER: *781-340-8111*

**DEF 0334**

I hereby acknowledge I have received and understand the discharge instructions outlined above.

Call for appointment with Dr. *Abzian*

Telephone Number *781-340-6420*

PATIENT / SIGNIFICANT OTHER SIGNATURE        NURSE SIGNATURE        DATE *7/30/04*

ORIGINAL - PATIENT COPY        COPY - MEDICAL RECORD

1031-70 REV. 10/00        Page 1 of 1

**Aboualkheir Alzaim, M.D.**
*Office Note*

Patient Name: __Daniel Greenwood__    DOB: __05/03/63__    Date: __08/03/04__

Drug Allergies: __NKA__    SSN: __025 54 4891__

WT __264__    RR __18__    BP __116/80__    P __71__    T __97.4__    SaO2 __96% RA__    RTC __1 week__

Latest: Labs:_____    CXR/MRI/CT:_____    Hospitalization: __7/28/04__    Referral:_____

PSA:_____    Pap Smear:_____    Mammogram:_____    HB1AC:_____    Colonoscopy:_____

Vaccinations: Pneumonia:_____    Hepatitis B:_____    Influenza:_____

Chief Complaints:

Came today. Discharged recently from SSH with hx diverticulitis. On antibiotics with no problems. Noted loose BM at times. Back to fat rich diet. Advised low fat one in addition to stool softener/binder. Complained of right elbow muscle ache for months / ? tennis elbow.

Headache: N – Y,
Dizziness: N – Y,
Lightheadedness: N – Y,
Fever: N – Y,
Wheeze: N – Y,
Chills: N – Y,
Pleuritic Pain: N – Y,
C/P Angina: N – Y,
Cough: N – Y,
Sore throat: N – Y,

Sputum Production: N – Y,
SOB/OP/PND: N – Y,
Hemoptysis: N – Y,
Post Nasal Drip: N – Y,
Rhinorrhea: N – Y,
Nasal Discharge: N – Y,
Nasal Congestion: N – Y,
N/V: N – Y,
Abdominal Pain: N – Y,
Melena: N – Y,

Hematoschezia: N – Y,
Leg Edema: N – Y,
Diarrhea: N – Y,
Dysuria: N – Y,
Hematuria: N – Y,
Flank Pain: N – Y,
Urinary F/U: N – Y,
Neck Pain: N – Y,
Back Pain: N – Y,
Numbness: N – Y,

Weakness: N – Y,
Visual Prob: N – Y,
Knee Pain: N – Y,
Hip Pain: N – Y,
Foot Pain: N – Y

**Physical Examination:**
Patient appeared in acute distress: N – Y, Cyanotic: N – Y, Anxious: N – Y, Pleasant: N – Y
Clear Skin: N – Y, Others:
HEENT: grossly benign: N – Y,
    Nasal Cavity: Redness: N – Y, Congestion: N – Y, Swelling: N – Y, Mucosa: N – Y,
    Turbinates: N - Y
    Oral Cavity: grossly benign: N – Y, Redness: N – Y
    Congestion: N – Y, Post nasal drip: N – Y
Neck: Supple: N – Y, Tender: N – Y, Spasm: N – Y
Heart: Regular Rhythm: N – Y, Irregular Rhythm: N – Y, Murmur: N – Y, Rub: N – Y, PP(++): N – Y
Lungs: Clear: N – Y, Diminished breath sounds: N – Y, Musical Ronchi: N – Y, Wheeze: N – Y
    Rales: N – Y
Abdomen: Soft: N – Y, Tender: N – Y, Bowel Sounds: N – Y, Organomegaly: N – Y, Rebound: N – Y,
    Rigidity: N – Y
Musculoskeletal: Calf Tenderness: N – Y, Tender points: N – Y *right epicondyl /elbow*
Extremities: Edema: N – Y, Clubbing: N – Y, Cyanosis: N – Y
Neuro Exam: Alert: N – Y, Oriented: N – Y, x3: N – Y, Focal Deficit: N – Y
Others:

Plan per next page--------

EXHIBIT
25
Greenwood
WG 10/13/06

*Aboualkheir Alzaim, M.D.*          **Office Notes**                              ***Page 2***

Impression:  **tendonitis / right elbow, diverticulitis**

**Plan:- Continue meds. per list already verified, reviewed and approved during this visit ⟨  ⟩**

New Meds.:                                                    W/U                              Renew Meds:

Cipro 500mg po bid x 3D
Flagyl 500mg po tid x 3D
Low fat, high fiber diet
Metamucil cap 1 hs prn
Advil Liqui -Gel 2 tabs po qid prn
Consider Cortisone injection

Medications:
Metamucil 1 cap po hs prn, Advil Liqui-Gel 2 tabs po qid prn

# Aboualkheir Alzaim, M.D.

## Pulmonary Medicine & Internal Medicine

1221 Main Street, Suite 301, South Weymouth, MA 02190
Tel: 781-340-6420  Fax: 781-340-6421

### Return to Work

Date: _8/9/04_____

This is to certify that

_Daniel  Greenwood_____

has been under my care, and will be able to return to work on the following date:

_Tues.  August  9,  2004_____

Remarks:

_____

_____

_____

_____

_____

Aboualkheir Alzaim, M.D.

**DEF 0333**

DATE:    Monday, August 09, 2004

TO:      Daniel Greenwood

FROM:  Lewis Frazer, Director of Operations

RE:      Voluntary Resignation

CC:      Employee File, Steven Sheinkopf


In accordance with Yale's policy and procedures manual, for which you have signed for and agreed to abide by, we consider your absence from work for the days of August 4th, 5th and 6th without notification or authorization as a voluntary resignation. As detailed in Section 8, Article D, paragraph i, "An absence of three (3) consecutive days without notification or authorization from Yale will be considered a voluntary resignation and employment will be immediately terminated."

Since these days were not authorized and you did not provide notification one hour prior to your shift as stipulated in Article D, these absences are considered unexcused absences. For these and for other reasons, your employment with Yale is terminated effective today, August 9, 2004.

In accordance with Massachusetts Law, I am also providing you with a DET brochure on How to File for Unemployment Insurance Benefits.

Regards


Lewis Frazer
Director of Operations


James Rapoza
Manager, Service and Delivery


Transmitted via Regular mail and Certified Mail, Return Receipt Requested


DEF 0145



January 19, 2007

MICHAEL R BARTLETT
76 HOYLE ST
APT 2
NORWOOD, MA  02062

Identification Number: XXXXX5713
Policy: HMO Blue Value Plus
Reference Number: 2224619JAN07                    Employer: Yale Electric

To whom it may concern:

The above mentioned policy was in effect from March 1, 2002 through September 1, 2002. That policy covered Michael Bartlett, date of birth 03/20/76.

Sincerely,

HECTOR GONZALEZ
Account Service Associate

An Independent Licensee of the Blue Cross and Blue Shield Association