## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| DANIEL GREENWOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-10605 JLT |
| v. ) | |
| ) | |
| YALE APPLIANCE AND LIGHTING, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1
### STATEMENT OF MATERIAL FACTS  AS TO WHICH
### NO GENUINE ISSUE REMAINS TO BE TRIED

1.      ("Plaintiff"), resides at 143 High Street, Whitman, Massachusetts. (Deposition of Daniel Greenwood ("Greenwood Dep."), relevant pages of which are attached collectively hereto as Exhibit 1, at 12).

RESPONSE:  Admitted.

2.      Defendant, Yale Appliance and Lighting, Inc. ("Defendant" or "Yale"), has a place of business at 240 Forbes Boulevard, Mansfield, MA 02248. (Affidavit of Lewis Frazer ("Frazer Aff."), attached hereto as Exhibit 2, at ¶2). The core of Yale's business is the sales and servicing of appliances and lighting. (Frazer Aff., Ex. 2, at ¶3).

RESPONSE:  Admitted.  On September 17, 2004, Plaintiff filed a Charge with the Massachusetts Commission Against Discrimination ("MCAD") alleging discrimination on the basis of his age. (Charge attached hereto as Exhibit 3).

3.      On March 28, 2005, the MCAD issued a Dismissal and Notification of Rights indicating that it was "unable to conclude that the information establishes a

violation of the statutes." (Dismissal and Notification of Rights attached hereto as <u>Exhibit 4</u>).

       RESPONSE:  Admitted.

       4.      On or about March 28, 2005, Plaintiff filed the Complaint in the United States District Court for the District of Massachusetts. (Complaint attached hereto as <u>Exhibit 5</u>). Plaintiff's Complaint alleged the following causes of action: Count I: Violation of the FLSA; Count II: Violation of M.G.L. c. 149, § 148; Count III: Violation of the FMLA; Count IV: Retaliatory Discharge under the FMLA; Count V: Violation of the ADEA; Count VI: Violation of M.G.L. c. 151B (age); and Count VII: Violation of M.G.L. c. 152, § 75B(2).[2]

       RESPONSE:  Admitted.

       5.      On or about March 28, 2005, Plaintiff filed the Complaint in the United States District Court for the District of Massachusetts. (Complaint attached hereto asExhibit 5). Plaintiffs Complaint alleged the following causes of action: Count I:Violation of the FLSA; Count II: Violation of M.G.L. c. 149, § 148; Count III:Violation of the FMLA; Count IV: Retaliatory Discharge under the FMLA; Count V: Violation of the ADEA; Count VI: Violation of M.G.L. c. 151B (age); and Count VII: Violation of M.G.L. c. 152, § 75B(2).

       RESPONSE: Admitted.

       6.      Plaintiff began with Yale in 1998 as a delivery driver and remained in that position for the duration of his tenure with Yale. (Greenwood Dep., Ex. 1, at 55-56).

       RESPONSE:  Admitted.

       7.      Plaintiff's job was to load, deliver, and unload heavy appliances.

(Greenwood Dep., Ex. 1, at 209). On-the-job injuries are not uncommon at Yale due to the nature of the business. (Greenwood Dep., Ex. 1, at 209). As a result, Yale regularly deals with employees who are on, and returning from, workers' compensation leaves. (Greenwood Dep., Ex. 1, at 209; Frazer Aff., Ex. 2, at ¶5).

RESPONSE:   The Plaintiff objects to the argumentative nature of this assertion, and requests the court to disregard it. Responding further, the Plaintiff admits that the job he held, which required him to load and unload heavy appliances, carries with it obvious physical risks, and results in frequent injuries that cause Yale to incur manpower shortages, which it finds undesirable.[1]

8.     Plaintiff was given Yale's employee handbook and signed an Acknowledgment of Receipt of the handbook. (Greenwood Dep., Ex. 1, at 113-15, 122-23; 2003 and 2004 Acknowledgments attached hereto collectively as Exhibit 6). Plaintiff testified he received the 2004 handbook, among others. (Greenwood Dep., Ex. 1, at 128-29). Moreover, Stephen Sheinkopf, the President of Yale, held meetings with employees to review the handbook and "school" employees on its terms. (Greenwood Dep., Ex. 1, at 114-18; 122; Frazer Aff, Ex. 2, at ¶ ). At these meetings, as Plaintiff himself described, Mr. Sheinkopf would "go through each and every page . . . ." of the handbook. (Greenwood Dep., Ex. 1, at 117-18).

RESPONSE:   Admitted.

9.     Yale's handbook included a policy entitled "Notification/Unexcused Absences." (2004 Yale Appliance + Lighting Policies and Procedures ("Handbook"), which is attached hereto as Exhibit 7, at 12-13; Affidavit of Mary T. Conley ("Conley Aff."), attached hereto as Exhibit 8, at ¶2). This policy required Yale employees to notify

their supervisor of an unexcused absence as soon as possible and, at a minimum, no later than an hour before the employee's scheduled start time. (Handbook, Ex. 7, at 12-13). The policy gives the employee other options for who to call if the supervisor should be unreachable. (Handbook, Ex. 7, at 12-13). The policy provides that an employee's failure to follow these rules, "may result in disciplinary action, including, in the discretion of Yale, immediate termination." (Handbook, Ex. 7, at 12-13).

     RESPONSE:  Greenwood admits that provisions of the cited exhibits support the assertions made herein.  Greenwood denies Yale's implication in this paragraph, that during the time he was absent from work in July and August of 2004, that Yale managers were not aware that he would not be present at work on the days he was absent, had not been informed of the reasons for which he was absent.  Responding further, Greenwood incorporates by reference paragraphs 6-19 of the "Plaintiff's Statement of Additional Material Facts," in which he summarizes the many phone conversations during this period he had with his manager, James Rapoza, about his condition and his inability to report to full or light duty; his face-to-face meetings with James Rapoza and his other manager, Louis Frazer, about the same subjects; and  his efforts to provide medical documentation about his condition.

     10.    Plaintiff was familiar with and fully understood the terms of the Notification/Unexcused Absences policy. (Greenwood Dep., Ex. 1, at 123-25).

     RESPONSE:  Greenwood admits that he testified that he received the policy manuals cited and reviewed them. Greenwood denies that at any time during his absence from work that his managers at Yale notified him that he ran the risk of violating the provisions, or as related in his response to the previous paragraph and incorporated parts

---

[1] Pl.'s Ex. 1, Rapoza Tr./8.

of his Statement of Additional Facts, which he hereby incorporates by reference, that his managers did not know that he was absent and incapable of working for legitimate medical reasons.

11.    This reporting procedure is repeated in the Handbook as part of Yale's policy entitled "Attendance/Tardiness." (Handbook, Ex. 7, at 2 1-22).

RESPONSE:  Greenwood admits to the accuracy of the quoted section. Responding further, Greenwood denies that at any time during his absence from work, that his managers at Yale notified him that he ran the risk of violating the provisions, or as related in his response to the previous paragraph and incorporated parts of his Statement of Additional Facts, which he hereby incorporates by reference, that his managers did not know that he was absent and incapable of working for legitimate medical reasons.

12.    The Attendance/Tardiness policy further provided that unexcused absences of three or more days "will be considered a voluntary resignation and employment will be immediately terminated." (Handbook, Ex. 7, at 22).

RESPONSE:  Greenwood incorporates by reference his previous response.

13.    Plaintiff was familiar with and fully understood the terms of the Attendance/Tardiness policy, including those specific to unexcused absences. (Greenwood Dep., Ex. 1, at 124-26).

RESPONSE:  Greenwood objects to the argumentative nature of this assertion ("fully informed"), and asks the court to disregard it.  He admits that during his deposition, counsel for Yale read portions of the handbook to him and he agreed that she

read them accurately.[2] . Responding further, Greenwood denies that at any time during his absence from work, that his managers at Yale notified him that he ran the risk of violating the provisions, or as related in his response to paragraph 9 above and incorporated parts of his Statement of Additional Facts, that his managers did not know that he was absent and incapable of working for legitimate medical reasons.

14.    Yale's Handbook also outlined its Family and Medical Leave Act policy. (Handbook, Ex. 7, at 3). That policy provided, in relevant part, that Yale will grant up to twelve weeks of unpaid leave for, among other reasons, "[t]o tend to the employee's own serious health condition that renders the employee unable to perform the functions of his or her job." (Handbook, Ex. 7, at 3).

RESPONSE:   Admitted.  Greenwood admits to the accuracy of the quoted section.  Responding further, Greenwood denies that at any time during his absence from work, that his managers at Yale notified him that he ran the risk of violating the provisions, or as related in his response to the paragraph 9 and incorporated parts of his Statement of Additional Facts, that his managers did not know that he was absent and incapable of working for legitimate medical reasons.

15.        The Family and Medical Leave Act policy further provided that:

> [t]he twelve (12) month period during which an eligible employee can take a leave under this policy is a rolling period. This period is measured backward from the date an employee uses FMLA leave. An eligible employee's leave entitlement consists of up to twelve (12) weeks of FMLA leave during this rolling twelve (12) month period.
(Handbook, Ex. 7, at 4).

RESPONSE:   Greenwood incorporates by reference his previous response.

---

[2] Greenwood Dep., Def.'s Ex. 1, at 124-26

16.    The Family and Medical Leave Act policy also provided that employees wishing to take family and medical leave must exhaust all available paid leave (e.g. vacation or paid time off) before unpaid family and medical leave may be used. (Handbook, Ex. 7, at 4).

RESPONSE:   Greenwood incorporates by reference his response to paragraph 14.

17.    The Family and Medical Leave Act policy further provided: [a]n on-the-job injury may result in a serious health condition for which FMLA leave may be taken. When this occurs, Yale may require that an employee's FMLA leave run concurrently with the employee's worker's compensation leave. Accordingly, in those instances when an employee's work-related injury qualifies as a serious health condition under the FMLA, the FMLA leave will run concurrently with the employee's worker's compensation leave.

(Handbook, Ex. 7, at 7).

RESPONSE:   Greenwood incorporates by reference his response to paragraph 14.

18.    Plaintiff admittedly was made aware of these policies relating to the Family and Medical Leave Act. (Greenwood Dep., Ex. 1, at 114-18, 126-13 1; Frazer Aff., Ex. 2, at ¶4).

RESPONSE:   Greenwood admits that at his deposition, he confirmed that these policies are reflected in materials Yale published to him.  Responding further, he incorporates by reference his response to paragraph 9.

19.    Specifically, Plaintiff testified that, at these meetings, Mr. Sheinkopf, the President of Yale, would "go through each and every page . . . ." of the Handbook.

(Greenwood Dep., Ex. 1, at 117-18; Frazer Aff., Ex. 2, at ¶4).

RESPONSE:   Greenwood incorporates by reference his previous response.

20.    On November 12, 2003, Plaintiff suffered an on-the-job injury that resulted in a hernia for which surgery was required. (Greenwood Dep., Ex. 1, at 199-200; Employer's First Report of Injury or Fatality, attached hereto as Exhibit 9).

RESPONSE:   Admitted.

21.    Plaintiff was absent due to this injury, surgery, and recuperation from November 12, 2003 through January 22, 2004. (Greenwood Dep., Ex. 1, at 199-200; Conley Aff., Ex. 8, at ¶3; relevant drivers' work schedules attached hereto collectively as Exhibit 10).

RESPONSE:   Admitted.

22.    Plaintiff returned to work on a light duty basis and remained on light duty through February 13, 2004, returning to work full-time with no restrictions on February 17, 2004. (Greenwood Dep., Ex. 1, at 200-03; Conley Aff., Ex. 8, at ¶3).

RESPONSE:   Admitted.

23.    Plaintiff fully consented to the light duty assignment. (Greenwood Dep., Ex. 1, at 202). During his light duty period of work, Plaintiff was not working in his position. (Greenwood Dep., Ex. 1, at 202; Deposition of Lewis Frazer ("Frazer Dep."), attached hereto as Exhibit 11, at 19). Rather, Plaintiff was doing some paperwork in the office, some light construction within Yale's warehouse, and helping as a runner in the office. (Frazer Dep., Ex. 11, at 19).

RESPONSE:   The Plaintiff objects to the argumentative nature of this assertion ("fully consented"), and asks the court to disregard it.  The Plaintiff admits that he was

given a light duty assignment.

24.     Plaintiff received workers' compensation benefits for this absence. (Greenwood Dep., Ex. 1, at 203; Frazer Dep., Ex. 11, at 16-17; Affidavit of Michael Kelley, attached hereto as Exhibit 12, at ¶ ).

RESPONSE:  Admitted.

25.     This was the only workers' compensation leave of absence Plaintiff had at Yale. (Greenwood Dep., Ex. 1, at 208, 218).

RESPONSE:  Admitted.

26.     The total time of Plaintiff's absence related to his on-the-job injury, including his light duty work, lasted from November 12, 2003 through February 13, 2004, a total of thirteen weeks and two days. (Greenwood Dep., Ex. 1, at 199-201; Conley Aff., Ex. 8, at ¶3; drivers' work schedules, Ex. 10).

RESPONSE:  Greenwood was absent from work from November 12, 2003 until January 26, 2004, a period of 10 weeks and 2 days.[3]  He began a light duty assignment on January 26, 2004, and received full pay for this work.[4]

27.     On July 6, 2004, the company that leased Yale the delivery trucks that Plaintiff drove for Yale sent Lewis Frazer, Vice President of Operations, a letter informing him that Plaintiff had been involved in a third "avoidable accident" in the last thirty-six months. (Letter from AMI Leasing dated July 6, 2004 attached hereto as Exhibit 13). By this letter, the leasing company required Plaintiff be prohibited from driving any trucks they leased to Yale. (AMI Leasing letter, Ex. 13).

RESPONSE:  Greenwood responds that the letter speaks for itself.

---

[3] Def.'s Ex. 8, Conley Aff./3.
[4] Pl.'s Ex. 3, Greenwood Aff./4

9

28.     Despite the fact that Yale could have disciplined Plaintiff for this, they did not. (Greenwood Dep., Ex. 1, at 205-06).

RESPONSE:   Greenwood objects to the speculative and argumentative nature of this statement, and therefore denies this assertion, and requests the court to disregard it.

29.     Rather, Yale was willing to hear Plaintiff's perspective on the matter and to work it out with him by allowing him to ride in, but not drive, these trucks. (Greenwood Dep., Ex. 1, at 205-06).

RESPONSE:   Admitted.

30.     Plaintiff received no discipline for the accident/driving issue. (Greenwood Dep., Ex. 1, at 205-06; Performance appraisal, Ex. 14).

RESPONSE:   Admitted.

31.     On Tuesday, July 27, 2004, Plaintiff informed Yale he would not be in the next day because he was going to the doctor's due to stomach pain. (Greenwood Dep., Ex. 1 at 137-39; Memo from Lewis Frazer dated August 10, 2004, attached hereto as Exhibit 15;[3] Deposition of James Rapoza ("Rapoza Dep."), relevant pages of which are attached hereto collectively as Exhibit 16, at 7).

RESPONSE:   The Plaintiff objects to the memorandum of Mr. Frazer for the reasons set forth in Greenwood's Motion to Strike, which will be filed in conjunction with this opposition.  Greenwood admits he informed Frazer and Rapoza of his need to miss work because of severe abdominal pain.  Responding further, Greenwood incorporates by reference paragraphs 6-19 his Statement of Additional Facts, in which he accounts for the communications that took place between Rapoza, Frazer and himself about his medical condition and need to miss work.

32.     On July 28, 2004, Plaintiff was admitted to the emergency room at South Shore hospital and was diagnosed with diverticulitis. (Inpatient Record attached hereto as Exhibit 17; Greenwood Dep., Ex. 1, at 131-33, 135).

RESPONSE:  Admitted.

33.     Plaintiff 's admitting and treating physician was Aboualkheir Alzaim, M.D. (Inpatient record, Ex. 17; Greenwood Dep., Ex. 1, at 135-36; Deposition of Dr. Alzaim ("Dr. Alzaim Dep."), relevant pages of which are attached hereto collectively as Exhibit 18, at 8).

RESPONSE:  Admitted.

34.     Plaintiff was discharged on Friday, July 30, 2004. (Greenwood Dep., Ex. 1, at 143; Patient Discharge Instruction and Information Form attached hereto as Exhibit 19). Plaintiff admittedly was determined to be discharged by Friday, July 30, 2004 because he was concerned staying longer would disrupt a court date he had scheduled for that day and weekend plans at his home involving a party. (Greenwood Dep., Ex. 1, at 142).

RESPONSE:  Admitted.

35.     Plaintiff's Discharge Instruction and Information Form was completed by a nurse based on instructions given by Plaintiff's treating physician, Dr. Alzaim. (Dr. Alzaim Dep., Ex. 18, at 12-13).

RESPONSE:  Admitted.

36.     Plaintiff's Discharge Instruction and Information Form included absolutely no restrictions on activity, including no restrictions relating to work. (Discharge Form, Ex. 19; Dr. Alzaim Dep., Ex. 18, at 20, 23-24). Indeed, this is reflected

in the Discharge Instruction and Information Form. (Discharge form, Ex. 19). In the section entitled "ACTIVITIES / RESTRICTIONS" was the following entry: "0 restriction on activity." (Discharge form, Ex. 19) (emphasis added).

RESPONSE:  Greenwood objects to the argumentative nature of the assertion made in this paragraph ("absolutely"; "[i]ndeed").  Responding further, the document speaks for itself.  Responding further, Dr. Alzaim testified at his deposition that the discharge form was not intended to reflect whether or not Greenwood could perform work upon his discharge, and acknowledged that he had signed a note stating that Greenwood could return to work on August 9.[5]  Responding further, Greenwood incorporates paragraph 10 his Statement of Additional Facts, in which he cites Dr. Alzaim's deposition testimony to support the foregoing assertion.

37.    The only restrictions Dr. Alzaim detailed for Plaintiff upon his discharge related to Plaintiff's diet and Dr. Alzaim's instructions to take antibiotics and follow-up with Dr. Alzaim at his office. (Discharge form, Ex. 19; Dr. Alzaim Dep., Ex. 18, at 20, 23-24).

RESPONSE:  Greenwood admits that Dr. Alzaim acknowledged that the discharge form reflects these conditions of his discharge.

38.    On July 30, 2004, the day of Plaintiff's discharge from the hospital, James Rapoza, Yale's Delivery Manager and Plaintiff's supervisor, having not heard

from Plaintiff, called Plaintiff to inquire as to his status. (Rapoza Dep., Ex. 16, at 5, 9; Greenwood Dep., Ex. 1, at 156). Plaintiff told Mr. Rapoza that his doctor wanted Plaintiff to see him the following Monday morning. (Greenwood Dep., Ex. 1, at 156-58;

---

[5] Pl.'s Ex. 2, Alzaim Tr./23-24; Def.'s Ex. 21.

Rapoza Dep., Ex. 16, at 9). Plaintiff admitted at his deposition, however, that his

Discharge Instruction and Information Form did not require him to visit Dr. Alzaim on any

particular day but, rather, just indicated he should "[c]all for appointment with Dr.

Alzaim." (Greenwood Dep., Ex. 1, at 148; Discharge form, Ex. 19). Indeed, Dr. Alzaim

himself testified Plaintiff was not told to see him on the following Monday or within any

specific time period, but just to follow-up at some point. (Dr. Alzaim Dep., Ex. 18, at 18-

20).

RESPONSE:  Greenwood admits he spoke to Rapoza on the date of his discharge,

and informed him that he had to seek additional medical treatment.  Responding further,

Greenwood was released against the advice of his medical providers, because he was still

having "pain" and experiencing "diarrhea".[6]  He was released because he insisted on

being discharged, but instructed to continue with a restricted diet and to continue to take

antibiotics.[7]  With respect to a possible return to work, one of his treating physicians, Dr.

Alzaim advised Greenwood to phone his office and to make an appointment with him so

he could evaluate him.[8]

39.            During the phone call between Plaintiff and Mr. Rapoza on Friday,

July 30, 2004, Mr. Rapoza asked Plaintiff whether he would be able to return to work on

a light duty basis. (Greenwood Dep., Ex. 1, at 158-160; Rapoza Dep., Ex. 16, at 9). Mr.

Rapoza asked Plaintiff to follow-up with him after Plaintiff's appointment with his

doctor. (Greenwood Dep., Ex. 1, at 16 1-62; Rapoza Dep., Ex. 16, at 9).

RESPONSE: Greenwood admits that Rapoza asked him if he could return to work

on light duty. Responding further, Greenwood told Rapoza in this conversation that he

---

[6] Pl.'s Ex. 2, Alzaim Tr./16; 20-21.
[7] Pl.'s Ex. 2, Alzaim Tr./18.

could not return to work on light duty, because he was still very uncomfortable, had not

regained his strength, and was suffering from diarrhea.[9]  Responding further,

Greenwood's physician, Dr. Alzaim, had advised him not to return to work.[10]

40.        On Monday, August 2, 2004, Plaintiff did not call Mr. Rapoza as

he said he would. (Greenwood Dep., Ex. 1, at 161-62; Rapoza Dep., Ex. 16, at 9). As a

result, Mr. Rapoza called Plaintiff and Plaintiff told him his doctor's appointment had

been rescheduled to the next day, Tuesday, August 3rd. (Rapoza Dep., Ex. 16, at 9-10;

Greenwood Dep., Ex. 1, at 166-67). Mr. Rapoza again asked Plaintiff for medical

documentation to verify his absences and to find out whether he could work on a light

duty basis. (Rapoza Dep., Ex. 16, at 9-10; August 10, 2004 Memo, Ex. 15).

RESPONSE:   Greenwood admits that he spoke with Rapoza on or about August

2.  Responding further, Greenwood has moved to strike Exhibit 15, for the reasons set

forth in his Motion to Strike it, and thus denies the factual assertions it is meant to

support.  Responding further, Greenwood objects to the Defendant's assertion that he

"did not call Rapoza as he said he would" as conclusory and argumentative, and requests

that the court disregard it.  Responding further, and in necessarily argumentative manner,

Greenwood points out that Rapoza's admitted call to him should be viewed as mooting

any issue as to whether or not he was in contact with Yale on August 2.  Responding

further, and insofar as it matters, at his deposition, Greenwood could not recall whether

Rapoza contacted him or if he contacted Rapoza on August 2 or in their subsequent

communications, and he therefore denies the assertion that he "did not call" Rapoza "as

---

[8] Pl.'s Ex. 2, Alzaim Tr./18-19.
[9] Def.'s Ex. 1, Greenwood Tr./159.
[10] *Id.*

he said he would".[11]   For all of these reasons, Greenwood denies the this paragraph's

implication that he committed an practical or actual work rule

41.     On Tuesday, August 3rd, Greenwood visited Dr. Alzaim (Greenwood Dep.,

Ex. 1, at 167; Note from Dr. Alzaim's office records dated August 3, 2004 attached

hereto as Exhibit 20). Neither Dr. Alzaim's office record nor his memory of the August

3rd appointment reflect any restrictions on Plaintiff's ability to work. (August 3, 2004

office record, Ex. 20; Dr. Alzaim Dep., Ex. 18, at 24-30).

RESPONSE: Greenwood admits he visited Dr. Alzaim on August 3. Responding

further, Dr. Alzaim's memory and the records generated by his office do not show that

Greenwood was cleared to work on August 3.[12]  Responding further, Dr. Alzaim later

wrote a note for Greenwood, permitting him to return to work on August 9, 2004.[13]

42.     On Tuesday, August 3rd, having again not heard from Plaintiff, Mr.

Rapoza called his house and was told by Plaintiff's girlfriend that he was asleep. (Rapoza

---

[11] Def.'s Ex. 1, Greenwood Tr./166,quoted verbatim here:

 Q. You didn't call Mr. Pl.'s Ex. 1, Rapoza in the morning;
is that right?
 A. I can't recall.
 Q. You don't remember, okay. You and
Mr. Pl.'s Ex. 1, Rapoza talked that afternoon?
 A. I would imagine so. I mean, I was in
contact with them, you know.
 Q. Well, Mr. Pl.'s Ex. 1, Rapoza called you that afternoon?
 A. Like I said, I can't remember. All I can
remember - I was in contact with them all week.
 Q. You were in contact with them all week,
oftentimes only because they called you, correct?
 A. I'm pretty sure, you know, if I'm in
contact, I'm sure it was going both ways, you know.
 Q. But sitting here today, you tell me what day
you called them.
 A. You know, a year out. Like I said, I had my
work phone. I mean, I was in contact with them. I
mean, I was, you know, the phone was on.

[12] See August 3, 2004 office record, Def.'s Ex. 20; Dr. Pl.'s Ex. 2, Alzaim Dep., Def.'s Ex. 18, at 24-30

Dep., Ex. 16, at 10; Greenwood Dep., Ex. 1, at 169-170).

RESPONSE: Greenwood incorporates by reference his response to paragraph 40.

43.    On Tuesday, August 3rd, in the afternoon, Plaintiff arrived at Yale and asked Mr. Rapoza whether he could use his vacation time as paid time off for the week since he already had exhausted all of his paid time off days and he expected to be out all week. (Greenwood Dep., Ex. 1, at 17 1-72; Rapoza Dep., Ex. 16, at 14). Mr. Rapoza told Plaintiff he would have to discuss it with Mr. Frazer. (Greenwood Dep., Ex. 1, at 171-73; August 10, 2004 Memo, Ex. 15).

RESPONSE: Greenwood admits he met with Rapoza and told him his medical condition would force him to miss work for the rest of the week. Greenwood has moved to strike Exhibit 15, and denies the assertions it is cited to support.

44.    On Tuesday, August 3rd, Plaintiff did not provide Mr. Rapoza with any documentation excusing him from work for the days he already had missed or for his ability to work that week, despite Mr. Rapoza's request for that documentation. (Greenwood Dep., Ex. 1, at 171; Rapoza Dep., Ex. 16, at 14; August 10, 2004 Memo, Ex. 15).

RESPONSE: Greenwood admits that he did not provide Rapoza with documentation on August 3, but responding further, asserts that Rapoza was aware of his medical condition, and as acknowledged by Yale in paragraph 43, had already informed Rapoza that he would have to miss work for the entire week, and that Rapoza had not questioned whether this was medically necessary.[14] Responding further, Greenwood has

---

[13] Def.'s Ex. 21.
[14] Pl.'s Ex. 3, Greenwood Aff./6.

16

moved to strike Exhibit 15, and thus denies the factual assertions it is cited to support.

45.    Later that day, Mr. Rapoza called Plaintiff to inform him he would not be permitted to use his vacation time as paid time off for that week. (Greenwood Dep., Ex. 1, at 174; August 10, 2004 Memo, Ex. 15). Mr. Rapoza again asked Plaintiff to obtain medical documentation to verify his absences that week and any restrictions on his ability to work and again asked Plaintiff whether he could return to work on a light duty basis. (Greenwood Dep., Ex. 1, at 174-75; Rapoza Dep., Ex. 16, at 14-15; August 10, 2004 Memo, Ex. 15).

RESPONSE: Greenwood denies that in his deposition testimony, at pages 174-75, he admitted that Mr. Rapoza asked him for medical documentation.[15]   Responding further, Greenwood has moved to strike Exhibit 15, and thus denies the factual assertions it is cited to support.

46.    Indeed, Mr. Rapoza and Mr. Frazer wanted Plaintiff to return to work in whatever capacity he was able as Yale was in the middle of its busiest season. (Greenwood Dep., Ex. 1, at 175-76; Rapoza Dep., Ex. 16, at 13-14; Frazer Dep., Ex. 11, at 38-39). However, Plaintiff admittedly never even bothered to ask his doctor whether light duty work would be permissible. (Greenwood Dep., Ex. 1, at 175-76).

RESPONSE: Greenwood objects to Yale's assertion about the subjective desires of Frazer and Rapoza that he return to work, and requests the court to disregard it. He admits that Yale is busy in the summer. Greenwood further objects to and asks the court to disregard Yale's argumentative assertion that he "never bothered" to discuss light duty with his physician. Responding further, and in a necessarily argumentative manner, Greenwood states that he was never required to raise the issue of light duty work with his

17

physician because he was incapable of performing it, and as Rapoza admitted at his

deposition, informed Rapoza of this.[16]  Greenwood further responds that his physician

had advised him not to work for the week, and that his physician subsequently wrote a

note to Yale not clearing him for return until August 9, 2004.[17]

47.    Despite the fact Plaintiff told Mr. Rapoza he would be back in touch with

him on Wednesday, Plaintiff did not do so. (Greenwood Dep., Ex. 1, at 176-77; Rapoza

Dep., Ex. 16, at 15; August 10, 2004 Memo, Ex. 15). On Wednesday, August 4th, Plaintiff

failed to call in an hour before the start of his shift. (Greenwood Dep., Ex. 1, at 176-77;

Rapoza Dep., Ex. 16, at 15). Plaintiff still had not provided documentation to support this

absence or the absences for any of the previous days. (Greenwood Dep., Ex. 1, at 177-

78).

RESPONSE:   Greenwood responds that Yale has acknowledged in its paragraph

---

[15] Def.'s Ex. 1, Greenwood Tr./174-75.
[16] Def.'s Ex. 1, Greenwood Tr./176; Pl.'s Ex. 1, Rapoza Tr./14.
[17] Def.'s Ex. 1, Greenwood Tr./176;  Def.'s Ex. 21.  Given Yale's mischaracterization of the subject,
Greenwood's deposition testimony on the subject of light duty and his ability to perform any work bears
reproduction here:

Q. It was you who had decided?
A. Yes. I mean, now that I'm thinking about
it, it was actually that doctor when I went and seen
him Tuesday, he told me to take the week off and
relax. So, I mean, that wasn't exactly a true
statement that I wasn't told medically not to work.
But as far as light duty thing, you know, yeah, I
mean, he didn't say oh, you know, he told me to take
a week off and relax. He didn't specifically say,
"Oh, but you can do light duty," you know what I
mean? It was just, "Go home and relax and recover."
Q. Did you ever call the doctor and ask him if
you could do light duty?
A. No, I wasn't up for the light duty. I just
wanted to stay home and recover.
Q. But you understood that Mr. Pl.'s Ex. 1, Rapoza felt he
needed you on light duty?
A. I don't think that light duty, I don't
think - I don't know what I could have possibly
done that would have helped them, you know.

43 (above) that he had told Rapoza, in a face to face meeting on the previous day (Tuesday), that he would be medically unable to work, even in a light duty capacity, for the remainder of the week, and that this notification obviated the need for any further communication on the subject.  Greenwood accordingly denies this paragraph's implication that he violated a work rule by failing to contact Yale in the manner described.

48.     On Thursday, August 5th, Plaintiff did not come to work and again failed to call in an hour before his shift. (Greenwood Dep., Ex. 1, at 178). Mr. Frazer left Plaintiff a message on his home answering machine regarding his lack of contact and the need for documentation regarding his absences. (Greenwood Dep., Ex. 1, at 182-83; August 10, 2004 Memo, Ex. 15.

RESPONSE: Greenwood responds that Yale has acknowledged in its paragraph 43 (above) that he had told Rapoza, in a face to face meeting on the previous day (Tuesday), that he would be medically unable to work, even in a light duty capacity, for the remainder of the week, and that this notification obviated the need for any further communication on the subject.  Greenwood accordingly denies this paragraph's implication that he violated a work rule by failing to contact Yale in the manner described. Responding further, Greenwood has moved to strike Exhibit 15, and thus denies the factual assertions it is cited to support.

49.     On Friday, August 6th, Plaintiff did not call Yale about whether he would be in that day. (Greenwood Dep., Ex. 1, at 183; Rapoza Dep., Ex. 16, at 15-16). Rather, in the afternoon, Plaintiff appeared at Yale to inquire about his paychecks.(Greenwood Dep., Ex. 1, at 183-84; August 10, 2004 Memo, Ex. 15; Rapoza Dep., Ex. 16, at 15-16). At this

time, Plaintiff provided Mr. Frazer with his hospital discharge form. (Greenwood Dep., Ex. 1, at 185; Frazer Dep., Ex. 11, at 33; August 10, 2004 Memo, Ex. 15; Discharge Form, Ex. 19). This was the first documentation Plaintiff provided since his hospitalization over one week prior on July 28th and it provided "0 restrictions on activity." (Greenwood Dep., Ex. 1, at 185, 188-89; August 10, 2004 Memo, Ex. 15; Discharge Form, Ex. 19) (emphasis added). As a result, and as Plaintiff admits, this document did not explain why Plaintiff could not work during that week, the week of August 2nd; to the contrary, it specifically indicated there were no restrictions on Plaintiff's activity after his discharge from the hospital. (Greenwood Dep., Ex. 1, at 189; Frazer Dep., Ex. 11, at 33). During this meeting, Mr. Frazer explained to Plaintiff the potential violations of company policy relating to unexcused absences and verification of sick leave. (August 10, 2004 Memo, Ex. 15). Plaintiff indicated he would endeavor to get the proper documentation. (August 10, 2004 Memo, Ex. 15; Frazer Dep., Ex. 11, at 33; Greenwood Dep., Ex. 1, 189-90). Yale agreed to give Plaintiff yet another opportunity to provide documentation to establish the need for his absences. (Rapoza Dep., Ex. 16, at 17-18; Frazer Aff., Ex. 2., at ¶7).

RESPONSE: Greenwood objects to the argumentative nature of the assertions in this paragraph ("yet another opportunity") and requests the court to disregard them. Responding further, Greenwood disputes the paragraph's implication that he engaged in misconduct by not phoning Yale on Friday morning, because he had previously informed his managers he would miss work for the entire week,[18] and as Yale acknowledges, appeared in person at Yale on Friday afternoon to discuss his work status.  Responding further, Greenwood has moved to strike Exhibit 15, and thus denies the factual assertions

it is cited to support.

50.    On Monday, August 9th, Plaintiff returned to Yale with a note from Dr.

Alzaim that provided "This is to certify that Daniel Greenwood has been under my care,

and will be able to return to work on the following date: Tues. August 9 [sic], 2004."

(Note from Dr. Alzaim dated August 9, 2004, attached hereto as Exhibit 21; Greenwood

Dep., Ex. 1, at 190-91; Frazer Dep., Ex. 11, at 28-29, 33-35).[4]

RESPONSE: Admitted.

51.    According to Dr. Alzaim, the first time Plaintiff ever mentioned work in

any way was at his second follow-up appointment on August 9, 2004. (Dr. Alzaim Dep.,

Ex. 18, at 33-34). On August 9th, Plaintiff asked for a return-to-work note for the first

time so Dr. Alzaim gave it to him. (Dr. Alzaim Dep., Ex. 18, at 3 3-34). The extent of this

note simply was to say Plaintiff could return to work but it provided no excuse for

Plaintiff's absences up to that point, nor did it address whether Plaintiff could have been

working light duty. (August 9, 2004 note, Ex. 21; Greenwood Dep., Ex. 1, at 190-92;

Frazer Dep., Ex. 11, at 44-46).

RESPONSE:  The Plaintiff objects to argumentative nature of this paragraph

("simply was to say") and asks the court to disregard it. Responding further, the

Defendant has provided no evidence that it informed Greenwood of any specific template

that his physician was required to fill out to excuse his absence, and Frazer and Rapoza

have both admitted that they made no attempt to contact Greenwood's physician to

clarify the note Greenwood presented, or to ascertain whether Greenwood had a

legitimate reason to be absent from work.[19]

---

[18] Def.'s Ex. 1, Greenwood Tr./176.
[19] Pl.'s Ex. 1, Rapoza Tr./21; Pl.'s Ex. 4, Frazer. Tr./30.

52.     By memorandum dated Monday, August 9th, Mr. Frazer informed Plaintiff of the termination of his employment due to violation of the Attendance/Tardiness Policy based on his unexcused absences during the week of August 2, 2004. (Memo to Plaintiff dated August 9, 2004 attached hereto as Exhibit 22).

RESPONSE: Admitted.

53.     Plaintiff's absences while hospitalized, July 28 – July 30, 2004, were not counted against him as "unexcused absences." (Frazer Aff., Ex. 2, at ¶6).

RESPONSE:    Admitted.

54.     Plaintiff's date of birth is May 3, 1963, which makes him forty-one years old at the time of his termination. (Complaint, Ex. 5, at ¶4).

RESPONSE:    Admitted.

55.             Plaintiff was replaced with Philip Conroy. (Frazer Dep., Ex. 11, at 5 1-52). In July 2004, Mr. Conroy was employed as a driver's helper. (Frazer Dep., Ex. 11, at 51-52). In August 2004, Mr. Conroy replaced Plaintiff as a delivery driver after Plaintiff's termination. (Frazer Dep., Ex. 11, at 5 1-52; Greenwood Dep., Ex. 1, at 209-210).

RESPONSE:   Greenwood cannot admit or deny this allegation, and contrary to Yale's foregoing assertion, stated at his deposition that he does not know who replaced him.[20]

RESPONSE:   Greenwood cannot admit or deny this allegation, and contrary to Yale's foregoing assertion, stated at his deposition that he does not know who replaced him.[21]

---

[20] Def.'s Ex. 1, Tr./209-10.
[21] Def.'s Ex. 1, Tr./209-10.

56.     In August 2004, Mr. Conroy was forty-two (42) years old, which means he was older than Plaintiff. (Conley Aff., Ex. 8, at ¶4; Complaint, Ex. 5, at ¶4).

RESPONSE: Greenwood cannot admit or deny this allegation, as he has no personal knowledge of Mr. Conroy's age.

57.     In August 2005, Mr. Conroy was injured and was on workers' compensation leave from August 28, 2005 until he returned on light duty status in a different position on December 13, 2005. (Conley Aff., Ex. 8, at ¶5). To date, Mr. Conroy still is working light duty. (Conley Aff., Ex. 8, at ¶5).

RESPONSE:   Greenwood objects to this assertion as irrelevant, insofar as the circumstances described occurred after Mr. Greenwood was terminated in August of 2004, and after he commenced this action at the MCAD on September 17, 2004.[22]

58.     At the time of Plaintiff's termination, Richard Boultenhouse was the oldest delivery driver employed at Yale. (Conley Aff., Ex. 8, at ¶6). In August 2004, Mr. Boultenhouse was fifty-three (53) years old. (Conley Aff., Ex. 8, at ¶6). On October 17, 2004, Mr. Boultenhouse began an FMLA-protected leave of absence due to a heart attack and related surgery. (Conley Aff., Ex. 8, at ¶6). Mr. Boultenhouse returned successfully to his employment at Yale thereafter on December 13, 2004 and remains employed with Yale. (Conley Aff., Ex. 8, at ¶6).

RESPONSE: Greenwood objects to this assertion as irrelevant, insofar as the circumstances described occurred after Mr. Greenwood was terminated in August of 2004, and after he commenced this action at the MCAD on September 17, 2004, and are thus irrelevant.[23]

---

[22] MCAD Charge, Def.s' Ex. 3.
[23] MCAD Charge, Def.'s Ex. 3.

59.     Mr. Boultenhouse also has suffered two workers' compensation injuries and has returned to his employment as a driver with Yale from both absences. (Conley Aff., Ex. 8 at ¶7). First, Mr. Boultenhouse was absent from August 12, 2002 until September 9, 2002 due to an ankle sprain, at which time he was fifty-one years old. (Conley Aff., Ex. 8 at ¶7). Second, Mr. Boultenhouse was absent from October 29, 2003 until November 3, 2003 due to a back strain, at which time he was fifty-two years old. (Conley Aff., Ex. 8 at ¶7).

RESPONSE: Greenwood cannot admit or deny this allegation, as he has no personal knowledge of the circumstances of Mr. Boultenhouse's injuries.

60.     Despite the fact that Plaintiff was replaced with an employee who was older than him and both the replacement, Mr. Conroy, and Mr. Boultenhouse are two examples of employees who returned from workers' compensation leave successfully, Plaintiff alleges Mr. Frazer made the following comment to him in August 2004:

And, you know, he told me, `Well, you seem to be getting hurt a lot,' and this and that. `Maybe you're too old for that. You know, maybe you're too old to keep doing what you're doing.' I told him, you know, I mean I got hurt, you know, the previous year, you know what I mean, doing their work and doing the best I could. You know, I have that hernia injury, you know, and he was just -- `Well, you're getting hurt. You're getting hurt too much. How old are you,' and this and that.

(Greenwood Dep., Ex. 1, at 186-87).

RESPONSE:   Greenwood admits his deposition testimony is accurately quoted.

61.     Michael Bartlett was a delivery driver for Yale from November 2001 to July 2002. (Conley Aff., Ex. 8, at ¶8). Mr. Bartlett was terminated for his violation of the

24

Attendance/Tardiness policy when he failed to appear for work on two consecutive days, after previously being told he could not have those days off. (Conley Aff., Ex. 8 at ¶8). Mr. Bartlett was twenty-eight years old at the time. (Conley Aff., Ex. 8, at ¶8; Letter from Hector Gonzalez attached hereto as Exhibit 23).

RESPONSE: Greenwood cannot admit or deny this allegation, as he has no personal knowledge of the circumstances of Mr. Bartlett's dismissal.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1.    Yale Electric sells home appliances from a showroom in Dorchester, Massachusetts.[24]  Daniel Greenwood began working for Yale, loading trucks with appliances, driving them to customers, and unloading the appliances, in 1999.[25]  At the time he was fired in August 2004, Greenwood was 41 years old, and the most senior delivery driver Yale employed.[26]  Until that point, Yale had never disciplined Greenwood for any reason, and had never had any issues with his attendance.[27]  During the entire time Greenwood worked for Yale, it employed more than 50 full-time employees, including its drivers, administrators, warehouse workers, and sales force.[28]

2.    On November 12, 2003, Greenwood was injured while he was delivering a large refrigerator in the Back Bay.[29]  As a result of his injury, he suffered a hernia, had to have an operation, and could not return to work until January 26, 2004, a period of 10 weeks and two days.[30]  Greenwood received worker's compensation benefits for the

---

[24] Pl.'s Ex. 3, Greenwood Aff./2
[25] *Id.*.
[26] Pl.'s Ex. 4, Frazer. Tr./10; Greenwood Aff./2.
[27] Pl.'s Ex. 4, Frazer. Tr./13; 21.
[28] Pl.'s Ex. 3, Greenwood Aff./2.
[29] Pl.'s Ex. 3, Greenwood Aff./4.
[30] *Id.*

period of time he missed 10 weeks and two days of work.[31]  When he returned, and on the basis of a vocational assessment Yale received, and which Mr. Frazer testified Yale mandates as a matter of policy before any employee returning from an injury may resume work, Greenwood was given a light duty assignment.[32]  Despite missing these 10 weeks and 2 days of work, in the 12 months prior to July 28, 2004, Greenwood worked in excess of 1,250 hours for Yale.[33]

3.      Yale did not ask Greenwood for a vocational assessment when it was considering his return to work in August of 2004.[34]

4.      At the time Greenwood was fired, James Rapoza was employed by Yale as its Customer Service Manager, and Louis Frazer was its Director of Operations.[35]

5.      Both Rapoza and Frazer admitted that during his employment with Yale, Greenwood had not had any attendance issues.[36]  During the time Greenwood, Frazer, and Rapoza were employed by Yale, Yale had fired three employees (Bartlett, Johnson, and Lewis) for failing to report to work.[37]  None of these employees claimed to miss work due to medical issues.[38]

6.      At the end of his run on July 27, 2004, Greenwood experienced severe abdominal pain.[39]  He told Frazer, whom he saw at the dispatch office, that he thought he

---

[31] Insurer's letter, Ex. .
[32] Pl.'s Ex. 4, Frazer. Tr./19-20.
[33] Pl.'s Ex. 3, Greenwood Aff./4.
[34] Pl.'s Ex. 4, Frazer. Tr./41.
[35] Pl.'s Ex. 1, Rapoza Tr./4; Pl.'s Ex. 4, Frazer. Tr./5.
[36] Pl.'s Ex. 1, Rapoza Tr./6.
[37] Pl.'s Ex. 1, Rapoza Tr./6; Pl.'s Ex. 4, Frazer. Tr./14-16.
[38] Pl.'s Ex. 4, Frazer. Tr./13-16.
[39] Pl.'s Ex. 3, Greenwood Aff.,/5.

would have to check himself into the hospital.[40]  Frazer replied, "I paid to have your belly fixed last year.  You better be in tomorrow."[41]

7.     Greenwood was uninsured and thus concerned about the cost of hospitalization, but the pain was so severe that he checked himself into the emergency room at the South Shore Hospital, in Weymouth.[42]  Greenwood was soon thereafter diagnosed with "diverticulitis", and admitted as an inpatient.[43]  (diverticulitis is "a condition in which diverticuli in the colon rupture. The rupture results in infection in the tissues that surround the colon."[44] )

8.     In or about this same time period, Rapoza received word that Greenwood was hospitalized and could not report to work.[45]  Rapoza called Greenwood at the hospital the following day.[46]  Greenwood told Rapoza that his physician had advised him that he should stay through the weekend, but that he planned on checking out earlier, because he had a court date on Friday and had planned to host a party at his home over the weekend.[47]  Rapoza asked Greenwood to call him on Friday about his status.[48]

9.     Greenwood and Rapoza spoke again on Friday, July 30, 2004.[49] Greenwood told Rapoza he was checking himself out of the hospital, and going to his court date.[50]  This was against the advice of Greenwood's medical providers, because he

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] http://www.medicinenet.com/diverticulosis/article.htm
[45] Pl.'s Ex. 1, Rapoza Tr./7.
[46] Pl.'s Ex. 1, Rapoza Tr./8.
[47] Pl.'s Ex. 1, Rapoza Tr./9.
[48] Pl.'s Ex. 1, Rapoza Tr./9.
[49] Pl.'s Ex. 1, Rapoza Tr./9.
[50] Pl.'s Ex. 1, Rapoza Tr./9.

was still having "pain" and experiencing "diarrhea".[51]  He was released because he

insisted on being discharged, but instructed to continue with a restricted diet and to

continue to take antibiotics.[52]

        10.     With respect to a possible return to work, one of his treating physicians,

Dr. Alzaim advised Greenwood to phone his office and to make an appointment with him

so he could evaluate him.[53]  According to Dr. Alzaim, the issue of whether Greenwood

could or could not return to work is not an issue that was addressed or intended to be

addressed in the discharge summary.[54]

---

[51] Pl.'s Ex. 2, Alzaim Tr./16; 20-21.

[52] Pl.'s Ex. 2, Alzaim Tr./

[53] Pl.'s Ex. 2, Alzaim Tr./18-19.

[54] Pl.'s Ex. 2, Alzaim Tr./23-24.  Notably, the statement "no restrictions" on the discharge form, Def.'s Ex. 19, has been cited liberally by the Defendant to stand for the proposition that Greenwood was not restricted in his work activity. Dr. Pl.'s Ex. 2, Alzaim's testimony contradicts this assertion, and makes clear that the issue of whether or not Greenwood had been cleared to work was not addressed. The relevant testimony, from pages 22-24 of Dr. Pl.'s Ex. 2, Alzaim's deposition are set forth here for the benefit of the court.

---

   Q.  Do you see where Exhibit 3 it says
activities and restrictions,  the section that's
titled Activities/Restrictions?

   A.  Yeah.

   Q.  And it says,  "0 restriction on activity"?

   A.  yeah,

   Q.  If this patient was being told not to return
to work, wouldn't it be reflected there in that
section?

   A.  Remember,  this I'm not familiar with,  I am
talking about this medical  restriction is not
reflected in my notes,  so I can't make a comment on.

   Q.  Meaning you didn't give him any restrictions
on activity?

         MR. RICE:  Ojection.

   Q.  Is that fair to say?

   A.  What I am saying here,  if it's not in my
note,  this means I don't know.

   Q.  Okay.  well, based on all of the notes that
you've reviewed in preparation for today,  is there
anything in it that would suggest that you ever told
Mr. Greenwood he should not return to work after he
was discharged from the hospital?

   A.  If it's not reflected,  I can't tell you.

   Q.  That's what I am asking you,  though, based
on after everything that you've seen and you've

11.     In response to Rapoza's inquiry about when he would return to work, Greenwood told Rapoza he had a follow up appointment with his physician the following Monday, and would contact him about his status then.[55]

12.     Rapoza spoke with Greenwood the following Monday, August 2, 2004, as planned.[56] Greenwood told Rapoza that his appointment had been cancelled, and that he planned on meeting his physician the following day, Tuesday, and at that time, would give him an update on his status.[57] Rapoza did not ask Greenwood when he might be able to return to work in this conversation.[58]

13.     On Tuesday afternoon, August 3, Greenwood met at Yale's warehouse with Rapoza.[59] He told Rapoza that his physician had told him that he had to miss work for the rest of the week,[60] and he could not perform any work, even light duty.[61] Rapoza to provide some documentation of his need to miss work, but did not make this request in

---

reviewed, you've told me today you reviewed all   the
records that you have of Mr. Greenwood,    correct, so
after reviewing all of those,   did you review
anything in any of those documents that would
reflect that you ever told Mr.   Greenwood
    A. The word --
    Q. -- to return back to work?   Just let me
finish.
    A. The word restriction doesn't really come in,
it's a matter you are sick.   Let's say you have a
heart attack or you have,   let's say,  pneumonia, for
example, you take the medication,    you go home,  you
continue the course.   There is nothing to say I am
restricting you not to walk outside or not to do
this,  it doesn't come at all,    You follow the
instructions,   you take this, you are going home,   and
you call  for appointment for follow-up.

---

[55] Pl.'s Ex. 1, Rapoza Tr./9.
[56] Pl.'s Ex. 1, Rapoza Tr./9.
[57] Pl.'s Ex. 1, Rapoza Tr./10.
[58] Pl.'s Ex. 1, Rapoza Tr./28.
[59] Pl.'s Ex. 1, Rapoza Tr./14.
[60] Pl.'s Ex. 1, Rapoza Tr./28.
[61] Rapoaza Tr./14.

writing, provide him with a standard DOL FMLA certification form,[62] or give him any specific instructions on what form or substance the documentation should take.[63]  Rapoza believed that Greenwood's physician had indeed told Greenwood that he had to miss work, and assumed that Greenwood's continued need to miss work related to the malady that had forced his hospitalization.[64]

14.     On Friday, August 6, Greenwood met with Rapoza and Frazer and gave them a copy of his discharge from South Shore Hospital.[65]  Frazer noted that the discharge summary stated that Greenwood had "no restrictions" on his activity, and asked Greenwood to obtain additional documentation concerning his absences.[66]  Frazer also asked Greenwood how old he was, and whether Greenwood thought he could still do his job because he had noticed that Greenwood had been out hurt quite often lately.[67]  Frazer also stated that Greenwood might be getting too old to carry out his duties on the truck.[68]  Frazer stated, "If that is the case, I have no other job duties for you." He added, "How much longer do you think you can be doing this job?"[69]  Greenwood replied that he expected to return to work on August 10, 2004 with his doctors' permission.[70]

15.     On the next work day, Monday, Greenwood met with Frazer and Rapoza, and gave them a note signed by his physician, excusing him from work to "Tuesday, August 9[71], 2004."[72]

---

[62] Pl.'s Ex. 5.
[63] Pl.'s Ex. 1, Rapoza Tr./14-15; Pl.'s Ex. 3, Greenwood Aff./6.
[64] Pl.'s Ex. 1, Rapoza Tr./29.
[65] Pl.'s Ex. 1, Rapoza Tr./16.
[66] Pl.'s Ex. 1, Rapoza Tr./16.
[67] Pl.'s Ex. 3, Greenwood Aff., Ex. 7.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] It is noted that Tuesday of that week was August 10, not August 9 as noted in Dr. Pl.'s Ex. 2, Alzaim's note.

16.    Neither Frazer nor Rapoza ever asked Greenwood for permission to speak with his physician about his medical condition generally, his need to miss work, or his ability to work light duty.[73]

17.    Greenwood had exhausted all of his available sick time at the time of his absences in July of 2004, so he was not entitled to be paid for any of the time he missed work.[74]

18.    Prior to the time Yale fired Greenwood, Rapoza had no doubt that Greenwood suffered from a malady that had forced him to be hospitalized, but never asked Greenwood, with whom he had worked for six years at that point, in any of the conversations they had during his absence, what his actual diagnosis had been.[75]

19.    Yale has proffered no evidence that during Greenwood's absence, that either Frazer, Rapoza, or any other individual from Yale cited Yale's personnel policies as requiring Greenwood to provide specific documentation justifying his absence; that his continued absence without some kind of specific documentation jeopardized his continued employment; or that portions of Yale's employee handbook had any application to Greenwood's situation at all.[76]

20.    Prior to the time he fired Greenwood, Frazer knew that Greenwood had been diagnosed with diverticulitis.[77]

---

[72] Def.'s Ex. 21; Pl.'s Ex. 1, Rapoza Tr./18.
[73] Pl.'s Ex. 1, Rapoza Tr./21; Pl.'s Ex. 4, Frazer. Tr./30.
[74] Pl.'s Ex. 1, Rapoza Tr./13; Pl.'s Ex. 4, Frazer. Tr./40.
[75] Pl.'s Ex. 1, Rapoza Tr./23-26.
[76] Pl.'s Ex. 1, Rapoza Tr./30.
[77] Pl.'s Ex. 4, Frazer. Tr./25.

RESPECTFULLY SUBMITTED,

THE PLAINTIFF

By his attorney,

s/Daniel W. Rice
Daniel W. Rice
GLYNN, LANDRY,
HARRINGTON & RICE, LLP
10 Forbes Road, Suite 270
Braintree, MA 02184
BBO # 559269
(781) 356-1399

Dated: February 26, 2007

**Deposition of James Rapoza**
Daniel Greenwood v. Yale Appliance and Lighting, Inc.
Case 1:05-cv-10605-JLT    Document 26-2    Filed 02/26/2007    Page 1 of 10    November 22, 2006

**Page 1**

Volume I
Pages 1 to 39
Exhibits (See Index)
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 05-10605 JLT

DANIEL GREENWOOD,
Plaintiff,

vs

YALE APPLIANCE AND LIGHTING, INC.,
Defendant.

DEPOSITION OF JAMES RAPOZA, taken pursuant to Notice under the Massachusetts Rules of Civil Procedure on behalf of the Plaintiff, before Linda M. Thomas, RMR, a Notary Public and Registered Merit Reporter, in and for the Commonwealth of Massachusetts at the offices of GLYNN, LANDRY, HARRINGTON & RICE, LLP, Ten Forbes Road, Braintree, Massachusetts on November 22, 2006, commencing at 12:07 p.m.

KATHLEEN A. GARDNER
Registered Professional Reporter
11 Roman Avenue
Danvers, Massachusetts  01923
Tel: (978) 777-3574 / Fax: (978) 750-8342

---

**Page 2**

APPEARANCES

DANIEL W. RICE, ESQ.
GLYNN, LANDRY, HARRINGTON & RICE, LLP
10 Forbes Road
Braintree, Massachusetts  02184
(For the Plaintiff)

JACLYN KUGELL, ATTORNEY AT LAW
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts  02109
(For the Defendant)

Also present:

Daniel Greenwood
James Rapoza

---

**Page 3**

### INDEX

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| James Rapoza | | | | |
| (By Mr. Rice) | 4 | | | |
| (By Ms. Kugell) | | 32 | | |

### EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Memo dated August 10, 2004 from Lewis Frazer to Employee File, Daniel Greenwood | 31 |

---

**Page 4**

### STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deposition transcript shall be read and signed; notarization waived.

It is furthermore stipulated that all objections, except as to form and Motions to Strike are reserved until the time of trial.

**JAMES RAPOZA**, first having shown identification and been duly sworn on oath, deposes and says as follows:

### DIRECT EXAMINATION

BY MR. RICE:

Q.  Could you state your name, please?

A.  James Rapoza.

Q.  And where are you employed?

A.  Yale Appliance and Lighting.

Q.  And what is your job there?

A.  Customer Service Manager.

Q.  How long have you had that job?

A.  That particular position, roughly, two

**5**

```
 1   years.
 2       Q.   And prior to that, did you also work for
 3   Yale?
 4       A.   I have.
 5       Q.   And, what was your job before that?
 6       A.   I, initially, started out at Yale as a
 7   helper on the delivery trucks, and then became a
 8   driver.
 9       Q.   And then you rose to a management-level
10   position?
11       A.   Not initially.  I did move inside and had
12   some responsibilities inside, and ultimately into the
13   management position, but not directly from the road.
14       Q.   In August of 2004, did you have a job in
15   which you had some supervisory authority over Dan
16   Greenwood?
17       A.   Yes.
18       Q.   What was the name of the job you had?
19       A.   I would say Delivery Manager.
20       Q.   So, you were in charge of supervising all of
21   the individuals employed by Yale who were involved in
22   delivering appliances?
23       A.   Correct.
24       Q.   Of those employees, which employee on July
```

**6**

```
 1   of 2004, had been employed by Yale the longest and
 2   assigned to work in the delivery area?
 3       A.   That would be difficult to answer.  When I
 4   came on to Yale, when I was initially employed, there
 5   were a few employees there previous to me.  I could
 6   certainly speak to them.  When they were actually
 7   hired, and who was there first, I couldn't really
 8   speak to.
 9       Q.   Well, was Greenwood up there in the top
10   echelon of drivers?
11       A.   In terms of seniority, yes, I would say so.
12       Q.   How long had you been supervising him in the
13   2004 time frame?
14       A.   That would have been roughly -- trying to go
15   back and get specific dates is difficult.  At that
16   point in time, I would say somewhere around a year.
17       Q.   Had he had any attendance problems?
18       A.   Not that I recall.
19       Q.   Obviously, attendance is important?
20       A.   Very, very important at Yale, yes.
21       Q.   And Mr. Frazer identified three individuals
22   who had been fired for attendance issues?
23       A.   I believe so.
24       Q.   Bartlett, Johnson and Lewis?
```

**7**

```
 1       A.   Correct.
 2       Q.   At some point in July of 2004, did you learn
 3   that Mr. Greenwood was not going to be reporting to
 4   work?
 5       A.   Yes.
 6       Q.   Okay.  How did you learn that?
 7       A.   Either on a Tuesday -- I am not sure about
 8   the date -- Tuesday evening, I don't recall whether I
 9   spoke with Mr. Greenwood, or received a message from
10   him that he was going to the doctor's, or might have
11   been at the doctor's already, and that he would not be
12   at work the next day.  That was the initial moment
13   that I learned about it.
14       Q.   As a result of being notified of that, what
15   did you do?
16       A.   I, at that point, would have let Lewis
17   Frazer know, and Jim O'Neill, most likely.  He was the
18   dispatcher at the time for the delivery trucks.  I
19   would have let him know that Dan wouldn't be in and we
20   would need to find a substitute for him.
21       Q.   How do you find a substitute?
22       A.   Back in '04, it was probably, and I can say
23   with almost certainty, it was someone out of the
24   warehouse.  We didn't have, if I remember correctly,
```

**8**

```
 1   many spare people back then.
 2       Q.   Is that something that is difficult to do?
 3   Does that hurt your operation to take someone from the
 4   warehouse?
 5       A.   Certainly.
 6       Q.   Why is that?
 7       A.   Because it leaves them shorthanded, also,
 8   and they have responsibilities they need to meet.
 9       Q.   What pays more, warehouse or driver?
10       A.   Oh, driver certainly.
11       Q.   Okay.  At the time you got the notice that
12   Greenwood was not going to report to work, did you
13   have an understanding as to how long he would be out
14   of work?
15       A.   Not at that initial -- not on that Tuesday
16   evening.
17       Q.   Did you take steps to -- were you later, or
18   subsequently able to ascertain how long he'd be out of
19   work?
20       A.   Yes.  I called Dan the next day, Wednesday.
21       Q.   Did you call him in the hospital?
22       A.   Correct.
23       Q.   Okay.  And what did he tell you?
24       A.   He told me that he was admitted to the
```

9

1  hospital; that his doctor, at that point in time,
2  thought that he might be in the hospital through the
3  weekend, but that he had planned on checking himself
4  out on Friday. He had a Court date and some events
5  planned at his house on the weekend; that he would
6  need to check himself out on Friday. I asked him to
7  call me on Friday to let me know what his status was.
8      Q.   Did he call you?
9      A.   I did speak with Dan on Friday. I believe I
10 called Dan. He did let me know he was checking
11 himself out of the hospital and going to his Court
12 date.
13          At that point he told me he had a doctor's
14 appointment on the following Monday. And I asked him
15 to please call me after the doctor's appointment to
16 let me know what his status was in terms of work, if
17 he would be able to work, full duty, light duty, but
18 to please call me after the appointment.
19     Q.   Did he call you?
20     A.   No.
21     Q.   When was the next contact you had with him?
22     A.   I called Dan on Monday, Monday afternoon at
23 some point, because I hadn't heard from him. He told
24 me that his appointment had been cancelled; that he

10

1  had an appointment the very next day on Tuesday. And
2  I reiterated to please get me some documentation --
3  medical documentation as to what his condition was in
4  terms of his work status. Can he work full duty,
5  light duty? We certainly needed him, if we were going
6  to replace him with someone out of warehouse, there
7  are some functions in the warehouse that potentially
8  he could have helped us out with, and to please
9  provide that to us.
10     Q.   Well, did you say all that, what you just
11 said in the conversation you had with him or --
12     A.   No, I absolutely said that to him.
13     Q.   And what did he say?
14     A.   He said "okay," he will call me on Tuesday
15 after his appointment.
16     Q.   And did he call you on Tuesday?
17     A.   No.
18     Q.   Did you have contact with him on Tuesday?
19     A.   I called Dan's house on Tuesday afternoon,
20 again, I would say early afternoon at some point;
21 spoke with his girlfriend; did not speak with Dan;
22 asked if Dan was there, and she said that he was
23 sleeping; that the appointment was in the afternoon.
24 And I asked that he call when the appointment was

11

1  done.
2      Q.   At the time you had the conversation with
3  his girlfriend, what was your understanding as to the
4  medical reasons?
5      A.   I didn't have any understanding at that
6  point. I'm sorry for speaking over you.
7      Q.   She probably got it anyway. What was your
8  understanding as to the medical reasons. You had no
9  understanding? That is your answer?
10     A.   Not in terms of exactly what his condition
11 was. When I spoke with Dan the previous week at the
12 hospital, he said there was something going on with
13 Dan -- to use Dan's words -- his belly.
14     Q.   Did you consider it unusual that he had been
15 admitted to the hospital for something?
16     A.   Did I as compared to what?
17     Q.   Well, just in your general experience did
18 you consider it unusual that somebody had been -- that
19 Greenwood had been admitted to the hospital?
20     A.   No, I wouldn't consider it unusual. It was
21 the first time Dan to my knowledge, had been admitted
22 to the hospital. But, I mean as compared to what, I
23 really can't answer that question whether I consider
24 it unusual or not.

12

1      Q.   What is your belief -- I withdraw that
2  question. Did he discuss with you what -- okay.
3  Actually, let me withdraw this. This is Wednesday.
4  We moved up to Wednesday now?
5      A.   Well, this is the previous Wednesday when he
6  was admitted to the hospital.
7      Q.   And then you have a conversation with his
8  girlfriend?
9      A.   On Tuesday.
10     Q.   At that point you don't know why it was that
11 he was admitted to the hospital?
12     A.   No. Again, the only knowledge I had at the
13 time was something, again to use Dan's words at the
14 time, with his belly. That is all that I knew that
15 was happening at the time.
16     Q.   Was it your understanding when you had that
17 conversation that the reason he hadn't reported to
18 work was related to the medical issue that had caused
19 his hospitalization?
20     A.   Well, as per our conversation on Friday, Dan
21 told me he had a doctor's appointment, a follow-up
22 appointment after his release from the hospital to see
23 his doctor pertaining to his hospitalization. I mean
24 that was my understanding that it had to do with his

November 22, 2006

Case 1:05-cv-10605-JLT    Document 26-2    Filed 02/26/2007    Page 4 of 10

Deposition of James Rapoza
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

13

1   hospitalization.

2      Q.   Were you aware that he had used up all his

3   paid sick leave at the time?

4      A.   I believe so, yes.

5      Q.   Could you think of any reason then, or now,

6   that Greenwood would not report to work if he were

7   able to?

8      A.   Can you rephrase that question for me,

9   please?

10     Q.   Did you think -- let's cut to the chase

11  here.  Did you think when you were talking to his

12  girlfriend on Tuesday that he just plain-old didn't

13  want to show up to work?

14     A.   All I was looking for at that time was that

15  Dan was going to be out of work, as to why, and some

16  medical documentation that had been at that point.

17  You know, the three previous days, the Wednesday,

18  Thursday, Friday, Monday, and then Tuesday at that

19  point.  So, five days for medical documentation as to

20  why he was out of work.  Being the summer time, and

21  needing people, whether or not he was capable of

22  performing any functions for us, whether that be light

23  duty, full duty, and if he wasn't capable of

24  performing any functions.  That is all I was looking

14

1   for at the time.

2      Q.   After you had the conversation with his

3   girlfriend on Tuesday, what was the next contact you

4   had with anybody about Greenwood's status?

5      A.   I would have, at that point, informed Lewis

6   Frazer of my conversations on the phone, and I would

7   assume, again, that I spoke with Jim O'Neill, again

8   who does the routing for the trucks and dispatching,

9   that Dan was still not available.  So, we would have

10  to continue with the sub.

11     Q.   How about in terms of getting in touch with

12  Greenwood and trying to figure out if and when I was

13  going to come back?

14     A.   After I spoke with his girlfriend on that

15  Tuesday afternoon, Dan came into the office later on

16  that Tuesday probably a couple of hours later saying

17  that he was at the appointment; that he had to be out

18  for the week per his doctor; that he couldn't perform

19  any functions.  I asked him if he was able to do any

20  light duty; that we could use his help in the office,

21  or in the warehouse and if he had any documentation

22  with him for us.  And he didn't have any at the time.

23  I told him we would need that.

24     Q.   Okay.

15

1      A.   At that point in time --

2      Q.   Did he say that he couldn't do light duty?

3      A.   He said he wasn't up for it, if I remember

4   correctly.

5      Q.   And okay, so then he left?

6      A.   He left and told me he would be back in

7   touch with me on Wednesday with some paperwork from

8   his doctor.

9      Q.   And, in fact, was he back in touch with you

10  on Wednesday?

11     A.   I did not hear from Dan on Wednesday.

12     Q.   When did you hear from him next?

13     A.   The next time I personally spoke with Dan

14  would have been on Friday, that following Friday.  And

15  that would have been at the office.  I don't believe I

16  spoke with him personally on the phone that day.

17     Q.   And you met with him?

18     A.   I met with him and Lewis Frazer.

19     Q.   And what did Greenwood say at that meeting?

20     A.   He had -- he had come in.  I believe at that

21  point in time he had called and spoke with Lewis

22  looking if he had a pay waiting for him for the

23  previous week.  And Lewis had asked him to come in to

24  bring some documentation again to explain this past

16

1   week and, you know, some medical documentation again

2   supporting his position.  And Dan turned in his

3   release form from the hospital at that point in time.

4      Q.   Okay.  And, did you say anything about that?

5      A.   I personally did not, no.

6      Q.   Did Mr. Frazer say something about it?

7      A.   Yes.

8      Q.   What did he say?

9      A.   He asked Dan if he read the release

10  document, and Dan said, "No."  Lewis then said that

11  this released you on Friday, the previous Friday with

12  zero restrictions, and that didn't, at that point in

13  time, explain his absence for the week.

14     Q.   Did Mr. Frazer ask him to get another note?

15     A.   We had asked that he provide further

16  documentation as to what his restrictions were for

17  work for this previous week to explain or, again, to

18  support whether or not we could have used him in the

19  warehouse or in the office.

20     Q.   Did you have any conversations about his

21  future with the company at that point?

22     A.   Not at that point in time.  We wanted to

23  wait and see what documentation he provided to us.

24     Q.   Did you discuss with him getting off the

17

1    trucks and moving inside and working?
2        A.   Did I discuss with who?
3        Q.   With Greenwood.  Did that ever come up?
4        A.   It came up throughout the week.
5        Q.   And you had discussions with Greenwood in
6    which you said, "Why don't you consider getting off
7    the trucks and taking an inside job?"
8        A.   Oh, no, certainly not, not myself.
9        Q.   Are you aware was that ever something that
10   was on the table, Greenwood moving off the trucks and
11   going inside?
12       A.   Dan had mentioned it in various
13   conversations over time.  I don't recall any
14   conversation specifically with myself where we spoke
15   about that with official, professional level.
16            MS. KUGELL:  Objection.  I'm sorry.
17   You don't have a question pending.  I think you guys
18   are not talking about the same thing.
19            MR. RICE:  Okay.
20   BY MR. RICE:
21       Q.   So, there is a meeting on Friday.  And is it
22   fair to summarize that to say that Mr. Frazer asked
23   Greenwood to bring in some other documentation?
24       A.   Correct.

18

1        Q.   And were you involved in any other meetings
2    with Greenwood after that?
3        A.   The next contact with Dan would have been on
4    the following Monday when he returned to the office
5    and provided -- can I refer to this Exhibit?
6        Q.   Sure.
7        A.   Exhibit 1.
8        Q.   Were you there when he handed it in?
9        A.   I was there in the office.  I don't know if
10   I was in the office when he, specifically, handed it
11   to Lewis, but I was certainly there at one point in
12   time.
13       Q.   Were you involved in a conversation with
14   Greenwood that day?
15       A.   I, personally, did not have a conversation
16   with Dan.
17       Q.   Did you have a conversation with Mr. Frazer
18   about Exhibit 1?
19       A.   Yes, we did.
20       Q.   Was Greenwood present?
21       A.   No.
22       Q.   Okay.  What was expressed in the
23   conversation you had with Mr. Frazer about Exhibit 1?
24       A.   It would have been, basically, that it

19

1    didn't support his absence in the previous week as to
2    what we were seeking, which was again any type of
3    documentation that would have shown us that he was
4    able to work full duty, light duty, or not at all.
5        Q.   When was the last time you read that
6    document?
7        A.   I reviewed that would have been last week.
8        Q.   Take a second and just look at it again.  It
9    is kind of short.
10       A.   Certainly, yeah.
11       Q.   Does this document indicate that Dan
12   Greenwood has been under a doctor's care?
13       A.   Yes, it does.
14       Q.   Does it indicate a date that he can return
15   to work?
16       A.   It does.
17       Q.   And as you have just read that, do you still
18   think that it doesn't indicate that he was incapable
19   of working for a period of time up until August 9th?
20       A.   It doesn't indicate what we were seeking
21   from Dan.  It does not indicate, or fulfill our
22   request for that previous week, again, where he had
23   been absent for the week of whether or not he would
24   have been capable of performing some functions for us

20

1    because it was needed, and again whether or not that
2    would have been full duty, light duty, office work,
3    whatever the case may have been.  We needed the help,
4    and we were looking for some help from Dan, and if he
5    was capable of it at all.
6        Q.   Well, he gave this note to you on Monday,
7    August 9th, right?
8        A.   Yeah.  There is some discrepancy in the date
9    there, but it was that Monday.
10       Q.   And he had been out of work since, or he had
11   missed his scheduled days of work starting on the last
12   Thursday in July, right?
13       A.   It would have been that Wednesday.
14       Q.   So, what difference did it make at that
15   point as to what he might have been able to do during
16   the period he was out?  Why did you care at that
17   point?
18       A.   Again, it is a busy season.  Dan was off the
19   trucks.  We needed to substitute his position with
20   somebody else, further burdening the warehouse at that
21   point in time.  I am assuming that is where the help
22   came from.  And without the proper documentation
23   stating why he couldn't have provided those functions,
24   this is what this does not satisfy for us.

21

1  Q.  So, the problem with the note is that it
2  didn't go back in time and say the reason he wasn't
3  able to be here is X, Y, and Z?
4  A.  Between the release from the hospital
5  stating zero restrictions, and this form here, which
6  is over a week later roughly, yes, there is no
7  explanation in terms of why he was excused from work
8  of any kind.
9  Q.  You never had a conversation with his
10 doctor, right?
11 A.  Me personally, no.
12 Q.  Did you ever, in your conversations with
13 Greenwood, say, "Hey, we need to talk to your doctor
14 about why you are not here"?
15 A.  No.
16 Q.  Did you give him instructions -- specific
17 instructions about what documentation he needed to
18 provide you?
19 A.  Only the instructions that I have stated
20 already.
21 Q.  What were those?
22 A.  That we needed documentation from his doctor
23 as to what his capabilities were, whether those be, "I
24 can't work full duty; I can't work light duty," or if

22

1  he is capable of working light duty because we could
2  use the help.  Those would have been the instructions
3  repeated to him.
4  Q.  Did Mr. Frazer tell you that he had decided
5  that Greenwood had to be considered to have
6  voluntarily resigned?
7  A.  Did Mr. Frazer?  I'm sorry.
8  Q.  Did he say to you that -- on or about August
9  9th, did Mr. Frazer tell you that Greenwood was going
10 to be dismissed from the company?
11 A.  Yes, we spoke about that, correct.
12 Q.  Did you get a copy of this Exhibit 2?
13 A.  I don't have a copy of it.  I certainly have
14 read the letter.  I signed it.  I don't have a copy of
15 it in any files, but I certainly did read it and sign
16 it.
17 Q.  How long after you met with, or after
18 Greenwood came in, did you sign this letter?
19 A.  Mr. Greenwood was in the building on Monday
20 morning some time; that happened some time Monday
21 afternoon.
22 Q.  At any time during the period that Greenwood
23 was out, did you have any doubt that the reasons that
24 he was out were related to the same reasons that

23

1  caused his hospitalization?
2  A.  Can you repeat that?
3  Q.  Do you think at the time you got notice that
4  he was hospitalized, did you understand that he had a
5  medical condition that forced him to be hospitalized?
6  A.  Yes.  But, that initial conversation with
7  Dan on that Wednesday and Friday when he signed
8  himself out of the hospital, I was aware that he was
9  in the hospital for a medical condition, yes.
10 Q.  But, up until the time he was fired, you
11 didn't know what that condition was?
12 A.  I didn't -- when we mentioned I still don't
13 -- diverticulitis, if I am pronouncing it correctly,
14 at that point in time I did not know that, no.
15 Q.  And did you ask Greenwood what it was?
16 A.  I don't recall.
17 Q.  Well, you had known him for seven years or
18 so, right?
19 A.  No.
20 Q.  No?
21 A.  No.  Dan was there a year longer than I was.
22 Q.  Since you have been at Yale Electric, right?
23 A.  Certainly.
24 Q.  Did you play on the softball team with him?

24

1  A.  No.  I don't believe Dan ended up playing.
2  Q.  You socialized with him and did other
3  things, right?
4  A.  The drivers would occasionally get together
5  on a Friday after work.
6  Q.  He is hospitalized, and you didn't ask him
7  why?
8  A.  I talked to him on Wednesday.  I don't
9  recall what I asked him on Wednesday when I talked to
10 him at the hospital.  At that point in time he also
11 told me he would be checking himself out on Friday.
12 And when I spoke to him on Friday, he was checked out
13 of the hospital.  I would assume, at that point in
14 time, like anyone, if you're out of the hospital, you
15 are probably okay.
16 Q.  Weren't you curious what it was that led him
17 to be in the hospital?
18 A.  I can't recall at that time whether my
19 curiosity --
20 Q.  Well, has a friend of yours ever been
21 admitted to the hospital for a couple of days?
22 A.  Quite honestly, I can't recall anybody.
23 Q.  Do you have any doubt, as you sit here
24 today, that the reason that Greenwood didn't report to

25

1  work during that week, or ten days I guess it was,
2  related to the condition that caused him to be
3  hospitalized?
4         MS. KUGELL: Objection. You can
5  answer.
6         THE WITNESS: I can only go by what Dan
7  was telling me at the time. Dan was telling me at the
8  time he wasn't able to work. And all that I was
9  asking Dan was for documentation stating such, as
10  we do with any -- as is expected of any employee.
11  BY MR. RICE:
12     Q.   But, you talk with Greenwood every day that
13  you worked together, right?
14     A.   No, I wouldn't say every day.
15     Q.   You talk to him a lot, though?
16     A.   Are we talking about since I was inside, or
17  both because --
18     Q.   Since you were inside. You were supervising
19  the drivers.
20     A.   Yeah, we talked frequently.
21     Q.   You had casual conversation sometimes,
22  didn't you, just about like sports teams and that kind
23  of thing?
24     A.   I would say we had casual conversations.

26

1      Q.   It wasn't a formal relationship between you
2  two guys?
3      A.   It was a work relationship.
4      Q.   So, when you called him up, that never came
5  up, the subject of what it was that caused this
6  hospitalization?
7      A.   When I spoke with Dan on Wednesday, he was
8  not at that point in time clear as why he was being
9  hospitalized. He had something going on with his
10  belly, and they wanted him to stay in the hospital.
11  That was his knowledge at the time, so therefore, it
12  was my knowledge.
13     Q.   Okay. So, he ends up at the busiest time of
14  the year for you guys missing like a week of work?
15     A.   Correct.
16     Q.   So, didn't it -- it didn't peek your
17  curiosity as to what this condition was?
18     A.   I don't recall at the time whether you,
19  know, asking him specifically what exactly is wrong
20  with your stomach. I don't recall asking that.
21     Q.   Well, but you did know -- it wasn't a
22  surprise to you during the week that after you had the
23  first conversation with him that he wasn't reporting,
24  correct? Because he told you he couldn't report to

27

1  work?
2         MS. KUGELL: Objection. Can you be
3  clear about when you are talking about?
4  BY MR. RICE:
5      Q.   You had a conversation with him on Monday
6  after he got out --
7      A.   I had a conversation with Dan on Friday
8  stating that he had a doctor's appointment on that
9  following Monday, and to call me afterwards. So, I
10  knew on Monday he would not be at work.
11     Q.   And you did talk to him?
12     A.   I talked to him on Monday. I called Dan on
13  Monday after he did not call me by the afternoon.
14     Q.   And he said he wasn't up for working, or
15  light duty?
16     A.   At that point in time he said his doctor's
17  appointment had been cancelled, and that he was
18  rescheduled for the next day.
19     Q.   And then you did have a subsequent
20  conversation with him in which he said he wasn't able
21  to work, or to do light duty?
22         MS. KUGELL: Objection; you can answer.
23         THE WITNESS: Dan told me he was not up
24  for work, and that I just asked that we need medical

28

1  documentation.
2      Q.   Did you at that time -- when you had that
3  conversation with him, did you say, "Well, do you have
4  an estimated return time?"
5      A.   Not on that particular Monday because I was
6  waiting again for his rescheduled appointment, which
7  he had told me on the Tuesday.
8      Q.   But, obviously -- let me strike that
9  "obviously" from my question. Being able to know what
10  your manpower was going to be for that week was
11  important, right?
12     A.   It is always important.
13     Q.   So, you didn't ask Greenwood when he thought
14  he would be back?
15     A.   Not on the Monday because, again, he hadn't
16  seen his doctor, yet.
17     Q.   Subsequent to that, did you ask him when he
18  was going to be back?
19     A.   On Tuesday, after Dan came into the shop, he
20  said that his doctor told him he would have to take
21  the week off. And I had asked at that point again for
22  documentation stating such.
23     Q.   When he said that he had to take the week
24  off, did you believe that he had to take the week off

November 22, 2006

Case 1:05-cv-10605-JLT    Document 26-2    Filed 02/26/2007    Page 8 of 10

Deposition of James Rapoza
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

29

1  because of the condition that caused his
2  hospitalization?
3      A.    I believe that is what his doctor told him
4  on Tuesday.
5      Q.    Okay.  But, in your own mind were you
6  thinking, well, the reason he is saying he has got to
7  take the week off must be because of whatever it was
8  that kept him in the hospital for two days?
9      A.    I would assume he is seeing his doctor
10 because of his hospitalization.
11     Q.    That is normally how it goes.  You go to the
12 hospital and you go see the doctor?
13     A.    Right.  So, I think we are stating the
14 obvious.
15     Q.    Then you wanted to see some documentation
16 about that?
17     A.    Correct.
18     Q.    From his doctor?
19     A.    From his doctor.
20     Q.    Is that what you said?
21     A.    Yes.  And, again, stating again because on
22 Tuesday when he showed up, we did not have the release
23 form from the hospital stating he needed to be out of
24 work, and we did not have anything from that Tuesday

30

1  appointment stating he needed to be out of work.  So,
2  I asked him again, you know, we just have some medical
3  documentation, if you are going to be out the week,
4  and again, talked to him about light duty if he was
5  capable, that we could use it.
6      Q.    Did you cite the personnel policy like
7  chapter and verse in your conversations with him?
8      A.    I don't recall doing so, no.
9      Q.    And all your communications with him were
10 over the phone, or they were oral, right?  There is no
11 letter out there that I haven't seen that says
12 something like, you know, Greenwood per the personnel
13 policy you have to provide X, Y and Z?
14     A.    No, no.
15     Q.    Well, during the week that he was out before
16 he got fired on that Monday, was there some
17 conversation between you and anybody else at Yale in
18 which it was suggested that Greenwood might get fired
19 for being out of work?
20     A.    No, not during that week, no.
21     Q.    So, the only time that came up, as far as
22 you know anyway, was on Monday?
23     MS. KUGELL: Objection.
24 BY MR. RICE:

31

1      Q.    Monday, the 9th?
2      A.    Sitting here today, we spoke about it
3  certainly on Monday.  Prior to that, I can't recall if
4  that was talked about.
5      MR. RICE:  All right, thanks.
6      MS. KUGELL:  I definitely will need one
7  question, but I want to look at something.  Dan, you
8  have a copy of this document, right?
9      MR. RICE:  Can I see it, and I can tell
10 you?
11     MS. KUGELL:  I know you have a copy of
12 it.
13     MR. RICE:  You know what, I don't know.
14     MS. KUGELL:  I know it is in the
15 production.  I wanted to mark it, and I don't have
16 extra copies of it.
17     MR. RICE:  Here you go.
18
19     **(Deposition Exhibit No. 1, the**
20     **above-referred to Memo dated August**
       **10, 2004 from Lewis Frazer to**
       **Employee File, Daniel Greenwood,**
21     **was marked for identification.)**
22
23
24     **CROSS EXAMINATION**

32

1      Q.    Mr. Rapoza, I am going to show you a
2  document that has been marked Exhibit 1 to your
3  deposition.  Have you ever seen that document before?
4      A.    Yes.
5      Q.    Did you, in any way, participate in putting
6  this document together?
7      A.    Yes.
8      Q.    And, how did you do that?
9      A.    Myself and Lewis Frazer sat in his office
10 and went over the sequence of events, you know, of
11 that period and put as much detail down on paper as we
12 could.
13     Q.    And when did you sit down and do that and
14 put this document together?
15     A.    That, I don't recall.  It was some time
16 after Dan's, you know, after Dan voluntarily resigned.
17     Q.    This memo is dated August 10th.  Is that
18 when you did it?
19     A.    Yes, that would be accurate.
20     Q.    So, the date on the memo is about --
21     A.    Yes.
22     Q.    Is it fair to say that you might have
23 started doing it on the 9th, but it was completed on
24 the 10th?

**33**

1    A.    Yeah, that's fair to say.

2    Q.    I am going to ask you to look at the

3    beginning of the first full paragraph of the second

4    page of this document.

5    A.    Okay.

6    Q.    See the sentence that is the

7    second-to-the-last sentence in the -- why don't I

8    actually just ask you to read that first full

9    paragraph to yourself.

10    A.    Okay.  (Witness reading document)

11    Q.    So upon reading this, now that you have read

12    this, is this an accurate depiction of what occurred

13    at the time?

14    A.    Yes.

15    Q.    So, during your conversation on Tuesday

16    afternoon, did you understand that Mr. Greenwood was

17    going to check with his doctor to see if he could

18    perform light duty?

19    A.    Yes.

20    Q.    And did you ever hear back from him about

21    whether he could do that?

22    A.    No, I did not.

23    Q.    So, you did not hear from him on Wednesday?

24    A.    Correct.

**34**

1    Q.    As the document indicates that he said he

2    would provide that information on Wednesday?

3    A.    Correct, that is correct.

4    Q.    So, at the time did he say he wasn't up for

5    it, or did he say he would check with his doctor?

6    A.    On that Tuesday he said that he would check

7    with his doctor, yes.

8    Q.    And you didn't talk to him again until

9    Friday; is that correct?

10    A.    Correct.

11    Q.    So, is it a fair statement -- let me strike

12    that and ask you a different question.  There was some

13    discussion that you had with Attorney Rice about Mr.

14    Greenwood quote "coming off the truck."  Do you

15    remember that conversation with Attorney Rice?

16    A.    Yes.

17    Q.    The conversations that you were referring to

18    relative to Mr. Greenwood saying he wanted off the

19    truck, when did those conversations, or -- strike

20    that.  Did those conversations happen during that week

21    of August 2004?

22    A.    No, no.

23    Q.    You didn't have any conversations about,

24    specifically, about him coming quote "off the truck,"

**35**

1    during August 2004?

2    A.    Correct.

3    Q.    With respect to those conversations that you

4    were referring to with him coming off the truck, the

5    conversations you were referring to, those had to do

6    with him being reassigned out of the delivery area,

7    correct?

8    A.    Correct, correct.

9    Q.    They were not referring to light duty?

10    A.    No.

11    Q.    Sitting here today, do you have a memory of

12    being present when Mr. Greenwood presented Exhibit 1

13    to Mr. Frazer's deposition to Yale?

14    A.    Yes.

15    Q.    So, you were present when he presented that?

16    A.    Correct.

17    Q.    And you were present during the

18    conversations that Mr. Frazer had with Mr. Greenwood

19    about that note?

20    A.    Correct.

21    Q.    And Exhibit 1 to your deposition, is that an

22    accurate depiction of your memory of what occurred

23    concerning Mr. Greenwood leading up to his separation

24    from Yale's employment?

**36**

1    A.    Yes.

2    Q.    Okay.

3        MS. KUGELL:  Why don't we take a

4    30-second break so Lewis and I can confer, but I think

5    we're pretty much done.

6        (Brief recess; 12:48 to 12:53 p.m.)

7        MS. KUGELL:  I have no further

8    questions for this witness at this time.

9        MR. RICE:  We are done.

10

11        (The deposition was concluded at 12:53 p.m.)

12

November 22, 2006

Case 1:05-cv-10605-JLT    Document 26-2    Filed 02/26/2007    Page 10 of 10

Deposition of James Rapoza
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

37

1   UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS

2     I, LINDA M. THOMAS, Registered Merit Reporter and

3   Notary Public duly qualified in and for the

4   COMMONWEALTH OF MASSACHUSETTS do hereby certify there

5   came before me the deponent herein, namely **JAMES**

6   **RAPOZA**, who was by me duly sworn to testify to the

7   truth and nothing but the truth concerning the matters

8   in this cause.

9     I further certify that the foregoing transcript

10   is a true and correct transcript of my original

11   stenographic notes.

12     I further certify that I am neither attorney or

13   counsel for, nor related to, or employed by any of the

14   parties to the action in which this deposition is

15   taken; and furthermore, that I am not a relative, or

16   employee of any attorney, or counsel employed by the

17   parties hereto, or financially interested in the

18   action.

19     IN WITNESS WHEREOF, I have hereunto set my hand

20   and affixed my Notarial Seal this 6th day of December,

21   2006.

22     _____

23     LINDA M. THOMAS, RPR, RMR
    CSR No. 129293
    NOTARY PUBLIC

24     My Commission expires July 30, 2010.

---

38

1

2   **PLEASE NOTE:**

3     **THE FOREGOING CERTIFICATION OF THIS**

4   **TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE**
  **SAME BY ANY MEANS UNLESS UNDER THE DIRECTION OF THE**

5   **CERTIFYING REPORTER**.
    C-E-R-T-I-F-I-C-A-T-E

6

7     I, JAMES RAPOZA, do certify that I
  have read the foregoing deposition and that, to the

8   best of my knowledge, said deposition is true and
  accurate.

9

10   _____
    JAMES RAPOZA

11

12

13

14   Subscribed and sworn before me this ___ day of

15   _____, 2006.

16

17

18   DATE _____    _____
    NOTARY PUBLIC

19

20

21   WITNESS SIGNATURE _____

22

23   My Commission expires: _____

24

---

39

1     ERRATA SHEET

2

3     In accordance with the rules of procedure

4   governing depositions, you are entitled to read and

5   correct your deposition.

6     Accordingly, please carefully read your

7   deposition and, on this errata sheet, make any changes

8   or corrections in form or substance to your deposition

9   that you feel should be made. PLEASE DO NOT MARK THE

10   TRANSCRIPT.

11     After completing this procedure, sign at the

12   conclusion of such changes/corrections (if any) and

13   return it in accordance with your instructions.

14

15   PAGE LINE     CHANGE

16

17

18

19

20

21

22   SIGNATURE: _____ DATE: _____

23

24

1

VOLUME I

PAGES 1 - 41

EXHIBITS 1 - 7

UNITED STATES DISTRICT COURT

District of Massachusetts

-----------------------------

DANIEL GREENWOOD,

             Plaintiff       Civil Action

v.                     No. 05-10605


YALE APPLIANCE AND LIGHTING, INC.,

             Defendant

-----------------------------


DEPOSITION of ABOUALKNEIR ALZAIM, M.D.

Thursday, October 26, 2006

Medical Office of Aboualkneir Alzaim, M.D.

540 Main Street

Weymouth, Massachusetts

11:18 a.m. to 12:05 p.m.


----------- CAROL A. CARUSO, CSR -----------

Aboualkneir Alzaim, M.D.

13

1    in the hospital, presumably you would have had input

2    in his discharge instructions such as those

3    contained in Exhibit 3, is that right?

4        A.  Oh, yeah, about medication, about dieting,

5    everything, from A to Z.

6        Q.  So although you did not write up Exhibit 3,

7    it's based on your input as Mr. Greenwood's treating

8    physician?

9        A.  This basically copy off the orders in the

10   chart.

11       Q.  Which you write?

12       A.  Which we write, and they take the plans, so

13   that's how it's interpreted taken to this, that's

14   how it works.

15       Q.  All right.  Do you recall how Mr. Greenwood

16   was feeling on the day of his discharge, without

17   looking at your notes?

18           MR. RICE:  Objection.  You can answer

19   that.  I can object to the form of her questions.

20       Q.  But you can still answer it, it's just for

21   the record, without referring to any document, I am

22   not referring to the documents anymore.

23       A.  Let me tell you one thing, just to clear one

24   thing.

Aboualkneir Alzaim, M.D.

14

1    Q.   Okay.

2    A.   I can't know any patient except through my

3  documentation, I know nothing.  You see, I see a lot

4  of patients every day, I admit the chart, especially

5  after two years, and I saw him only twice after

6  that, I can't recall him, so I can only look at my

7  documentation and comment on it.

8    Q.   That's fine.

9    A.   So I saw him, yes, he was seen by

10  consultant, yes, and cleared, yes, according to my

11  note.

12    Q.   That's fine.  I understand what you are

13  saying, I would just request that if you'd tolerate

14  my questions, if you don't have any independent

15  recollection to answer my question, your answer can

16  just be no, that's fine, and I am happy to walk you

17  through documents.  Okay?

18    A.   Okay.

19    Q.   So you don't have any independent

20  recollection of --

21    A.   No.

22    Q.   -- how Mr. Greenwood was feeling on the day

23  of his discharge?  If you could say yes or no.

24    A.   I know that --

Aboualkneir Alzaim, M.D.

15

1    Q.  Doctor, I just want to keep the record
2    clear, I don't mean to interrupt you, but I was just
3    asking you, and I am going to restate it so you can
4    put a yes or no answer on the record.  You don't
5    have any independent recollection --
6        A.  No.
7        Q.  Again it helps for the purposes of the
8    stenographer if you let me finish the question
9    before answering, we will get out of here a lot
10   faster.  I am going to do it one more time.
11            You don't have any independent
12   recollection of how Mr. Greenwood was feeling on the
13   day of his discharge, correct?
14       A.  No.
15            MS. BOLAND:  Okay, thank you.  Could you
16   mark this as the next exhibit, please.
17            (Document was marked Exhibit No. 4 for
18   identification.)
19       Q.  We are giving you what has been marked
20   Exhibit 4, have you seen this document before,
21   Doctor?
22       A.  Yes, it's my handwriting.
23       Q.  This is your handwriting, okay.  Take a
24   moment to review this document, Exhibit 4, please.

Aboualkneir Alzaim, M.D.

16

1    A.   (Witness reviews exhibit.)

2    Q.   Does that help to refresh your recollection

3    about how Mr. Greenwood was feeling on July 30th?

4    A.   Yeah, but in addition to one thing, if you

5    can, the comments I made in my Discharge Summary.

6    You have that, right?   You should.

7    Q.   Okay.   Let's just stick to this document

8    first, if we can, and then we will go to the next

9    document.

10    A.   The reason I am saying it's contained, the

11    whole part of it, because sequence, the point I am

12    trying to say, sequence of events is not just one

13    day, remember, I take care of him from start to the

14    end, and it's reflection of what I am seeing, what

15    the consultants and nursing removing every day, so I

16    can't just say this is yes, but this came after,

17    let's say, like, I remember, because I read my

18    Discharge Summary, of course, that we asked him to

19    stay longer because he still having pain and he

20    still have diarrhea, but he said he has to go.   Now

21    according to this, I reflected it here.

22    Q.   This being Exhibit 4.

23    A.   This one, he said, Yeah, he wants to go home

24    today.   I quoted him, "'I feel fine."   Cleared by

Aboualkneir Alzaim, M.D.

17

1    surgery for discharge."

2        Q.  If I could just ask you a question.  So

3    where you see the reference in the second line where

4    it says "feeling much better"?

5        A.  Yeah.

6        Q.  And then two lines down, "I feel fine,"

7    those are your entries based on your discussion with

8    Mr. Greenwood, correct?

9        A.  Yes.

10       Q.  Okay.  We can move on from this document.

11   Going back to his actual discharge on the 30th of

12   July, do you recall if Mr. Greenwood was discharged

13   with any restrictions on his activity?  You can

14   refer to Exhibit 3, if that's helpful.

15       A.  First of all, he would be coming to see me

16   in my office, that was the first thing, because he

17   still having diarrhea and reflected in the notes,

18   even with the consultant notes that were sent to

19   him.  So we are advising him if he wants to go home,

20   see, he wants to go home, so we decide, okay, we

21   send you some, but he have, according to my note

22   here, must have restricted diet and another 24 hours

23   on clear liquid, we give him specific instructions,

24   and he is to continue antibiotics.

Aboualkneir Alzaim, M.D.

18

1    Q.  Okay.

2    A.  So the point is to continue treatment, but

3  he has to go.  You see if you look at the notes from

4  day one, day of admission, they reflected that on

5  the 28th he wants to go home.

6    Q.  Okay.

7    A.  And that's cleared by nursing.

8    Q.  So the restrictions you recall related to

9  you following up with you in your office, diet and

10 antibiotics, is that correct?

11   A.  Yes, but he still have diarrhea, and we are

12 trying just to control it.

13   Q.  Okay.  Did you advise Mr. Greenwood in any

14 way regarding his return to work, any -- go ahead.

15   A.  He was off work because he was sick because

16 of diverticulitis, and he was told to come back to

17 the office and I will evaluate him.

18   Q.  You told him to come back to your office?

19   A.  Yes, and that's reflected in your things

20 there.

21   Q.  It's reflected in Exhibit 3.

22   A.  In this one here.

23   Q.  Exhibit 3.

24   A.  To follow up, it's reflected there.  He was

Aboualkneir Alzaim, M.D.

19

1  given instruction by me, case manager, and by the

2  nursing to follow.

3      Q.  Do you recall when you told him to follow up

4  with you?

5      A.  Recalling, no, but the only thing always I

6  write here, if you see it --

7      Q.  Referring to Exhibit 4.

8      A.  -- call my phone number for follow-up, so

9  that's now up to the patient to follow.

10     Q.  Okay.  But does it refer -- is there any

11 reference in Exhibit 4 or elsewhere to the time

12 period that should pass before he comes to see you

13 after his discharge?

14     A.  Here is nothing mentioned, there is no time

15 on it.

16     Q.  No time on Exhibit 4 or otherwise that you

17 recall?

18     A.  I can only read through this.  So supposedly

19 if you look at it here, he is taking antibiotics for

20 seven days, the bottom of the list.

21     Q.  The bottom of Exhibit 4, yes.

22     A.  So this means he should be seen, I mean

23 that's with common sense, but left open to him, I

24 can't force him with the time, he should be seen

Aboualkneir Alzaim, M.D.

1    probably within that time.                                    20

2        Q.   There is no reference, though, on Exhibit 4

3    on his discharge form as to a specific time period

4    by which he should come see you, is that correct?

5        A.   It's not listed there.

6        Q.   Okay.   Back to Mr. Greenwood's work

7    schedule, though, did you, do you recall or is there

8    any reference in the paperwork that you reviewed to

9    suggest that you gave Mr. Greenwood any direction

10   with regard to whether he could return to work?

11       A.   You mean on discharge?

12       Q.   After his discharge?

13       A.   That's what the only thing given to him,

14   basically it's you go home, continue with the diet,

15   continue with your liquid, everything reflected

16   there for another 24 hours, and to advance your

17   diet, take the antibiotics, and see me in the

18   office, those are the instructions.

19       Q.   Okay.

20       A.   Now, if you look at the, to add, if you look

21   at the consultant's, Dr. Senatore's notes, you have

22   it with you, he is still raising question this

23   patient needs to be monitored and continue, but the

24   patient wants to go.   Now, why?   We did not go that

Aboualkneir Alzaim, M.D.

21

1    far, it's not like you have to discuss all these

2    issues, we taking the medical aspect of it.  So the

3    reason we said here, continue with your liquid

4    another 24 hours and take the antibiotic and be

5    followed and call if there is anything unusual.

6        Q.  Okay.  If you were giving a patient who is

7    being discharged direction not to return to work

8    yet, would that typically be reflected in the

9    discharge instruction form?

10       A.  This one here, I can't tell you yes or no if

11   it's not written.  The only thing in here is to come

12   and see me.  He is still ill, basically, he needs to

13   continue treatment and to see me as soon as he can.

14       Q.  You are referring to Exhibit 4 again, just

15   for purposes of the record.  I will just refer

16   to -- sorry, that was Exhibit 3, sorry, my mistake.

17            Referring back to Exhibit 3, which is

18   the discharge form, Doctor, in the section

19   entitled --

20       A.  Remember this, I told you I didn't see, so I

21   am not going to comment on it.

22       Q.  I believe you did testify that Exhibit 3 is

23   written up based on your treatment and discharge

24   recommendations, correct?

Aboualkneir Alzaim, M.D.

22

1    A.  Yes.  According to this, this said call for

2  appointment with Dr. Alzaim, and they give him the

3  phone number, patient signed, nurse signed, and this

4  was July 30, '04.  It does not say when to see me

5  exact date, they gave him the phone number.  They

6  followed exactly the direction.  Now, of course,

7  it's an individual basis, it's up to the patient's

8  timing, schedule, or whatever, to call for

9  appointment, so it's individual effort on the side

10 of a patient.

11   Q.  Do you see where Exhibit 3 it says

12 activities and restrictions, the section that's

13 titled Activities/Restrictions?

14   A.  Yeah.

15   Q.  And it says, "0 restriction on activity"?

16   A.  Yeah.

17   Q.  If this patient was being told not to return

18 to work, wouldn't it be reflected there in that

19 section?

20   A.  Remember, this I'm not familiar with, I am

21 talking about this medical restriction is not

22 reflected in my notes, so I can't make a comment on

23 it.

24   Q.  Meaning you didn't give him any restrictions

Aboualkneir Alzaim, M.D.

23

1    on activity?

2            MR. RICE:  Objection.

3        Q.  Is that fair to say?

4        A.  What I am saying here, if it's not in my

5    note, this means I don't know.

6        Q.  Okay.  Well, based on all of the notes that

7    you've reviewed in preparation for today, is there

8    anything in it that would suggest that you ever told

9    Mr. Greenwood he should not return to work after he

10   was discharged from the hospital?

11       A.  If it's not reflected, I can't tell you.

12       Q.  That's what I am asking you, though, based

13   on after everything that you've seen and you've

14   reviewed, you've told me today you reviewed all the

15   records that you have of Mr. Greenwood, correct, so

16   after reviewing all of those, did you review

17   anything in any of those documents that would

18   reflect that you ever told Mr. Greenwood --

19       A.  The word --

20       Q.  -- to return back to work?  Just let me

21   finish.

22       A.  The word restriction doesn't really come in,

23   it's a matter you are sick.  Let's say you have a

24   heart attack or you have, let's say, pneumonia, for

Aboualkneir Alzaïm, M.D.

24

1  example, you take the medication, you go home, you

2  continue the course.  There is nothing to say I am

3  restricting you not to walk outside or not to do

4  this, it doesn't come at all.  You follow the

5  instructions, you take this, you are going home, and

6  you call for appointment for follow-up.

7      Q.  And the only instructions you gave him

8  related to his diet, following up with you in your

9  office and taking his antibiotics?

10         MR. RICE:  Objection.

11     A.  True, true.

12     Q.  Okay.  Do you -- strike that.

13         Mr. Greenwood was discharged on July

14  30th, as we've discussed.  Do you recall when you

15  next saw him in follow-up in your office?  I will

16  give you a document to look at.

17         (Document was marked Exhibit No. 5 for

18  identification.)

19     Q.  I am giving you what has been marked Exhibit

20  5, just take a minute to look at that and tell me if

21  you have seen it before?

22     A.  Yes.

23     Q.  And is that your office note from your first

24  follow-up appointment with Mr. Greenwood?

Aboualkneir Alzaim, M.D.

25

1    A.  Yes.

2    Q.  And that's dated August 3, 2004?

3    A.  Mm-hmm.

4    Q.  Okay.  Now, do you see in the chief

5  Complaints Category where it refers to "back to fat

6  rich diet"?

7    A.  What I said is, "Came today.  Discharged

8  recently from South Shore Hospital with hx

9  diverticulitis.  On antibiotics with no problems.

10  Noted loose BM at times.  Back" -- he changed now,

11  he didn't follow the advice, of course, the

12  instruction.

13    Q.  Just slow down for the stenographer.  If you

14  can just slow down a little bit for the

15  stenographer.  Let me just ask you a question.

16    A.  I said, "Noted loose bowel movement at

17  times.  Back to fat rich diet."  The explanation

18  here I am saying he did not follow the instruction.

19  In fact it's explained after that, "Advised low fat

20  one in addition to stool softener/binder."

21    Q.  So when you, when you say here, "Back to fat

22  rich diet," that was based on what Mr. Greenwood

23  reported to you he was eating, correct?

24    A.  Yes, yes.  I remember on discharge we said

Aboualkneir Alzaim, M.D.

26

1   low fat diet, in fact the first 24 hours clear

2   liquid, then he will go to full liquid, then after

3   full liquid he has to go to low fat diet and stay on

4   low fat diet until I see him and evaluate him.  Now,

5   what happened here, he changed the whole thing, he

6   went to full fat, everything.

7       Q.   Okay.  Do you see below there there is a

8   list of things that you can circle yes or no, and in

9   the third column there is a indication for whether

10  the patient has diarrhea, do you see that?

11      A.   Yeah.

12      Q.   And you indicated no.  Can you just answer

13  audibly for the stenographer?  Let me just restate

14  the question, Dr. Alzaim.

15          You see the reference to diarrhea, and

16  you circled "No," correct?

17      A.   Yes.

18      Q.   Okay.

19      A.   But let me add, if I can.

20      Q.   Sure.

21      A.   That is at the time of the interview.

22      Q.   On August 3rd?

23      A.   At the time of you are like now sitting with

24  me, when I talk to you, you say, yeah, I don't have

Aboualkneir Alzaim, M.D.

27

1   diarrhea this morning, that's reflection of this.

2       Q.  Okay.

3       A.  The chief complaint is what you came to me

4   with, and I am investigating.  When I ask you if you

5   have chest pain right now, you say I have no chest

6   pain.  This is what I'm reflecting here.  Do you

7   have shortness of breath?  You say I don't have

8   right now at the time of the interview.

9       Q.  Okay.

10      A.  Just to clarify that.

11      Q.  Okay, that's fine.  So is there anything in

12  your office notes that would reflect the general

13  condition of the patient versus how he is feeling

14  the moment you are asking him the question?

15      A.  Yeah, the chief complaint, what he presented

16  to me.

17      Q.  Okay.  In the Chief Complaint section on

18  Exhibit 5, you see the reference to "stool

19  softener"?

20      A.  Yes, stool softener/binder.  Are you talking

21  about this one?

22      Q.  On Exhibit 5, yes.  So if Mr. Greenwood had

23  reported that he was still experiencing diarrhea,

24  why would you prescribe a stool softener?

Aboualkneir Alzaim, M.D.

28

1    A.   I am telling him, you know, first he has to

2    go back to the instruction, No. 1.  No. 2, to take

3    stool softener to lessen the frequency.

4    Q.   Okay, thank you.

5    A.   You know, you might have diarrhea over

6    night, but when you come to me, let's say you eat

7    anything, you are fine.  You say it's not like it

8    has to be on exact time just like this.  This is

9    what's reported to me when I asked you when did you

10   have this, I had it yesterday, I have it today, or I

11   felt it, now I don't have any.  Now, it's my job to

12   interpret your symptoms and to work with you, but

13   you could be fine, like we see patients in the

14   emergency room, I had chest pain, but now, you know,

15   they brought me by ambulance, I am fine, I want to

16   go home.  Now, that's where now we try to go

17   backward and find out why.  So that's what I am

18   doing here, he reported to me, and I am trying to

19   address again the issues with him to remind him what

20   to do.

21   Q.   I am just trying to get a sense, and maybe

22   you can answer this, from Exhibit 5 whether

23   Mr. Greenwood was still as of August 3rd generally

24   experiencing diarrhea, can you tell from your office

Aboualkneir Alzaim, M.D.

29

1  note whether that was still part of his condition?

2    A.  I tell you one thing, from someone reading

3  it, you see his compliance is not 100 percent with

4  instructions.

5    Q.  So if he was still having diarrhea, your

6  assumption would be that that might be in part or

7  wholly because he wasn't following the diet you

8  instructed?

9    A.  Yeah, when you say back to fat rich diet,

10  this is answering you that question.

11    Q.  Okay.

12    A.  Because he left with specific instructions

13  to follow, but he didn't, specifically didn't, he

14  went opposite with it.

15    Q.  Now, do you see in the last column, the

16  fourth column where it says "weakness" on Exhibit 5?

17    A.  Yeah.

18    Q.  And you circled "No"?

19    A.  Mm-hmm.

20    Q.  Again, is that representative of

21  Mr. Greenwood's condition at the moment he was in

22  your office or generally how he was feeling?

23    A.  Oh, at that time exactly, everything is

24  reflecting that moment of interview.

Aboualkneir Alzaim, M.D.

30

1    Q.  Okay.  So am I correct that you can't draw

2  any opinions or memory as to whether Mr. Greenwood

3  was still experiencing weakness generally as of

4  August 3rd?

5    A.  You know, everything this is the way, you

6  know, exactly the moment I see you, and I document

7  it.  I asked him this question, I go over

8  everything.  You have this or this?  No, no, that's

9  it, at this time, it's not reflected.

10    Q.  So if you ask a patient like Mr. Greenwood

11  whether he is feeling weakness as he sits in your

12  office and he answers no, do you inquire as to

13  whether he has been experiencing weakness since he

14  has been discharged from the hospital otherwise as

15  part of his condition as a whole?

16    A.  Keep in mind one thing, he was admitted,

17  this is a continuum of his condition, it's not like

18  it's a new chapter, I am following the case from day

19  one, and I am interested to know how he is feeling

20  and investigating how his response is and how he is

21  acting on the instructions given, you know, it's not

22  like one time no.  It started there, you follow.

23    Q.  Okay.

24    A.  And I notice, "Came today.  Discharged

Aboualkneir Alzaim, M.D.

31

1    recently from South Shore Hospital." I am trying to

2    make the comment that it's a continuing thing, it's

3    not like I am seeing the patient the first time in

4    my office, I am following up on his case.

5                   MS. BOLAND:  Okay.  I will give you one

6    more document.

7                   (Document was marked Exhibit No. 6 for

8    identification.)

9        Q.  Giving you what's been marked Exhibit 6,

10   take a minute to review it, please.

11       A.  Yes.

12       Q.  Have you seen it before?

13       A.  Yes.

14       Q.  Is this your office note from the next time

15   that you saw Mr. Greenwood?

16       A.  Yes.

17       Q.  And that was on August 9?

18       A.  Yes.

19       Q.  Would you mind just referring back to

20   Exhibit 5 briefly, the office note from August 3.

21   Can you tell me if there is any indication on the

22   August 3rd note as to whether Mr. Greenwood should

23   follow up with you again after that appointment?

24       A.  You mean this?

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ )<br><br>DANIEL GREENWOOD, )<br><br> )<br><br>Plaintiff, )<br><br> )<br><br>v. )<br><br> )<br><br>YALE APPLIANCE AND LIGHTING, INC., )<br><br> )<br><br>Defendant. )<br>_____ ) | Civil Action No. 05-10605 JLT |

## AFFIDAVIT OF DANIEL GREENWOOD

I, Daniel Greenwood, being duly sworn, do hereby depose and state under oath as follows:

1.      I make this affidavit on the basis of my personal knowledge, except as to matters I believe to be true, which I make upon the basis of information and belief.

2.      I was born on May 3, 1963.  I became employed by the Defendant Yale Electric in 1999.  Yale sells large appliances from a showroom in Dorchester, MA.  For the whole time I worked for Yale, I was driver, which meant I had to load and unload appliances on to trucks and deliver them.  While I worked for Yale, Yale employed many

1

more than 50 employees, including the drivers like me, sales people, administrators, and warehouse workers.

3.      I never had any attendance issues with Yale, and was never disciplined until I was fired in August of 2004.

4.      On November 12, 2003, I hurt myself while I was trying to deliver a large oven in the Back Bay. I suffered a hernia and needed an operation for this.  I missed 10 weeks and 2 days of work as a result of this injury, the operation, and my period of rehabiliation.  I started a light duty assignment on Monday, January 26, 2004, for which I received full pay. I received worker's compensation benefits for the period of time I was out of work.  Other than missing work because of this injury, I had not missed work at Yale for any significant or even insignificant period of time.  I worked at least 40 hours a week for Yale, and often more, although Yale did not pay us overtime for this work. I therefore have personal knowledge, just by doing simple math and multiplying the weeks I worked by 40, that in the 12 months prior to July 28, 2004, even though I missed 10 weeks and 2 days of work because of my hernia, I worked well in excess of 1,250 hours for Yale in the 12 months prior to July 28, 2004, as I had no other gaps in my employment during this time period.

5. At the end of my run on or about July 27, 2004, I experienced severe abdominal pain.  I told Lewis Frazer, whom I saw at the dispatch office, that I thought I would have to check myself into the hospital. Frazer replied, "I paid to have your belly fixed last year. You better be in tomorrow."  I was uninsured at the time and worried about the cost, but my

abdomen hurt so badly, I had to check myself into the emergency room at South Shore Hospital.  I was diagnosed there with diverticulitis and admitted as an inpatient.

6. I did have conversations with Mr. Rapoza about documenting my need to miss work.  Mr. Rapoza never specified what kind of documentation he might need, and he never expressed any doubt when I told him I would have to miss work for the entire week, and was too sick to even do light duty work.  He did not give me a FMLA certification form from the Department of Labor, or any written instructions about what kind of documentation I might need. What I produced was what I thought was sufficient.

7. On Friday August 6, 2004, I called Yale to find out whether I could pick up my paycheck from my accrued vacation time. I was then told that I had better "get some documentation" for them before I came in for my paycheck.  I arrived at Yale with documentation and met with Frazer and Rapoza. I was told they had a lot of people out that week and that they needed me to return now. I was also asked by Frazer how old I was and whether I thought I could still do my job because he had noticed that I had been out hurt quite often lately. He stated that I may be getting too old to carry out my duties on the truck. He stated, "If that is the case, I have no other job duties for you." He added, "How much longer do you think you can be doing this job?" I told them during that meeting that I expected to return to work on August 10, 2004 with my doctors' permission.  I made the assertions set forth here in a written submission to the MCAD, which I submitted on December 3, 2004.

Signed under the pains and penalties of perjury this 23d day of February, 2007.

Daniel Greenwood

# DEPOSITION OF LEWIS FRAZER

November 22, 2006

Daniel Greenwood v. Yale Appliance and Lighting, Inc.
United States District Court
District of Massachusetts
C.A. No. 05-10605 JLT
Linda M. Thomas, Registered Merit Reporter

KATHLEEN A. GARDNER
Registered Professional Reporter
11 Roman Avenue
Danvers, MA  01923
(978) 777-3574

**Deposition of Lewis Frazer**
Daniel Greenwood v. Yale Appliance and Lighting Inc.
Case 1:05-cv-10605-JLT    Document 26-5    Filed 02/26/2007    Page 2 of 17
November 22, 2006

10:45:54

Volume I
Pages 1 to 58
Exhibits (See Index)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C. A. NO. 05-10605 JLT

—————————————————
DANIEL GREENWOOD,                    )
          Plaintiff,                 )
                                     )
     vs                              )
                                     )
YALE APPLIANCE AND LIGHTING, INC.,   )
          Defendant.                 )
—————————————————

DEPOSITION OF LEWIS FRAZER, taken
pursuant to Notice under the Massachusetts Rules of
Civil Procedure on behalf of the Plaintiff, before
Linda M. Thomas, RMR, a Notary Public and Registered
Merit Reporter, in and for the Commonwealth of
Massachusetts at the offices of GLYNN, LANDRY,
HARRINGTON & RICE, LLP, Ten Forbes Road, Braintree,
Massachusetts on November 22, 2006, commencing at
10:50 a.m.

KATHLEEN A. GARDNER
Registered Professional Reporter
11 Roman Avenue
Danvers, Massachusetts  01923
Tel:  (978) 777-3574 / Fax:  (978) 750-8342

---

### Page 3

I N D E X

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Lewis Frazer
(By Mr. Rice)     4          53
(By Ms. Kugell)   51

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Return-to-Work form of Aboualkheir Alzaim, M.D. dated 8/9/04 | 27 |
| 2 | Memo dated 8/9/04 to Daniel Greenwood from Lewis Frazer | 36 |

14
15
16
17
18
19
20
21
22
23
24

---

### Page 2

A P P E A R A N C E S

DANIEL W. RICE, ESQ.
GLYNN, LANDRY, HARRINGTON & RICE, LLP
10 Forbes Road
Braintree, Massachusetts  02184
     (For the Plaintiff)

JACLYN KUGELL, ATTORNEY AT LAW
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts  02109
     (For the Defendant)

Also present:

Daniel Greenwood
James Rapoza

---

### Page 4

1
2          **STIPULATIONS**
3
4          It is hereby stipulated and agreed by and
5    between counsel for the respective parties that the
6    deposition transcript shall be read and signed;
7    notarization waived.
8          It is furthermore stipulated that all
9    objections, except as to form and Motions to Strike
10   are reserved until the time of trial.
11         **LEWIS FRAZER**, first having shown
12   identification and been duly sworn on oath, deposes
13   and says as follows:
14         **DIRECT EXAMINATION**
15
16   BY MR. RICE:
17      **Q.**  Would you state your name, please?
18      **A.**  Lewis Frazer.
19      **Q.**  And where do you work?
20      **A.**  Yale Appliance and Lighting.
21      **Q.**  And what is your job there, Mr. Frazer?
22      **A.**  Director of Operations.
23      **Q.**  And how long have you held that job?
24      **A.**  For seven years.

5

1      Q.    And did you work for Yale previous to that?
2      A.    No, I did not.
3      Q.    Do you know Dan Greenwood?
4      A.    Yes.
5      Q.    And you knew him in connection with your
6   employment at Yale?
7      A.    Yes.
8      Q.    Did you supervise him?
9      A.    Not directly, but yes, indirectly.
10     Q.    Have you played some role in personnel
11  matters at Yale?
12     A.    Yes.
13     Q.    What role have you played?
14     A.    I have as Director of Operations been
15  responsible for delivery, finance, service.  So, any
16  of the personnel that fall in those departments are
17  ultimately my responsibility.
18     Q.    And Dan was classified as a driver?
19     A.    Delivery driver, yes.
20     Q.    Is there a position description for that
21  job?
22     A.    Yes, there is.
23     Q.    Is there some minimum qualification for like
24  the amount of weight you would have to lift in the

6

1   position description to do the job?
2      A.    You, obviously, have to be able to deliver
3   appliances as part of that job.  In terms of a minimum
4   weight that you would have to lift, you would have to
5   be able to handle a refrigerator, or stove, whatever
6   the heaviest object was.  They are given equipment to
7   help them do that.
8      Q.    What is the biggest piece of equipment that
9   the drivers have had to deliver since you have been
10  there?
11     A.    The biggest appliance would probably be a
12  Sub-Zero Refrigerator.
13     Q.    How much do those weigh?
14     A.    Four -- 500 pounds, I believe.  Somewhere
15  around there.
16     Q.    What kind of equipment do the drivers have
17  to help them deliver those?
18     A.    They have electric StairClimber dollies.
19  They have a numerous assortment of straps and dollies
20  that help them lift those up the stairs.
21     Q.    Was there an occasion when Mr. Greenwood was
22  injured making a delivery?
23     A.    To my knowledge, no.
24     Q.    Are you aware any time that he was out of

7

1   work and got Workers' Comp benefits?
2      A.    Yes.
3      Q.    Do you know how he was injured?
4      A.    I don't know how he was injured.  I know he
5   had a hernia.
6      Q.    What is your understanding of how he was
7   injured, if any?
8      A.    There is not a specific incident that I am
9   aware of that led to his injury, if that is what you
10  asked.  I know he had a hernia.
11     Q.    At the time Dan was fired, and we can agree
12  that for the sake of this deposition in the month of
13  August 2004, who else was working at Yale as a driver?
14     A.    We would have had six or -- five or six
15  crews on the road delivering.  At this moment in time
16  I can't say exactly the teams; that would all be a
17  matter of record.
18     Q.    How many drivers per team?
19     A.    One driver per team.
20     Q.    Okay.  So, when you say "team," I am
21  thinking there is more than one person?
22     A.    Correct.  Two, sometimes three.
23     Q.    So, is everybody who is involved in
24  delivering appliances called a driver?

8

1      A.    No.  There is a driver and there is a
2   helper, and then there is a swing guy.  So, you could
3   potentially have three people on a delivery truck.
4      Q.    And who assigns them on a daily basis?
5      A.    Well, the drivers are always assigned.  They
6   generally have a driver-partner team.  The only
7   question would be the swing guys and where they would
8   wind up based on, obviously, the day and the routing,
9   the work load, or if there were vacations, or
10  situations that necessitated changes in teams, but we
11  try to stay away from that.
12     Q.    The drivers help with unloading?
13     A.    Absolutely.
14     Q.    So, is it fair to say the only difference
15  between a driver and a helper is that the driver
16  drives the truck?
17     A.    The driver drives the truck, but he is also
18  responsible for the vehicle.
19     Q.    And the helper rides along and helps get the
20  appliance into the house?
21     A.    Yes.
22     Q.    Okay.  Is the ability to be able to lift
23  something the same for a driver as it is for a helper?
24     A.    Yes.

9

1    Q.    And, what is -- the swing guy is just an
2    extra helper who might have to go along and help on
3    given deliveries on a day like you got five Sub-Zeros
4    going to a condominium or something, a swing guy would
5    go?
6    A.    Generally, it is a new guy.  A swing guy is
7    a new position -- a new person coming into the
8    department.  So, they are there to be trained as a
9    third guy on the truck.
10    Q.    Tell me who some of the helpers were who
11    were working at Yale in August of 2004?
12    A.    Off the top of my head, I want to go back to
13    check the records for the names specifically.  But, we
14    would have had Peter Greenwood would have been a
15    driver at the time, I believe.  Phil Conroy would have
16    been a driver at the time.  In terms of exact
17    positions, I would want to go back and check the
18    records to see exactly who was doing what at those
19    times.
20    Q.    How about names of people who were involved
21    generally in the delivery of appliances, without
22    distinguishing whether they were drivers, or helpers?
23    A.    Again, there would be Peter Greenwood; there
24    would be Phil Conroy; there would be at the time Amori

10

1    Caso (phonetic).  There would be, at the time, Dan
2    Drummey.  There would be at the time who else?  Adam
3    Silva would have been part of the department, and
4    still is.  A lot of other people.  There were probably
5    14-15 people in the department at the time -- 13-14,
6    something like that.
7    Q.    What is the turnover like?
8    A.    Very low for the whole company.
9    Q.    Yale pays pretty well for this kind of work?
10    A.    Yes, absolutely.  We viewed them as customer
11    service people -- very important part of the job.
12    Q.    In August of 2004, who had the longest
13    tenure of the individuals involved in the delivery of
14    appliances?
15    A.    In terms of their employment at Yale, I
16    would have to go back and check the record.  There is
17    another gentleman, Dan Hankins, who also is still at
18    Yale and would have been in that position at the time.
19    I am not sure who would have had seniority at the time
20    without checking the records.
21    Q.    Where would Greenwood fit in with respect to
22    Conroy?
23    A.    Greenwood would have been in the same
24    position as Conroy, but he would have been -- he would

11

1    have had seniority to him, yes, in terms of longevity.
2    Q.    I should have distinguished my Greenwoods.
3    Dan Greenwood?
4    A.    Yes.
5    Q.    How about with respect to Caso?
6    A.    He would have been with Yale longer than
7    Caso, yes.
8    Q.    And Drummey?
9    A.    Yes, he would have been there longer.
10    Q.    Silva?
11    A.    I would want to check the records on that.
12    I think so, but Silva came from another department
13    into the delivery.  So, I would want to check the
14    records on that.
15    Q.    With respect to just working in the
16    delivery?
17    A.    Yes, yes, correct.
18    Q.    How about Hankins?
19    A.    Again, I want to check the records on that.
20    I am not sure on that.
21    Q.    Can you think of anybody who was working in
22    the delivery part of the company, and again, be they a
23    driver, a helper, a swing guy, who had more seniority
24    in that area than Greenwood in August of 2004?

12

1    A.    There was one other person.  Again, I would
2    want to check the records on exactly dates that there
3    were a host of people who came to Yale as we bought
4    another delivery company.  And I am not sure about the
5    timing of who came to be employed.  But, there was
6    Richie Bodenhouse was in the department.  Again, Dan
7    Hankins, who all came in around the time of Dan
8    Greenwood.
9    Q.    Okay.  Did they come over with Greenwood
10    from another entity?
11    A.    I don't remember because I wasn't involved
12    in that transaction that Yale purchased another
13    company.
14    Q.    Do you believe, or let me ask you this way:
15    Had Greenwood been at Yale for about seven years as a
16    driver in August of 2004?
17    A.    I don't remember.  I don't remember if he
18    was an employee of Yale for seven years at that point
19    in time.
20    Q.    Did you evaluate Greenwood?
21    A.    Yes.
22    Q.    Did anybody else?
23    A.    Yes.
24    Q.    Who?

---

**13**

1    A.    Steve Sheinkopf.

2    Q.    Did you interact on a daily basis with

3    Greenwood while you worked there?

4    A.    On and off, yes.

5    Q.    Okay.  Prior to August of 2004, let's make

6    it prior to July of 2004, had you had any occasion to

7    discipline Greenwood?

8    A.    He had received reviews that were not

9    positive for his behavior, if you would.

10   Q.    Do you consider that disciplinary?

11   A.    I don't consider it disciplinary.  I

12   consider it a non -- not a positive review.

13   Q.    Okay.  But, had he been disciplined?

14   A.    He had not been disciplined.

15   Q.    Now, do you keep attendance records at Yale?

16   A.    Yes.

17   Q.    Have you ever -- let's leave Dan out of this

18   for now and what happened to him.  But, had you

19   disciplined any employees yourself for attendance

20   issues?

21   A.    Yes.

22   Q.    Okay, who?

23   A.    Again, are you talking prior to Dan?

24   Q.    Yeah.

---

**14**

1    A.    Off the top of my head, I can't remember the

2    names of the employees.  There is, obviously, Mike

3    Bartlett was an issue -- was a disciplinary issue.

4    There would have been Mike Johnson.  There would have

5    been Daryl Lewis.  I'm not sure the timing of

6    these people.

7    Q.    Okay.  Bartlett, did he get fired?

8    A.    Yes.

9    Q.    Why did he get fired?

10   A.    For failure to show up for work.

11   Q.    Okay.  And, did you ever have any

12   conversations with Bartlett about his failure to show

13   up for work?

14   A.    I did not personally.  There were managers

15   who discussed it with Mike at the time.

16   Q.    Based on -- so, did you have some

17   conversations with the managers about what happened

18   with Bartlett?

19   A.    Yes.

20   Q.    Was it a medical issue?

21   A.    No.

22   Q.    Did you arrive at some conclusion as to why

23   Bartlett didn't show up for work?

24   A.    We did not arrive at any conclusion as to

---

**15**

1    why he did not show up at work.  We know he did not

2    show up at work when he was supposed to show up at

3    work.

4    Q.    Did Bartlett offer some excuse as to why he

5    should be excused from work and try to get his job

6    back?

7    A.    No, he did not.

8    Q.    How about Johnson?  Was he fired?

9    A.    Yes.

10   Q.    Was it for attendance reasons?

11   A.    Yes.

12   Q.    And were you the one who decided to fire

13   him?

14   A.    Yes.

15   Q.    Did he ever offer any explanation as to why

16   he -- was it again because he didn't show up at work?

17   A.    Yes.

18   Q.    Did he ever give you a reason for why he

19   didn't show up for work?

20   A.    He gave various reasons, but he never

21   provided any type of documented proof as to where he

22   was and why he could not work.

23   Q.    Did he claim he had a medical reason?

24   A.    No.

---

**16**

1    Q.    What did he say it was?

2    A.    Car broke down; you know, got something I

3    got to go do.

4    Q.    Okay.  And is it Daryl Lewis?

5    A.    Yes.

6    Q.    What happened with him?

7    A.    He was terminated for pretty much a lot of

8    the same, or under the same part of our handbook that

9    Dan was of no-call no-show for three days.

10   Q.    Did he ever come up with a reason for not

11   doing that, like try to get his job back?

12   A.    He called and gave excuses.  But, again, he

13   never came forward and presented any documentation as

14   to where he was and why he could not come in.

15   Q.    Now, you testified earlier that you are

16   aware that Greenwood got Workers' Compensation

17   benefits?

18   A.    Yes.

19   Q.    And, is it your understanding that an

20   employee's entitlement to get those arises if they

21   suffer an injury arising out of work?

22   A.    Yes.

23   Q.    Do you, as you sit here today, think that

24   Greenwood did not suffer an injury that arose out of

Deposition of Lewis Frazer                    November 22, 2006
Daniel Greenwood v. Yale Appliance and Lighting, Inc.
Case 1:05-cv-11607-RCL    Document 26-5    Filed 02/26/2007    Page 6 of 17

17

1  his work with Yale?
2      A.   I can't comment.  I don't know medically
3  where his hernia came from.  I am not qualified to
4  talk about that.  I know he had an injury, a hernia,
5  that was qualified as a Workmen's Comp under the way
6  the law works.  If you are asking me to say whether
7  his hernia was related to his job, I am not qualified
8  to do that.
9      Q.   Well, you have seen -- other employees since
10  you have been there have filed Workers' Comp claims,
11  haven't they?
12      A.   We have had accidents on the job that have
13  resulted in Workmen's Comp claims, yes.
14      Q.   Have you ever seen a Notice of Injury come
15  in?
16      A.   Yes, Form 301, or something like that --
17  101, or 100?
18      Q.   I don't know.  But, it is fair to say on
19  those forms the employee has to describe what
20  happened?
21      A.   Yes.
22      Q.   Do you recall seeing something like that for
23  Greenwood?
24      A.   I recall it would be -- I recall seeing

18

1  something.  It would be in the file, yes.
2      Q.   Your best memory of what it alleged?
3      A.   I can't -- I don't remember.
4      Q.   Did he allege that he hurt his back
5  delivering a refrigerator?
6          MS. KUGELL:  Objection.
7          THE WITNESS:  Are we talking about his
8  back, or are we talking about his hernia?
9  BY MR. RICE:
10      Q.   Did he allege he sustained that delivering
11  an appliance?
12      A.   I can't comment.  Again, without the
13  document in front of me, I just don't remember.
14      Q.   Do you have an insurer for that?
15      A.   Yes, we do.
16      Q.   Do you know whether or not the insurer
17  contested the claim?
18      A.   I don't believe they did, but again, without
19  going back and reviewing that part of the file, I
20  don't know.  I don't believe they did.
21      Q.   How long was Greenwood out?
22      A.   For his hernia, I believe he was out 13-14
23  weeks, something like that.  Again, we would have to
24  go back and look at the payroll records, and we could

19

1  put that together.
2      Q.   And then he returned to work?
3      A.   Yes.
4      Q.   Did he return with any restrictions?
5      A.   He returned to work with restrictions and
6  was put to work on light duty.
7      Q.   Okay.  What was his light-duty assignment?
8      A.   At the time I believe he was doing some
9  paperwork in the office.  He was doing some small
10  light construction for a training facility that we
11  used.  Building -- when you talk about Sub-Zeros,
12  building a sort of cabinet in the warehouse for us to
13  do training.  He was helping as a runner in the office
14  is what I remember.
15      Q.   How long did he stay on light duty?
16      A.   I don't remember.
17      Q.   Did you get a vocational assessment from his
18  doctor about what restrictions he might have been
19  under?
20      A.   I believe so, yes.
21      Q.   Okay.  Who asked, or how did it come about
22  that a vocational assessment was given?
23      A.   We require that from any employee returning
24  to work from an injury so that we know what they're

20

1  capable of doing as a matter of policy.
2      Q.   You get that before you formulate light
3  duty?
4      A.   Absolutely.
5      Q.   Now, going to July of 2004, at some point
6  did you become aware that Greenwood was not going to
7  report to work?
8      A.   Yes.
9      Q.   And by the way, that is a busy time of year
10  for Yale Electric?
11      A.   Very busy.
12      Q.   Just out of curiosity, why is that?
13      A.   Because it is the summer time, and
14  everybody's refrigerator seems to expire.  And the
15  refrigerator is sort of the one thing that you can't
16  live without for very long.  You can live without a
17  washer, a dishwasher, a stove, but you can't live
18  without a refrigerator -- very busy time.
19      Q.   Okay.  And as part of the business is people
20  come in -- and I volunteer at Bob's.  So, you come in
21  and people see it and they want to have the thing at
22  their house as soon as they can, right?
23      A.   You need it right away.
24      Q.   So, meeting customer demand in the summer is

**21**

1  paramount?

2      A.    Absolutely.

3      Q.    And the drivers and the swing guy and the

4  helper, they play a big role in that?

5      A.    Attendance is absolutely critical in this

6  department.

7      Q.    Okay.  Now, up until July of 2004, had you

8  ever had any attendance issues with Greenwood?

9      A.    Not to my knowledge.

10      Q.    And you named three people you did have them

11  with, Bartlett, Johnson and Lewis?

12      A.    Yes.

13      Q.    Any of the other guys that were working

14  there that they did present attendance issues?

15      A.    Not to my knowledge.

16      Q.    How did you become aware that Greenwood was

17  not going to report to work?

18      A.    Jim Rapoza came to me and kept me abreast of

19  the situation.

20      Q.    And that is Mr. Rapoza right over here?

21      A.    That's him.

22      Q.    What did he tell you?

23      A.    He told me that Dan was in the hospital and

24  would be released from the hospital and would be in

**22**

1  touch, but would not be in for work on Wednesday, or

2  Thursday because he was in the hospital.

3      Q.    Okay.  Now, did you make inquire as to what

4  the reason was that Greenwood was in the hospital?

5      A.    We asked Dan to provide, as we do with any

6  employee who has been either injured or out sick,

7  provide medical documentation as to what is going on

8  with him.

9      Q.    Okay.  My question is actually -- let me

10  just clarify the question.  Did you, yourself -- okay,

11  you got notice from Mr. Rapoza here that Greenwood was

12  in the hospital?

13      A.    Yes.

14      Q.    At that time, what did you do, if anything,

15  with respect to getting that news?

16      A.    At what point in time are we talking about?

17      Q.    Right when you get told.  It is the busy

18  time of the year and Mr. Rapoza says, "Hey, Greenwood

19  is in the hospital," or something to that effect.  You

20  heard that, right?

21      A.    I heard that.  I heard that on Tuesday

22  morning, or Wednesday morning.

23      Q.    That caused you some concern because of the

24  man-power issue?

**23**

1      A.    Absolutely.

2      Q.    And so, what did you do?

3      A.    I said, "That is too bad.  Did he give you

4  any indication as to when he would be out, or what is

5  going on with him?"  At that point in time we didn't

6  know.

7      Q.    What did Rapoza say?

8      A.    He said that he had spoken with Dan, I

9  believe, Wednesday morning.  He was in the hospital.

10  We weren't sure what was going on with him.

11      Q.    And then what did you do?

12          MS. KUGELL:  Objection.

13  BY MR. RICE:

14      Q.    Did you do something after that with respect

15  to Greenwood?

16      A.    What was I capable of doing at that point in

17  time?

18      Q.    Okay.  It sounded like Mr. Rapoza's response

19  was that things were up in the air; that Greenwood is

20  in the hospital.

21      A.    Things were very up in the air, yes.

22      Q.    Okay.  So, things were up in the air, and

23  then as a result of Mr. Rapoza saying things were up

24  in the air, and then I am in my own head thinking here

**24**

1  about the fact that you had man-power issues, did you

2  ask Mr. Rapoza to do anything and figure out when

3  Greenwood was going to be back?

4      A.    When we were notified by Mr. Greenwood on

5  Wednesday that he was out of the hospital, we asked

6  him to stay in touch with us and tell us what was

7  going on with him.  Jimmy and I were both under the

8  understanding Dan would be back in touch with us to

9  tell us what was going on.  So, while he was in the

10  hospital, did we go see him in the hospital, or

11  something like that?  No, we couldn't do that.

12      Q.    Did you have any doubts that he was in the

13  hospital?

14      A.    I had no reason to believe he was not.

15      Q.    Did you -- well, at some point you have

16  become aware of what the reasons were for his

17  hospitalization?

18      A.    Yes.

19      Q.    And it was as a result of diverticulitis?

20      A.    Yes.

21      Q.    When did you first become aware that that

22  was the reason that Greenwood was hospitalized?

23      A.    Specifically, what moment in time, I don't

24  remember.

25

1   Q.   Was it before, or after his employment was
2   terminated?
3   A.   It was before.
4   Q.   And, how did you become aware of that fact?
5   A.   In the absolute I became aware of that fact
6   when he handed me his discharge note, I believe, from
7   the hospital.
8   Q.   Okay.  Had you ever heard of diverticulitis
9   at the time you got the discharge note?
10   A.   Yes.
11   Q.   How have you heard of it before?
12   A.   General conversation.
13   Q.   With -- just I mean did you know what it
14   was?
15   A.   No.  I'm not a doctor.  I don't know
16   exactly, specifically, medically what diverticulitis
17   was.
18   Q.   At the time, though, you -- I guess I just
19   want to clear this up a little.  It says that on the
20   discharge paper that he had diverticulitis, you think?
21   MS. KUGELL:  Objection.
22   THE WITNESS:  I would like to look at
23   the document to say that.  I'm not sure.
24   BY MR. RICE:

26

1   Q.   I don't have it here.  I don't know if Ms.
2   Kugell has it, but I will stay away from that for the
3   time being.  But, you believe it was around that time
4   that you were notified that he had been hospitalized
5   for diverticulitis?
6   A.   I had been notified that he was hospitalized
7   on the Wednesday morning.  As to what his condition
8   was, I don't remember exactly what point in time I
9   learned of that fact.
10   Q.   Okay.  As you sit here today, do you know
11   what diverticulitis is?
12   A.   I am aware that it is a problem with the
13   bowel.  Beyond that, no.
14   Q.   When you got the discharge notice, or
15   whatever else it was before Greenwood got fired, did
16   you know what diverticulitis was?
17   A.   No.
18   Q.   Did you -- at some point Greenwood gave you
19   a note from his physician?
20   A.   Yes.
21   Q.   Okay.  And, did you ask him to bring a note?
22   A.   Absolutely.
23   Q.   And he brought you one?
24   A.   I asked him -- at what point in time are we

27

1   talking about?  He first brought me a discharge.
2   MS. KUGELL:  Dan, before we start down
3   this road of questioning, can we take a short break?
4   MR. RICE:  If you want one, sure.
5
6   **(Deposition Exhibit No. 1, the**
   **above-referred to Return-to-Work**
7   **form of Aboualkheir Alzaim, M.D.**
   **dated 8/9/04 was marked for**
8   **identification.)**
9
10   BY MR. RICE:
11   Q.   We are talking about diverticulitis.  At the
12   time you found out that that was the reason Greenwood
13   -- Mr. Greenwood missed work, you didn't know what it
14   was?
15   A.   No.
16   Q.   Okay.  Now, we have got this Exhibit here,
17   Exhibit 1, which you have committed to memory, but I
18   will give you one anyway.
19   MS. KUGELL:  Thank you.
20   BY MR. RICE:
21   Q.   We have marked this as Exhibit 1.  Do you
22   recognize this document?
23   A.   Yes.
24   Q.   And it is a doctor's note, right?

28

1   A.   Yes.
2   Q.   From an individual, we will just call him
3   "AA" because that name was a little hard to pronounce.
4   A.   Fair enough.
5   Q.   Okay.  Did Mr. Greenwood give you this
6   document?
7   A.   Yes.
8   Q.   And, it does represent on this that
9   Greenwood has been under care -- excuse me -- "has
10   been under my care, and will be able to return to work
11   on the following date:  Tuesday, August 9, 2004,"
12   right?  It says that?
13   A.   That is what it says.
14   Q.   Did you ask Mr. Greenwood to get you a note?
15   A.   No.
16   Q.   Are you aware of anybody else asking him to
17   get you a note?
18   A.   What we asked Mr. Greenwood for was
19   documentation as to his condition and what he could do
20   and what he could not do.
21   Q.   Okay.  Now, but he did give you this?
22   A.   Correct.
23   Q.   So, I take it from the way you answered my
24   question that you don't think that this note was

**29**

1  responsive to your request?

2      A.   It did not answer what we had requested from

3  Mr. Greenwood.

4      Q.   So, what other kinds of things were you

5  looking for?

6      A.   We were looking for, as we require from any

7  employee who was going out on either an injury, or a

8  medical issue, documentation as to what they can and

9  cannot do and their condition. We, at the time,

10  needed Danny greatly, as we have stated, and were

11  looking for him to do any type of work. So, this does

12  not tell me what he could, or could not do.

13      Q.   And when did you conclude that this note was

14  not responsive to what you were looking for?

15      A.   The moment he gave it to me.

16      Q.   And so, did you tell him that?

17      A.   Absolutely.

18      Q.   What did you say?

19      A.   I said, "This does not excuse you from where

20  you have been for the last week."

21      Q.   And what did you say? Anything else?

22      A.   I said that I would be back in touch with

23  him.

24      Q.   Did you say, "Go back to your doctor and

**30**

1  come back with a Vocational Assessment?

2      A.   No.

3      Q.   Well, he had given you one before, though,

4  hadn't he?

5      A.   No.

6      Q.   When he came back from Comp the first time,

7  you didn't get a Vocational Assessment?

8      A.   That was way previous to this.

9      Q.   Okay. But, your company, you get those

10  things, Vocational Assessments?

11      A.   Yes.

12      Q.   Typically, those are put together by

13  doctors?

14      A.   Correct.

15      Q.   And a doctor would be capable, or that is

16  because a doctor has a medical opinion as to what

17  someone can and can't do? You are saying "yes" to

18  that?

19      A.   Is that a question?

20      Q.   Maybe I didn't inflect it. I will withdraw

21  it. Now, AA, the doctor here, did you ask Greenwood

22  if you could talk to him?

23      A.   No.

24      Q.   Have you, as a manager, ever had

**31**

1  conversations with an employee's doctor about their

2  ability to work?

3      A.   No.

4      Q.   Have you ever had an employee consent to

5  permitting you to get medical records?

6      A.   Me, personally, or the HR Department?

7      Q.   Your HR Department.

8      A.   I don't know the answer to that. I am not

9  familiar with some of the medical records required

10  with Workmen's Comp claims, or other situations. So,

11  I don't know how to answer that. I have not, no.

12      Q.   Okay. Now, on the discharge note that you

13  saw, was Greenwood's physician identified?

14      A.   I don't recall.

15      Q.   At the time you saw that, did you have any

16  doubt in your mind that Greenwood had, in fact, been

17  hospitalized?

18      A.   No.

19      Q.   Had he told you that he wasn't capable of

20  working?

21      A.   He had not told us he was not capable of

22  working.

23      Q.   Had he had any conversations with you

24  directly between the time you first found out that he

**32**

1  wasn't reporting to work, up until the time he gave

2  you this note?

3      A.   I don't understand the question.

4          MS. KUGELL: Objection.

5  BY MR. RICE:

6      Q.   Did you meet with Greenwood? I will define

7  a time span here for you, okay?

8      A.   Yeah.

9      Q.   There is the first time you hear that

10  Greenwood is not going to report to work?

11      A.   Correct.

12      Q.   And I think you have testified that was

13  Wednesday?

14      A.   Yes.

15      Q.   And then he gave you this note, right?

16      A.   Correct.

17      Q.   Do you remember when he gave you the note?

18      A.   He gave us the note, I believe, on -- I

19  would have to look back at the record. I'd want to

20  look back at the record exactly. We documented when

21  he gave us this note. I think it was on this date.

22      Q.   August 9th?

23      A.   Yes.

24      Q.   Okay. So, in between the Wednesday --

33

1     A.    Yes.

2     Q.    August 9th, did you have any conversations

3   with Greenwood?

4     A.    Yes.

5     Q.    And in any of those conversations, did you

6   discuss his ability to come back and work?

7     A.    Yes.

8     Q.    Okay.  And what was the first such

9   conversation you had with him?

10    A.    The first conversation I directly had with

11  Danny would have been when he was discharged from the

12  hospital and showed up at work with his discharge that

13  indicated no restrictions on his activity.  I would

14  have discussed with him, "This does not tell us any

15  restrictions on you Danny.  Where have you been and

16  what can you do?  We need you for light duty."

17    Q.    And what did he say?

18    A.    He said, "I am seeing my doctor.  I'll be in

19  touch."

20    Q.    And then was he in touch?

21    A.    No.

22    Q.    Did you talk to him in the interim?

23    A.    No.

24    Q.    And, when was the next time -- was the next

34

1   time you saw him --

2     A.    It's correct that I talked to him prior to

3   receiving this note Friday, I believe, Friday.

4   Actually, there is a document that outlines the time

5   line, Dan, that we could look at that would refresh my

6   memory as to the exact dates that all of this

7   occurred.

8     Q.    I will volunteer this:  I am not looking for

9   specific dates.  I am just looking for the sequence of

10  events here.

11    A.    The document we have created for Danny's

12  file would outline the exact specific sequence of

13  events.

14    Q.    Just without that, to move this thing along,

15  you talked to him before he brought in the note from

16  AA here, correct?

17    A.    Yes.

18          MS. KUGELL:  You're referring to

19  Exhibit 1?

20  BY MR. RICE:

21    Q.    Yes, Exhibit 1.  Did you tell him to get

22  documentation in the conversation you had?

23    A.    Yes.

24    Q.    And this is what he brought?

35

1     A.    Yes.

2     Q.    And your opinion was that this was not

3   responsive to what you wanted?

4     A.    This is not what we asked for.

5     Q.    That day, after you concluded that, okay,

6   and your testimony is you told him that then the

7   decision was made to fire Greenwood?

8          MS. KUGELL:  Objection.

9          THE WITNESS:  Can you rephrase that?

10  BY MR. RICE:

11    Q.    Okay.  Your testimony -- we will just go by

12  the dates, and we won't hold them to you if it turns

13  out to be different.  You can prove that it wasn't.

14  You think it was August 9th, he gave you this note?

15    A.    Yeah.

16    Q.    August 9th, is also the day that Greenwood

17  got fired, right?

18          MR. RICE:  Can you just identify this?

19          THE WITNESS:  I wanted to look at the

20  dates because this says "Tuesday, August 9th," but

21  this says "August 9th," and this says "Monday, August

22  9th."  If we looked at a calendar, that date should

23  actually be August 10th.  Monday was the 9th.

24          MR. RICE:  Could we mark this as

36

1   Exhibit 2?

2

3          **(Deposition Exhibit No. 2, the**

4          **above-referred to Memo dated 8/9/04**
           **to Daniel Greenwood from Lewis**
           **Frazer, was marked for**
           **identification.)**

5

6

7   BY MR. RICE:

8     Q.    I am placing a document before you, and this

9   is Exhibit 2?

10    A.    Yes.

11    Q.    This is a memo to Greenwood from you, right?

12    A.    Correct.

13    Q.    And, you say in here that Greenwood

14  resigned, right?

15    A.    As per our handbook stipulates three days no

16  call, no show, unauthorized absence is considered a

17  voluntary resignation.  So, yes.

18    Q.    I know what you wrote there, but, in fact,

19  Greenwood didn't raise his hand and say "I'm

20  quitting"?

21    A.    Correct.

22    Q.    You decided that he should be terminated

23  from employment?

24    A.    He violated a work-place rule that is

November 22, 2006
Case 1:05-cv-10605-JLT    Document 26-5    Filed 02/26/2007    Page 1 of 1
Deposition of Lewis Frazer
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

**37**

1  uniformly enforced, and I had no choice.

2     Q.   Okay.  You had no choice?

3     A.   It is a rule.

4     Q.   You could have taken his note, though,

5  right?

6     A.   The note did not provide what we had asked

7  for.

8     Q.   Okay.  What time was it -- what time of day

9  was it when he gave you that note?

10     A.   I don't remember.

11     Q.   Morning?

12     A.   Don't remember.

13     Q.   Did you consult with anybody before you --

14  first of all, before I ask that, is this date the date

15  you actually wrote this up, August 9th?

16     A.   Yes.

17     Q.   Did you talk to somebody before you wrote

18  that up?

19     A.   Yes.

20     Q.   Who?

21     A.   Obviously, I would have talked to Jimmy

22  Rapoza because he had signed it.  I would have talked

23  to Steven Sheinkopf, the owner of the company, and I

24  would have spoken to Maria Moynihan.

**38**

1     Q.   We will leave the conversations with Maria

2  out of this, obviously.  But, what did you talk to Mr.

3  Sheinkopf about?

4     A.   I explained the situation as -- I explained

5  the situation with Danny as per the details that were

6  documented, and that would have been it.

7     Q.   What did you say?

8     A.   I said, "Here are the details; Danny was

9  released from the hospital with a release with no

10  restrictions.  We asked him for medical documentation

11  where he has been this following week.  He has gone

12  out of communication -- is not communicating with us

13  at all; not providing us with any documentation.  I

14  have no choice under the policies we enforce but to

15  send him a resignation letter."

16     Q.   Okay.  And what did you say to Mr. Rapoza?

17     A.   The same.  It would have been the same

18  conversation.

19     Q.   Were you a little steamed that this was

20  going on during the busy time?

21     A.   Define "steamed."

22     Q.   Were you upset by the fact that Greenwood

23  was not there during the busy period?

24     A.   I was -- at the time we needed all hands on

**39**

1  deck.  It was very busy.  So, whatever Danny could

2  have done, we would have used him in that capacity.

3     Q.   What was your belief as to what he could do?

4     A.   I have no idea what he could do.

5     Q.   Did you ask him what he could do?

6     A.   Absolutely.

7     Q.   When?

8     A.   Throughout the process.

9     Q.   Okay.  I have heard about three

10  conversations you had with him, I think.

11     A.   Correct.

12     Q.   Actually, two.  When was the first time that

13  you asked him what he could do?

14     A.   It would have been when he provided me with

15  the release from the hospital with no restrictions.

16     Q.   Okay.  By the way, did his doctor write

17  that, no restrictions?

18     A.   I have no idea.

19     Q.   Have you ever talked to this doctor?

20     A.   No.

21     Q.   Did you say, when you got that note, to Dan,

22  "Hey, it looks like you have no restrictions"?

23     A.   Absolutely.

24     Q.   And what did he say?

**40**

1     A.   He never read it.

2     Q.   Did he tell you that he did not think he

3  could perform the job of whatever he was, driver?

4     A.   I don't remember.

5     Q.   Well, in the past had he ever not shown up

6  for work without explaining why he couldn't go?

7     A.   To my knowledge, no.

8     Q.   Did you have -- did you, in your mind, have

9  some opinion as to why he suddenly was being difficult

10  about going to work?

11     A.   No.

12     Q.   Was he -- did he get paid time off during

13  this period?

14     A.   During which period?

15     Q.   Well, I think the end of July, and then he

16  comes back in August, or he presented a note.  Was he

17  getting paid sick time?

18     A.   He had, actually, exhausted all his paid

19  time off, if that is to what you are referring.  He

20  had requested to use vacation time for paid time off,

21  which is not according to our policies.  He'd

22  exhausted all his (inaudible) time.

23     Q.   So, he wasn't getting paid?

24     A.   Correct.

---

**41**

1  Q.   And he had never had an absenteeism like
2  this before?
3  A.   No.
4  Q.   So, did you think he was malingering?
5  A.   At the time, I don't remember what I
6  thought.  Sitting here today I don't remember what I
7  thought.  What I do know is that he was not providing
8  documentation as to his condition and what he can and
9  cannot do, which is what we asked him for.
10  Q.   Okay.  So, on the 9th, he gave you the note,
11  and this is a note from a doctor?
12  A.   Yes.
13  Q.   Okay.  Have you seen notes like this before?
14  A.   Have I seen notes like this before?  I have
15  seen doctors' notes before.
16  Q.   And you wanted something along the lines of
17  a Vocational Assessment?
18  A.   Correct.
19  Q.   Did you tell him, "Get me a Vocational
20  Assessment"?
21  A.   In those specific words, no.
22  Q.   Do you have any idea what this doctor's work
23  load is?
24  A.   No.

**42**

1  Q.   In your experience, is it easy to go to a
2  doctor and get them to write up some specific
3  statement?
4  A.   Yes.
5  Q.   Had you provided Greenwood any documents
6  from Yale by which AA, this doctor here, might be able
7  to come up with an assessment for him?
8  A.   No.
9  Q.   And it was on the 9th, that you wrote up
10  that note?
11  A.   Yes.
12  Q.   To fire him, or you say to confirm that he
13  voluntarily resigned?
14  A.   Correct.
15  Q.   Now, after -- did you hand deliver that to
16  Greenwood?
17  A.   No.  As indicated on the bottom, it is
18  transmitted via Regular mail and Certified Mail Return
19  Receipt Requested.
20  Q.   Did you have any conversations with
21  Greenwood after?
22  A.   No.
23  Q.   Why didn't you give Greenwood a chance to go
24  back to his doctor and get a Vocational Assessment?

**43**

1  A.   This note he provided us with did not do
2  what we had asked him for, which is, under your terms
3  a Vocational Assessment, which we asked him for all
4  week long.
5  Q.   But, he had been there for seven years,
6  right?
7  A.   A direct employee of Yale, I don't know if
8  it was seven years, or five years.  Again, there was
9  company changes that went on.
10  Q.   Why is that the last straw that he gives you
11  this note?  Why don't you say, "We need more"?  Your
12  testimony here is this note is just insufficient,
13  right?
14  A.   Because we had been asking all week for
15  more.
16  Q.   When did you ask?
17  A.   I asked him when he provided me with the
18  release from the hospital with no restrictions.
19  Q.   What did you say?
20  A.   I said, "This confirms you were in the
21  hospital, Danny, and were released with no
22  restrictions.  This does not excuse you for the entire
23  week that you have been gone and that we have been
24  asking you for what you can do.  We need your help in

**44**

1  light duty."
2  Q.   Now, the note you did get, in fact, AA does
3  state, and he is a doctor, that in his medical opinion
4  Greenwood is excused up until Tuesday, August 9th?
5      MS. KUGELL:  Objection.
6      THE WITNESS:  No, it does not say that.
7  BY MR. RICE:
8  Q.   What does that say?
9  A.   It says, "has been under my care and will be
10  able to work on the following day:"  It does not say
11  where he was the previous week at all.
12  Q.   So, was that something you concluded at the
13  time you got it that that question was left
14  unanswered?
15  A.   Absolutely.
16  Q.   Were you interested in what his status was
17  for that week?
18  A.   Absolutely.
19  Q.   So, in order to satisfy curiosity at that
20  point, what did you do?
21  A.   I said, "Danny, this does not --" If you are
22  asking me what I did when Danny -- what are you asking
23  me, specifically?
24  Q.   You testified that he gave you the note

November 22, 2006

**Deposition of Lewis Frazer**

Case 1:05-cv-10605-JLT     Document 26-5     Filed 02/26/2007     Yale Appliance and Lighting, Inc.

---

45

1 here, and in your view it didn't answer the question
2 as to where the heck Greenwood was for the previous
3 week basically, right?
4     A.    It did not answer what we had asked him,
5 which was, "What can you do under what restrictions?
6 We need you for light duty."
7     Q.    Okay.  So, prospectively, are you talking
8 about what is going on after this date, what can you
9 do and what can't you do?
10     A.    No.  We are talking about the week of the
11 second, third, fourth, five and sixth.
12     Q.    This note, in your view, doesn't -- didn't
13 clear up that ambiguity?
14     A.    It makes no representation about that week
15 at all.
16     Q.    Okay.  And you wanted to see something that
17 did?
18     A.    We asked for, and he is required to under
19 the terms of our handbooks, provide that for an
20 absence medical documentation.
21     Q.    So, as a result --
22     A.    Unexcused absence.
23     Q.    So, the note isn't clear, in your view.  So,
24 as a result of that --

---

46

1     A.    It is not that the note is not clear.  The
2 note doesn't provide documentation.
3     Q.    Okay.
4     A.    It only makes a statement that he has been
5 under my care and able to return to work on a day.
6     Q.    At the time you got the note from Greenwood,
7 and as you are sitting here today, you can, in your
8 mind, hypothesize about a note that actually would
9 have said something about that, correct?
10         MS. KUGELL:  Objection.
11 BY MR. RICE:
12     Q.    For example, if the doctor said, "Dan
13 Greenwood has diverticulitis, which is this really
14 painful condition that affects somebody's bowels and
15 debilitated him from the ability to move heavy
16 appliances around in the middle of the summer," that
17 would have been satisfactory?
18         MS. KUGELL:  Objection.
19         THE WITNESS:  Rephrase the question, if
20 you would, please.
21 BY MR. RICE:
22     Q.    I couldn't possibly do it.  But, if he -- in
23 your view, there is a lack of information on this as
24 to what his status was up until August 9th, 2004?

---

47

1     A.    We had asked Dan, once presented with
2 information that he was released with no restrictions,
3 to provide additional documentation about his
4 condition and what he was able to do, whether it be
5 light duty, whether it be answer the phone, file
6 paperwork, and this does not address that.
7     Q.    Okay.  But, it could have in your view?
8     A.    No.
9     Q.    No note could have done that?
10     A.    No.  A note could have done that; this did
11 not.
12     Q.    Why not just, instead of firing Greenwood,
13 why don't you just say, "Dan, go back to your doctor
14 and have him answer the question"?
15     A.    Because we had asked for that all week long.
16     Q.    You had asked once?
17     A.    I had asked.  Jim Rapoza had asked every
18 time he spoke or left a message with Dan.
19     Q.    Have you -- actually, let's go on to the pig
20 roast.  There has been a lot of talk about the pig
21 roast in this case.  You sure weren't at the pig
22 roast, right?
23     A.    No.
24     Q.    Do you think Greenwood was partying and

---

48

1 having a great time at this pig roast and pretending
2 to be sick and not able to work at Yale Electric?
3     A.    I have no idea.
4     Q.    There hasn't been some guest from the pig
5 roast that has come to you, or somebody else that you
6 know and say, "Hey, in fact, Greenwood was knocking
7 them back and eating the pig," that kind of thing?
8 That hasn't happened?
9     A.    What is your question?
10     Q.    I am asking you -- I keep hearing about the
11 pig roast.  Is there some information that you have
12 that Dan here had a jolly old time at the pig roast
13 and, therefore, he could have been lugging
14 refrigerators around that week?
15     A.    I didn't go to the pig roast.  I can't make
16 any representation about it.
17     Q.    Have you had conversations with somebody
18 that was at the pig roast?
19     A.    No.
20     Q.    Are you aware of Yale Electric having
21 knowledge of somebody who was at the pig roast who
22 claims to have observed Dan Greenwood acting in a
23 manner inconsistent with somebody who was just
24 discharged from the hospital with diverticulitis?

---

49

```
1        A.    It is a pretty long question.
2        Q.    Is there somebody out there telling Yale
3   Electric, to your knowledge, that Greenwood was at the
4   pig roast and not acting consistent with somebody who
5   couldn't report to work?
6        A.    There was an employee of Yale who was at the
7   pig roast who was Dan's nephew.  Beyond that, I don't
8   understand your question.  Peter Greenwood.
9        Q.    To your knowledge, has Peter told somebody
10  at Yale Electric, or representing Yale Electric that
11  Dan was at the pig roast and not acting in a manner
12  consistent with somebody who just got discharged from
13  the hospital?
14       A.    Ask the question again.
15       Q.    I will try to simplify it.  Has Peter
16  Greenwood told you, or anybody that you know of, that
17  Dan was enjoying himself at the pig roast?
18       A.    What do you mean "enjoying himself"?
19       Q.    How do you enjoy yourself at a pig roast?
20  Drinking beer, eating the pig, eating pig?
21       A.    I can't comment as to what Peter Greenwood
22  will say.
23       Q.    What is your knowledge of it?  I don't know
24  what Peter is going to say, either, but what is your
```

50

```
1   knowledge?
2        A.    I have no knowledge what occurred at the pig
3   roast.
4        Q.    During the time that Dan was out of work,
5   were you aware --
6        A.    Which point in time out of work?
7        Q.    Between July and August right before August
8   9th when he got fired?
9        A.    Yes.
10       Q.    Had you received information that he was at
11  the pig roast?
12       A.    No.
13       Q.    So, the fact that he might have had a pig
14  roast at his house, did that have any impact at all on
15  your decision to fire him?
16       A.    None.
17       Q.    Have you ever heard of a law called, "The
18  Family Medical Leave Act?
19       A.    Yes.
20       Q.    Before you fired Greenwood, or before he
21  voluntarily resigned, in your view, did you consider
22  whether or not Greenwood's absences might have been
23  excused under the Family Medical Leave Act?
24       A.    Yes.
```

51

```
1        Q.    Did you conclude that they were not?
2        A.    Yes.
3              MS. KUGELL:  Objection.  I don't want
4   to get into discussion with counsel.
5              MR. RICE:  Okay.  That is probably
6   enough.
7   BY MR. RICE:
8        Q.    Did you make a review of his attendance file
9   before you decided to fire him?
10       A.    I don't remember.
11             MR. RICE:  Can we go off the record?
12             (Off-the-record discussion)
13             MR. RICE:  I don't have any further
14  questions for you, Mr. Frazer.
15             MS. KUGELL:  I have just a couple of
16  small questions.
17
18             CROSS EXAMINATION
19  BY MS. KUGELL:
20       Q.    In July of 2004, do you recall what position
21  Mr. Phil Conroy was in?
22       A.    Phil Conroy was in a helper position at that
23  point in time.
24       Q.    And, at some point in August of 2004, or
```

52

```
1   thereabouts, did he assume another position?
2        A.    He was Dan Greenwood's direct replacement as
3   a delivery driver.
4        Q.    Now, there has been a whole lot of
5   discussion about something called a "Vocational
6   Assessment" during your deposition, Mr. Frazer.
7   Before today, was that a term that you were familiar
8   with?
9        A.    No.
10       Q.    Is "Vocational Assessment" a term that is
11  regularly used at Yale Electric?
12       A.    No.
13       Q.    Specifically, what is it that you asked Mr.
14  Greenwood for relative to his ability to perform work?
15       A.    We had asked him, specifically, as to what
16  he can and cannot do in terms of light duty, in terms
17  of full duty.  What were the restrictions on his
18  activity?  What were we provided with, and after
19  asking for numerous times, was first the release from
20  the hospital that provided no restrictions on his
21  activity; and then secondly, a doctor's note that
22  provided no information as to the restrictions on his
23  activity.
24       Q.    And, the second document you are referring
```

53

1    to, in any event, is Exhibit No. 1?

2    A.    Correct.

3    Q.    The first document you referred to is the

4    discharge paperwork?

5    A.    The discharge paperwork, which has not been

6    made an Exhibit here.

7    Q.    Is this generally the same process you do

8    with employees who are out of work and taking time off

9    due to a condition?

10    A.    Yes.

11    MS. KUGELL:  I don't have any other

12    questions.

13

14    **REDIRECT EXAMINATION**

15    BY MR. RICE:

16    Q.    Tell me the names of the employees who you

17    followed that procedure with?

18    A.    Off the top of my head?

19    Q.    Yeah.

20    A.    Anyone who is out sick or injured.

21    Q.    Okay.

22    A.    Specifically, I can give you names without

23    going back through the files, but it is a matter of

24    policy.

54

1    Q.    Okay.  Who?

2    A.    Again, I can't tell you names off the top of

3    my head.  I will be willing to submit names after

4    review, but off the top of my head, I don't remember.

5    Q.    Have you ever told an employee that they had

6    to get you some more persuasive documentation?

7    A.    What do you mean "persuasive"?

8    Q.    For example, Greenwood gives you that note

9    and you look at it and say it doesn't offer the detail

10    that we wanted, right?  That was the problem you had

11    with it?

12    A.    The problem I had with it is that through a

13    week and a half we had asked Danny for documentation.

14    The first documentation we were provided with was only

15    his release from the hospital with zero restrictions.

16    After asking numerous times of Mr. Greenwood to

17    provide us with documentation, this is what we

18    received.

19    Q.    Okay.  Has there ever been an employee who

20    gave you something -- who gave you a medical note that

21    you did not think provided sufficient detail about

22    their status?

23    A.    I don't recall.

24    Q.    Is there any policy at Yale that prohibits

55

1    you from asking an employee to provide more detail in

2    the first medical note that they might give you?

3    A.    No policy; but again, this is the second

4    note he gave us.

5    Q.    Is there a policy at Yale that says you only

6    get two chances to provide medical documentation?

7    A.    No.

8    MR. RICE:  I have no other questions.

9    MS. KUGELL:  Okay.

10

11    (The deposition was concluded at 12:01 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

56

1    UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS

2    I, LINDA M. THOMAS, Registered Merit Reporter and

3    Notary Public duly qualified in and for the

    COMMONWEALTH OF MASSACHUSETTS do hereby certify there

4    came before me the deponent herein, namely **LEWIS**

5    **FRAZER**, who was by me duly sworn to testify to the

6    truth and nothing but the truth concerning the matters

7    in this cause.

8    I further certify that the foregoing transcript

9    is a true and correct transcript of my original

10    stenographic notes.

11    I further certify that I am neither attorney or

12    counsel for, nor related to, or employed by any of the

13    parties to the action in which this deposition is

14    taken; and furthermore, that I am not a relative, or

15    employee of any attorney, or counsel employed by the

16    parties hereto, or financially interested in the

17    action.

18    IN WITNESS WHEREOF, I have hereunto set my hand

19    and affixed my Notarial Seal this 6th day of December,

20    2006.

21

22    _____

    LINDA M. THOMAS, RPR, RMR

23    CSR No. 129293
    NOTARY PUBLIC

24    My Commission expires July 30, 2010.

49:2, 49:6, 49:10,
52:11, 54:24, 55:5
**year** - 20:9, 22:18
**years** - 4:24, 12:15,
12:18, 43:5, 43:8
**yourself** - 13:19,
22:10, 49:19

## Z

**zero** - 6:12, 54:15
**zeros** - 9:3, 19:11

**Certification of Health Care Provider**
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



---

*(When completed, this form goes to the employee, __Not to the Department of Labor__.)*

OMB No.: 1215-0181
Expires: 08-31-2007

---

| 1. Employee's Name | 2. Patient's Name *(If different from employee)* |
|---|---|
| | |

---

3.  Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act.  Does the patient's condition[1] qualify under any of the categories described?  If so, please check the applicable category.

(1) _____  (2) _____  (3) _____  (4) _____ (5) _____  (6) _____ , or None of the above _____

---

4.  Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

---

5.  a.  State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

b.  Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

If yes, give the probable duration:

c.  If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

---

[1]  Here and elsewhere on this form, the information sought relates **only** to the condition for which the employee is taking FMLA leave.

[2]  "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

6.  a.  If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

b.  If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

c.  **If a regimen of continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (*e.g.*, prescription drugs, physical therapy requiring special equipment):

7.  a.  If medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

b.  If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

c.  If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment**?

8.  a.  If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

b.  If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

c.  If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

_____          _____
Signature of Health Care Provider                                          Type of Practice

_____          _____
Address                                                                              Telephone Number

                                                                                     _____
                                                                                     Date

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_____          _____
Employee Signature                                                          Date

A **"Serious Health Condition"** means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

   **Inpatient care** (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

   (a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

   (1) **Treatment**[3] **two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

   (2) **Treatment** by a health care provider on **at least one occasion** which results in a **regimen of continuing treatment**[4] under the supervision of the health care provider.

3. Pregnancy

   Any period of incapacity due to **pregnancy**, or for **prenatal care**.

4. Chronic Conditions Requiring Treatments

   A **chronic condition** which:

   (1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

   (2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

   (3) May cause **episodic** rather than a continuing period of incapacity[2] (*e.g.*, asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

   A period of **Incapacity**[2] which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be **under the continuing supervision of, but need not be receiving active treatment by, a health care provider**. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

   Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, **or** for a condition that **would likely result in a period of Incapacity**[2] **of more than three consecutive calendar days in the absence of medical intervention or treatment**, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

---

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

---

## Public Burden Statement

We estimate that it will take an average of 20 minutes to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

***DO NOT SEND THE COMPLETED FORM TO THIS OFFICE; IT GOES TO THE EMPLOYEE.***

*U.S. GPO: 2000-461-954/25505