**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
)
DANIEL GREENWOOD,                      )
                                       )
                        Plaintiff,     )
                                       )    Civil Action No. 05-10605 JLT
v.                                     )
                                       )
YALE APPLIANCE AND LIGHTING, INC.,     )
                                       )
                        Defendant.     )
_____)

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION TO STRIKE PORTIONS OF**
**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS AND**
**AFFIDAVIT, OR IN THE ALTERNATIVE, TO DISREGARD THE IDENTIFIED**
**PORTIONS IN CONSIDERING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.    **INTRODUCTION**

Defendant Yale Appliance and Lighting, Inc. ("Defendant" or "Yale") hereby moves

to strike portions of Plaintiff's Statement Of Additional Material Facts ("Plaintiff's Facts")

and Plaintiff's Affidavit, attached to Plaintiff's Response to Defendant's Local Rule 56.1

Statement at Exhibit 3 ("Plaintiff's Affidavit").[1]  As explained more fully below, the

identified portions of Plaintiff's Facts, and some corresponding portions of Plaintiff's

Affidavit, either wholly contradict prior deposition testimony or so mischaracterize

deposition testimony as to not be appropriately before the Court in its consideration of

Defendant's Motion For Summary Judgment.

---

[1]    Plaintiff's Facts are found at the end of Plaintiff's Response to Defendant's Local Rule 56.1 Statement Of Material Facts As To Which No Genuine Issue Remains To Be Tried.

II.    **ARGUMENT**

A plaintiff cannot create a disputed issue of fact by submitting an affidavit that contradicts his earlier sworn testimony.  *See Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994).  Moreover, mischaracterizations of deposition testimony by a plaintiff in an attempt to oppose a defendant's motion for summary judgment can be disregarded by the Court.  *See, e.g., Adler v. Schultz et al.*, 1999 WL 1320337, *3-4 (Mass.Super. Feb. 24, 1999) (disregarding plaintiff's misrepresentations of deposition testimony and characterizations of testimony favoring plaintiff's view of case and intended to mislead Court and imposing sanctions for same).[2]

In the present case, portions of Plaintiff's Facts and Plaintiff's Affidavit either contradict his own previous sworn testimony or mischaracterize testimony in a manner that misleads the Court.  For these reasons, Defendant objects to the following (bolded) portions of Plaintiff's Facts, and any corresponding portions of paragraph 7 of Plaintiff's Affidavit, and asks the Court to strike the same, or at a minimum, disregard them for purposes of its consideration of Defendant's Motion for Summary Judgment.  Defendant addresses each bolded, objectionable "Fact" in turn.[3]

**Objectionable "Facts" in Paragraphs 2-3 of Plaintiff's Facts read as follows: (the objectionable portions are in bold):**

2.    On November 12, 2003, Greenwood was injured while he was delivering a large refrigerator in the Back Bay.  As a result of his injury, he suffered a

---

[2]    For the Court's convenience, a copy of the *Adler* decision is attached hereto as Exhibit A.

[3]    The vast majority of Plaintiff's objectionable "Facts" relate to Plaintiff's Family and Medical Leave Act ("FMLA") claims.  As explained in Defendant's Memorandum in Support of its Motion for Summary Judgment, and Reply Memorandum, Plaintiff had exhausted any FMLA entitlement prior to his absences in July/August 2004, and thus as a matter of law, cannot maintain any claim thereunder.  (*See* section III(B) of Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment; *see also* sections II(A) and (B) of Defendant's Reply Memorandum).  Presuming the Court finds that Plaintiff indeed was without the protections of the FMLA in July/August 2004, the vast majority of the instant Memorandum may be mooted as the Court will have no need to consider paragraphs 2-3 and 12-13 of Plaintiff's Facts as they relate to the FMLA claim.

hernia, had to have an operation, and could not return to work until January 26, 2004, a period of 10 weeks and two days.  Greenwood received worker's compensation benefits for the period of time he missed 10 weeks and two days of work.  When he returned, and on the basis of **a vocational assessment** Yale received, and which Mr. Frazer testified Yale mandates as a matter of policy before any employee returning from an injury may resume work, Greenwood was given a light duty assignment. []

3.    **Yale did not ask Greenwood for a vocational assessment when it was considering his return to work in August of 2004.**

These bolded portions mischaracterize Mr. Frazer's testimony, and are used by Plaintiff to suggest that he was asked for different types of medical documents to support his absence and return to work in January, 2004, and August, 2004.  Specifically, the assertion is that Defendant asked Plaintiff for a "vocational assessment" in January, 2004, and no "vocational assessment" in August, 2004.  A review of Mr. Frazer's deposition testimony, however, demonstrates that the term "vocational assessment" was actually *Plaintiff's counsel's* term, and Plaintiff was asked for the same type of medical documentation regarding his absence, and particularly his return to work, in both January, 2004 and August, 2004.

Specifically, Mr. Frazer testified that the term "vocational assessment" is not a term commonly used by Yale.  (Frazer Dep., Ex. 11 to Defendant's Facts, at 52).[4]

---

[4]    Mr. Frazer offered the following testimony.

Q:    Is "Vocational Assessment" a term that is regularly used at Yale Electric?
A:    No.
Q:    Specifically, what is it that you asked Mr. Greenwood for relative to his ability to perform work?
A:    We had asked him, specifically, as to what he can and cannot do in terms of light duty, in terms of full duty.  What were the restrictions on his activity.
[]
Q:     Is this generally the same process you do with employees who are out of work and taking time off due to a condition?
A:    Yes.

(Frazer Dep., Ex. 11 to Defendant's Facts, at 52-53).

Nonetheless, Mr. Frazer explained, Plaintiff was asked on several occasions in August, 2004 to provide medical information that, to use *Plaintiff's counsel's term*, constituted, a "vocational assessment."

Specifically, Mr. Frazer testified:

Q:    Why didn't you give Greenwood a chance to go back to his doctor [in August, 2004] and get a Vocational Assessment?
A:    This note he provided us with [on August 9, 2004] did not do what we had asked him for, *which is, under your terms, a Vocational Assessment, which we asked him for all week long.* (emphasis supplied)

(Frazer Dep., Ex. 11 to Defendant's Facts, at 42-43).

Plaintiff had provided the same information in January 2004.  (Frazer Dep., Ex. 11 to Defendant's Facts, at 17-20).

In other words, any suggestion that Defendant sought differing medical verification from Plaintiff in January, 2004, and August, 2004, is wholly inaccurate and unsupported by the very testimony upon which Plaintiff relies.  As such, all references to such alleged "facts" should be stricken from Plaintiff's Opposition Papers, or at least disregarded by the Court in considering Defendant's Motion for Summary Judgment.

**<u>Objectionable "Facts" In Paragraph 12 of Plaintiff's Facts read as follows:</u>**
**(the objectionable portion is in bold)**

Rapoza spoke with Greenwood the following Monday, August 2, 2004, as planned.  Greenwood told Rapoza that his appointment had been cancelled, and that he planned on meeting his physician the following day, Tuesday, and at that time, would give him an update on his status.  (Pl.'s Ex. 1, Rapoza Tr./10).
**Rapoza did not ask Greenwood when he might be able to return to work in this conversation.**

This statement gives the false impression that Defendant did not ask Plaintiff for information about his absence as early as Monday, August 2nd.  In fact, Defendant most certainly did.  The *complete* testimony of Mr. Rapoza on this issue reflects that while he

did not yet specifically ask Plaintiff on Monday, August 2nd for his return to work date

"because, again, [Plaintiff] hadn't seen his doctor yet,"  Mr. Rapoza did ask Plaintiff

generally for information about when he could return to work and what type of work he

could perform.  (Rapoza Dep., Exhibit B hereto, at 28).[5]  Specifically, the remainder of

Mr. Rapoza's testimony regarding August 2nd, which Plaintiff omits, reflects that Mr.

Rapoza did, on August 2nd, ask Plaintiff to obtain medical documentation to verify his

absences and to find out from his doctor whether he could work light duty.  (Rapoza

Dep., Ex. 16 to Defendant's Facts, at 9-10).[6]  Accordingly, to the extent that Plaintiff uses

such bolded testimony above to suggest otherwise, the references to such testimony

throughout Plaintiff's Opposition papers should be stricken, or at a minimum,

disregarded in considering Defendant's Motion for Summary Judgment.

### Objectionable "Facts" in Paragraph 13 of Plaintiff's Facts read as follows: (the objectionable portion is in bold)

On Tuesday afternoon, August 3, Greenwood met at Yale's warehouse with Rapoza.  (Pl.'s Ex. 1, Rapoza Tr./14).  **He told Rapoza that his physician had told him that he had to miss work for the rest of the week,** (Pl.'s Ex. 1, Rapoza Tr./28) **and he could not perform any work, even light duty.**  (Pl.'s Ex. 1, Rapoza Tr./14).  [sic] Rapoza to provide some documentation of his need to miss

---

[5]        Page 28 to the Rapoza deposition transcript is attached hereto as Exhibit B as it was not attached to Defendant's Facts.

[6]        Mr. Rapoza testified:

| | |
|---|---|
| Q: | When was the next contact you had with him? |
| A: | I called Dan on Monday, Monday afternoon at some point, because I had not heard from him.  He told me that his appointment had been cancelled; that he had an appointment the very next day on Tuesday.  *And I reiterated to please get me some documentation – medical document as to what his condition was in terms of his work status.  Can he work full duty, light duty?*  We certainly needed him, if we were going to replace him with someone out of the warehouse, there are some functions in the warehouse that potentially he could have helped us out with, and to please provide that to us. |
| Q: | Well, *did you say all that, what you just said in the conversation you had with him or –* |
| A: | *No, I absolutely said that to him.* |
| Q: | And what did he say? |
| A: | He said "okay," he will call me on Tuesday after his appointment. |

(Rapoza, Ex. 16 to Defendant's Facts, at 9-10)(emphasis supplied).

work, but did not make this request in writing, provide him with a standard DOL FMLA certification form, (Pl.'s Ex. 5) or give him any specific instructions on what form or substance the documentation should take.  (Pl.'s Ex. 1, Rapoza Tr./14-15; Pl.'s Ex. 3, Greenwood Aff./6).  Rapoza believed that Greenwood's physician had indeed told Greenwood that he had to miss work, and assumed that Greenwood's continued need to miss work related to the malady that had forced his hospitalization.  (Pl.'s Ex. 1, Rapoza Tr./16).

This bolded statement does not accurately reflect Mr. Rapoza's testimony.  Once again Plaintiff relies on only a portion of Mr. Rapoza's testimony, while ignoring the remainder of his testimony, in an effort to manufacture a "fact."  Specifically, Plaintiff attributes to Mr. Rapoza a concession that Plaintiff told him on August 3rd that his doctor had restricted him from performing any work, including light duty.  However, this testimony contradicts Plaintiff's own testimony on the issue, *i.e.*, that he never even asked his doctor whether he could work light duty, let alone whether his doctor told him not to do so.  (Greenwood Dep., Ex. 1 to Defendant's Facts, at 175-76).  Moreover, Mr. Rapoza's testimony was that Plaintiff **did not** advise him that he could not work light duty.  (Rapoza Dep., Exhibit C hereto, at 33).[7]  Indeed, Mr. Rapoza understood that Plaintiff was going to ask his doctor if he could perform light duty work.[8]  (*Id.*)

Accordingly, to the extent that Plaintiff attributes a different meaning to Mr. Rapoza's testimony, the references to the testimony throughout Plaintiff's Opposition

---

[7]     Page 33 to the Rapoza deposition transcript is attached hereto as Exhibit C as it was not attached to Defendant's Facts.

[8]     Mr. Rapoza testified:

Q:     So upon reading this, now that you have read this, is this an accurate depiction of what occurred at the time?
A:     Yes.
Q.     So, during your conversation on Tuesday afternoon, did you understand that Mr. Greenwood was going to check with his doctor to see if he could perform light duty?
A:     Yes.
Q:     And did you ever hear back from him about whether he could do that?
A:     No, I did not.

(Rapoza Dep., Ex. C hereto, at 33).

papers should be stricken, or at a minimum, disregarded in considering Defendant's

Motion for Summary Judgment.

> ### Objectionable "Facts" in Paragraph 14 of Plaintiff's Facts And Corresponding Portions of Plaintiff's Affidavit, Par. 7: (the objectionable portion of Paragraph 14 is in bold)
>
> On Friday, August 6, Greenwood met with Rapoza and Frazer and gave them a copy of his discharge from South Shore Hospital.  (Pl.'s Ex. 1, Rapoza Tr./16). Frazer noted that the discharge summary stated that Greenwood had "no restrictions" on his activity, and asked Greenwood to obtain additional documentation concerning his absences.  (Pl.'s Ex. 1, Rapoza Tr./16).  Frazer also asked Greenwood how old he was**, and whether Greenwood thought he could still do his job because he had noticed that Greenwood had been out hurt quite often lately.**  (Pl.'s Ex. 3, Greenwood Aff., Ex. 7).  **Frazer also stated that Greenwood might be getting too old to carry out his duties on the truck.** (Pl.'s Ex. 3, Greenwood Aff., Ex. 7).  **Frazer stated, "If that is the case, I have no other job duties for you."  He added, "How much longer do you think you can be doing this job?"**  (Pl.'s Ex. 3, Greenwood Aff., Ex. 7).  Greenwood replied that he expected to return to work on August 10, 2004 with his doctors' permission.  (Pl.'s Ex. 3, Greenwood Aff., Ex. 7).

These statements, contained in this form only in Plaintiff's Affidavit submitted in

opposition to summary judgment, contradict and/or embellish his previous sworn

testimony.  Specifically, at his deposition, Plaintiff testified regarding this conversation

and Mr. Frazer's alleged remark as follows:

> And, you know, he told me, `Well, you seem to be getting hurt a lot,' and this and that.  `Maybe you're too old for that.  You know, maybe you're too old to keep doing what you're doing.'  I told him, you know, I mean I got hurt, you know, the previous year, you know what I mean, doing their work and doing the best I could.  You know, I have that hernia injury, you know, and he was just -- `Well, you're getting hurt.  You're getting hurt too much.  How old are you,' and this and that.

(Greenwood Dep., Ex. 1 to Defendant's Facts, at 186-87).

Plaintiff cannot utilize an affidavit, created after his sworn testimony, to alter or

embellish that prior testimony, as he has attempted to do here.  *See Colantuoni*, 44 F.3d at

4-5.  Accordingly, to the extent the Court considers Mr. Frazer's alleged remark, it must

consider it in the form to which Plaintiff testified at his deposition; any references to the

to the contrary throughout Plaintiff's Opposition papers, including those in Paragraph 14

to Plaintiff's "Facts" and Paragraph 7 of Plaintiff's Affidavit should be stricken, or at a

minimum, disregarded in considering Defendant's Motion for Summary Judgment.

**III.    CONCLUSION**

For the foregoing reasons, Defendant respectfully requests the Court allow

Defendant's Motion To Strike Portions Of Plaintiff's Statement Of Additional Material

Facts And Affidavit Or, In the Alternative, To Disregard The Identified Portions In

Considering Defendant's Motion For Summary Judgment.

> YALE ELECTRIC,
>
> By its attorneys,
>
> /s/Tracy Thomas Boland
> Jaclyn Kugell (BBO# 561622)
> Tracy Thomas Boland (BBO# 638878)
> MORGAN, BROWN & JOY, LLP
> 200 State Street

Dated: March 19, 2007    (617) 523-6666

**CERTIFICATION PURSUANT TO LOCAL RULE 7.1**

Pursuant to Local Rule 7.1(A)(2), I hereby certify that counsel for Defendant, Yale
Appliance and Lighting, Inc., has conferred and attempted in good faith to resolve or narrow
the issues addressed by the foregoing Motion.

> /s/ Tracy Thomas Boland
> Tracy Thomas Boland

## **CERTIFICATE OF SERVICE**

I, Tracy Thomas Boland, hereby certify that I have caused a copy of the foregoing to be served upon Plaintiff's attorney, Daniel W. Rice, Glynn, Landry, Harrington & Rice, LLP, 10 Forbes Road, Braintree, MA 02184, by ECF on this 19th day of March, 2007.

/s/ Tracy Thomas Boland
Tracy Thomas Boland

# EXHIBIT A

Westlaw.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

**H**
Adler v. SchultzMass.Super.,1999.Only the Westlaw
citation is currently available.
Superior Court of Massachusetts.
Charles ADLER et al.,[FN1]

>   FN1. Marilyn Adler.
>           v.
>   Martin SCHULTZ [FN2] et al.[FN3]

>   FN2. Individually, as a trustee of the
>   Abraham Schultz Trust, as a trustee of the
>   Mollie Schultz Trust, and as executor of the
>   Estate of Abraham Schultz.

>   FN3. Beverly Schultz, individually;
>   BankBoston, individually, as a Trustee of
>   the Abraham Schultz Trust, as a Trustee of
>   the Mollie Schultz Trust, and on behalf of its
>   predecessors; Abraham Schultz,
>   individually, as a Trustee of the Abraham
>   Schultz Trust and as a Trustee of the Mollie
>   Schultz Trust, via the executor of his estate,
>   Martin Schultz.

**No. 9705154F.**

Feb. 24, 1999.

MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT BANKBOSTON'S MOTION
FOR SUMMARY JUDGMENT
SMITH.

### I. INTRODUCTION

*1 Plaintiffs Charles and Marilyn Adler (the
"Adlers"). brought an action against defendants
Martin and Beverly Schultz, the Estate of Abraham
Schultz and BankBoston. As against BankBoston
plaintiffs claim breach of contract (Count I), breach
of fiduciary duty (Count II), fraud/misrepresentation
(Count III), breach of implied covenant of good faith
and fair dealing (Count IV), violations of G.L.c. 93A
(Count VI), conversion (Count VIII), violations of
the federal civil RICO statute (Count IX), unjust
enrichment (Count XI), breach of loyalty/conflict of
interest/self dealing (Count XVII), negligent
misrepresentation (Count XX), intentional infliction

of emotional distress (Count XXI), and civil
conspiracy (Count XXII). The plaintiffs additionally
seek a constructive trust (Count XI), an equitable lien
(Count XII), an accounting (Count XIII), removal of
trustees (Count XIV), declaratory judgment (Count
XVIII), and an equitable order to compel trust
distributions (Count XIX). Defendant BankBoston
now moves for summary judgment on all counts.

### II. PRELIMINARY MOTIONS

*1 BankBoston moves to strike plaintiffs' Opposition
to its motion for summary judgment on the grounds
that the Opposition Memorandum is rife with
unsupported assertions of fact, inadmissible
conclusions and conjecture based on no facts to such
an extent it is of no service to the Court. In the
alternative, BankBoston requests that the Court strike
plaintiffs' affidavit; strike plaintiffs' Exhibits 4-14; [FN4]
sanction the plaintiffs and counsel for flagrant
misrepresentations of the facts and award
BankBoston its attorneys fees and costs; sanction the
plaintiffs and counsel for misrepresentations made
regarding the status of their dismissed claims under
G.L.c. 93A and the federal civil RICO statute; and
allow BankBoston's motion for summary judgment.
The Court first considers all BankBoston's requests to
strike and sanction as preliminary motions and
separately considers the motion for summary
judgment.

>   FN4. BankBoston also argues that Exhibits
>   11 and 34 be stricken for plaintiffs' failure to
>   include the pertinent documents. These
>   documents do appear in the exhibits
>   plaintiffs submitted to the Court. Exhibit 11
>   is discussed below; Exhibit 34 is a portion of
>   Martin Schultz's deposition.

#### A. Affidavits and Other Exhibits

*1 Exhibit I of plaintiffs' Opposition Memorandum is
an affidavit of Charles and Marilyn Adler dated
October 16, 1998 which provides a blanket statement
that all facts set forth in their opposition to
defendant's motion for summary judgment, summary
judgment memorandum, and Rule 9(b)(5) responses
are true and based on their personal knowledge and
that for any facts not based on their personal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                        Page 2
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

knowledge they reference deposition transcripts or documents. This affidavit is defective first because it does not indicate which sentences or phrases in the "Facts" section of the Opposition Memorandum are statements of fact based on personal knowledge, as opposed to declarations of others' states of mind, argument or conclusion,[FN5] and second, because it does not indicate which factual statements are based on the personal knowledge of both Marilyn and Charles Adler or either alone.

> FN5. Many sentences lack any citation and so presumably are supported by the plaintiffs' affidavit. The Court concurs with BankBoston that many of these sentences contain statements as to other parties' states of mind, conclusions and argument for which an affidavit, when properly limited to personal knowledge, cannot support.

*1 Exhibits 4-14 include three letters, Exhibits 8, 12 and 14, that are neither certified nor sworn as required by Mass.R.Civ.P. 56(e). Exhibits 4-7, 9-11, 13-14 are affidavits which impermissibly contain statements as to the thoughts, state of mind, mental health and intent of Abraham and/or Mollie Schultz. Accordingly, the Court ALLOWS BankBoston's request to strike the Adler affidavit, Exhibit 1, and Exhibits 4-14. The only statements of fact the Court will consider in reviewing the motion for summary judgment are those statements supported by citations to Exhibits 2, 3 and 15-41.

B. Misrepresentations

*2 BankBoston argues that plaintiffs' and counsel's alleged misrepresentations of facts and about the status of dismissed claims warrant sanctions. BankBoston discusses three particular misrepresentations that it claims are examples of plaintiffs' bad faith in opposing summary judgment and includes a chart outlining other misrepresentations.[FN6] The first statement in plaintiffs' Opposition Memorandum that BankBoston alleges is false is, "They [the Bank] made no trust distributions for Marilyn's living and medical expenses. Not a single penny." (Opposition Memorandum, page 6.) BankBoston cites to the affidavit of a BankBoston official, Sarah Lentz, that details medical, living and condominium payments and reimbursements made to Marilyn Adler by BankBoston totaling $98,698.55 as of August 6, 1998.[FN7] The Court finds that plaintiffs' statement

when taken alone is patently false. Although, elsewhere in the Opposition Memorandum, plaintiffs do acknowledge BankBoston's payment of some medical expenses and contend that the Bank made no distributions for living or medical expenses until the date of litigation, October 2, 1997, (Opposition Memorandum, pages 5, 7), such concessions do not cure the bad faith of the patently false statement made by the plaintiffs. Rather the concession underscores the level of bad faith in the plaintiffs' making a manifestly false statement when they knew the truth. Therefore, the Court concludes that the plaintiffs have acted in bad faith in making this statement and that they made it to mislead the Court. Thus, the Court ALLOWS BankBoston's motion for sanctions as to this statement and its related argument. Pursuant to Mass.R.Civ.P. 11 the Court shall award BankBoston costs and attorneys fees. These costs and attorneys fees shall be assessed against plaintiffs' counsel.

> FN6. See Exhibit 2, BankBoston's Reply.

> FN7. See Lentz Aff., Exhibit 8.

*2 The second statement to which BankBoston takes exception refers to a "warning" allegedly made by Martin Schultz to BankBoston which resulted in BankBoston not paying certain medical bills.[FN8] The Court need not consider the veracity of this statement because there is no cited supporting affidavit and the plaintiffs' general affidavit is stricken, above. Thus BankBoston's motion for sanctions as to this statement is DENIED. The Court notes, however, that had it not stricken the plaintiffs' improper general affidavit, it would have found that this statement was false and made in bad faith in violation of Mass.R.Civ.P. 11 and Rule 56(g).

> FN8. The statement is as follows:
> The Bank followed Martin's warning and refused to pay certain bills for medical services Marilyn required regarding her wrist and still has not paid these medical bills which date back to January 1997. To date, the Bank has not distributed trust funds to pay many of these medical bills, despite the Court's prior orders.
> (Opposition Memorandum, page 5.)

*2 The third statement concerns the Bank's alleged grant to Martin Schultz of disapproval rights over distributions to Marilyn Adler.[FN9] BankBoston

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

objects to the lack of evidentiary support for the contention as to the Bank's actions and the misrepresentation of the cited deposition testimony. The Court finds that the statement as to the Bank's actions is to be disregarded for lack of evidentiary support. As to plaintiffs' characterization of the attorney's testimony, the Court finds that the testimony is not misquoted as BankBoston claims and that standing alone does not misrepresent the testimony.[FN10] Here again, the Court does not find evidence of bad faith on the plaintiffs' part. Thus BankBoston's motion for sanctions as to this statement is DENIED.

FN9. The statement reads:
The Bank allowed Martin to disapprove of any trust distributions to Marilyn, even though the Bank and its and Martin's counsel admit that it was improper to allow Martin to approve or have any say over Marilyn's trust distributions. (Ex. 21, Atty. Coleman's deposition testimony.)
(Opposition Memorandum, page 6.)

FN10. Attorney Coleman testified:
He [Martin] did not participate, was not permitted to participate, was excluded by the terms of this trust instrument from any decision as to distributions. Those were made by the corporate trustee.
(Opposition Memorandum, Exhibit 21, page 139.)

*3 After reviewing the additional alleged factual misrepresentations outlined by BankBoston in its Exhibit 1 of its Reply Memorandum to the Plaintiffs' Opposition to BankBoston's Motion For Summary Judgment, the Court finds that plaintiffs frequently combine unsupported statements of fact or states of mind with characterizations of testimony that favor their view of events and that this constitutes deliberate attempts to mislead the Court. Such distortions go well beyond zealous advocacy. The Court ALLOWS BankBoston's request for sanctions against plaintiffs and counsel for misrepresentations of the facts. Pursuant to Mass.R.Civ.P. 11 the Court shall award BankBoston costs and attorneys fees. These costs and attorneys fees shall be assessed against plaintiffs' counsel.

*3 The Court further takes note of plaintiffs' failure to comply with the provisions of Superior Court Rule 9A(b)(5) with regards to its response to the defendant's statement of undisputed facts. Rule

9A(b)(5) requires a "concise statement" of disputed material facts, with "page or paragraph references to supporting pleadings, depositions, answers to interrogatories, admissions and affidavits." Plaintiffs' references fail to direct the Court to the relevant page or paragraph. Additionally, plaintiffs improperly combine additional allegations, argument and conclusions with their statement of disputed material facts. The Court will consider only those statements properly presented in accordance with Superior Court Rule 9A and Mass.R.Civ.P. 56.

*3 As to BankBoston's request for sanctions for plaintiffs' alleged misrepresentation of the status of their dismissed claims under G.L.c. 93A and the federal civil RICO statute, the Court is in agreement with BankBoston that plaintiffs have engaged in misconduct. Plaintiffs assert that an earlier motion by BankBoston to dismiss these counts had been denied by J. Spurlock and that J. Butler dismissed these same counts only as against defendants Martin, Beverly and Abraham Schultz.

*3 Contrary to plaintiffs' assertions, Spurlock, J. denied BankBoston's motion to strike, not a motion to dismiss on December 3, 1997. (Docket, page 5.) Butler, J. later dismissed both the C. 93A (Count VI) and civil RICO (Count IX) counts "in their entirety" on April 30, 1998. (BankBoston Reply, Exhibit 9.) This order was upheld by a Single Justice of the Appeals Court on June 4, 1998. (BankBoston Reply, Exhibit 10.) A Single Justice of the Appeals Court also upheld Sosman's, J. denial of Plaintiffs' request to add a civil RICO count against BankBoston on September 4, 1998. (BankBoston Reply, Exhibit 11.) The Court finds that there is absolutely no ambiguity in either the trial Judges' dismissing these counts or in the Single Justice affirming the dismissals or in denying the plaintiffs leave to add a RICO count. For plaintiffs to represent that these claims are still alive against BankBoston constitutes deliberate misrepresentation and sanctions are appropriate. Accordingly, the Court ALLOWS BankBoston's request for sanctions against plaintiffs and their attorney for misrepresentations made with regards to c. 93A and civil RICO counts. Pursuant to Mass.R.Civ.P. 11 the Court shall award BankBoston costs and attorneys fees. These costs and attorneys fees shall be assessed against plaintiffs' counsel.

*4 In its discretion, the Court DENIES the motion to strike plaintiffs' Opposition Memorandum. For reasons discussed above, the Court will disregard much of the memorandum as well as plaintiffs' response to BankBoston's statement of undisputed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

facts.

## BACKGROUND

### III. BANKBOSTON'S MOTION FOR SUMMARY JUDGMENT

#### A. Background

*4 The following undisputed facts are taken from the summary judgment record pursuant to the discussion above. Plaintiffs Charles Adler and Marilyn Adler are husband and wife. Plaintiff Marilyn Adler is a co-beneficiary with her brother Martin Schultz of the Mollie Schultz Trust ("Mollie Trust") and the Abraham Schultz 1991 Trust ("Abraham Trust"). Defendant BankBoston is the corporate trustee of both the Mollie and Abraham Trusts. Mollie and Abraham Schultz, the parents of Marilyn Adler, died in 1986 and 1996, respectively.

*4 Under the Mollie Trust, Marilyn Adler is a lifetime beneficiary. The Mollie Trust provides, in relevant part,

*4 All or any part of the net income and principal of the trust may be paid from time to time to any one or more of the Donor's husband, Abraham Schultz, her daughter, Marilyn, her son Martin and Martin's issue, in such amounts and proportions as the corporate trustee, in its discretion, think advisable for any purpose.

*4 (Mollie Trust, Fourth Amendment, Article THIRD, attached as Ex. D to Schultz defendants' motion for partial summary judgment (referenced by BankBoston as Exhibit 1 to Affidavit of Sarah Lentz dated October 15, 1997, previously submitted in Opposition to Plaintiffs' Motion for Preliminary Injunction).)

*4 The Abraham Trust provides that half of the trust principal remaining after payment of debts, administration expenses, estate taxes and a single $10,000 bequest, is to be distributed outright to Martin Schultz, and the remaining half is to be held in trust for the benefit of Marilyn Adler during her lifetime. The Abraham Trust provides for lifetime distributions to Marilyn Adler by the corporate trustee as follows:
*4 All or any part of the net income may be paid to Marilyn from time to time as the corporate trustee in

its discretion thinks advisable for any purpose. Any net income not so paid may be added to principal at any time or times. The corporate trustee may also make payments of principal at any time or times to Marilyn, in such amounts as the corporate trustee in its discretion thinks advisable. The donor hopes, without limiting the discretion of the corporate trustee, that in the exercise of its authority to make payments of income and principal to Marilyn, the corporate trustee will provide for [Marilyn's] medical care and other living expenses, using as a guide the level of financial assistance the Donor provided during his lifetime.

*4 (Abraham Trust, Article SIXTH, Plaintiffs' Opposition Memorandum, Ex. 3.)

*4 Pursuant to the Abraham Trust instrument, Marilyn Adler may occupy a condominium located in Florida which is owned by the Trust. (BankBoston Memorandum, Ex. 1, para. 9.) The Abraham Trust states that support payments to Marilyn Adler are to be made "for the benefit of her and not (insofar as possible) of her husband, Charles S. Adler." (Abraham Trust, Article ELEVENTH (a).)

*5 Under both trusts, upon Marilyn Adler's death, the remainder will pass to Martin Schultz or his issue or surviving spouse. (Abraham Trust, Article SIXTH (C); Mollie Trust, Article FOURTH (b).) The Dana Farber Cancer Institute is the final contingent remainderman.

*5 B. Discussion

*5 Summary judgment shall be granted where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. *Cassesso v. Comm'r. of Correction,* 390 Mass. 419, 422, 456 N.E.2d 1123 (1983); *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553, 340 N.E.2d 877 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. *Pederson v. Time, Inc.,* 404 Mass. 14, 17, 532 N.E.2d 1211 (1989). Once the moving party established the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. *Id.* Where the party moving for summary judgment does not bear the burden of proof at trial, the movant must submit affirmative evidence negating an essential element of the nonmoving party's case or show that the nonmoving party has no reasonable expectation of proving an essential

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

element of its case at trial. *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716, 575 N.E.2d 734 (1991).

### 1. Claims Arising From alleged Contract Between the Plaintiffs and BankBoston

**\*5** The Adlers raise contract actions against BankBoston based on their characterization of the Mollie and Abraham Trusts as contracts between trustee BankBoston and the donors, for the benefit of Marilyn Adler. Plaintiffs claim that as a third-party beneficiary to a contract Marilyn Adler may raise a contract action against BankBoston. As BankBoston explains, the plaintiffs ignore the fundamental distinctions between a contract and a trust. A trust is "a legal entity created by a grantor for the benefit of designated beneficiaries" and gives rise to a fiduciary responsibility by the trustee to "manage the trust's corpus assets and income for the economic benefit of all of the beneficiaries." Black's Law Dictionary 1508 (6th ed.1991). As trustee, BankBoston's obligations to Marilyn Adler, a trust beneficiary, are created by the terms of the Trusts. *Harrison v. Marcus*, 396 Mass. 424, 429, 486 N.E.2d 710 (1985). As a matter of law, any contract claims arising from any of BankBoston's actions as trustee of the Mollie and Abraham Trusts fail.

**\*5** The Adlers point to additional alleged contracts beyond the Trust instruments and claim BankBoston failed to perform. They claim that representatives of BankBoston promised to make "generous distributions" from the Trusts to Marilyn Adler and to reimburse $140,000 in condominium fees, yet failed so to do. Assuming, arguendo, the existence of such a promise, BankBoston argues that the promises lacked consideration and therefore are unenforceable as contracts. The Adlers argue that Marilyn relied on BankBoston's promises to her detriment, but fail to offer evidence of her alleged detriment.[FN11] Consequently, as a matter of law the promise is not a contract. See *O'Connor v. Nat'l Metals, Co.*, 317 Mass. 303, 306, 58 N.E.2d 153 (1944).

> FN11. Presumably, Marilyn's detriment is the failure to receive Trust distributions she Claims are due. BankBoston demonstrates, below, that it has developed and carried out a distribution plan in good faith. Therefore, her unsuccessful claims against the Bank cannot serve as a basis for detriment here.

**\*6** The Adlers allege that they entered into several agreements with BankBoston's real estate officer, Carl Izzo, to repair the Florida condominium owned by the Abraham Trust. The only evidence the Adlers offer of these agreements is Carl Izzo's March 11, 1998 letter to Marilyn Adler. (Plaintiffs' Opposition Memorandum, Ex. 35.) The letter presents various contractor bids, recommends one contractor and asks Marilyn Adler to consent to that contractor. The letter does not include the elements necessary to constitute a contract as there is no offer to contract, nor any agreement to contract. At best the letter provides the Bank's analysis of bids received with a recommendation of which bid to select. Any contract claims arising from that letter must fail as being wholly without merit.

**\*6** The plaintiffs also allege that Sara Lentz's letter dated March 24, 1997 is a contract. (Plaintiffs' Opposition Memorandum, Ex. 20.) The letter presents a proposed distribution plan to Marilyn Adler and contains no contractual language. Therefore, it cannot support any contract claims against BankBoston.

**\*6** The Adlers contend that BankBoston is bound by promises allegedly made by Abraham Schultz to the Adlers to the extent that BankBoston is deemed to be Abraham's successor. BankBoston correctly argues that the Bank's obligations arise only pursuant to the Trust instrument and the donor's intent. The Adlers do not and frankly cannot dispute this argument. Therefore, any claims against BankBoston arising from Abraham Schultz's promises must fail.

**\*6** In summary, the Court ALLOWS BankBoston's motion for summary judgment on Count I, breach of contract.

### 2. Claims Arising From BankBoston's Duties as Trustee

**\*6** The Adlers claim that BankBoston breached its fiduciary duty to Marilyn Adler by allowing Abraham Schultz, co-trustee of the Mollie Trust, to invest certain distributions of Marilyn Adler from the Mollie Trust, by making inappropriate distributions of the Abraham and Mollie Trusts, by failing to distribute $75,000 in principal to Marilyn Adler from the Abraham Trust upon Abraham Schultz's death, by receiving fees based on the size of the trusts, and by seeking to preserve Marilyn Adler's trust assets for the benefit of Martin Schultz.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

**\*6** A trustee has the duty to execute the intent of the settlor, based on the language of the entire trust instrument construed in light of attendant circumstances. *Harrison v. Marcus,* 396 Mass. at 429, 486 N.E.2d 710. The trustee may not use that discretion so as to shift beneficial interests in the trust, even where a trust grants broad discretionary powers. *Fine v. Cohen,* 35 Mass.App.Ct. 610, 617, 623 N.E.2d 1134 (1993). Trustees may not act for their own interests in conflict with the interest of the beneficiaries. *Johnson v. Witkowski,* 30 Mass.App.Ct. 697, 706, 573 N.E.2d 513 (1991). The burden is on the trustee to prove good faith and fairness as well as to show that any questioned transaction was advantageous to the beneficiary. *Id.*

**\*7** As to the alleged investment by Abraham Schultz of certain of Marilyn Adler's distributions from the Mollie Trust, allegedly allowed by BankBoston, BankBoston asserts that the Adlers fail to identify any such distributions. BankBoston also maintains that Marilyn Adler acknowledged that the investments were made for her benefit and fails to show she was damaged by the investments. Further, BankBoston contends that Marilyn Adler's statements that she received K-1 forms and tax documents for the Mollie Trust from BankBoston indicates her awareness of the principal distributions. The Adlers fail to respond to this argument in their Opposition, but offer additional statements of facts in their Response to the Defendant's Statement of Undisputed Facts with regards to the Mollie Trust. As support for these factual statements the Adlers cite to their blanket affidavit, which the Court has stricken, above. Accordingly, the Court finds that there are no disputed material facts and as a matter of law, the alleged investment of the alleged distributions does not constitute breach of fiduciary duty by BankBoston.

**\*7** BankBoston contends that the Adlers' allegations of inappropriate distributions from the Abraham Trust are completely unsupported. The Adlers contend that BankBoston refused to distribute "a single penny" for Marilyn Adler's medical and living expenses prior to commencement of litigation. BankBoston offers evidence that it had distributed $98,698.56 as of August 6, 1998. See Lentz Aff., Ex. 8. Given that Abraham Schultz died on November 20, 1996, that BankBoston proposed a distribution plan in March 1997, and that plaintiffs' counsel made demand by letter dated May 16, 1997 that no distributions be made from the Abraham Estate,[FN12] the Adlers' suggestion that BankBoston delayed payments in bad faith is unfounded. The evidence

offers nothing to support the Adlers' claim.[FN13]

FN12. See Lentz Aff., Ex. 3.

FN13. The Adlers suggest that BankBoston made no payments for medical and living expenses until ordered by the Court in October 1997. BankBoston's evidence indicates payment of condominium expenses beginning in February 1997. See Lentz Aff., Ex. 8, p. 6-9.

**\*7** The Adlers further contend that BankBoston's distributions made after litigation began were not in keeping with the donor's intent, the trust terms, Marilyn Adler's age and needs, and BankBoston's promise to make generous distributions. In response, BankBoston argues that it acted in good faith to carry out Abraham's Schultz's intent, that it developed the distribution plan based on the information available to it and that Marilyn Adler failed to provide additional documentation to support her claim for greater regular distributions. As the Court concluded in Section III(B)(1) above, the promises were not a contract. The March 24, 1997 letter from BankBoston to Marilyn Adler [FN14] explains that the rationale for the proposed distribution is based on the documented past financial assistance from Marilyn's father and a concern that funds be available for her ongoing support. The proposed distribution plan included funds for health insurance, real estate taxes, homeowner's insurance and living and medical expenses. The plaintiffs fail to offer evidence that this distribution plan runs afoul of the Trust terms that BankBoston make payments to "provide for Marilyn's medical care and other living expenses, using as a guide the level of financial assistance the Donor provided during his lifetime." Indeed, there is evidence that Marilyn Adler's failure to provide required documentation has contributed to nonpayment of certain claims, contrary to plaintiffs' assertion that the Bank failed to inquire with diligence and reasonably into Marilyn's needs.[FN15]

FN14. See Lentz Aff., Ex. 2.

FN15. See Georgia Z. Beit's statements that home health aide claims had not been paid due to lack of supporting documentation. (Third Affidavit of Georgia Z. Beit, para. 5, BankBoston's Reply to plaintiffs' Opposition, Ex. 4.) See also discussion of BankBoston's efforts to obtain information

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

from Marilyn Adler, Lentz Aff., 2(c).

**\*8** The Adlers claim that BankBoston has a fiduciary duty to pay Marilyn Adler's medical bills pursuant to the Trust terms. This is a misinterpretation of the Trust language stated above. As BankBoston notes, there is no specific requirement that all Marilyn's medical bills be paid by the Abraham Trust.

**\*8** With respect to Mollie Trust distributions, BankBoston asserts that since 1986 Marilyn Adler had not objected to the $1,000 monthly distributions and periodic distributions of interest and principal. Citing case law that assent may be inferred from conduct and where plaintiff never repudiated payments, conduct affirmed payments, BankBoston maintains that it cannot be found to have breached its fiduciary duty. See _Reynolds v. Remick,_ 333 Mass. 1, 10, 127 N.E.2d 653 (1954); _Smith v. Paquin,_ 325 Mass. 231, 236, 90 N.E.2d 1 (1950). The Adlers fail to demonstrate any actions of BankBoston that breach its fiduciary duty.[FN16]

> FN16. The Adlers allege in their Opposition, without supporting affidavits, that BankBoston refused Marilyn the $1,000 distribution in April 1997. They further allege in their Response to defendant's statement of undisputed facts that following Abraham's death, the Bank discontinued "routine" payments of $65,000 for living expenses. They offer no supporting evidence for this claim.

**\*8** The Adlers allege that BankBoston improperly failed to distribute $75,000 in principal from the Abraham Trust when Abraham died. See Abraham Trust, Article SIXTH (a). BankBoston offers evidence that the Trust directed that payment of the lump sum occur after Marilyn Adler's share of the Trust is determined and that BankBoston could determine the share only after distribution of estate taxes from the Trust to the executor and after receipt of estimates of other estate expenses. See Lentz Aff., 2(d)(2). The Court finds that the Adlers offer no evidence of bad faith, self dealing or failure to comply with the donor's intent.

**\*8** The Adlers' allegation that BankBoston's receipt of fees as trustee based on the size of the trusts demonstrates a motive for the Bank to deny distributions to Marilyn Adler is an unfounded conclusion. The Adlers offer no facts to buttress their claim of wrongdoing on this basis by BankBoston.

Payment of fees to the trust administrator is proper. See _Rothwell v. Rothwell,_ 283 Mass. 563, 571, 186 N.E. 662 (1933).

**\*8** Finally, the Adlers claim that BankBoston seeks to preserve Marilyn Adler's trust assets for the benefit of Martin Schultz, thereby constituting a conflict of interest. As support, the Adlers maintain that BankBoston sought approval from Martin Schultz for Marilyn Adler's distributions, referencing BankBoston's March 1997 letter, a June 1997 fax to Marilyn Adler and a handwritten bank memo dated July 25, 1997 that "Martin says that he doesn't want to pay anything." [FN17] However, BankBoston notes that the letter proposes securing Martin Schultz's approval, as trust remainderman, of the proposed distribution guidelines.[FN18] The fax informed Marilyn Adler that counsel had advised securing approval of the remainderman interest, Martin Schultz, in light of Marilyn Adler's Notice of Demand.[FN19] The bank memo does not indicate from what source Martin Schultz does not want to pay anything, nor in what context. The language of these documents falls far short of evidencing a preference for Martin Schultz's interest to the detriment of his sister and offers no support to the Adlers' allegation. Further, the Bank offers testimony from both Martin Schultz and a BankBoston official that Martin Schultz did not approve Trust distributions.[FN20]

> FN17. See plaintiffs' Opposition Memorandum, Ex. 20, 22, 23.

> FN18. The March 1997 letter reads in relevant part:
> I also propose to ask Martin Schultz as remainderman of the trust to approve these guidelines as well.

> FN19. The June 1997 fax reads in relevant part:
> However, while this Notice of Demand is in effect, our counsel advises us that we ask for all requests to be made in writing and that we also get the approval of the remainderman interest, namely Martin Schultz.

> FN20. See Lentz Aff., Ex. 7, 8.

**\*9** The Adlers further maintain that Martin Schultz has received "hundreds of thousands of dollars" from the Abraham Trust and that BankBoston's list of payments to Marilyn Adler is "inaccurate."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

BankBoston has submitted affidavit testimony that Marilyn Adler received 2.7 times the amount received by Martin Schultz and his issue from the Mollie Trust during Abraham's lifetime, and since Abraham's death, Martin has received $10,000 in contrast with payments to or for Marilyn totaling $98,698.55. See Lentz Aff., para. 18 and Ex. 10. The Adlers offer no evidence to contradict the Bank's testimony.

**\*9** In summary, the Adlers fail to show disputed issues of material fact regarding their claim of breach of fiduciary duty against BankBoston. BankBoston's motion for summary judgment on Count II is ALLOWED.

**\*9** A number of additional claims require analyses overlapping that of the breach of fiduciary duty. A trustee's fiduciary duty binds the trustee to good faith and fair dealing. *O'Brien v. Dwight,* 363 Mass. 256, 294-95, 294 N.E.2d 363 (1973). For the reasons discussed above, the Adlers' claim of breach of implied covenant of good faith and fair dealing falls and summary judgment on Count IV for BankBoston is ALLOWED.

**\*9** The Adlers claim BankBoston has been unjustly enriched. To succeed, the Adlers must show that BankBoston was unjustly enriched at the expense of the Adlers. *Fox v. F & J Gattozzi Corp.,* 41 Mass.App.Ct. 581, 589, 672 N.E.2d 547 (1996). The Adlers allege unjust enrichment based on the fact that it receives a percentage fee to administer the Trust and allegedly is attempting to enlarge the assets. The Adlers also assert that BankBoston allegedly has received $40,000 in fees from Martin Schultz and hopes to obtain further investment funds from him, and that BankBoston refused to repair the Florida condominium. See Plaintiffs' Answers to Interrogatories, No. 7 (Defendant's Memorandum, Ex. 2). As to the Bank's fee, as discussed above, there is no evidence of impropriety. As to the Bank's desire to obtain investment funds from Martin Schultz, the only evidence the Adlers offer is a form indicating Martin Schultz's request to invest his distributions from the Mollie Trust. (Plaintiffs' Opposition, Ex. 32.) Nothing in the form supports any allegation of enrichment, just or unjust, on BankBoston's part nor is there evidence of the $40,000 fee. As to the alleged refusal to repair the condominium, it is mysterious how this might in some way contribute to the Bank's unjust enrichment. The Adlers present no evidence to clarify the matter. The Court ALLOWS BankBoston's motion for summary judgment on Count XI.

**\*9** The Adlers' claims of breach of loyalty and/or conflict of interest and/or self dealing have already been addressed in the breach of fiduciary duty analysis, above. Summary judgment for BankBoston on this claim, Count XVII, is ALLOWED.

### 3. Claims of Fraud/Misrepresentation and Negligent Misrepresentation

**\*10** BankBoston argues that the Adlers' claims of fraud/misrepresentation and negligent misrepresentation must fail because the Adlers failed to plead with particularity pursuant to Mass.R.Civ.P. 9(b). Even if the pleadings were sufficient, BankBoston argues that the Adlers fail to present evidence to support each element of the claim. The Adlers contend that they have set forth sufficient facts to raise a triable issue and question BankBoston's description of particularity requirements. They further contend that the issue of intent is not appropriate for summary judgment.

**\*10** When considering a motion for summary judgment the Court need not determine whether the claim was pled properly, rather it must determine whether there are no genuine issues of fact and that the moving party is entitled to judgment as a matter of law. *Cassesso,* 390 Mass. at 422, 456 N.E.2d 1123. Here, the movant must show that the plaintiffs fail to present evidence showing that the Bank made a "false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Barrett Asso., Inc. v. Aronson,* 346 Mass. 150, 152, 190 N.E.2d 867 (1963) (citations omitted). To survive summary judgment on a claim of negligent misrepresentation, the plaintiff must show that the defendant acted unfairly or unreasonably. *Adams v. Hyannis Harborview, Inc.,* 838 F.Supp. 676, 694 (D.Mass.1993).

**\*10** The Court has reviewed the issue of BankBoston's alleged promises and assurances to Marilyn Adler, above, and found that there was no evidence of bad faith or of detriment to the plaintiff. Further, there is no evidence suggesting that BankBoston made any false representations of material fact to the plaintiffs. Accordingly, there can be no basis for claims of fraud/misrepresentation or negligent misrepresentation. BankBoston's motion for summary judgment on Counts III and XX is *ALLOWED.*

Not Reported in N.E.2d                                                                                            Page 9
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

### 4. Conversion

**\*10** The Adlers allege that BankBoston engaged in acts of conversion against the Adlers. The Adlers point to alleged improper dominion or control over Trust property as evidence of conversion. BankBoston correctly asserts that Charles Adler's claim must fail because he holds no legal rights or interests in the Trust property. BankBoston further maintains that Marilyn Adler's claim fails both because of lack of factual support and because it was raised after the three year statute of limitations for tort claims.

**\*10** The Adlers identify alleged conversion with respect to three legal interests: Marilyn Adler's bank account, Marilyn's Trust funds, and Marilyn's $75,000 principal distribution from the Abraham Trust. The Court need not again address the propriety of BankBoston's administration of Marilyn's Trust funds nor the $75,000 principal distribution. As to the bank account, the Adlers allege that the Bank participated in the conversion, carried out by Abraham Schultz, of distributions of some $150,000 for Marilyn from the Mollie Trust to a clandestine account. See Amended Complaint, Ex. 1 of defendant's memorandum and Plaintiffs' Answers to Interrogatories No. 6, Ex. 2 of defendant's memorandum. As discussed above,[FN21] the Court finds there is no evidence to support any claim of mishandling of the Mollie Trust distributions. The Court need not address the Adlers' claim that there are issues of fact with regards to the date at which Marilyn learned of the alleged fraud, for purposes of determining application of the statute of limitations. The Adlers do not respond to the Bank's contention that Charles Adler has no legal interest to support a conversion claim here. Charles Adler's conversion claim is without merit. The Court now ALLOWS BankBoston's motion for summary judgment on the conversion claim, Count VIII.

> FN21. See discussion of Mollie Trust distributions in Section II.

### 5. Claims of Civil Rico and Chapter 93A Violations

**\*11** In its discussion of sanctions against plaintiffs and their attorney, above, the Court noted that both the c. 93A and civil RICO claims were dismissed as against all defendants. Accordingly, the Court ALLOWS summary judgment for BankBoston on

Counts VI and IX.

### 6. Intentional Infliction of Severe Emotional Distress[FN22]

> FN22. BankBoston erroneously identifies Count XXI as negligent infliction of emotional distress in subheading XXI of its memorandum. However, its legal argument properly addresses intentional infliction of emotional distress.

**\*11** To succeed on a claim of intentional infliction of severe emotional distress, the plaintiffs must demonstrate, among other elements, that the defendant's conduct was "extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community." *Kurker v. Hill,* 44 Mass.App.Ct. 184, 193, 689 N.E.2d 833 (1998).

**\*11** BankBoston argues that the Adlers do not present evidence that the Bank's conduct was extreme and outrageous, relying on two decisions in which the Court held that actions associated with a breach of fiduciary duty did not constitute extreme and outrageous conduct. See *Kurker,* 44 Mass.App.Ct. at 193, 689 N.E.2d 833 (complaint alleged that attorneys facilitated the plaintiff's loss of his interest, salaried position and benefits in a family business); *Garrity v. Garrity,* 399 Mass. 367, 369-70, 504 N.E.2d 617 (1987) (complaint alleged that defendant, who with the plaintiff were the sole stockholders, directors and officers of a close corporation, diverted funds). The Adlers contend that the issue of whether the defendant's conduct was extreme and outrageous is a question of fact for the jury to determine.

**\*11** To determine the nature of a defendant's conduct, it is not always necessary to place the question before a jury. Only if the conduct "may reasonably be viewed" as extreme and outrageous is the issue one for the jury. *Boyle v. Week,* 378 Mass. 592, 595, 392 N.E.2d 1053 (1979). In the instant case, the Court has already allowed summary judgment for BankBoston on the Adlers' claim of breach of fiduciary duty. In light of the Court's order and the decisions noted above that evaluate the nature of a fiduciary's bad acts as falling short of the point of extreme and outrageous, it is inconceivable that a jury might reasonably view the Bank's actions as falling to such a level of intolerability. Accordingly, BankBoston's motion for summary judgment on this claim, Count XXI, is ALLOWED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                            Page 10
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

### 7. Civil Conspiracy

**\*11** BankBoston argues that the Adlers fail to present facts supporting either of the two elements of civil conspiracy: common design or agreement to commit a wrongful act and a tortious act in furtherance of the agreement. See *Aetna Cas. Sur. Co. v. P & P Autobody,* 43 F.3d 1546, 1564 (1st Cir.1994) (citing Restatement (Second) of Torts § 876 cmt. b). The Adlers respond that whether or not the Bank conspired with Beverly and Martin Adler is a question of fact for the jury, noting that Massachusetts case law permits inferences of conspiracy from the conduct and actions of the parties. See *Nelson v. Nelson,* 343 Mass. 220, 222, 177 N.E.2d 887 (1961).

**\*12** Once again, issues of fact go before a jury where the plaintiffs present evidence of facts such that a reasonable jury might determine both elements of a conspiracy claim. The Adlers do not present the requisite evidence. They highlight a November 25, 1996 meeting among BankBoston, Marilyn Schultz and Marilyn Adler and state in conclusory fashion that BankBoston and Martin arranged the meeting to mislead Martin. The only evidence the Adlers present regarding the meeting is a notation "nothing to hire attorney about" handwritten on a "R. & G. Memorandum" sheet.[FN23] With no supporting affidavits, the Adlers contend that BankBoston and Martin assured Marilyn of generous distributions.

> FN23. The Adlers claim this reflects the advice of an attorney from Ropes and Gray, also present at the meeting. (See Plaintiffs' Opposition, Ex. 18.)

**\*12** The Adlers also highlight alleged conspiratorial conduct between Martin and Beverly Schultz and BankBoston during the period following the November meeting until March 24, 1997. They allege that Martin and Beverly put BankBoston on notice that Marilyn's medical bills should not be paid when they "warned" and "instructed" the Bank to "carefully" review a medical bill related to a broken wrist.[FN24] (Plaintiffs' Opposition, Ex. 19.) The Adlers then contend that BankBoston has refused to pay certain medical bills, following Martin's "warning." They also cite to BankBoston's March 24, 1997 letter in which Sarah Lentz wrote, "I also propose to ask Martin Schultz as remainderman of the trust to approve these guidelines as well"; the June 12, 1997

fax in which Sarah Lentz wrote, "However, while this Notice of Demand is in effect, our counsel advises us that we ask for all requests to be made in writing and that we also get the approval of the remainder interest, namely Martin Schultz," and a Bank memo that reads "7/25/97-Martin says that he doesn't want to pay anything." (Plaintiffs' Opposition, Ex. 20, 22, 23.) The Court has already reviewed the Adlers' claims that the Bank deliberately held back on payment of medical bills, and found them without evidentiary support. Similarly, the Court reviewed the three documents referred to above and found they did not provide evidence of breach of fiduciary duty. On the basis of this evidence, the Court now finds that the Adlers cannot support their claim of conspiracy against BankBoston, and therefore ALLOWS the Bank's motion for summary judgment.

> FN24. The Adlers cite the deposition of Sarah Lentz, trust officer at BankBoston, stating in pertinent part,
> My sense was, and the reason I put this in this discretionarythis statement, is that it's unusual for the remainder interest to have concerns about ongoing administration of the estate; and whenever a remainderman makes a statement that should review things carefully, it does put me on notice that I should be careful in distributions.

### 8. Remedial Orders Sought by the Plaintiffs

**\*12** In addition to their claims of wrongdoing, the Adlers seek various remedial orders, including a constructive trust (Count XI), an equitable lien (Count XIII), an accounting (Count XIII), removal of trustees (Count XIV), declaratory judgment (Count XVIII), and an equitable order to compel trust distributions (Count XIX).

**\*12** The Adlers seek ownership of the Florida condominium by way of a constructive trust for their benefit on the grounds that they are the true and legal owners of the condominium. In the alternative, they seek an equitable lien against the Abraham Trust for $140,000 they allegedly paid towards the condominium. Both requests are remedies, not cause of actions. As a remedy, it is premature for the Court to decide and as a cause of action, it fails as a matter of law. See *Shick v. Farmers Home Admin.,* 583 F.Supp. 534, 536 n. 2 (D.Mass.1984) (aff d in part, rev'd in part on other grounds, remanded 748 F.2d 35 (1st Cir.1984)). The Court ALLOWS summary judgment for BankBoston on Counts XI and XII to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

the extent that these counts are treated as causes of action. Treating these counts as requests for remedies, there is no need for the Court to take any action at this time.

*13 The Adlers claim that BankBoston breached its duty to provide an annual accounting of the Mollie Trust to Marilyn Adler by its failure to provide annual accountings during the period 1986 to January 1997, by providing an illegible accounting in January 1997 and by failing to provide monthly accountings. The Adlers demand an accounting of the Mollie and Abraham Trusts.

*13 A trust beneficiary may compel the trustee to provide an accounting. *Briggs v. Crowley*, 352 Mass. 194, 199, 224 N.E.2d 417 (1967). Charles Adler is not a beneficiary of either the Mollie or Abraham Trusts and so may not claim an accounting against BankBoston. There is no dispute that Marilyn Adler received copies of all the annual Mollie Trust accountings in January 1997, following the death of the Mollie Trust co-beneficiary, Abraham Schultz. It is also undisputed that the terms of both Trusts call for annual accountings and that after January 1997 BankBoston sent quarterly accountings to Marilyn Adler. Moreover, plaintiffs have stated that the accountings "received in 1997 appear on the surface to contain adequate disclosure of the assets." See Plaintiffs' Answer to Interrogatory, No. 9, BankBoston Memorandum, Ex. 2.

*13 Plaintiffs' claim here boils down to a complaint that the accountings received were illegible and that BankBoston sent quarterly rather than monthly accountings, although only obligated to provide annual accountings. This claim, like so many of the plaintiffs' claims lacks merit. There is no evidence of any breach of duty by BankBoston and therefore no grounds on which to order additional accountings. BankBoston's motion for summary judgment on Count XIII is ALLOWED.

*13 Plaintiffs' claim for removal of BankBoston as trustee is based on its allegation of hostility between BankBoston and Marilyn Adler to an extent that BankBoston is unable to make distribution decisions objectively. A trustee may be removed when hostility threatens to interfere with administration of the trust, particularly when distributions are at the discretion of the trustee. *Shear v. Gabovitch*, 43 Mass.App.Ct. 650, 689, 685 N.E.2d 1168 (1997). However, the mere existence of hostility does not require removal of the trustee and it is recognized that proper administration of a trust often results in hostility of

some of the beneficiaries. *Id.* at 688, 685 N.E.2d 1168. In the instant case, there may well be hostility between BankBoston and Marilyn Adler. Nevertheless, the Adlers have not produced evidence to indicate that BankBoston's actions as trustee have been tainted by the alleged hostility so as to warrant removal. Accordingly, BankBoston's motion for summary judgment on Count XIV is ALLOWED.

*13 BankBoston's motion for summary judgment on plaintiffs' Count XVIII demanding declaratory judgment is uncontested by the plaintiffs. BankBoston correctly argues that declaratory judgment is a form of relief, not a cause of action. The Court ALLOWS BankBoston's motion for summary judgment on Count XVIII.

*14 The Adlers seek an equitable order from the Court to compel distributions to Marilyn Adler and argue that summary judgment is improper because there are disputed facts concerning BankBoston's alleged breach of contract and breach of fiduciary duty, claims which form the basis of the order they seek. As discussed above, the Court finds there are no material disputed facts concerning the breaches alleged by the Adlers. Consequently, there is no basis for this remedy which the Adlers seek and summary judgment on Count XIX is ALLOWED for BankBoston.

## ORDER

*14 1. BankBoston's Motion To Strike the Adler affidavit, Exhibit 1, and Exhibits 4-14 is ALLOWED to the extent specified on pages 2-3 of this Memorandum of Decision.

*14 2. BankBoston's Motion to Strike the plaintiffs' Opposition Memorandum in ALLOWED in part and DENIED in part as specified on page 6 of this Memorandum of Decision.

*14 3. For the foregoing reasons, it is hereby ORDERED that BankBoston's motion for summary judgment on the Adlers' claims of breach of contract, breach of fiduciary duty, fraud/misrepresentation, breach of implied covenant of good faith and fair dealing, violations of G.L.c. 93A, conversion, violations of the Federal civil RICO statute, unjust enrichment, breach of loyalty/conflict of interest/self dealing, negligent misrepresentation, intentional infliction of emotional distress and civil conspiracy, Counts I, II, III, IV, VI, VIII, IX, XI, XVII, XX, XXI, XXII, respectively, as well as counts seeking a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)
(Cite as: Not Reported in N.E.2d)

Page 12

constructive trust, an equitable lien, an accounting, removal of trustees, declaratory judgment and an equitable order to compel trust distributions, Counts XI, XII, XIII, XIV, XVIII and XIX, respectively, be ALLOWED.

*14 4. BankBoston's Motion for Sanctions is ALLOWED in part and DENIED in part as specified on pages 3-6 of this Memorandum of Decision. Pursuant to Mass.R.Civ.P. 11 the Court shall award BankBoston costs and attorneys fees. These costs and attorneys fees shall be assessed against plaintiffs' counsel. BankBoston shall, within 30 days of the date of this Order, file a memorandum with supporting affidavits requesting the amount of costs and attorneys fees it proposes that the Court award it. Within 45 days of the date of this Order, the plaintiffs shall file their opposition, if any, to BankBoston's request.

Mass.Super.,1999.
Adler v. Schultz
Not Reported in N.E.2d, 1999 WL 1320337 (Mass.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Deposition of James Rapoza                                                                   November 22, 2006
Case 1:05-cv-10605-JLT     Document 35-3     Filed 03/19/2007     Page 2 of 2
Daniel Greenwood v. Yale Appliance and Lighting, Inc.

25

1   work during that week, or ten days I guess it was,
2   related to the condition that caused him to be
3   hospitalized?
4           MS. KUGELL: Objection. You can
5   answer.
6           THE WITNESS: I can only go by what Dan
7   was telling me at the time. Dan was telling me at the
8   time he wasn't able to work. And all that I was
9   asking Dan was was for documentation stating such, as
10  we do with any -- as is expected of any employee.
11  BY MR. RICE:
12      Q.   But, you talk with Greenwood every day that
13  you worked together, right?
14      A.   No, I wouldn't say every day.
15      Q.   You talk to him a lot, though?
16      A.   Are we talking about since I was inside, or
17  both because --
18      Q.   Since you were inside. You were supervising
19  the drivers?
20      A.   Yeah, we talked frequently.
21      Q.   You had casual conversation sometimes,
22  didn't you, just about like sports teams and that kind
23  of thing?
24      A.   I would say we had casual conversations.

26

1   Q.   It wasn't a formal relationship between you
2   two guys?
3       A.   It was a work relationship.
4       Q.   So, when you called him up, that never came
5   up, the subject of what it was that caused this
6   hospitalization?
7       A.   When I spoke with Dan on Wednesday, he was
8   not at that point in time clear as why he was being
9   hospitalized. He had something going on with his
10  belly, and they wanted him to stay in the hospital.
11  That was his knowledge at the time, so therefore, it
12  was my knowledge.
13      Q.   Okay. So, he ends up at the busiest time of
14  the year for you guys missing like a week of work?
15      A.   Correct.
16      Q.   So, didn't it -- it didn't peek your
17  curiosity as to what this condition was?
18      A.   I don't recall at the time whether you,
19  know, asking him specifically what exactly is wrong
20  with your stomach. I don't recall asking that.
21      Q.   Well, but you did know -- it wasn't a
22  surprise to you during the week that after you had the
23  first conversation with him that he wasn't reporting,
24  correct? Because he told you he couldn't report to

27

1   work?
2           MS. KUGELL: Objection. Can you be
3   clear about when you are talking about?
4   BY MR. RICE:
5       Q.   You had a conversation with him on Monday
6   after he got out --
7       A.   I had a conversation with Dan on Friday
8   stating that he had a doctor's appointment on that
9   following Monday, and to call me afterwards. So, I
10  knew on Monday he would not be at work.
11      Q.   And you did talk to him?
12      A.   I talked to him on Monday. I called Dan on
13  Monday after he did not call me by the afternoon.
14      Q.   And he said he wasn't up for working, or
15  light duty?
16      A.   At that point in time he said his doctor's
17  appointment had been cancelled, and that he was
18  rescheduled for the next day.
19      Q.   And then you did have a subsequent
20  conversation with him in which he said he wasn't able
21  to work, or to do light duty?
22          MS. KUGELL: Objection; you can answer.
23          THE WITNESS: Dan told me he was not up
24  for work, and that I just asked that we need medical

28

1   documentation.
2       Q.   Did you at that time -- when you had that
3   conversation with him, did you say, "Well, do you have
4   an estimated return time?"
5       A.   Not on that particular Monday because I was
6   waiting again for his rescheduled appointment, which
7   he had told me on the Tuesday.
8       Q.   But, obviously -- let me strike that
9   "obviously" from my question. Being able to know what
10  your manpower was going to be for that week was
11  important, right?
12      A.   It is always important.
13      Q.   So, you didn't ask Greenwood when he thought
14  he would be back?
15      A.   Not on the Monday because, again, he hadn't
16  seen his doctor, yet.
17      Q.   Subsequent to that, did you ask him when he
18  was going to be back?
19      A.   On Tuesday, after Dan came into the shop, he
20  said that his doctor told him he would have to take
21  the week off. And I had asked at that point again for
22  documentation stating such.
23      Q.   When he said that he had to take the week
24  off, did you believe that he had to take the week off

# EXHIBIT C

33

1    A.    Yeah, that's fair to say.

2    Q.    I am going to ask you to look at the

3    beginning of the first full paragraph of the second

4    page of this document.

5    A.    Okay.

6    Q.    See the sentence that is the

7    second-to-the-last sentence in the -- why don't I

8    actually just ask you to read that first full

9    paragraph to yourself.

10   A.    Okay.  (Witness reading document)

11   Q.    So upon reading this, now that you have read

12   this, is this an accurate depiction of what occurred

13   at the time?

14   A.    Yes.

15   Q.    So, during your conversation on Tuesday

16   afternoon, did you understand that Mr. Greenwood was

17   going to check with his doctor to see if he could

18   perform light duty?

19   A.    Yes.

20   Q.    And did you ever hear back from him about

21   whether he could do that?

22   A.    No, I did not.

23   Q.    So, you did not hear from him on Wednesday?

24   A.    Correct.

34

1    Q.    As the document indicates that he said he

2    would provide that information on Wednesday?

3    A.    Correct, that is correct.

4    Q.    So, at the time did he say he wasn't up for

5    it, or did he say he would check with his doctor?

6    A.    On that Tuesday he said that he would check

7    with his doctor, yes.

8    Q.    And you didn't talk to him again until

9    Friday; is that correct?

10   A.    Correct.

11   Q.    So, is it a fair statement -- let me strike

12   that and ask you a different question.  There was some

13   discussion that you had with Attorney Rice about Mr.

14   Greenwood quote "coming off the truck."  Do you

15   remember that conversation with Attorney Rice?

16   A.    Yes.

17   Q.    The conversations that you were referring to

18   relative to Mr. Greenwood saying he wanted off the

19   truck, when did those conversations, or -- strike

20   that.  Did those conversations happen during that week

21   of August 2004?

22   A.    No, no.

23   Q.    You didn't have any conversations about,

24   specifically, about him coming quote "off the truck,"

35

1    during August 2004?

2    A.    Correct.

3    Q.    With respect to those conversations that you

4    were referring to with him coming off the truck, the

5    conversations you were referring to, those had to do

6    with him being reassigned out of the delivery area,

7    correct?

8    A.    Correct, correct.

9    Q.    They were not referring to light duty?

10   A.    No.

11   Q.    Sitting here today, do you have a memory of

12   being present when Mr. Greenwood presented Exhibit 1

13   to Mr. Frazer's deposition to Yale?

14   A.    Yes.

15   Q.    So, you were present when he presented that?

16   A.    Correct.

17   Q.    And you were present during the

18   conversations that Mr. Frazer had with Mr. Greenwood

19   about that note?

20   A.    Correct.

21   Q.    And Exhibit 1 to your deposition, is that an

22   accurate depiction of your memory of what occurred

23   concerning Mr. Greenwood leading up to his separation

24   from Yale's employment?

36

1    A.    Yes.

2    Q.    Okay.

3          MS. KUGELL:  Why don't we take a

4    30-second break so Lewis and I can confer, but I think

5    we're pretty much done.

6          (Brief recess; 12:48 to 12:53 p.m.)

7          MS. KUGELL:  I have no further

8    questions for this witness at this time.

9          MR. RICE:  We are done.

10

11         (The deposition was concluded at 12:53 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24