# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                   )
DANIEL GREENWOOD,            )
                                   )
                   Plaintiff,     )
                                   )   C.A. No. 05-10605-JLT
v.                                )
                                   )
YALE APPLIANCE AND LIGHTING, INC.,  )
                                   )
                   Defendant.   )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE PORTIONS OF PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS, OR IN THE ALTERNATIVE, TO DISREGARD THE IDENTIFIED PORTIONS IN CONSIDERING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, WITH INCORPORATED MEMORANDUM OF LAW

Now comes the Plaintiff, and opposes the Defendant's Motion To Strike Portions Of Plaintiff's Statement Of Additional Material Facts, Or In The Alternative, To Disregard The Identified Portions In Considering Defendant's Motion For Summary Judgment. The Plaintiff's arguments in opposition are set forth below, and correspond with the argument leads in the Defendant's Memorandum. They are lettered for the court's convenience.

**A.**     **Response to Defendant's Allegation of Objectionable "Facts" in Paragraphs 2-3 of Plaintiff's Facts:**

Regarding the Defendant's objection to the Plaintiff's use of Mr. Frazer's testimony about Yale's use of vocational assessments to make light duty assignments for Greenwood specifically in January of 2004, and the departure from this practice in

1

August of 2004, the terminology was first used in Mr. Frazer's testimony in this exchange, reproduced here:[1]

> Q.  Did he return with any restrictions?
> A.  He returned to work with restrictions and was put to work on light duty.
> Q.  Okay.  What was his light-duty assignment?
> A.  At the time I believe he was doing some paperwork in the office.  He was doing some small light construction for a training facility that we used. Building -- when you talk about Sub-Zeros, building a sort of cabinet in the warehouse for us to do training, He was helping as a runner in the office is what I remember.
> Q.  How long did he stay on light duty?
> A.  I don't remember.
> Q.  Did you get a vocational assessment from his doctor about what restrictions he might have been under?
> A.  I believe so, yes.
> Q.  Okay.  Who asked, or how did it come about that a vocational assessment was given?
> A.  We require that from any employee returning to work from an injury so that we know what they're capable of doing as a matter of policy.
> Q.  You get that before you formulate light duty?
> A.  Absolutely.

Later, to show that Yale deviated from the policy of only making light duty assignments on the basis of a vocational assessment when Greenwood missed work due to diverticulitis in August of 2004, this testimony was gleaned from Mr. Frazer:

> Q.  And when did you conclude that this note was not responsive to what you were looking for?
> A.  The moment he gave it to me.
> Q.  And so, did you tell him that?
> A.  Absolutely.
> Q.  What did you say?

---

[1] Ex. A, Frazer Tr., Ex. A, p. 19-20.

A.  I said, This does not excuse you from where you have been for the last week."
Q.  And what did you say? Anything else?
A.  I said that I would be back in touch with him.
Q.  Did you say, "Go back to your doctor and come back with a Vocational Assessment?
A.  No.
Q.  Well, he had given you one before, though, hadn't he?
A.  No.
Q.  When he came back from Comp the first time, you didn't get a Vocational Assessment?
A.  That was way previous to this.
Q.  Okay.  But, your company, you get those things, Vocational Assessments?
A.  Yes.[2]

Contrary to the Defendant's argument, therefore, as indicated, Frazer testified that Yale requires every employee returning to work to undergo a vocational assessment before formulating a light duty assignment, and that Greenwood was given one before he was given his light duty assignment in January of 2004.  Moreover, he testified that Yale departed from this practice when Greenwood's return to work was contemplated in August of 2004.  Mr. Frazer's testimony, therefore, supports the assertions in paragraphs 2 and 3 of the Plaintiff's Statement of Material Facts, and they are not objectionable, and should be stricken.

**B.  Plaintiff's Response to Defendant's Allegation of Objectionable "Facts" In Paragraph 12 of Plaintiff's Facts.**

The Defendant cites as "objectionable" the Plaintiff's assertion that on Monday, August 2, 2004, Rapoza did not ask Greenwood when he might be able to return to work. The Defendant does not attempt to show, by citation to Mr. Rapoza's deposition, or to his affidavit, or any other source, that Rapoza did ask Greenwood when he might be able to

---

[2]Ex. A, Frazer Tr./29-30.

return to work in this conversation.  Rather, it objects to the assertion because it implies that Rapoza did not ask Greenwood, generally, for "information" about his absences there is no evidentiary or other basis, other than the Defendant's concern about what might be implied from Rapoza's failure to ask Greenwood about a return.  Of course, it is well within the province of a factfinder to draw reasonable inferences from admissible evidence. The Defendant, therefore, has not stated a valid reason to strike this assertion, and this part of its Motion should be denied

      **C.**     **Plaintiff's Response to Defendant's Allegation of Objectionable "Facts" In Paragraph 12 of Plaintiff's Facts**

The Defendant cites as objectionable the Plaintiff's assertion that "Rapoza did not ask Greenwood when he might be able to return to work in this conversation."  The conversation alluded to took place on Monday, August 2, 2004.[3]  The Defendant's objection to the Plaintiff's assertion is groundless, because Rapoza plainly stated in his deposition that he did not ask Greenwood in this conversation when he would be back, and provided a rationale for not asking him this question.

> Q.  So, you didn't ask Greenwood when he thought he would be back?
> A.  Not on the Monday because, again, he hadn't
> seen his doctor, yet.

Accordingly, this part of the Defendant's motion should be denied.

      **D.**     **Plaintiff's Response To Defendant's Allegation of Objectionable "Facts" in Paragraph 13 of Plaintiff's Facts.**

Next, contrary to the Defendant's argument, Rapoza's deposition testimony supports Greenwood's assertion that he informed Rapoza that he could not perform light duty work.  The relevant portion of the testimony[4] is reproduced here:

---

[3] Ex. B, Rapoza Tr./28.
[4] Ex. B., Rapoza Tr./14-15.

> Q.  How about in terms of getting in touch with Greenwood and trying to figure out if and when I was going to come back?
> A.   After I spoke with his girlfriend on that Tuesday afternoon, Dan came into the office later on that Tuesday probably a couple of hours later saying that he was at the appointment; that he had to be out for the week per his doctor; that he couldn't perform any functions.  I asked him if he was able to do any light duty; that we could use his help in the office, or in the warehouse and if he had any documentation with him for us. And he didn't have any at the time. I told him we would need that.
> Q.  Okay.
> A.  At that point in time --
> Q.  *Did he say that he couldn't do light duty?*
> A.  *He said he wasn't up for it, if I remember Correctly*  (Emphasis added.)

As indicated by the emphasized testimony quoted above, there is plainly a factual basis, in the form of Mr. Rapoza's sworn testimony, to support Greenwood's assertion that he could not perform light duty.   The Defendant's motion on this point should therefore be denied.

### E.    Plaintiff's Response Defendant's Allegation Of Objectionable "Facts" in Paragraph 14 of Plaintiff's Facts And Corresponding Portions of Plaintiff's Affidavit, Par. 7

Regarding the last subject of the Defendant's Motion, which in summary objects to Greenwood's assertions that Frazer made reference to Greenwood's age as limiting his ability to deliver heavy appliances, first, Greenwood alluded to these statements in his deposition testimony,[5] which is reproduced here:

> A. Then I think -- you know, I had another appointment with my doctor to get me cleared for work. He told me to -- you know, I told him -- I

---

[5] Def.'s Summary Judgment Ex. 1, Greenwood Tr./187.

think I had an appointment for Tuesday, for Monday or Tuesday. And he told me, you know, I told him I'd see him then. Then they were telling me, you know, we're busy, we're this, we're that, "I had nobody to run this truck, that truck. You really put us in a tough position." You know, my thing was, "Hey, you know what, I'm sick. You know, I'm trying to recover, you know." And, you know, he told me, "Well, you seem to be getting hurt a lot," and this and that. "Maybe you're too old for that. You know, maybe you're too old to keep doing what you're doing." I told him, you know, I mean I got hurt, you know, the previous year, you know what I mean, doing their work and doing the best I could. You know, I have that hernia injury, you know, and he was just -- "Well, you're getting hurt. You're getting hurt too much. How old are you," this and that. Basically telling me I couldn't do what I was doing.

Moreover, even if Greenwood had not offered testimony at his deposition consistent with his Affidavit and Statement of Facts, the part of Greenwood's deposition testimony cited by the Defendant as "contradictory" does not actually contradict assertions made by Greenwood in his summary judgment opposition, but merely expands on what was covered in the conversation.   It is permissible for Greenwood in his Affidavit, as it would be in his testimony on direct or redirect examination, to include responses not mentioned in his prior testimony.   There is thus no basis to strike these assertions.

Moreover, as the Defendant is aware, the attribution of age-biased remarks to the Defendant that Greenwood makes in paragraph 14 of his Statement of Facts , as well as in paragraph 7 of his Affidavit, correspond almost verbatim with submissions he made to the Massachusetts Commission Against Discrimination, *pro se*, on September 14, 2004,

and December 3, 2004, at the inception of this controversy, years before he was deposed in October of 2006.[6] ,

First, by a sworn statement that accompanied the Charge[7] he filed with the MCAD on September 17, 2004, before he supplemented it with the foregoing statement, Greenwood stated as follows (emphasis added):

> 1. I have been employed with Yale Electric as a Truck Driver since 1998. My responsibilities included delivering and installing major appliances.
>
> 2. Throughout my employment, I consistently received outstanding performance evaluations. Until November 2003, I never missed a day of work.
>
> 3. In November of 2003, I was required to have hernia surgery and received workers' comp. I was out of work for approximately six-seven weeks.
>
> 4, Around thus Lewis Frazier and James Rapoza, my supervisors, began suggesting that I was too old for the job and might want to think about finding another job.
>
> 5. When I returned to work, I continued to receive outstanding evaluations.
>
> 6. On July 27 2004, I began experiencing abdominal pain and, after finishing my shift, I met with Lewis Frazier to discuss the pain. He said he didn't want to hear about as they had "just dealt" with my hernia. Later that day, I contacted a dispatcher and informed him that I would be going to the hospital and would likely be out the following day.
>
> 6. (*sic*) I was admitted to the hospital with an intestinal infection and remained there until July 30th. I was in contact with James Rapoza throughout this time.
>
> 7. I was out, on doctor's orders throughout the first week of August. On August 6th, I met with Mr. Frazier and Mr. Rapoza. At this meeting they wanted to know what duties I could perform. *They asked how old I was and asked how long I thought I'd be able to continue working. They told me they thought I was getting too old for the job.*
>
> 8. On August 9, I returned to work with a note from my doctor clearing me for work. Lewis Frazier accepted the note, told me to go home while he spoke to his company lawyer.
>
> 9. On August 12, I received a letter from Mr. Frazier stating that I had `self-terminated' by taking unauthorized time off from August 4th through 6th.

---

[6] MCAD Charge, Ex. C; Greenwood Statement, Ex. D.
[7] Ex. C.

7

10. To the best of my knowledge, I was the oldest Truck Driver on staff.

11. I can also provide information regarding younger employees who have violated similar company rules and who were not terminated.

Next, in response to the Position Statement the Defendant filed in response to these allegations, by letter dated December 3, 2004,[8] Greenwood stated as follows (emphasis added):

This is to advise you of what I believe is unlawful employment termination by Yale Electric based on age discrimination.

After receiving a copy of the Supplemental Position Statement from Yale Electric's Attorneys, I could not believe what they perceived as the truth of this matter. It certainly slanted the story to favor Yale and did not provide a level of fairness to me without my legal interpretation of what happen. I believe they are attempting to silence me with their legal mumbo jumbo while evading the events that led up to my termination.

On or about July 27, 2004, I was extremely ill and was hospitalized for several days. I contacted Yale to inform them that I could not return to my job for an unknown period of time.

While hospitalized, into my hospital stay I was contacted by James Rapoza who inquired about the possibility of my returning to work. I informed him that my release date from the hospital, as well as, my return date to work was still unknown.

On Tuesday, August 3, 2004, after leaving my doctors office, I visited Yale in Norwood Ma. and spoke with W. Rapoza and returned my company radio at W. Rapoza's request. I informed him on that visit that I would not be able to return to work until I was re-evaluated by my doctor on Monday, August 9, 2004. I asked if I could be paid for the week with my accrued vacation time. He told me that he would check and let me know.

That same afternoon he called me and told me that I would need a doctor's note specifying when I would be able to return to work. He asked if I would be interested in returning to light duty status, which he was unable described the job duties in detail. I informed him at that time, the doctor's orders were to not return to work for at least one week from this date.

---

[8] Ex. D.

On Friday August 6, 2004, I called Yale to find out whether I could pick up my paycheck from my accrued vacation time. I was then told that I had better "get some documentation" for them before I came in for my paycheck.

I arrived at Yale with documentation and met with W . Frazer and W . Rapoza. I was told they had a lot of people out that week and that they needed me to return now. *I was also asked by W . Frazer how old I was and whether I thought I could still do my job because he had noticed that I had been out hurt quite often lately. He stated that I may be getting too old to carry out my duties on the truck. He stated, "If that is the case, I have no other job duties for you." He added, "How much longer do you think you can be doing this job?" I told them during that meeting that I expected to return to work on August 10, 2004 with my doctors' permission.*

August 9, 2004, I returned to work with my doctors' note and met with W . Frazer who copied the note and told me to go home and that he would call me after talking *with his* lawyer. On August 12, 2004, I received a letter from Yale stating that I was terminated.

I was not aware of Yale's "Unexcused Absences of Three of more Days" policy nor do I feel I violated that policy as I had been in c o n t  with my place of employment, including Jim Rapoza. I was never informed of this "Unexcused Absences of Three of more Days" policy during previous times of absences. I have never received verbal counseling or disciplinary actions for Attendance or Lack of Tardiness during my employment with Yale Electric. I strongly believe that Yale used that policy item against me to cover their intent to terminate me because of my age.

I had worked very hard for many years to help Yale grow and in fact trained many others to succeed for the company. Several of those people are still employed with Yale. I am now prevented from remaining with Yale in any capacity and unable to support my family because of the unlawful action against me.

I am now requesting opportunity to face my accusers with actual questioning from me and/or my legal representative in order to strike a balance of fairness toward this entire unbalanced Supplemental Position Statement from Yale Electric and their Attorneys.

Greenwood's assertions about the age-biased comments that were directed at him at the time of his termination, therefore, are not inconsistent with statements he made at

his deposition, or that he has formally asserted against the Defendant during the course of this controversy.  They should not be stricken.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion should be denied.

Respectfully submitted,

THE PLAINTIFF

By his attorney,

s/Daniel W. Rice

Daniel W. Rice, BBO # 559269
GLYNN, LANDRY,
HARRINGTON & RICE, LLP
10 Forbes Road
Braintree, MA 02184
(781) 849-8479

Dated: March 30, 2007

10

# EXHIBIT A

# DEPOSITION OF LEWIS FRAZER

November 22, 2006

Daniel Greenwood v. Yale Appliance and Lighting, Inc.
United States District Court
District of Massachusetts
C.A. No. 05-10605 JLT
Linda M. Thomas, Registered Merit Reporter

KATHLEEN A. GARDNER
Registered Professional Reporter
11 Roman Avenue
Danvers, MA  01923
(978) 777-3574

29

1  responsive to your request?
2      A.   It did not answer what we had requested from
3  Mr. Greenwood.
4      Q.   So, what other kinds of things were you
5  looking for?
6      A.   We were looking for, as we require from any
7  employee who was going out on either an injury, or a
8  medical issue, documentation as to what they can and
9  cannot do and their condition. We, at the time,
10 needed Danny greatly, as we have stated, and were
11 looking for him to do any type of work. So, this does
12 not tell me what he could, or could not do.
13     Q.   And when did you conclude that this note was
14 not responsive to what you were looking for?
15     A.   The moment he gave it to me.
16     Q.   And so, did you tell him that?
17     A.   Absolutely.
18     Q.   What did you say?
19     A.   I said, "This does not excuse you from where
20 you have been for the last week."
21     Q.   And what did you say? Anything else?
22     A.   I said that I would be back in touch with
23 him.
24     Q.   Did you say, "Go back to your doctor and

31

1  conversations with an employee's doctor about their
2  ability to work?
3      A.   No.
4      Q.   Have you ever had an employee consent to
5  permitting you to get medical records?
6      A.   Me, personally, or the HR Department?
7      Q.   Your HR Department.
8      A.   I don't know the answer to that. I am not
9  familiar with some of the medical records required
10 with Workmen's Comp claims, or other situations. So,
11 I don't know how to answer that. I have not, no.
12     Q.   Okay. Now, on the discharge note that you
13 saw, was Greenwood's physician identified?
14     A.   I don't recall.
15     Q.   At the time you saw that, did you have any
16 doubt in your mind that Greenwood had, in fact, been
17 hospitalized?
18     A.   No.
19     Q.   Had he told you that he wasn't capable of
20 working?
21     A.   He had not told us he was not capable of
22 working.
23     Q.   Had he had any conversations with you
24 directly between the time you first found out that he

32

1  wasn't reporting to work, up until the time he gave
2  you this note?
3      A.   I don't understand the question.
4          MS. KUGELL: Objection.
5  BY MR. RICE:
6      Q.   Did you meet with Greenwood? I will define
7  a time span here for you, okay?
8      A.   Yeah.
9      Q.   There is the first time you hear that
10 Greenwood is not going to report to work?
11     A.   Correct.
12     Q.   And I think you have testified that was
13 Wednesday?
14     A.   Yes.
15     Q.   And then he gave you this note, right?
16     A.   Correct.
17     Q.   Do you remember when he gave you the note?
18     A.   He gave us the note, I believe, on -- I
19 would have to look back at the record. I'd want to
20 look back at the record exactly. We documented when
21 he gave us this note. I think it was on this date.
22     Q.   August 9th?
23     A.   Yes.
24     Q.   Okay. So, in between the Wednesday --

ı  come back with a Vocational Assessment?
2      A.   No.
3      Q.   Well, he had given you one before, though,
4  hadn't he?
5      A.   No.
6      Q.   When he came back from Comp the first time,
7  you didn't get a Vocational Assessment?
8      A.   That was way previous to this.
9      Q.   Okay. But, your company, you get those
10 things, Vocational Assessments?
11     A.   Yes.
12     Q.   Typically, those are put together by
13 doctors?
14     A.   Correct.
15     Q.   And a doctor would be capable, or that is
16 because a doctor has a medical opinion as to what
17 someone can and can't do? You are saying "yes" to
18 that?
19     A.   Is that a question?
20     Q.   Maybe I didn't inflect it. I will withdraw
21 it. Now, AA, the doctor here, did you ask Greenwood
22 if you could talk to him?
23     A.   No.
24     Q.   Have you, as a manager, ever had

**Deposition of Lewis Frazer**                                    **November 22, 2006**
Daniel Greenwood v. Yale Appliance and Lighting, LLC
Case 3:05-cv-30605-LT   Document 37-2   Filed 03/30/2007   Page 4 of 4

17

1   his work with Yale?
2       A.   I can't comment.  I don't know medically
3   where his hernia came from.  I am not qualified to
4   talk about that.  I know he had an injury, a hernia,
5   that was qualified as a Workmen's Comp under the way
6   the law works.  If you are asking me to say whether
7   his hernia was related to his job, I am not qualified
8   to do that.
9       Q.   Well, you have seen -- other employees since
10  you have been there have filed Workers' Comp claims,
11  haven't they?
12      A.   We have had accidents on the job that have
13  resulted in Workmen's Comp claims, yes.
14      Q.   Have you ever seen a Notice of Injury come
15  in?
16      A.   Yes, Form 301, or something like that --
17  101, or 100?
18      Q.   I don't know.  But, it is fair to say on
19  those forms the employee has to describe what
20  happened?
21      A.   Yes.
22      Q.   Do you recall seeing something like that for
23  Greenwood?
24      A.   I recall it would be -- I recall seeing

18

1   something.  It would be in the file, yes.
2       Q.   Your best memory of what it alleged?
3       A.   I can't -- I don't remember.
4       Q.   Did he allege that he hurt his back
5   delivering a refrigerator?
6            MS. KUGELL:  Objection.
7            THE WITNESS:  Are we talking about his
8   back, or are we talking about his hernia?
9   BY MR. RICE:
10      Q.   Did he allege he sustained that delivering
11  an appliance?
12      A.   I can't comment.  Again, without the
13  document in front of me, I just don't remember.
14      Q.   Do you have an insurer for that?
15      A.   Yes, we do.
16      Q.   Do you know whether or not the insurer
17  contested the claim?
18      A.   I don't believe they did, but again, without
19  going back and reviewing that part of the file, I
20  don't know.  I don't believe they did.
21      Q.   How long was Greenwood out?
22      A.   For his hernia, I believe he was out 13-14
23  weeks, something like that.  Again, we would have to
24  go back and look at the payroll records, and we could

19

1   put that together.
2       Q.   And then he returned to work?
3       A.   Yes.
4       Q.   Did he return with any restrictions?
5       A.   He returned to work with restrictions and
6   was put to work on light duty.
7       Q.   Okay.  What was his light-duty assignment?
8       A.   At the time I believe he was doing some
9   paperwork in the office.  He was doing some small
10  light construction for a training facility that we
11  used.  Building -- when you talk about Sub-Zeros,
12  building a sort of cabinet in the warehouse for us to
13  do training.  He was helping as a runner in the office
14  is what I remember.
15      Q.   How long did he stay on light duty?
16      A.   I don't remember.
17      Q.   Did you get a vocational assessment from his
18  doctor about what restrictions he might have been
19  under?
20      A.   I believe so, yes.
21      Q.   Okay.  Who asked, or how did it come about
22  that a vocational assessment was given?
23      A.   We require that from any employee returning
24  to work from an injury so that we know what they're

20

1   capable of doing as a matter of policy.
2       Q.   You get that before you formulate light
3   duty?
4       A.   Absolutely.
5       Q.   Now, going to July of 2004, at some point
6   did you become aware that Greenwood was not going to
7   report to work?
8       A.   Yes.
9       Q.   And by the way, that is a busy time of year
10  for Yale Electric?
11      A.   Very busy.
12      Q.   Just out of curiosity, why is that?
13      A.   Because it is the summer time, and
14  everybody's refrigerator seems to expire.  And the
15  refrigerator is sort of the one thing that you can't
16  live without for very long.  You can live without a
17  washer, a dishwasher, a stove, but you can't live
18  without a refrigerator -- very busy time.
19      Q.   Okay.  And as part of the business is people
20  come in -- and I volunteer at Bob's.  So, you come in
21  and people see it and they want to have the thing at
22  their house as soon as they can, right?
23      A.   You need it right away.
24      Q.   So, meeting customer demand in the summer is

# EXHIBIT B

**Deposition of James Rapoza**
Daniel Greenwood v. Yale Appliance and Lighting, Inc.
Case 1:05-cv-10605-JLT    Document 37-3    Filed 03/30/2007    Page 2 of 4
**November 22, 2006**

**Page 1**

Volume I
Pages 1 to 39
Exhibits (See Index)
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. NO. 05-10605 JLT

DANIEL GREENWOOD,
Plaintiff,

vs

YALE APPLIANCE AND LIGHTING, INC.,
Defendant.

DEPOSITION OF JAMES RAPOZA, taken pursuant to Notice under the Massachusetts Rules of Civil Procedure on behalf of the Plaintiff, before Linda M. Thomas, RMR, a Notary Public and Registered Merit Reporter, in and for the Commonwealth of Massachusetts at the offices of GLYNN, LANDRY, HARRINGTON & RICE, LLP, Ten Forbes Road, Braintree, Massachusetts on November 22, 2006, commencing at 12:07 p.m.

KATHLEEN A. GARDNER
Registered Professional Reporter
11 Roman Avenue
Danvers, Massachusetts  01923
Tel:  (978) 777-3574 / Fax:  (978) 750-8342

---

**Page 2**

A P P E A R A N C E S

DANIEL W. RICE, ESQ.
GLYNN, LANDRY, HARRINGTON & RICE, LLP
10 Forbes Road
Braintree, Massachusetts  02184
(For the Plaintiff)

JACLYN KUGELL, ATTORNEY AT LAW
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts  02109
(For the Defendant)

Also present:

Daniel Greenwood
James Rapoza

---

**Page 3**

I N D E X

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| James Rapoza | | | | |
| (By Mr. Rice) | 4 | | | |
| (By Ms. Kugell) | | 32 | | |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Memo dated August 10, 2004 from Lewis Frazer to Employee File, Daniel Greenwood | 31 |

---

**Page 4**

**STIPULATIONS**

It is hereby stipulated and agreed by and between counsel for the respective parties that the deposition transcript shall be read and signed; notarization waived.

It is furthermore stipulated that all objections, except as to form and Motions to Strike are reserved until the time of trial.

**JAMES RAPOZA**, first having shown identification and been duly sworn on oath, deposes and says as follows:

**DIRECT EXAMINATION**

BY MR. RICE:

Q.    Could you state your name, please?

A.    James Rapoza.

Q.    And where are you employed?

A.    Yale Appliance and Lighting.

Q.    And what is your job there?

A.    Customer Service Manager.

Q.    How long have you had that job?

A.    That particular position, roughly, two

13

1  hospitalization.

2  **Q.**  Were you aware that he had used up all his

3  paid sick leave at the time?

4  **A.**  I believe so, yes.

5  **Q.**  Could you think of any reason then, or now,

6  that Greenwood would not report to work if he were

7  able to?

8  **A.**  Can you rephrase that question for me,

9  please?

10  **Q.**  Did you think -- let's cut to the chase

11  here.  Did you think when you were talking to his

12  girlfriend on Tuesday that he just plain-old didn't

13  want to show up to work?

14  **A.**  All I was looking for at that time was that

15  Dan was going to be out of work, as to why, and some

16  medical documentation that had been at that point.

17  You know, the three previous days, the Wednesday,

18  Thursday, Friday, Monday, and then Tuesday at that

19  point.  So, five days for medical documentation as to

20  why he was out of work.  Being the summer time, and

21  needing people, whether or not he was capable of

22  performing any functions for us, whether that be light

23  duty, full duty, and if he wasn't capable of

24  performing any functions.  That is all I was looking

14

1  for at the time.

2  **Q.**  After you had the conversation with his

3  girlfriend on Tuesday, what was the next contact you

4  had with anybody about Greenwood's status?

5  **A.**  I would have, at that point, informed Lewis

6  Frazer of my conversations on the phone, and I would

7  assume, again, that I spoke with Jim O'Neill, again

8  who does the routing for the trucks and dispatching,

9  that Dan was still not available.  So, we would have

10  to continue with the sub.

11  **Q.**  How about in terms of getting in touch with

12  Greenwood and trying to figure out if and when I was

13  going to come back?

14  **A.**  After I spoke with his girlfriend on that

15  Tuesday afternoon, Dan came into the office later on

16  that Tuesday probably a couple of hours later saying

17  that he was at the appointment; that he had to be out

18  for the week per his doctor; that he couldn't perform

19  any functions.  I asked him if he was able to do any

20  light duty; that we could use his help in the office,

21  or in the warehouse and if he had any documentation

22  with him for us.  And he didn't have any at the time.

23  I told him we would need that.

24  **Q.**  Okay.

15

1  **A.**  At that point in time --

2  **Q.**  Did he say that he couldn't do light duty?

3  **A.**  He said he wasn't up for it, if I remember

4  correctly.

5  **Q.**  And okay, so then he left?

6  **A.**  He left and told me he would be back in

7  touch with me on Wednesday with some paperwork from

8  his doctor.

9  **Q.**  And, in fact, was he back in touch with you

10  on Wednesday?

11  **A.**  I did not hear from Dan on Wednesday.

12  **Q.**  When did you hear from him next?

13  **A.**  The next time I personally spoke with Dan

14  would have been on Friday, that following Friday.  And

15  that would have been at the office.  I don't believe I

16  spoke with him personally on the phone that day.

17  **Q.**  And you met with him?

18  **A.**  I met with him and Lewis Frazer.

19  **Q.**  And what did Greenwood say at that meeting?

20  **A.**  He had -- he had come in.  I believe at that

21  point in time he had called and spoke with Lewis

22  looking if he had a pay waiting for him for the

23  previous week.  And Lewis had asked him to come in to

24  bring some documentation again to explain this past

16

1  week and, you know, some medical documentation again

2  supporting his position.  And Dan turned in his

3  release form from the hospital at that point in time.

4  **Q.**  Okay.  And, did you say anything about that?

5  **A.**  I personally did not, no.

6  **Q.**  Did Mr. Frazer say something about it?

7  **A.**  Yes.

8  **Q.**  What did he say?

9  **A.**  He asked Dan if he read the release

10  document, and Dan said, "No."  Lewis then said that

11  this released you on Friday, the previous Friday with

12  zero restrictions, and that didn't, at that point in

13  time, explain his absence for the week.

14  **Q.**  Did Mr. Frazer ask him to get another note?

15  **A.**  We had asked that he provide further

16  documentation as to what his restrictions were for

17  work for this previous week to explain or, again, to

18  support whether or not we could have used him in the

19  warehouse or in the office.

20  **Q.**  Did you have any conversations about his

21  future with the company at that point?

22  **A.**  Not at that point in time.  We wanted to

23  wait and see what documentation he provided to us.

24  **Q.**  Did you discuss with him getting off the

Deposition of James Rapoza
Daniel Greenwood v. Yale Appliance and Lighting, Inc.
Case 1:05-cv-10605-JLT    Document 37-3    Filed 03/30/2007    Page 4 of 4    November 22, 2006

25

1 work during that week, or ten days I guess it was,
2 related to the condition that caused him to be
3 hospitalized?
4          MS. KUGELL: Objection. You can
5 answer.
6          THE WITNESS: I can only go by what Dan
7 was telling me at the time. Dan was telling me at the
8 time he wasn't able to work. And all that I was
9 asking Dan was was for documentation stating such, as
10 we do with any -- as is expected of any employee.
11 BY MR. RICE:
12    Q.    But, you talk with Greenwood every day that
13 you worked together, right?
14    A.    No, I wouldn't say every day.
15    Q.    You talk to him a lot, though?
16    A.    Are we talking about since I was inside, or
17 both because --
18    Q.    Since you were inside. You were supervising
19 the drivers?
20    A.    Yeah, we talked frequently.
21    Q.    You had casual conversation sometimes,
22 didn't you, just about like sports teams and that kind
23 of thing?
24    A.    I would say we had casual conversations.

26

1    Q.    It wasn't a formal relationship between you
2 two guys?
3    A.    It was a work relationship.
4    Q.    So, when you called him up, that never came
5 up, the subject of what it was that caused this
6 hospitalization?
7    A.    When I spoke with Dan on Wednesday, he was
8 not at that point in time clear as why he was being
9 hospitalized. He had something going on with his
10 belly, and they wanted him to stay in the hospital.
11 That was his knowledge at the time, so therefore, it
12 was my knowledge.
13    Q.    Okay. So, he ends up at the busiest time of
14 the year for you guys missing like a week of work?
15    A.    Correct.
16    Q.    So, didn't it -- it didn't peek your
17 curiosity as to what this condition was?
18    A.    I don't recall at the time whether, you
19 know, asking him specifically what exactly is wrong
20 with your stomach. I don't recall asking that.
21    Q.    Well, but you did know -- it wasn't a
22 surprise to you during the conversation with him that
23 first conversation with him that he wasn't reporting,
24 correct? Because he told you he couldn't report to

27

1 work?
2          MS. KUGELL: Objection. Can you be
3 clear about when you are talking about?
4 BY MR. RICE:
5    Q.    You had a conversation with him on Monday
6 after he got out --
7    A.    I had a conversation with Dan on Friday
8 stating that he had a doctor's appointment on that
9 following Monday, and to call me afterwards. So, I
10 knew on Monday he would not be at work.
11    Q.    And you did talk to him?
12    A.    I talked to him on Monday. I called Dan on
13 Monday after he did not call me by the afternoon.
14    Q.    And he said he wasn't up for working, or
15 light duty?
16    A.    At that point in time he said his doctor's
17 appointment had been cancelled, and that he was
18 rescheduled for the next day.
19    Q.    And then you did have a subsequent
20 conversation with him in which he said he wasn't able
21 to work, or to do light duty?
22          MS. KUGELL: Objection; you can answer.
23          THE WITNESS: Dan told me he was not up
24 for work, and that I just asked that we need medical

28

1 documentation.
2    Q.    Did you at that time -- when you had that
3 conversation with him, did you say, "Well, do you have
4 an estimated return date?"
5    A.    Not on that particular Monday because I was
6 waiting again for his rescheduled appointment, which
7 he had told me on the Tuesday.
8    Q.    But, obviously -- let me strike that
9 "obviously" from my question. Being able to know what
10 your manpower was going to be for that week was
11 important, right?
12    A.    It is always important.
13    Q.    So, you didn't ask Greenwood when he thought
14 he would be back?
15    A.    Not on the Monday because, again, he hadn't
16 seen his doctor, yet.
17    Q.    Subsequent to that, did you ask him when he
18 was going to be back?
19    A.    On Tuesday, after Dan came into the shop, he
20 said that his doctor told him he would have to take
21 the week off. And I had asked at that point again for
22 documentation stating such.
23    Q.    When he said that he had to take the week
24 off, did you believe that he had to take the week off

# EXHIBIT C

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone:  (617) 994-6000 Fax:  (617) 994-6024**

---

MCAD DOCKET NUMBER: 04BEM02579          EEOC/HUD CHARGE NUMBER:  16CA402595
FILING DATE:  09/17/04                            VIOLATION DATE:  08/12/04

---

Name of Aggrieved Person or Organization:
Daniel  Greenwood
143 High St.
Whitman, MA 02382
Primary Phone: (781)447-0658 ext. _____

---

Named is the employer, labor organization, employment agency, or state/local government agency who
discriminated against me:
Yale Electric
HR Director
295 Freeport St
Boston, MA 02122
Primary Phone: (617)825-9253 ext. _____

Lewis  Frazier
Yale Electric
HR Director

,
Primary Phone: (617)825-9253 ext. _____

James  Rapoza
Yale Electric
HR Electric

,

No. of Employees:          25+

Work Location: warehouse

---

Cause of Discrimination based on:
Age, Age of Complainant, specified.

---

The particulars are:
I, Daniel  Greenwood, the Complainant believe that I  was discriminated against by Yale Electric, Lewis
Frazier,James  Rapoza, on the basis of Age. This is in violation of M.G.L. 151B Section b Paragraph 4 and
ADEA.

1.  I have been employed with Yale Electric as a Truck Driver since 1998.  My responsibilities included
delivering and installing major appliances.

2.  Throughout my employment, I consistently received outstanding performance evaluations.  Until
November 2003, I never missed a day of work.

MCAD Docket Number 04BEM02579, Complaint

**DEF 0150**

3. In November of 2003, I was required to have hernia surgery and received workers' comp. I was out of work for approximately six-seven weeks.

4. Around thiis Lewis Frazier and James Rapzsa, my supervisors, began suggesting that I was too old for the job and might want to think about finding another job.

5. When I returned to work, I continued to receive outstanding evaluations.

6. On July 27 2004, I began experiencing abdominal pain and, after finishing my shift, I met with Lewis Frazier to discuss the pain. He said he didn't want to hear about as they had "just dealt" with my heamia. Later that day, I contacted a dispatcher and informed him that I would be going to the hospital and would likely be out the following day.

6. I was admitted to the hospital with an intestinal infection and remained there until July 30th. I was in contact with James Rapoza throughout this time.

7. I was out, on droctor's orders throughout the first week of August. On August 6th, I met with Mr. Frazier and Mr. Rapoza. At this meeting they wanted to know what duties I could perform. They asked how old I was and asked how long I thought I'd be able to continue working. They told me they thought I was getting too old for the job.

8. On August 9, I returned to work with a note from my doctor clearing me for work. Lewis Frazier accepted the note, told me to go home while he spoke to his company lawyer.

9. On August 12, I received a letter from Mr. Frazier stating that I had "self-terminated" by taking unauthorized time off from August 4th through 6th.

10. To the best of my knowledge, I was the oldest Truck Driver on staff.

11. I can also provide information regarding younger employees who have violated similar company rules and who were not terminated.

---------------------------------------------------------------------------------------------------------------------

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein are true to the best of my knowledge.

(Signature of Complainant)

MCAD Docket Number 04BEM02579, Complaint

**DEF 0151**

# EXHIBIT D

December 3, 2004

Tanya Tazeras
Neldy Jean-Francois
Investigator
Commission Against Discrimination
One Ashburton Place
Boston, Ma 02108

      RE:    Daniel Greenwood v. Yale Electric
              MCAD Docket No.: 04BEM02579
              EEOC/HUD No.:      16CA402595

Dear Ms. Tazeras and Ms. Jean-Francois,

This is to advise you of what I believe is an unlawful employment termination by Yale Electric based on age discrimination.

After receiving a copy of the Supplemental Position Statement from Yale Electric's Attorneys, I could not believe what they perceived as the truth of this matter. It certainly slanted the story to favor Yale and did not provide a level of fairness to me without my legal interpretation of what happen. I believe they are attempting to silence me with their legal mumbo-jumbo while evading the events that led up to my termination.

On or about July 27, 2004, I was extremely ill and was hospitalized for several days. I contacted Yale to inform them that I could not return to my job for an unknown period of time.

While hospitalized, into my hospital stay I was contacted by James Rapoza who inquired about the possibility of my returning to work. I informed him that my release date from the hospital, as well as, my return date to work was still unknown.

On Tuesday, August 3, 2004, after leaving my doctors office, I visited Yale in Norwood Ma. and spoke with Mr. Rapoza and returned my company radio at Mr. Rapoza's request. I informed him on that visit that I would not be able to return to work until I was re-evaluated by my doctor on Monday, August 9, 2004. I asked if I could be paid for the week with my accrued vacation time. He told me that he would check and let me know.

That same afternoon he called me and told me that I would need a doctor's note specifying when I would be able to return to work. He asked if I would be interested in returning to light duty status, which he was unable described the job duties in detail. I informed him at that time, the doctor's orders were to not return to work for at least one week from this date.

On Friday August 6, 2004, I called Yale to find out whether I could pick up my paycheck from my accrued vacation time. I was then told that I had better "get some documentation" for them before I came in for my paycheck.

I arrived at Yale with documentation and met with Mr. Frazer and Mr. Rapoza. I was told they had a lot of people out that week and that they needed me to return now. I was also asked by Mr. Frazer how old I was and whether I thought I could still do my job because he had noticed that I had been out hurt quite often lately. He stated that I may be getting too old to carry out my duties on the truck. He stated, "If that is the case, I have no other job duties for you." He added, "How much longer do you think you can be doing this job?" I told them during that meeting that I expected to return to work on August 10, 2004 with my doctors' permission.

On August 9, 2004, I returned to work with my doctors' note and met with Mr. Frazer who copied the note and told me to go home and that he would call me after talking with his lawyer. On August 12, 2004, I received a letter from Yale stating that I was terminated.

I was not aware of Yale's "Unexcused Absences of Three of more Days" policy nor do I feel I violated that policy as I had been in contact with my place of employment, including Jim Rapoza. I was never informed of this "Unexcused Absences of Three of more Days" policy during previous times of absences. I have never received verbal counseling or disciplinary actions for Attendance or Lack of Tardiness during my employment with Yale Electric. I strongly believe that Yale used that policy item against me to cover their intent to terminate me because of my age.

I had worked very hard for many years to help Yale grow and in fact trained many others to succeed for the company. Several of those people arc still employed with Yale. I am now prevented from remaining with Yale in any capacity and unable to support my family because of the unlawful action against me.

I am now requesting an opportunity to face my accusers with actual questioning from me and/or my legal representative in order to strike a balance of fairness toward this entire unbalanced Supplemental Position Statement from Yale Electric and their Attorneys.

Should you need any additional information, please do not hesitate to contact me. Thank you.

Sincerely,


Daniel Greenwood